**IN THE UNITED STATES DISTRICT COURT FOR**
**THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| **DRE HEALTH CORPORATION,** <br><br> **Plaintiff,** <br><br> **v.** <br><br> **BERKLEY EQUITY LIMITED &** <br> **ANTHONY LYONS,** <br><br> **Defendants.** | **Case No.: ________________** |

**COMPLAINT**

DRE Health Corporation, by and through its undersigned counsel, and for its causes of action against Defendants Berkley Equity Limited (hereinafter "Berkley") and Anthony Lyons, states as follows:

1. Plaintiff DRE Health Corporation (hereinafter "DRE") is a Missouri Corporation authorized to conduct business in the state of Missouri.

2. Upon information and belief, Defendant Berkley is a foreign corporation or other business entity with its principal place of business in the British Virgin Islands and none of its members or owners are residents of the state of Missouri.

3. Defendant Anthony Lyons is an individual that is not a Missouri resident and who may be personally served at his residence in the town of Avon, state of Colorado.

4. This Court has subject matter jurisdiction over the case, personal jurisdiction over defendants, and venue is appropriate as follows:

    a. under Title 28 U.S.C. section 1332 as there is complete diversity of citizenship between Plaintiff and Defendants;

b. venue is proper in this court and this court has personal jurisdiction over Defendants pursuant to Berkley's specific agreement and consent to the exclusive venue and jurisdiction for the resolution of any dispute or suit arising between DRE and Berkley to be within the state or federal courts of Jackson County, Missouri, as agreed to in the New Customer Application dated September 2, 2021, which was executed by Defendant Lyons. A true and accurate copy of the New Customer Application (the "Initial Agreement") executed by Defendants Berkley and Defendants Lyons is attached hereto and incorporated herein as Exhibit A.

5. The Initial Agreement, signed by Lyons, states in pertinent part, as follows:

> "The applicant warrants the information supplied above to be true, and agrees that information set forth on this form may be shared with affiliates of DRE Health Corporation ("DRE"), including other members of the DRE Corporation family of companies. The Applicant authorizes DRE Health Corporation, to investigate the references herein, statements or other data obtained from Applicant or from any other person pertaining to the Applicant's credit and financial responsibility. The Applicant agrees to abide by the Standard Terms of Sale published regularly by DRE, as shown on DRE's invoices, or by any other terms of sale upon which DRE and the Applicant should agree in writing. The Applicant agrees to pay interest on past due accounts at the highest rate permitted by law, together with attorneys' fees and all other costs and expenses incurred by DRE in collecting such accounts. The Applicant agrees that all payments to which DRE is entitled shall be paid to DRE at its offices in Kansas City, Missouri. The Applicant agrees that the laws of Missouri shall govern all transactions between DRE and the Applicant, that exclusive venue and jurisdiction of any dispute or suit arising between DRE and the Applicant shall lie within the courts of the State of Missouri, and the Applicant hereby consents to the jurisdiction of the Missouri courts in any such dispute or suit. NOTICE: The federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from

> any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this credit is the Federal Trade Commission, Division of Credit Practices, 6th and Pennsylvania Avenue, NW, Washington, D.C. 20580."

6. Additionally, Venue is appropriate as set forth in Section 20.1 of the "Terms and Conditions of Sale – DRE Health" which were explicitly agreed to by Berkley. A copy of the Terms and Conditions of Sale – DRE Health is attached hereto as Exhibit B.

7. DRE and Berkley entered into a Memorandum of Understanding that was titled the "Sale & Purchase Agreement" ("SPA") effective September 2, 2021 which described a general agreement whereby DRE would sell large quantities of personal protective equipment (PPE), specifically 5 million boxes of blue surgical masks (or 250 million blue masks) and 1 million boxes of black surgical masks (or 50 million blacks masks) per week, to Berkley, and Berkley agreed to pay for the same. A copy of the SPA is attached hereto as Exhibit C.

8. Additionally, the SPA states on page 9 of 11 that Berkley agreed to be bound by the executed New Customer Application which Berkley submitted to DRE, and such application incorporates the DRE Health terms and conditions set forth in attached Exhibit B.

**FACTS COMMON TO ALL COUNTS**

SPA Signing, The Boxed Production Contract, and Efforts Taken in Immediate Reliance on the Same

9. DRE is a medical supply business which, among other things, manufactures and/or provides Personal Protective Equipment (PPE) to various medical entities and other medical suppliers.

10. DRE and Berkley entered into a SPA effective September 2, 2021, whereby DRE would sell large quantities of PPE, specifically 5 million boxes of blue surgical masks and 1 million

boxes of black surgical masks to be delivered pursuant to a subsequent and "more precise" schedule, to Berkley, and Berkley agreed to pay for the same.

11.     Annex B to the SPA states that "Once the Initial Deposit is received a more precise schedule will be confirmed based on current orders in the system…"

12.     Paragraph 6 (d) of the SPA provides that delivery schedules are provided in good faith and "no penalty charges for late deliveries outside of the time estimated will be accepted."

13.     Berkley made the anticipated Initial Deposit on September 3, 2021.  Acting in reliance on same, DRE both began working feverishly to build a factory that could meet the output demands of the SPA and, pursuant to Annex B, issued an Invoice and production schedule to Berkley.

14.     In particular, DRE sent Berkley an Invoice no. 279722, dated September 15, 2021, ("the Boxed Production Contract") which related to the PPE being sold to Berkley under the SPA, and among other things, provided a schedule and price and stated in clear terms that payment was due in full upon cargo (*i.e.* the PPE) being available for pickup. A copy of the Boxed Production Contract is attached hereto as Exhibit E.  The total price of the contract was $184,800,000.

15.     Berkley received the Boxed Production Contract and did not reject its terms and they paid the first deposit after receiving the Boxed Production Contract.

16.     Pursuant to the schedule provided in the Boxed Production Contract, the first shipment was to be ready on October 7-15, 2021.

17.     Though DRE worked overtime to meet the schedule laid out in the Boxed Production Contract, it was not quite able to meet that schedule.  Therefore, an Addendum dated October 19, 2021 agreed to by DRE and Berkley was added to the SPA.  A copy of the addendum is attached hereto as Exhibit D.  DRE entered into the Addendum in a showing of good faith despite

not being in any kind of breach of the SPA and despite Berkley agreeing to charge no penalties for late deliveries.

18. The Addendum provides for certain liquidated damages and states "Any damages are contingent upon Buyer's continued full performance under the SPA." See para 2 (a) (i) of Addendum.

19. DRE's terms and conditions, attached as Exhibit B, provide in section 11.3: In the event that the Company has a well - founded fear that the Customer will not fulfil his obligations, the Company shall at its discretion be entitled to require sufficient security from the Customer with regard to the fulfilment of the obligations to pay, before performing or continuing to do so," and further provides that "The Company shall be entitled to suspend the fulfilment of its obligations until the Customer has given said security."

20. Section 11(o) of the SPA on page 9 of 11 provides that in the event of any conflict on payment schedule or terms, the terms of the Invoice or Purchase Order shall govern.

21. As described, after entering into the Boxed Production Contract, which required production of massive volumes of PPE, DRE naturally needed to build a new factory and production facility to meet the demands of the Boxed Production Contract. This was made known to Berkley throughout the process.

22. DRE worked tirelessly to build a new manufacturing facility to meet the PPE production requirements of the Boxed Production Contract. In this pursuit DRE spent tens of millions of dollars. This fact was repeatedly made clear to Berkley, who knew at all times that DRE was acting in reliance on the various contracts.

23. While DRE was unable to initially meet the production demands of the Boxed Production Contract, it quickly built up the capacity to produce the required volume of goods and informed Berkley on numerous occasions that the first shipment was ready to be picked up.

24. In particular, DRE informed Berkley via text and other messaging services throughout the second half of October that the Boxed Production Contract PPE were ready to be picked up. Then, to leave no doubt, counsel for DRE sent letters to counsel for Berkley on both November 1, 2021 (Exhibit F) and November 4, 2021 (Exhibit G) making clear that the product was ready to be picked up and that DRE was invoking the right to payment under the terms of the Boxed Production Contract.

25. In particular, in the November 1, 2021 letter, counsel for DRE expressly and unambiguously stated that "pleased be advised that the first shipment is available for pickup today and payment is therefore due." (Exhibit F)

26. Counsel for DRE followed up three days later on November 4 after the product still had not been picked up despite it being unambiguously required under the terms of the various agreements. Counsel made clear that "[t]he bottom line is that DRE is performing under this contract and insists that Berkley does as well. The product just needs to be picked up. Further delay only exacerbates problems, as production must slow." (Exhibit G)

27. The DRE terms and conditions, attached in Exhibit B, provide in section 11.2 that in the event that Berkley alleges to have a claim of breach against DRE with regard to the performance of the agreement, Berkley will not be discharged from its obligation to pay in the manner agreed.

28. Berkley responded to DRE's demands that the product be paid for and picked up by engaging in a strange series of deflections, one day arguing about the location of the factory,

the next complaining about the location listed on certificates, another arguing for rights to inspection not contemplated by the Boxed Production Contract, and then claiming, without any evidence, that DRE was simply mistaken that the production was ready to be picked up.

29. Eventually, in December, Defendants actually did arrange for and inspect the Boxed Production PPE, even though they are housed in a secure facility. Upon information and belief, the inspector found the masks met all contract requirements.

30. Nevertheless, even after passing Berkley's inspection, Berkley still failed to arrange for pickup and pay for the massive amount of product that DRE continued to store for Berkley.

31. Throughout November and December, and despite the fact that it was false and not grounded in any kind of basis, Berkley continued to insist that DRE was unable to meet the capacity demands notwithstanding the fact that DRE could meet the capacity demands.

32. Regardless, under the terms and conditions, the first shipment was due for payment when it was available for pick up in October and certainly by November 1, 2021, the date of DRE's letter to Berkley. Berkley failed to make payment in material breach of the terms of the Boxed Production Contract and SPA.

The China Production

33. While the new manufacturing facility was being built, in good faith DRE offered to Berkley, and Berkley accepted, an order of certain masks of Chinese origin to fill Berkley's needs while it waited for the production facility's completion. To that end, DRE sent Berkley an Invoice no. 279723, dated September 10, 2021, (the "China Production Contract"), which related to the PPE being sold to Berkley which were coming from China and among other things, stated in clear terms that payment was due in full upon cargo customs clearance in the USA. A copy of the invoice is attached hereto as Exhibit H.

34.     The total price of the China Production Contract was $11,000,000 for 500 million masks.  Again, that invoice was subject to DRE's terms and conditions which required payment when the goods were ready for pickup, which they were at the time the invoice was sent.

35.     The goods under the China Production Contract cleared customs and on September 30, 2021, DRE provided to Berkley documentation substantiating of such clearance.

36.     The goods under the China Production Contract have been at all times available for pickup and on numerous occasions Berkley has promised DRE that payment for same was forthcoming.  Despite the goods being available for pickup, Berkley has not paid for the China Production nor picked up the goods made available for pickup.

37.     Despite the PPE goods clearing customs, Berkley has not paid for the goods under the China Production Contract.

38.     Despite being contractually obligated to send funds for the China Production, in late November of 2021, Berkley advised it was refusing to wire funds to DRE which were due to be paid by Berkley unless DRE signed yet another document which changed the terms of the SPA and the executed Addendum to remove reference to DRE's invoices and the DRE terms and conditions.

39.     Upon information and belief, Berkley insisted on removal of the reference to DRE's invoices and terms and conditions because it knew it was in material breach of same.

40.     Later, after DRE refused to agree to another Addendum unless and until Berkley began acting in good faith, Berkley again repeatedly said that it was, in fact, sending payment for the China Production.  Payment was never sent.

Berkley's Repeated Un-kept Promises and Reliance on the Same

41. During the time period of September – December, 2021, the Defendants have repeatedly made statements to DRE indicating that they intended to abide by and honor both the terms of the Boxed Production and SPA and the agreement to sell the China Production. DRE relied on these statements to its substantial detriment.

42. In particular, in reliance on the size of the Boxed Production Contract and the representations of Defendants Berkley and Lyons, DRE acquired and outfitted and staffed a factory in California to meet the delivery requirements of the Boxed Production Contract.

43. DRE borrowed monies from lenders at high rates to accomplish this rapid build-up of equipment and labor. At all times Berkley and co-defendant Lyons were aware that DRE was borrowing heavily to meet the requirements of the Boxed Production Contract, and at no point in time did the Defendants tell DRE to stop or that the Boxed Production Contract was off or terminated.

44. Upon information and belief, Defendants plan was to make money on both the Boxed Production and China Production deals by brokering agreements with third party Buyers. Defendants claimed to have Buyers lined up to purchase the masks at issue in both the Boxed Production and the China Production at the time the agreements were reached, but when DRE announced those productions were available for pick-up the Defendants dragged their feet and delayed because they did not actually have Buyers contractually in place.

45. DRE was merely a pawn in the Defendants' game, wherein Defendants hoped that both DRE could be incentivized to produce a massive quantity of masks at its own expense and the Defendants could find Buyers for those masks at a profit. When Defendants could not find the promised Buyers, DRE was left footing the bill.

46. Defendants Berkley and Lyons repeatedly advised DRE's management, including Ahmed "Isaac" Bawany, by text, by phone, by WhatsApp messages, and even in person that payment would be forthcoming for both the PPE under the Boxed Production Contract and the China Production Contract.

47. Due to DRE's hard work and massive expenditure, it was able to build the facilities required to meet the demands of the Boxed Production Contract and informed the Defendants of that fact including that the first order of 500,000 boxes was ready to be picked up. Because of the massive quantity it was physically impossible to pick up all 6 million boxes at the same time. The production and pick up by necessity, and obviously, had to be rolling.

48. DRE also relayed that the China Production needed to be picked up in order to make more physical space for additional production.

49. Defendants at all times informed DRE that both contracts (the Boxed Production Contract (sometimes called the "production deal" or "US production deal" in correspondence) and the China Production Contract remained in place and that Defendants intended to honor them, repeatedly informing DRE that payment would be sent.

50. In fact, at one point in time on September 28, 2021, Berkley even sent DRE evidence of adequate funds in its Bank account of over $1.9 billion dollars so that DRE would rely on their ability to pay. (Exhibit I) Berkley later explained that this was simply a show of good faith that the funds would be sent any moment.

51. For example, on October 2, 2021 defendant Anthony Lyons messaged Bawany:

*Please bear with Max who is on top of this*

*Our deal is set and the money is due any minute*

*We are all agreed and set*

*Just needs everyone to stay calm and patient*

52. On November 29, 2021, after weeks of texts and messages, Defendant Lyon assured DRE: “Max / Stephen tell me the money is due today for these 5 mil packs of Chinese masks - unfortunately, thanksgiving last week was unavoidable - these things happen but it will close any minute.”

53. On November 29, 2021, Defendant’s employee Max Dobi texted Bawany: “we are moving money should be in and I will wire u tomorrow from the escrow account Sunny titles.”

54. On November 29, 2021Anthony Lyons assured Bawany by text: Max & Stephen say funds coming thru today.

55. On December 3, 2021, Lyons messaged Bawany: “Max & Stephen say funds coming thru today.”

56. After another week of texts and messages, on December 8, 2021, defendant Anthony Lyons assured DRE again payment was coming:

> Hi there
>
> I have been on the phone to Max for probably three or four hours today discussing various deals including yours
>
> I do not want to have said she said situation so believe its best if you speak to him
>
> The good news, is the 6 million packs will be closed tomorrow

57. On December 9, 2021, Lyons messaged Bawany again:

- “The 5 or 6 mil pack deal is due to pay TODAY or tomorrow - the deals all agreed after the inspection report was received this morning.”

- max just said money is due today so we will all be relieved
- he [Max] and i are happy to let the inspector check the 500,000 tomorrow and pay for these and the 300,000 next Tuesday and at least gets these done ✅

58. On December 13, 2021, Lyons messaged Bawany again:

Anthony Lyons: I told you last week to get these 5 mil packs and the other 5 mil done ✅

And get the first 800k of your production deal collected and then we can speak from a position of happiness and peace

Agreed ?

59. On December 13, 2021, Berkley employee Matthew Ortolani messaged Bawany as follows:

[12/13/21, 1:58:26 PM] Matt Ortolani: Updates:

1. Chinese masks - should be sold and closed out today End of Business.

2. Donavin Heard inspection of the 500k - he was double booked this morning and they have to send a different inspector to the location to complete that inspection. Awaiting their details now

[12/13/21, 2:21:51 PM] A. Isaac Bawany: I need the information for inspection please asap

[12/13/21, 2:22:06 PM] Matt Ortolani: getting it any time now

[12/13/21, 3:43:31 PM] A. Isaac Bawany: ??

[12/13/21, 4:00:19 PM] A. Isaac Bawany: Please adjust

[12/13/21, 4:00:21 PM] A. Isaac Bawany: Advise*

[12/13/21, 4:04:17 PM] Matt Ortolani: I'm waiting on the inspectors information and eta to Buena Park

[12/13/21, 4:07:39 PM] A. Isaac Bawany: And how about the Chinese masks

[12/13/21, 4:13:02 PM] Matt Ortolani: Who is John LaFay and Jennifer Saltzman and George with VRC

[12/13/21, 4:28:30 PM] Matt Ortolani: Dan Shaugnessy with VRC

[12/13/21, 5:49:25 PM] A. Isaac Bawany: I don't know

[12/13/21, 9:11:19 PM] A. Isaac Bawany: Any updates ?

[12/14/21, 12:19:18 PM] A. Isaac Bawany: Any updates?

[12/14/21, 12:28:58 PM] Matt Ortolani: Just spoke to the Doctor who signs off on the purchases, Anthony spoke to them, they assured him the purchase is happening today for the 5M

They may want a certain quantity boxed, awaiting if they want it and how much boxed

[12/14/21, 12:29:19 PM] A. Isaac Bawany: Where's the inspector for the US production?

[12/15/21, 5:28:04 PM] A. Isaac Bawany: What's going on exactly?

[12/15/21, 5:56:22 PM] Matt Ortolani: I think max just forwarded it

[12/15/21, 5:56:41 PM] Matt Ortolani: Update from Buyer Back Office:

- Judy heads the back office operations

- Judy is in charge of wiring from their company

- They are finalizing paperwork for the wire transfer

- Dr. Pennington at the hospital is on east coast time zone

- Judy is west coast time zone

- It is in the final stretch and just final sign offs are happening now.

[12/16/21, 2:02:46 PM] A. Isaac Bawany: Any update?

[12/16/21, 2:15:56 PM] Matt Ortolani: Spoke at 11am EST

Assured that they will take all 5 million packs of masks in poly bags, no boxing needed.

They will also take more boxes of US made masks after the 5M packages are transacted upon.

Assured wire is imminent. Nothing is holding up the deal other than their internal transaction process.

60. During this entire time period DRE incurred massive storage fees, equipment costs, payroll costs, consultant costs, and borrowing costs, in an effort to honor the terms of its agreements with Defendants.

61. Similarly, DRE continued spending on labor and machinery to improve the manufacturing process so that it could meet the production requirements of the SPA deal.

62. On December 23, 2021, Isaac Bawany on behalf of DRE flew to meet with Defendants Berkley and Lyons while Lyons was vacationing in Colorado and Lyons specifically promised at the meeting on the December 24, 2021 that payment would be forthcoming that same day. In fact, Mr. Lyons even set up a call with the supposed end Buyer who informed Mr. Bawany that the wire was being processed that day.

63. During the in person meeting Mr. Bawany expressed skepticism about the supposed end Buyers on the phone call and Mr. Lyons assured Mr. Bawany that funds would be received no later than January 2, 2022. Payment never came.

64. During this time Mr. Bawany continued to suffer substantial damages as a result of Defendants' breach and his reliance on their promises. In particular, two different lenders filed suit against DRE and Mr. Bawany during December because he was unable to repay loans that were taken out in reliance on Defendants' promises and contractual obligations.

**COUNT I – Actions for Account Stated**

65. DRE incorporates the averments made and contained in paragraphs 1 through 64 above as if the same were fully stated herein.

66. DRE and Defendants had prior financial dealings.

67. DRE and Defendants had various open accounts, including open accounts related to the Boxed Production Contract as well as the China Production.

68. For the dealings associated with the Boxed Production Contract, including the dealings associated the building of manufacturing and warehousing facilities by DRE and the sale of PPE to Defendants, DRE submitted uncontested invoices to Defendants reflecting owed accounts in Invoice No. 279722 of September 10, 2021.

69. Defendants received DRE's Invoice No 279722, with such invoice reflecting a demand for payment owed on accounts totaling $184,800,000. *See* Exhibit E.

70. The accounts stated as owed in Invoice No 279722 were not contingent on any future event, occurrence, or action.

71. Defendants acknowledged the propriety of the account stated on Invoice No 279722 on multiple occasions.

72. Defendants repeatedly stated their unconditional intention to pay DRE all accounts stated on Invoice No 279722.

73. DRE's Invoice No 279722 reflects the amount owed by Defendants related to the Boxed Production Center under the instruments and arrangements previously agreed between the parties.

74. The parties' course of dealings led also to the sale of the China Production.

75. Flowing from these prior dealings, DRE submitted a second uncontested Invoice to Defendants reflecting owed accounts on September 10, 2021, in Invoice No 279723. *See* Exhibit H.

76. The accounts stated as owed in Invoice No 279723 were not contingent on any future event, occurrence, or action.

77. Defendants received DRE's Invoice No 279723, with such invoice reflecting a demand for payment owed on accounts totaling $11,000,000.

78. Defendants acknowledged the propriety of the account stated on Invoice No 279723 on multiple occasions.

79. Defendants repeatedly stated their unconditional intention to pay DRE all accounts stated on Invoice No 279723.

80. DRE's Invoice No 279723 reflects the amount owed by Defendants related to the China Production under the instruments and arrangements previously agreed between the parties

81. Defendants have repeatedly acknowledged the propriety of the accounts stated in DRE's invoices and have likewise repeatedly stated their unconditional intention to pay the same.

82. At all times, the charges reflected in DRE's Invoices were reasonable.

83. Defendants are therefore foreclosed from contesting the transactions reflected in the accounts stated in DRE's Invoices. *Chisler v. Staats*, 502 S.W. 2d 424, 427 (Mo. App. 1973).

WHEREFORE, based on the above and foregoing, DRE prays the Court grant judgment against Berkley and Lyons for $195,000,000.00, as well as all lawful interest, together with DRE's costs and reasonable attorney's fees, and for any and all relief the Court deems just and equitable.

**COUNT II – BREACH OF CONTRACT – Boxed Production Contract**

84. DRE incorporates the averments made and contained in paragraphs 1 through 83 above as if the same were set forth herein.

85. Berkley entered into a contract with DRE whereby DRE agreed to sell large quantities of PPE equipment based on the terms set forth in attached exhibits A through E in exchange for Berkley's promise to pay for the same.

86. DRE made it clear to Berkley that it would require some time and investment to build up the proper manufacturing facility. .

87. On September 15, 2021, DRE sent the Boxed Production Contract which included terms and conditions and a delivery schedule.

88. By October of 2021, DRE was ready to fully perform its responsibilities and provide the PPE product required under the Boxed Production Contract and on November 1, 2021 DRE unambiguously informed Berkley of such through counsel's letter.

89. Pursuant to the terms of the Boxed Production Contract and DRE's terms and conditions, payment was due immediately upon receipt of DRE's November 1, 2021 letter. But Berkley breached the contract by failing to pay for and pick up the PPE product.

90. DRE relied on the promises of Berkley that it had a stable of ready and willing buyers for the medical masks who desperately wanted to purchase the masks.

91. DRE focused on the Berkley contracts in lieu of pursuing other significant ventures in order to honor DRE's obligations under the agreement with Berkley.

92. Based on its agreement with Berkley, DRE understood the Berkley contracts would be a reliable and steady source of profitable revenue for DRE..

93. Berkley breached its contract with DRE by failing to pay the required amounts pursuant to the parties' agreement and by failing to fulfill Berkley's obligations pursuant to the parties' agreement.

94. In addition, as Berkley knew when it entered into the Boxed Production Contract that DRE borrowed and spent millions of dollars building a production facility to meet the massive quantity requirements of the contract.

95. Due to Berkley's breaches of the agreement, DRE has sustained and continues to sustain substantial damages.

WHEREFORE, based on the above and foregoing, DRE prays the Court grant judgment against Berkley for $195,000,000.00, for DRE's costs and reasonable attorney's fees, and for any and all relief the Court deems just and equitable.

**COUNT III – PROMISSORY ESTOPPEL**
**(in the Alternative to Count I – Breach of Contract)**

96. DRE incorporates the averments made and contained in paragraphs 1 through 83 above as if the same were fully stated herein.

97. Berkley made a promise to DRE that Berkley would pay for the millions of boxes of masks set forth in the Boxed Production Contract.

98. DRE foreseeably relied on Berkley's promise, and as part of such foreseeable reliance, DRE focused its efforts on the significant Berkley contracts and invested in labor, materials, equipment, consultants, and storage based on the expectation Berkley would honor its promise.

99. DRE reasonably relied on Defendants' continued reassurances that Berkley would pay for and pick up the PPE.

100. Defendants breached its promise by failing to pay for the products to be supplied by DRE and Berkley further failed to comply with the terms and conditions applicable to such promise.

101. DRE would suffer substantial injustice absent the enforcement of the promises made by Defendants, in that DRE's focused and invested on the Berkley contracts to its detriment in reliance on the promises of Defendants.

102. In addition to direct monetary losses DRE sustained by Berkley's failure to honor its promise, DRE also sustained additional damages to its reputation within the industry as a trusted supplier of PPE supplies.

WHEREFORE, based on the above and foregoing, DRE prays the Court grant judgment against Berkley for an amount in excess of $75,000, for DRE's costs and reasonable attorney's fees, and for any and all relief the Court deems just and equitable

**COUNT IV – SPECIFIC PERFORMANCE-Boxed Production Contract**
**(in the Alternative to Count I – Breach of Contract)**

103. DRE incorporates the averments made and contained in paragraphs 1 through 83 above as if the same were fully stated herein.

104. DRE and Berkley entered into the aforementioned SPA and Boxed Production Contract, which together with the DRE terms and conditions and new customer application, set forth the terms of the parties' agreement..

105. The parties' agreement is complete in its essential and material terms.

106. The parties' agreement is capable of being enforced without adding to its terms.

107. DRE performed and/or stood ready to perform its obligations pursuant to the parties' agreement.

108. Berkley breached the parties' agreement by failing to pay the required funds, refusing to pay amounts admittedly due and owing to DRE unless DRE agreed to changes the terms of the parties' agreement, and by failing to fulfill Berkley's obligations pursuant to the parties' agreement.

109. Due to Berkley's breach of the parties' agreement, DRE has sustained and continues to sustain substantial damages.

110. DRE is entitled to the specific performance of the parties' agreement in that the parties' agreement may preclude the recovery of certain damages thereby leaving DRE without a fully adequate remedy at law to recover its substantial losses due to Berkley's failure to perform its obligations pursuant to the parties' agreement.

111. DRE is also entitled to specific performance of the parties' agreement with Berkley in that the facts existing at the time Berkley was to perform its obligations under the parties' agreement *(i.e.* the existence of an ongoing global pandemic and heightened need for DRE to supply customers with PPE), Berkley's failure to perform its contractual obligations caused DRE to sustain additional damages, both to its reputation in the marketplace as a supplier of critical health supplies such as PPE, as well as DRE's lost opportunities to provide PPE to entities with heightened needs for PPE, all of which cannot be adequately compensated by monetary damages alone.

WHEREFORE, based on the above and foregoing, DRE prays the Court grant judgment against for specific performance of its agreements outlined above, for DRE's costs and reasonable attorney's fees, and for any and all relief the Court deems just and equitable.

**COUNT V – BREACH OF CONTRACT—China Production – Defendant Berkley**

112. DRE incorporates the averments made and contained in the above paragraphs 1 through 111 above as if the same were fully stated herein.

113. Though not called for by the SPA Agreement, DRE first raised with Berkley the notion of selling them the China Production, and made them an offer regarding same.

114. Berkley accepted the offer via text message, agreeing to purchase the China Production for $11 Million with certain amounts offset as agreed to by the Parties.

115. DRE sent Berkley an Invoice no. 279723, dated September 10, 2021, (the "China Production Contract"), which related to the PPE being sold to Berkley which were coming from China and among other things, stated in clear terms that payment was due in full upon cargo customs clearance in the USA.

116. DRE provided Berkley valuable consideration by holding the China Production for it and giving it exclusive rights to those masks.

117. In reliance on Berkley's agreement to purchase the China Production, DRE held that Production for Berkley at its detriment, including that the five millions masks takes up an inordinate amount of space in DRE's factory, precluding it from manufacturing additional masks that it could have sold to other buyers. DRE also was precluded from selling those masks elsewhere at a time when the value of masks was sky high.

118. As a result of Berkley's break of the China Production Contract, DRE was damaged.

WHEREFORE, based on the above and foregoing, DRE prays the Court grant judgment against Berkley for an amount in excess of $11,000,000, for DRE's costs and reasonable attorney's fees, and for any and all relief the Court deems just and equitable.

**COUNT VI – NEGLIGENT MISREPRESENTATION—All Defendants**

119. DRE incorporates the averments made and contained in paragraphs 1 through 118 above as if the same were fully stated herein.

120. The Defendants made repeated representations to DRE that they intended to honor the Boxed Production Contract and the China Production Contract. Defendants continued informing DRE that they had buyers lined up and that DRE should continue working toward meeting the production requirements each contract.

121. At no point in time did the Defendants inform DRE that it viewed the Boxed Production Contract as terminated or no longer binding.

122. The promises made by the Defendants were made to induce DRE to continue working toward compliance with the significant production requirements of the Boxed Production Contract. DRE acted in reliance on same.

123. In reality, the representations were false, as Defendants have yet to make payments under the terms of the Boxed Production Contract.

124. In addition, Defendants repeatedly represented to DRE that they intended to follow through on the China Production Contract.

125. Relying on these representations, DRE held the millions of masks in the China Production for Berkley's exclusive use, turning down offers to sell the masks elsewhere and holding the masks at its facilities taking up valuable space that could have been used for different product several times over.

126. During this time, masks were extremely valuable, with the Omicron variant of Covid-19 running rampant.

127.     The representations that Defendants made regarding the China Production similarly were false, as payment was repeatedly promised and never received.

128.     The statements, promises and representations made by Defendants, as aforementioned, were a misrepresentation of the truth designed to induce Plaintiff's agreement to the Addendum and designed to buy time so Defendants could try to find buyers that they falsely claimed they already had in place.

129.     Defendants should have known at the time of conveying these promises, assurances and representations that they were false and would not be kept or honored.

130.     Defendants' misrepresentations were material, and they convinced Plaintiff to incur substantial costs as it borrowed and geared up and staffed up to meet the obligations of DRE under the Boxed Production Contract.

131.     Defendants' misrepresentations were, in fact, false, and were not substantially fulfilled, were not honored or complied with as Defendants never substantially performed or completed their above-referenced promises, agreements and assurances as Defendants did not provide the funds as promised, agreed and assured.

132.     Plaintiff relied upon the truth and honesty of Defendants' representations, and Plaintiff had the right to such reliance in that Defendants had superior knowledge of the facts in question, and such representations caused Plaintiff to undertake the detrimental actions aforementioned.

133.     As a result of Plaintiff's reasonable reliance on Defendants' misrepresentations, Plaintiff has sustained and incurred direct and proximate harm and damages.

WHEREFORE, based on the above and foregoing, DRE prays the Court grant judgment against Defendants for an amount in excess of $75,000, for DRE's costs and reasonable attorney's fees, and for any and all relief the Court deems just and equitable.

**COUNT VII – FRAUDULENT INDUCEMENT—All Defendants**

134. DRE incorporates the averments made and contained in the above paragraphs 1 through 133 above as if the same were fully stated herein.

135. The Defendants made repeated representations to DRE that they intended to honor the Boxed Purchase Agreement regardless of any issues with the delivery schedule. Defendants continued informing DRE that they had buyers lined up and that DRE should continue working toward meeting the production requirements of the Boxed Production Contract.

136. At no point in time did the Defendants inform DRE that it viewed the contracts as terminated or no longer binding.

137. The promises made by the Defendants were made to induce DRE to continue working toward compliance with the Boxed Production Contract. DRE acted in reliance on same.

138. In reality, the representations were false, as Defendants have yet to make payments under the terms of the Boxed Production Contract.

139. In addition, from September 10, 2021 up to just weeks before the filing of this Complaint, Defendants repeatedly represented to DRE that they intended to follow through on the China Production Contract, but no payment or even partial payment has been delivered.

140. Relying on these representations, DRE held the millions of masks in the China Production for Berkley's exclusive use, turning down offers to sell the masks elsewhere and taking up valuable space in DRE's facility.

141.    During this time period masks were extremely valuable, with the Omicron variant of Covid-19 running rampant.

142.    The representations that Defendants made regarding the China Production similarly were false, as payment was repeatedly promised and never received.

143.    The statements, promises and representations made by Defendants, as aforementioned, were a misrepresentations of the truth designed to induce Plaintiff's agreement to the Addendum and designed to buy time so Defendants could try to find buyers that they claimed they already had in place.

144.    Defendants knew or should have known at the time of conveying these promises, assurances and representations that they were false and would not be kept or honored.

145.     Defendants' misrepresentations were material, and they convinced Plaintiff to incur substantial costs as it borrowed and geared up and staffed up to meet the obligations of DRE under the  Boxed Production Contract.

146.    Defendants' misrepresentations were, in fact, false, and were not substantially fulfilled, were not honored or complied with as Defendants never substantially performed or completed their above-referenced promises, agreements and assurances as Defendants did not provide the funds as promised, agreed and assured.

147.    Throughout the process, DRE was transparent with Defendants that it was relying on Defendants' representations and was taking substantial financial steps in reliance on same. Defendants' intentionally made the statements in an effort to induce DRE to continue spending money performing under both the Boxed Production Contract and the China Production Contract as they searched for Buyers that they claimed existed but that never materialized.

148. The inducements were intentionally made in an effort to buy time as Defendants realized that Berkley was in substantial breach of the Boxed Production Contract and would owe massive damages to DRE if Defendants were unable to find Buyers as contemplated and promised.

149. Plaintiff relied upon the truth and honesty of Defendants' representations, and Plaintiff had the right to such reliance in that Defendants had superior knowledge of the facts in question, and such representations caused Plaintiff to undertake the detrimental actions aforementioned.

150. As a result of Plaintiff's reasonable reliance on Defendants' misrepresentations, Plaintiff has sustained and incurred direct and proximate harm and damages.

WHEREFORE, based on the above and foregoing, DRE prays the Court grant judgment against Defendants for an amount in excess of $75,000, for DRE's costs and reasonable attorney's fees, and for any and all relief the Court deems just and equitable.

**COUNT VIII – FRAUDULENT MISREPRESENTATION**

151. DRE incorporates the averments made and contained in paragraphs 1 through 150 above as if the same were fully stated herein.

152. The statements, promises and representations made by Defendants, as aforementioned, were fraudulent misrepresentations of the truth designed to induce Plaintiff's agreement to the Addendum.

153. Defendants repeatedly misrepresented to Plaintiff:

a. that Defendants would be ready to buy and pick up the PPE under the Boxed Production Contract on a weekly basis and they had customers locked down.

b. that payment was imminent and would be forthcoming.

154.     Defendants knew at the time of conveying these promises, assurances and representations that they were false and would not be kept or honored.

155.     Defendants' misrepresentations were material, and they convinced Plaintiff to incur substantial costs to meet the obligations of DRE under Boxed Production Contract.

156.     Defendants' misrepresentations were, in fact, false, and were not substantial fulfilled, were not honored or complied with as Defendants never substantially performed or completed their above-referenced promises, agreements and assurances as Defendants did not provide the funds as promised, agreed and assured.

157.     Defendants' intention at the time of making these misrepresentations was for the purpose of inducing and enticing Plaintiff into agreeing to the Addendum for Defendants' benefit and was designed to allow Defendants to obtain economic benefit and financial gain.

158.     Plaintiff was unaware of any information or knowledge which would have indicated or revealed the falsity of Defendants' representations, omissions and promises.

159.     Plaintiff relied upon the truth and honesty of Defendants' representations, and Plaintiff had the right to such reliance in that Defendants had superior knowledge of the facts in question, and such representations caused Plaintiff to undertake the detrimental actions aforementioned.

160.     As a result of Plaintiff's reasonable reliance on Defendants' misrepresentations, Plaintiff has sustained and incurred direct and proximate harm and damages.

WHEREFORE, based on the above and foregoing, DRE prays the Court grant judgment against Defendants for an amount in excess of $75,000, for DRE's costs and reasonable attorney's fees, and for any and all relief the Court deems just and equitable.

**COUNT IX – CIVIL CONSPIRACY**

161. DRE incorporates the averments made and contained in paragraphs 1 through 160 above as if the same were fully stated herein.

162. Defendants conspired together to defraud Plaintiff.

163. There was a meeting of minds on the course of the aforementioned actions to be accomplished by the co-conspirators.

164. The Defendants as co-conspirators committed one or more acts in furtherance of the conspiracy, including the causing or inducing a breach of contract or business expectancy of Plaintiff, and/or to injure or destroy the trade and business of Plaintiff.

165. As a result of the tortious acts by one or more Defendants as co-conspirators, which occurred in pursuance of the conspiracy, Plaintiff sustained substantial damages.

WHEREFORE, based on the above and foregoing, DRE prays the Court grant judgment against Defendants in an amount exceeding $75,000, as well as DRE's costs and reasonable attorney's fees, and for any and all relief the Court deems just and equitable.

Dated January 18, 2022.

Respectfully submitted,

**JAMES SOBBA, LLC**

*/s/ G. Edgar James*

G. EDGAR JAMES MO# 49585
LAWRENCE E. NORDLING MO# 62319
4435 Main Street, Suite 910
Kansas City, Missouri 64111
Telephone: (816) 623-0043
ejames@jamessobba.com
lnordling@jamessobba.com

**ATTORNEYS FOR PLAINTIFF**
**DRE HEALTH CORPORATION**

**And**

**JONES DAY**
Adam W. Wiers, Esq. – Will Admit Pro Hac Vice
77 West Wacker Drive
Suite 3500
Chicago, IL 60601
**ATTORNEYS FOR PLAINTIFF**
**DRE HEALTH CORPORATION**