UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| DRE HEALTH CORPORATION,<br><br>           Plaintiff,<br><br>   v.<br><br>BERKLEY EQUITY LIMITED &<br>ANTHONY LYONS,<br><br>           Defendants.<br><hr>BERKLEY EQUITY LIMITED,<br><br>           Counterclaim-<br>           Plaintiff,<br><br>   v.<br><br>DRE HEALTH CORPORATION &<br>AHMED "ISAAC" BAWANY,<br><br>           Counterclaim-<br>           Defendants.<br><hr>BERKLEY EQUITY LIMITED,<br><br>           Third-Party Plaintiff<br><br>   v.<br><br>AHMED "ISAAC" BAWANY,<br><br>           Third-Party Defendant. | Case No.: 4:22-cv-00031-RK |

## DRE HEALTH CORPORATION AND AHMED "ISAAC" BAWANY'S FIRST AMENDED ANSWER AND AFFIRMATIVE DEFENSES

DRE Health Corporation ("DRE") and Ahmed "Isaac" Bawany ("Bawany") here provide

their First Amended Answer and Affirmative Defenses to all counterclaims and third-party claims

brought by Berkley Equity Limited ("Berkley") and Anthony Lyons ("Lyons"). DRE and Bawany deny each and every allegation by Berkley and Lyons unless specifically admitted herein, and DRE and Bawany specifically deny that either party is liable in any respect for any claims whatsoever. DRE and Bawany give further answer as follows:

## THE PARTIES

13.     Berkley is a limited company organized and existing under the laws of the British Virgin Islands and with its principal place of business in Nassau, Bahamas.

       **ANSWER:**  In response to this Paragraph, DRE and Bawany admit the allegations.

14.     Upon information and belief, DRE is a corporation organized and existing under the laws of the State of Missouri, with its principal place of business in Kansas City, Missouri and has appeared as a party herein for all purposes.

       **ANSWER:**  In response to this Paragraph, DRE and Bawany admit that DRE is a corporation organized under the laws of the State of Missouri and that DRE has appeared as a party herein but denies all other allegations.

15.     Upon information and belief, Bawany is an individual residing in Kansas City, Missouri, and a citizen of the State of Missouri and has appeared as a party herein for all purposes.

       **ANSWER:**  In response to this Paragraph, DRE and Bawany admit Bawany has appeared as a party herein, but denies the remaining allegations.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between Berkley and Counter-Defendants, and the amount in controversy exceeds $75,000 exclusive of interest, attorney's fees and costs.

       **ANSWER:**  In response to this Paragraph, DRE and Bawany admit the allegations.

17.     By asserting affirmative claims, DRE accepts that it is subject to personal jurisdiction and that venue is correct in this forum.

> **ANSWER:**  In response to this Paragraph, DRE and Bawany admit the allegations.

18.     The Court has personal jurisdiction over Bawany because his actions giving rise to Berkley's claims took place in Missouri and, he has appeared as a party herein for all purposes. .

> **ANSWER:**  In response to this Paragraph, DRE and Bawany admit the allegations.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS

19.     Through this action, Berkley seeks declaratory relief, compensatory damages and other remedies arising out of a multi-faceted scheme by DRE and its principals to defraud Berkley out of millions of dollars in connection with an agreement for the production of PPE.

> **ANSWER:**  In response to this Paragraph, DRE and Bawany deny any scheme to defraud Berkley. As to all other allegations, DRE and Bawany state that they lack knowledge or information sufficient to form a belief as to the truth of such allegations and, on that basis, deny the same.

20.     Berkley is engaged in the business of purchasing PPE in large quantities and reselling such PPE to end users in the United States. At all relevant times, PPE was deemed to be a crucial element in the fight against the spread of COVID-19 in the United States and around the world and, hence, time was  of the essence in its supply.

> **ANSWER:**  In response to this Paragraph, DRE and Bawany state that they lack knowledge or information sufficient to form a belief as to the truth of such allegations and, on that basis, deny the same.

21.     At all relevant times, DRE represented to Berkley that it is a producer of medical supplies with specialized expertise in producing and distributing PPE and protective masks. Bawany serves as DRE's Chief Executive Officer.

**ANSWER:** In response to this Paragraph, DRE and Bawany admit only that they have always truthfully represented that DRE is a producer, supplier, and importer of medical supplies including personal protective equipment ("PPE"), and further that Bawany is the Chief Executive Officer of DRE. DRE and Bawany deny all other allegations.

22. In late summer 2021, Lyons, Berkley's Chairman and owner, was introduced to Bawany for the purpose of potentially engaging in the production and sale by DRE, and purchase by Berkley, of certain PPE.

**ANSWER:** In response to this Paragraph, DRE and Bawany admit only that a representative of Berkley introduced DRE and Bawany to Lyons in or around September 2021. The Berkley representative made the introduction to arrange for Berkley to purchase PPE from DRE. DRE and Bawany deny all other allegations.

23. Through the course of several conversations via email, WhatsApp Messenger, and telephone in or around August and September 2021, Bawany expressly represented to Lyons and Berkley representative Max Dobi ("Dobi"), among others, that he and DRE had extensive experience manufacturing and distributing PPE, including protective masks. Additionally, in early September 2021, Dobi and another representative of Berkley attended a large trade show in Miami sponsored by DRE and met with Bawany. DRE was a "Platinum Sponsor" of the event and marketed itself as a large, reputable manufacturer of PPE in the United States. Based largely on DRE's and Bawany's statements regarding DRE's ability to quickly produce the large quantities of masks that Berkley intended to purchase, Berkley decided to contract with DRE.

**ANSWER:** In response to this Paragraph, DRE and Bawany admit only that they have always truthfully represented that DRE is a producer, supplier, and importer of medical supplies that is based in the United States, and such products include personal protective equipment ("PPE"). DRE and Bawany further admit that they attended a large trade show in Miami sponsored by DRE and met with Berkley

representatives there and that DRE was a "Platinum Sponsor" of the event. DRE further states that Berkley representatives had been looking to meet with DRE prior to the trade show. Berkley had already prepared an offer for DRE prior to the tradeshow and sought Mr. Bawany out personally to sign the agreement. Mr. Bawany received calls that Berkley was there waiting for him before he even got there. It was Berkley who sought DRE out at the trade show and initiated the conversations between the parties and such conversations occurred no earlier than September 2021. DRE and Bawany deny all other allegations.

24.    Specifically, following those discussions, the parties agreed that Berkley would pay a $3 million initial deposit and DRE would shortly thereafter deliver six million protective masks, followed by weekly deliveries of masks in similar quantities.

**ANSWER:** In response to this Paragraph, DRE and Bawany admit only that, following negotiations for the sale and production of certain PPE, the parties agreed that Berkley would pay an initial deposit of $3 million to DRE related to the same. DRE and Bawany deny all other allegations, and further deny that the parties ever agreed that DRE would "shortly" deliver six million PPE masks followed by weekly deliveries of the same following receipt of such deposit.

25.    Insofar as the deal called for Berkley to wire millions of dollars to DRE in advance of Berkley receiving even a single unit of product, for Berkley to become comfortable with advancing such a large sum of cash in the weeks leading up to document execution, DRE representatives, including Bawany, repeatedly promised and assured Berkley representatives, including Lyons, that DRE was an expert in the industry and possessed the capabilities and resources necessary to timely meet Berkley's expectations and would ensure Berkley's initial funds were used solely to acquire materials for Berkley's orders and for no other purpose. Those representations were repeatedly made by DRE and Bawany throughout August 2021 through and

including December 2021. As explained below, however, DRE's and Bawany's promises and assurances were rooted in pure fiction.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

26.      In reliance on the representations of DRE and Bawany in August 2021, Berkley entered into a Sale & Purchase Contract, effective September 2, 2021 (the "SPA"), which sets forth the terms of DRE's agreement to produce and sell to Berkley, and Berkley's agreement to buy from DRE, 6 million boxes of protective masks (the "Product"). *See* attached Exhibit A.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

27.      Pursuant to the SPA, Berkley agreed to purchase and DRE agreed to sell the Product "on the terms and conditions set out" therein. SPA § 1. DRE further agreed "that the product it will deliver to [Berkley] will comply in all aspects with the following specifications":

| Product Description (See details in Annex A) | DRE Health Level 1 Surgical 3 ply masks (DRE DFM17) Dre Health Total defense 200 |
|---|---|
| Unit | 1 box (50 individual masks in a box) |
| Timing | The Seller and Seller's Agent warrants and represents that Seller and Seller's Agent shall make available the Product and Quantity as set out in this Agreement during the period commencing six (6) months from the date the Producer receives the Initial Deposit and for additional period of six (6) months, on substantially the same terms and conditions set forth herein, subject to the Parties entering into an additional Agreement. |
| Quantity | 5,000,000 (Five Million Blue) boxes of masks and 1,000,000 (One Million Black) boxes of masks |
| Price Letter | The Price in USD payable for the Blue and Black masks shall be set out in a Price Letter dated on or around the date hereof. |
| Sizes | Standard Adult |

> **ANSWER:** In response to this Paragraph, DRE and Bawany admit only that it reproduces a portion of the SPA. DRE and Bawany deny all other allegations and

deny that the cited portion of the SPA can be read or interpreted exclusive of other portions of the agreement. DRE and Bawany further state that the SPA is clear on its face and, on that basis, deny all allegations inconsistent therewith.

28.     Section 2 of the SPA sets forth certain pricing and delivery terms, including (i) a "Weekly Delivery Schedule" pursuant to which DRE agreed to a "quantity per week" of six million masks; (ii) an acknowledgment of an "Initial Deposit" in the amount of $3 million and an "Additional Deposit" in the amount of $3 million; and (iii) a representation that DRE "will provide [Berkley] upon prior notice, with an estimated Delivery Schedule (Annex B) updated from time to time, so that a final date of each delivery of the Product to the delivery point . . . can be agreed upon between the Parties." SPA § 2.

> **ANSWER:** In response to this Paragraph, DRE and Bawany admit only that it quotes a portion of the SPA. DRE and Bawany deny all other allegations and deny that the cited portion of the SPA can be read or interpreted exclusive of other portions of the agreement. DRE and Bawany further state that the SPA is clear on its face and, on that basis, deny all allegations inconsistent therewith.

29.     Section 3 of the SPA provides, in pertinent part, that "[u]pon execution of this Agreement the Initial Deposit shall be transferred to [DRE]'s designated account within three (3) business days from the date hereof," and that "[u]pon [DRE]'s receipt of the Initial Deposit, [Berkley] will receive confirmation and acceptance of availability of the Product for the agreed quantity." SPA § 3.

> **ANSWER:** In response to this Paragraph, DRE and Bawany admit only that it quotes a portion of the SPA. DRE and Bawany deny all other allegations and deny that the cited portion of the SPA can be read or interpreted exclusive of other portions of the agreement. DRE and Bawany further state that the SPA is clear on its face and, on that basis, deny all allegations inconsistent therewith.

30. Critically, section 3 further provides that, "[f]ollowing satisfactory delivery of Five Million boxes which shall be within ten business days of the Initial Deposit being paid of the Product to [Berkley], as [Berkley] shall determine in its reasonable discretion, [Berkley] shall then transfer the Additional Deposit to [DRE] within three (3) business days." SPA § 3.

> **ANSWER:** In response to this Paragraph, DRE and Bawany admit only that it quotes a portion of the SPA. DRE and Bawany deny all other allegations and deny that the cited portion of the SPA can be read or interpreted exclusive of other portions of the agreement. DRE and Bawany further state that the SPA is clear on its face and, on that basis, deny all allegations inconsistent therewith.

31. Section 4 sets forth the "Payment Terms" of the SPA and provides that Berkley will deposit $6 million in DRE's nominated account in accordance with the agreement and that Berkley "will transfer funds for the Products available for collection within one (1) business day of being provided: (i) "[c]onfirmation product is ready to be collected; (ii) a "packing list"; (iii) a "commercial invoice"; (iv) a "[p]hysical [i]nspection or time and dated video evidence of product availability; and (v) "[a]nay other documentation reasonably requested by [Berkley] in connection with the purchase, delivery, or specifications of the Product in relation to each individual orders [*sic*] invoices to Berkley." SPA § 4. Section 4 also states that the estimated delivery date "[i]n connection with the initial order" is "ten business days following receipt of Initial Deposit." *Id.*

> **ANSWER:** In response to this Paragraph, DRE and Bawany admit only that it quotes a portion of the SPA. DRE and Bawany deny all other allegations and deny that the cited portion of the SPA can be read or interpreted exclusive of other portions of the agreement, including material terms located in material documents incorporated into the agreement of the parties. DRE and Bawany further state that the SPA is clear on its face and, on that basis, deny all allegations inconsistent therewith.

32.     Additionally, through section 5 of the SPA, DRE agreed that, "[f]ollowing [DRE]'s receipt of the Initial Deposit, [DRE] shall commence the manufacturing of the Products in accordance with the specifications set forth herein and annexed hereto and confirm a delivery schedule for such Product in the quantities and amounts required herein with [Berkley]." SPA § 5.

> **ANSWER:** In response to this Paragraph, DRE and Bawany admit only that it quotes a portion of the SPA. DRE and Bawany deny all other allegations and deny that the cited portion of the SPA can be read or interpreted exclusive of other portions of the agreement. DRE and Bawany further state that the SPA is clear on its face and, on that basis, deny all allegations inconsistent therewith.

33.     Section 5 of the SPA confirmed, moreover, that the Additional Deposit would become due only "[f]ollowing successful delivery of Five Million Boxes of Product to Buyer in accordance with this Agreement." *Id.*

> **ANSWER:** In response to this Paragraph, DRE and Bawany admit only that it quotes a portion of the SPA. DRE and Bawany deny all other allegations and deny that the cited portion of the SPA can be read or interpreted exclusive of other portions of the agreement. DRE and Bawany further state that the SPA is clear on its face and, on that basis, deny all allegations inconsistent therewith.

34.     Upon the parties' execution of the SPA on or about September 3, 2021, Berkley wired to DRE the $3 million Initial Deposit as contemplated by the terms of the SPA, thereby triggering DRE's obligation to "commence the manufacturing of the Products in accordance with the specifications set forth" therein.

> **ANSWER:** In response to this Paragraph, DRE and Bawany admit only that Berkley transferred $3 million to DRE pursuant to the terms of the SPA, but DRE and Bawany deny all other allegations.

35. Annex B of the SPA provides that the initial order was to be delivered "ten (10) business days after receipt of the Initial Deposit." Thus, pursuant to the express terms of the SPA, the initial order of the Product was required to be delivered on or before September 13, 2021.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations and further deny that the SPA contemplated or required delivery of PPE within ten days of DRE's receipt of Berkley's initial deposit.

36. Further, as the terms of the SPA make clear, DRE was thereafter required to deliver to Berkley six million boxes of Product per week, for a period of six months.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

37. With millions of Berkley's dollars in hand, however, DRE utterly failed to fulfil its production and delivery obligations under the SPA. In fact, as Berkley would only discover months later, DRE never intended to uphold any of its contractual obligations, as it simply never had the capacity to do so.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

38. But DRE's initial default under the SPA was only the tip of the iceberg. Indeed, rather than owning up to their misdeeds, DRE and Bawany doubled down and continued their campaign of deceit in a calculated effort to delay DRE's inevitable exposure to millions of dollars in liability to Berkley.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

39. Unaware that DRE's and Bawany's repeated representations regarding DRE's production capabilities and DRE's intended use of the Initial Deposit were patently false, as a gesture of good faith and in an effort to facilitate a working business relationship among the parties, Berkley, at Bawany's request, agreed to forbear from exercising its rights and remedies in

connection with DRE's breach of the SPA, in consideration of DRE's agreement to deliver an additional 10 million bags of protective masks, originating in China, to Berkley (the "Additional Product").

        **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

40.     In offering to deliver the Additional Product to Berkley, DRE and Bawany expressly represented that the Product due under the SPA would be delivered within two weeks. DRE and Bawany knew that statement was false at the time it was made.

        **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

41.     In any event, the Additional Product was likewise not delivered as promised. As Berkley would later learn, the Additional Product shipment was significantly delayed, having been held on a ship waiting to be unloaded at the port of Los Angeles.

        **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

42.     In the interest of continued cooperation, Berkley in good faith agreed yet again to forebear in exercising its rights and remedies under the SPA if, and only if, DRE wired to Berkley $1,500,000 on or before October 22, 2021, in consideration for DRE's repurchase of the 10 million masks. That agreement was memorialized in an Addendum to the SPA dated October 19, 2021 (the "Addendum"). *See* attached Exhibit B.

        **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations of the first sentence. In response to the allegations in the second sentence, DRE and Bawany admit only that an Addendum to the SPA was memorialized and that a copy of the same appears to be attached as Exhibit B to Berkley's Answer and Counterclaims. However, DRE and Bawany state that such Addendum is clear on its face and, on that basis, deny all allegations inconsistent therewith. DRE and Bawany deny all other allegations.

43.     Initially, in entering into the Addendum, DRE unequivocally acknowledged its

defaults under the SPA. To that end, the Addendum provides as follows:

> **WHEREAS**, in connection with the delay of Product scheduled to be delivered on or before September 15, 2021 in accordance with the SPA, and in consideration for [Berkley] agreeing to forbear from exercising certain of its rights and remedies with respect to such default by [DRE], [DRE] agreed to deliver an additional Ten Million (10,000,000) boxes of Product to [Berkley];
>
> **WHEREAS**, as of the date hereof, Producer has remained unable to satisfy its obligations under the SPA, however, in consideration for the continued forbearance by [Berkley] of its rights and remedies under the SPA, [DRE] and [Berkley] desire to modify certain terms and conditions of the SPA ..."

Addendum at 1.

> **ANSWER:** In response to this Paragraph, DRE and Bawany admit only that it quotes a portion of the Addendum to the SPA. DRE and Bawany deny that the cited portion of the SPA can be read or interpreted exclusive of other portions of the agreement. DRE and Bawany further state that the terms of the Addendum to the SPA are clear on their face and, on that basis, deny all allegations that are inconsistent therewith. DRE and Bawany deny all other allegations.

44.     With respect to DRE's obligations under the Addendum, section 2 provides:

> On or before October 22, 2021 (the "Payment Date"), Producer shall wire [Berkley], in immediately available funds, to the escrow account designated to [Berkley], the amount of One Million Five Hundred Thousand and 00/100 ($1,500,000.00) Dollars (the "Payment") in consideration for the additional 10MM masks waiting to arrive in the port of Los Angeles that [DRE] is repurchasing.

Addendum § 2(a)(i).

> **ANSWER:** In response to this Paragraph, DRE and Bawany admit only that it quotes a portion of the Addendum to the SPA. DRE and Bawany deny that the cited portion of the SPA can be read or interpreted exclusive of other portions of the

agreement. DRE and Bawany further state that the terms of the Addendum to the SPA are clear on their face and, on that basis, deny all allegations that are inconsistent therewith. DRE and Bawany deny all other allegations.

45. Moreover, in acknowledgment of the significant risk Berkley undertook by continuing to forbear, DRE agreed in the Addendum to pay Berkley liquidated damages of $150,000.00 per day if the Payment was not made on or before the Payment Date:

> In the event the First Payment is not made on or before the Payment Date, as liquidated damages, [DRE] shall pay to [Berkley] the amount of One Hundred Fifty Thousand and 00/100 ($150,000.00) Dollars per day for every day that the Payment is not made following the Payment Date, under the Payment is received by [Berkley]. Any damages are contingent upon [Berkley]'s continued full performance under the SPA.

*Id.* § 2(a)(i).

> **ANSWER:** In response to this Paragraph, DRE and Bawany admit only that it quotes a portion of the Addendum to the SPA. DRE and Bawany deny that the cited portion of the SPA can be read or interpreted exclusive of other portions of the agreement. DRE and Bawany further state that the terms of the Addendum to the SPA are clear on their face and, on that basis, deny all allegations that are inconsistent therewith. DRE and Bawany deny all other allegations.

46. At the time DRE and Berkley executed the Addendum, the full extent of Berkley's anticipated damages in the event of further breaches by DRE was difficult to ascertain, particularly given the prospect of lost opportunities and damage to Berkley's reputation in the marketplace that would result from DRE's continued failures to perform. And considering the magnitude of the SPA, the agreed-upon amount was manifestly fair compensation to Berkley for the harm flowing from DRE's continued breaches and intended as such in the event of a breach of this obligation.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

47.     Once again, DRE failed to perform as promised by making the $1.5 million Payment in full by October 22, 2021 as required by the express terms of the Addendum. Worse yet, unbeknownst to Berkley, at the time the Addendum was executed DRE lacked the liquidity to make the $1.5 million payment to Berkley in full and had absolutely no intention of doing so.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

48.     As a result of DRE's breaches, beginning on October 22, 2021, liquidated damages began accruing at a rate of $150,000 per day. Currently, DRE owes Berkley over $15 million under the liquidated damages provision of the Addendum.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

49.     To be clear, Berkley agreed to the terms of the SPA, and agreed to forebear from exercising its rights and remedies thereunder on multiple occasions, in reliance on DRE's and Bawany's knowingly false representations regarding its willingness to perform its obligations under the SPA, its ability to produce the Product in accordance with the schedule contemplated in the SPA, and its intended use of the Initial Deposit. Had DRE informed Berkley that it lacked adequate production facilities to satisfy its obligations under the SPA, Berkley plainly would never have tendered any amount of payment or deposit, and would not have entered into the SPA in the first place nor agreed to forebear in exercising its remedies, much less on multiple occasions.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations in the first sentence. With regard to the allegations in the second sentence of this Paragraph, DRE and Bawany are without knowledge or information sufficient to form a belief as to the truth of such allegations and, on that basis, deny the allegations.

50. DRE's utter failure to perform under the SPA has resulted in numerous end-users canceling their agreements with Berkley and has damaged severely Berkley's reputation in the market.

**ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

51. To this day, DRE has failed to produce and make available to Berkley anywhere near the quantity of Product that it had expressly agreed to deliver ***within ten days of its receiving Berkley's Initial Deposit***. Berkley's repeated gestures of good faith and accommodations notwithstanding, DRE initially defaulted under the SPA by failing to deliver the Product by September 13, 2021, and it has remained in material breach of the SPA ever since.

**ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

52. In or around November 2021, DRE—knowing full well that it had materially breached both the SPA and the Addendum, and, in light of those breaches, that it owed Berkley millions of dollars in damages including liquidated damages that continue to accrue daily—took the offensive. Specifically, DRE, though its counsel, commenced a letter writing campaign in a transparent effort to obfuscate the record, which ultimately culminated in DRE running to the courthouse to file this anticipatory suit.

**ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

53. On November 1, 2021, DRE's counsel sent a letter to Berkley's counsel advising, *inter alia*, that "the first shipment [pursuant to the SPA] is available for pickup today and payment is therefore due." *See* attached Exhibit C. That statement was false, as nowhere near the quantities contemplated as the first shipment under the SPA were available. Moreover, DRE remained in breach of the Addendum by virtue of its continued failure to remit the entire $1.5 million payment due thereunder. Thus, counsel for Berkley responded as follows:

Just so we are clear, my office received your letter and our clients have had discussions regarding same. It has been expressed by Michael, that Dre Health is not prepared to delivery product today required under the SPA contrary to what your letter stated nor has my client received the 500k due under the Addendum. In that regard, the liquidated damages contemplated under the Addendum continue to accrue and my client continues to reserve all rights and remedies under the SPA, as amended and all applicable law.

*See* attached Exhibit D.

**ANSWER:** In response to this Paragraph, DRE and Bawany admit only the allegations in the first sentence. With regard to the allegations in the second sentence and third sentence of this Paragraph, DRE and Bawany deny the allegations. With regard to the allegations in the fourth sentence of this Paragraph, DRE and Bawany admit only that the allegations quote from documents which are clear on their face; DRE and Bawany therefore deny all allegations regarding such documents that are inconsistent therewith. DRE and Bawany deny all other allegations.

54.     On November 4, 2021, counsel for DRE sent Berkley's counsel an additional letter advising that "the product continues to sit in DRE's warehouse and is not being picked up by Berkley." *See* attached Exhibit E. The letter further asserted that "[t]his is causing DRE stress on their storage capabilities (which in turn slows production since there is nowhere to put new product), along with financial concern, as we still do not have the due and owing payment for this very large shipment." *Id.*

**ANSWER:**  In response to this Paragraph, DRE and Bawany admit the allegations.

55.     The following day, though under no obligation whatsoever to do so given DRE's ongoing defaults, counsel for Berkley advised DRE's counsel that Berkley would be willing to pick up "approximately 104,000 boxes of product today but would like to arrange a zoom inspection for their end user." *See* attached Exhibit F. Inexplicably, counsel for DRE declined

Berkley's request for an inspection notwithstanding the express condition in the SPA to Berkley's obligation to transfer funds for the Product that Berkley be granted a "[p]hysical [i]nspection or time and dated video evidence of product availability." SPA § 4. In response, Berkley's counsel explained, *inter alia*, that DRE's refusal was unreasonable and violated section 4 of the SPA. *See* attached Exhibit G.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations in the first sentence. With regard to the allegations in the second and third sentences of this Paragraph, DRE and Bawany deny the allegations and admit only that DRE made all of the relevant PPE reasonably available for inspection and that Berkely's representatives inspected the same to their satisfaction.

56.     As Berkley would eventually become aware, DRE refused Berkley's requests in an attempt to conceal the full extent of its fraudulent conduct, as DRE had in fact granted other third party buyers access to its facilities to conduct inspections of Product that it was required to deliver to Berkley pursuant to the SPA.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

57.     Notwithstanding DRE's stonewalling, Berkley persisted in its efforts to accommodate DRE by agreeing to pick up Product in quantities ranging from 100,000 to 300,000 per day from a third-party logistics facility in Fontana, California.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

58.     On November 8, 2021, Berkley attempted to inspect and schedule the pickup of a shipment of the Product at the Fontana facility. Contrary to DRE's affirmative representations, however, no Product was at the facility. Accordingly, counsel for Berkley sent the following email to DRE's counsel, among others:

Per the below, my client attempted to inspect and schedule the pickup of the Product today, however, Seller has advised that the product is not yet at the facility in Fontana but rather in transit. This is contrary to Seller's statement made Friday when Seller advised they had paid for a third party logistic company to pack and ship the Product to Fontana and that such Product was already in transit to Fontana on Friday.

The foregoing facts have caused a serious strain on Buyer's relationship with its end user and is putting this entire production deal in jeopardy. My client cannot continue to operate and transact in the wake of these misrepresentations by your client. Buyer has lost all faith in Seller's ability to fulfill its obligations and make good on its promises. Buyer requires assurances (via some form of proof and not just statements from Seller) that Seller can deliver the minimum 200,000 boxes of product per day as you set forth below. As you recall, the current delivery schedule is significantly lower than the required delivery of 5MM boxes per week as set forth in the SPA.

Further, Buyer needs to understand how many boxes will be available for inspection and pick up tomorrow, with the caveat that it should be a minimum of 400,000 boxes (200,000 per day commencing today). Buyer will not be obligated to pick up anything less as its not economically feasible for Buyer or its end user. Additionally, Seller remains in default of its obligations to meet the negotiated production quantities under the SPA and Buyer will not continue to forgo exercising it remedies under the SPA while simultaneously being required to pick up de minimis quantities (e.g. less than 100,000) of Product during an ongoing Seller default and/or tolerate being threatened to perform when Seller has failed at every instance to deliver in accordance with the SPA.

*See* attached Exhibit H.

**ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations in the first sentence. With regard to the allegations in the second sentence of this Paragraph, DRE and Bawany deny the allegations. With regard to the allegations in the third sentence of this Paragraph, DRE and Bawany admit only that the allegations quote from an email sent by counsel for Berkely to counsel for DRE. DRE and Bawany deny all other allegations and, further, specifically deny that

Berkley ever had any intent to take delivery of any PPE or negotiated in good faith with DRE.

59. On November 24, 2021, counsel for DRE emailed Berkley's counsel, baldly asserting once again that "DRE stands ready and willing and able to fulfill its obligations just as soon as the money is received." Again, that statement lacked any basis in fact. In response, counsel for Berkley clarified that DRE had informed Berkley earlier that day not that the Product was ready for pickup but "that boxes of product required to be delivered in October will now be ready next week." *See* attached Exhibit I.

> **ANSWER:** In response to this Paragraph, DRE and Bawany admit only that DRE was prepared to fulfill its obligations under the SPA and the Addendum, and deny all other allegations.

60. On December 14, 2021, DRE's counsel sent counsel for Berkley a so-called "payment demand" letter, which stated, *inter alia*, that "DRE can no longer continue both (1) holding millions of masks that your client has repeatedly promised to purchase as memorialized in Invoice 279723 (the Chinese masks) or (2) ramping up production manufacturing additional masks as required by the SPA and Invoice 279722." *See* attached Exhibit J. In the December 14 letter, DRE purported to impose deadlines on Berkley's supposed obligations to remit payments. Of course, DRE's demands were nonsensical, as DRE was at all relevant times in default of the SPA and the Addendum and therefore had no legal basis whatsoever to demand payment from Berkley, much less impose arbitrary deadlines for such payments. Accordingly, on December 15, 2021, counsel for Berkley explained the following in an email to DRE's counsel:

> DRE is certainly not the victim here and let me remind you
> that DRE's inability to perform in accordance with the SPA
> has significantly damaged my client. DRE was required to
> deliver 6MM in product per week commencing in October.

> To date, DRE alleges they only have 500,000 boxes of product ready for delivery and has openly admitted it cannot produce the weekly quantities of product required. DRE's inability to perform has caused damaged to Berkley in the market place which has resulted in its end users/buyers canceling their agreements with Berkley due to its inability to deliver the product as originally negotiated with DRE. The fact DRE asserts it has always been ready and able to deliver is undermined by its very conduct to date, not to mention the remarks made by DRE's own employees, who have admitted their inability to perform under the parties' agreement.

*See* attached Exhibit K.

> **ANSWER:** In response to this Paragraph, DRE and Bawany admit only that the letter attached as Exhibit J to Berkley's Answer and Counterclaims is clear and speaks for itself and, on that basis, DRE and Bawany deny all allegations inconsistent therewith. DRE and Bawany further admit only that the letters attached as Exhibits J and K to Berkley's Answer and Counterclaims represent communications between counsel. DRE and Bawany deny all other allegations.

61.     By Complaint dated January 18, 2022, DRE commenced this plainly anticipatory suit asserting claims sounding in breach of contract against Berkley and Lyons and seeking damages, declaratory, and injunctive relief.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

62.     As if DRE's flagrant disregard for Berkley's contractual rights described in detail above were not bad enough, however, it was only after DRE commenced this action that the full extent of DRE's and Bawany's nefarious conduct came to light. Indeed, as the allegations in DRE's Complaint make clear, neither DRE nor Bawany was ever operating in good faith.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

63.     Instead, DRE and Bawany were well-aware when they executed the SPA that DRE lacked access to a manufacturing facility necessary to satisfy the agreed-upon production

requirements, including the requirements that "[f]ollowing [its] receipt of the Initial Deposit," DRE would "commence the manufacturing of the Products in accordance with the specifications set forth herein and annexed hereto and confirm a delivery schedule for such Product in the quantities and amounts required herein with [Berkley]," SPA § 5, and that DRE would produce and deliver to Berkley six million masks per week commencing in September 2021 and for a period of six months.

      **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

64.    Worse yet, DRE and Bawany concocted a scheme whereby DRE would use Berkley's funds—more specifically, the $3 million Initial Deposit—not to purchase raw materials or "commence manufacturing of" the Product, but instead to either acquire/construct a new manufacturing facility in California (the "California Factory") for their own financial benefit and to Berkley's detriment, or for some other improper purpose. As explained in detail above, in furtherance of that scheme, Bawany assured Berkley and Lyons in August 2021 and thereafter that DRE had the financial and logistical capability to produce and deliver the Product in accordance with the schedule contemplated in the SPA— namely, six million masks per week commencing in September 2021 and continuing for a period of six weeks. Further, Bawany advised Berkley at all times that the Initial Deposit would be used for raw materials.

      **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

65.    Bawany's representations were knowingly false and made with the specific objective of inducing Berkley to enter into the SPA for the purpose of financing the construction of the California Factory for its own benefit or otherwise absconding with Berkley's funds. Such representations simply cannot be squared with DRE's allegations in its Complaint that, in reliance on the size of the SPA, DRE "needed to build a new factor and production facility to meet the

demands of the" SPA and therefore "acquired and outfitted and staffed a factory in California" to meet the SPA's delivery requirements. (Compl. ¶¶ 21, 42.)

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

66. Berkley reasonably relied on all such statements to its detriment when it entered the SPA and Addendum and has been damaged as a result.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

**COUNT I**
**<u>BREACH OF CONTRACT (SPA)</u>**

67. Berkley repeats and realleges the facts set forth in each of the foregoing paragraphs as if fully set forth herein.

> **ANSWER:** In response to this Paragraph, DRE and Bawany incorporate their Answers to all prior allegations as though fully restated and set forth herein.

68. Berkley and DRE entered into the SPA for the purpose of engaging in business involving the purchase and sale of protective masks.

> **ANSWER:** In response to this Paragraph, DRE and Bawany admit only that the SPA is clear on its face and, on that basis, denies all allegations inconsistent therewith.

69. Berkley complied with its obligations in full under the SPA by delivering the Initial Deposit to DRE on September 5, 2021.

> **ANSWER:** In response to this Paragraph, DRE and Bawany admit only that Berkley delivered a $3 million deposit to DRE. DRE and Bawany deny that Berkley complied with its obligations under the SPA and deny all other allegations.

70. DRE has materially breached the agreement by, among other things, failing to commence production of the Product upon receipt of the Initial Deposit; failing to produce and

make available to Berkley six million boxes of Product on or before September 15, 2021; and failing to produce and make available to Berkley additional Product in the amount of six million boxes per week in each successive week following the initial scheduled delivery on September 15, 2021.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

71.     By reason of the foregoing breaches, Berkley incurred damages in an amount to be determined at trial.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations and, further, deny that either party is in any way liable to Berkley or Lyons for any damages whatsoever.

## COUNT II
## BREACH OF CONTRACT (ADDENDUM)

72.     Berkley repeats and realleges the facts set forth in each of the foregoing paragraphs as if fully set forth herein.

> **ANSWER:** In response to this Paragraph, DRE and Bawany incorporate their Answers to all prior allegations as though fully restated and set forth herein.

73.     Berkley and DRE entered into the Addendum, pursuant to which Berkley agreed to forebear in exercising certain of its rights and remedies as against DRE and DRE's agreed to wire to Berkley $1,500,000 on or before October 22, 2021.

> **ANSWER:** In response to this Paragraph, DRE and Bawany admit only that the Addendum to SPA is clear on its face and, on that basis, deny all allegations inconsistent therewith.

74.     Berkley complied with its obligations in full under the Addendum.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

75.     DRE materially breached the Addendum by failing to wire Berkley the $1,500,000 payment in full.

     **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

76.     Under the terms of the Addendum, liquidated damages began accruing on October 23, 2021, at a rate of $150,000 per day. At the time DRE and Berkley executed the Addendum, the full extent of Berkley's anticipated damages in the event of further breaches by DRE was difficult to ascertain and the agreed-upon amount was manifestly fair compensation to Berkley for the harm flowing from DRE's continued breaches and intended as such.

     **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

77.     By reason of the foregoing breach, Berkley has incurred damages in an amount to be determined at trial.

     **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations and, further, deny that either party is in any way liable to Berkley or Lyons for any damages whatsoever.

## COUNT III
## BREACH OF IMPLIED CONVENANT OF GOOD FAITH AND FAIR DEALING

78.     Berkley repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

     **ANSWER:** In response to this Paragraph, DRE and Bawany incorporate their Answers to all prior allegations as though fully restated and set forth herein.

79.     SPA and the Addendum each include an implied covenant that the parties thereto will act in good faith and deal fairly with each other.

     **ANSWER:** In response to this Paragraph, DRE and Bawany state that the allegations are wholly legal conclusions not subject to admission or denial.

80.     The implied convent of good faith and fair dealing mandates that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

> **ANSWER:** In response to this Paragraph, DRE and Bawany state that the allegations are wholly legal conclusions not subject to admission or denial.

81.     DRE breached the implied covenant of good faith and fair dealing by luring Berkley into the SPA and the Addendum despite knowing that it lacked the capability to perform its obligations thereunder.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

82.     By reason of the foregoing, Berkley incurred damages in an amount to be determined at trial, plus its reasonable attorney's fees and costs incurred in this action.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations and, further, deny that either party is in any way liable to Berkley or Lyons for any damages whatsoever.

**COUNT IV**
**<u>UNJUST ENRICHMENT (ALTERNATIVE RELIEF)</u>**

83.     Berkley repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

> **ANSWER:** In response to this Paragraph, DRE and Bawany incorporate their Answers to all prior allegations as though fully restated and set forth herein.

84.     Despite having no legal right to do so, DRE has retained Berkley's $3 million Initial Deposit in connection with the SPA.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

85. Having failed to make a single delivery of Product pursuant to the terms of the SPA, DRE has been unjustly enriched in the amount of the Initial Deposit.

      **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

86. By reason of the foregoing, Berkley incurred damages in an amount to be determined at trial, plus its reasonable attorney's fees and costs incurred in this action.

      **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations and, further, deny that either party is in any way liable to Berkley or Lyons for any damages whatsoever.

## COUNT V
## DECLARATORY JUDGMENT

87. Berkley repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

      **ANSWER:** In response to this Paragraph, DRE and Bawany incorporate their Answers to all prior allegations as though fully restated and set forth herein.

88. Berkley and DRE entered into the SPA, pursuant to which Berkley agreed, among other things, to wire an Initial Deposit in the amount of $3 million to DRE, and DRE agreed, among other things, to produce the specified amount of PPE on the agreed upon timetable.

      **ANSWER:** In response to this Paragraph, DRE and Bawany admit only that DRE's obligations under the SPA are clear on their face and, on that basis, deny all allegations inconsistent therewith.

89. Berkley and DRE thereafter entered into the Addendum, pursuant to which Berkley agreed to forebear in exercising certain of its rights and remedies as against DRE and DRE's agreed to wire to Berkley $1,500,000 on or before October 22, 2021.

> **ANSWER:** In response to this Paragraph, DRE and Bawany admit only that DRE's obligations under the SPA and the Addendum to the SPA are clear on their face and, on that basis, deny all allegations inconsistent therewith.

90.     Berkley performed in all respects under the SPA and the Addendum.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

91.     DRE defaulted under both the SPA and the Addendum by, among other things, failing to commence production of the Product upon receipt of the Initial Deposit; failing to produce and make available to Berkley six million boxes of Product on or before September 15, 2021; failing to produce and make available to Berkley additional Product in the amount of six million boxes per week in each successive week following the initial scheduled delivery on September 15, 2021; and failing to remit the $1.5 million payment to Berkley on or before October 22, 2021.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

92.     Nevertheless, DRE has insisted that Berkley is in breach of the SPA because it refuses to purchase and pick-up products in quantities considerably below the shipment amounts contemplated under the SPA and despite DRE's failure to otherwise comply with the terms of the SPA.

> **ANSWER:** In response to this Paragraph, DRE and Bawany admit only that DRE's allegations against Berkley and Lyons are clear on the face of DRE's Complaint, and DRE and Bawany deny all other allegations.

93.     There exists a justiciable controversy between the parties as to whether Berkley is obligated to perform under the SPA in light of DRE's prior material breach of same.

**ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations, and further deny that either party is liable to Berkley or Lyons for any damages whatsoever.

**COUNT VI**
**FRAUDULENT INDUCEMENT**

94.     Berkley repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

**ANSWER:** In response to this Paragraph, DRE and Bawany incorporate their Answers to all prior allegations as though fully restated and set forth herein.

95.     In or around August 2021 and continuing through December 2021, Bawany expressly represented to Berkley representatives, including Lyons and Dobi, and that (i) DRE had the financial and logistical capability to produce and deliver the Product in accordance with the schedule and additional terms in the SPA, and (ii) that the Initial Deposit would be used for the sole purpose of obtaining raw materials and in furtherance of performing its obligations under the SPA (together, the "Misrepresentations").

**ANSWER:** In response to this Paragraph, DRE and Bawany admit only that Bawany and DRE's representatives consistently and truthfully represented that DRE had the financial and logistical capability to produce the PPE sought by Berkley and described in the SPA. DRE and Bawany deny all other allegations.

96.     At all relevant times, Bawany knew the Misrepresentations were false and/or knowingly intended to conceal material facts from Berkley or otherwise misrepresent material facts to Berkley, namely, that DRE lacked the production capabilities necessary to perform under the SPA and intended to use the Initial Deposit to construct the California Factory for its own benefit and to the detriment of Berkley.

**ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

97.     Bawany made the Misrepresentations with the intent that Berkley would rely on them in entering into the SPA and the Addendum and so that Berkley would refrain from sourcing product elsewhere.

> **ANSWER:**  In response to this Paragraph, DRE and Bawany deny the allegations.

98.     Berkley did not know, nor did it have reason to believe, that Bawany's statements were false.

> **ANSWER:**  In response to this Paragraph, DRE and Bawany deny that Bawany or DRE's representatives made any false statements to Berkley, Lyons, or any representative of Berkley. DRE and Bawany deny all other allegations.

99.     Bawany's false statements were material to Berkley's decision to enter the SPA and the Addendum and its decision to refrain from sourcing product elsewhere.

> **ANSWER:**  In response to this Paragraph, DRE and Bawany deny the allegations.

100.     Berkley relied on Bawany's false statements in entering into the SPA and the Addendum, and such reliance was reasonable under the circumstances.

> **ANSWER:**  In response to this Paragraph, DRE and Bawany deny the allegations.

101.     As a direct and proximate result of Bawany's false statements, Berkley incurred damages in an amount to be determined at trial, but estimated to be not less than $100 million, plus its reasonable attorney's fees and costs incurred in this action.

> **ANSWER:**  In response to this Paragraph, DRE and Bawany deny the allegations and, further, deny that either party is in any way liable to Berkley or Lyons for any damages whatsoever.

## COUNT VII
## <u>IMPOSITION OF CONSTRUCTIVE TRUST/EQUITABLE LIEN</u>

102.     Berkley repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

>        **ANSWER:** In response to this Paragraph, DRE and Bawany incorporate their Answers to all prior allegations as though fully restated and set forth herein.

103.     DRE received and retained Berkley's $3 million Initial Deposit and has not delivered a single unit of Product to Berkley in accordance with the terms of the SPA.

>        **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

104.     DRE induced Berkley into remitting the Initial Deposit under false pretenses, namely, that DRE intended to fulfill its production obligations under the SPA, that it was capable of doing so, and that it would use the Initial Deposit in furtherance of same.

>        **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

105.     By virtue of accepting the Initial Deposit, DRE owed Berkley a duty and/or had an obligation to produce the Product in accordance with the terms of the SPA and use the Initial Deposit in the agreed upon manner.

>        **ANSWER:** In response to this Paragraph, DRE and Bawany state that the obligations incurred under the SPA are clear and speak for themselves and, on that basis, deny all allegations inconsistent therewith. DRE and Bawany deny all other allegations.

106.     DRE accepted the Initial Deposit despite having actual knowledge that it had no intention of, and was in fact incapable of, performing its obligations under the SPA, and that it did not intend to use the Initial Deposit for raw materials as represented by DRE and Bawany.

>        **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

107.     Rather than using the Initial Deposit to acquire raw materials, produce the Product and perform under the SPA, and despite its representation to Berkley that it would begin producing the Product immediately upon receipt of the Initial Deposit, DRE fraudulently diverted the funds for the purpose of constructing the California Factory for its own benefit and to the detriment of Berkley.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

108.     DRE admittedly used the Initial Deposit, which it unlawfully obtained from Berkley, for the construction of the California Factory, and as such, the Initial Deposit can be traced to DRE's interest in the California Factory.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

109.     DRE therefore holds the Initial Deposit in constructive trust for Berkley, the victim of DRE and Bawany's fraudulent, deceptive, and unlawful conduct, and by virtue thereof, Berkley is entitled to have an equitable lien declared in its favor in and on the California Factory.

> **ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations and, further, deny that either party is in any way liable to Berkley or Lyons for any damages whatsoever.

## COUNT VIII
## ABUSE OF THE CORPORATE FORM/ALTER EGO

110.     Berkley repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

> **ANSWER:** In response to this Paragraph, DRE and Bawany incorporate their Answers to all prior allegations as though fully restated and set forth herein.

111.     Bawany controlled and completely dominated DRE's policies, finances, and business practices associated with actions surrounding the SPA, Addendum, and DRE's failure to deliver the Product to Berkley.

**ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

112.     Bawany used these acts of dominance and control to: (i) disburse the Initial Deposit in a manner inconsistent with the SPA; (ii) withhold the $1.5 million payment to Berkley in a manner inconsistent with the Addendum; (iii) direct DRE in a manner that all but ensured the Product due under the SPA and Addendum would never be delivered to Berkley; (iv) engage in deceptive business practices that misrepresented DRE's ability to manufacture the Product to induce Berkley into entering into the SPA and Addendum when DRE had no such capability; and (v) engage in business practices that would never allow DRE to operate in good faith under the SPA or Addendum.

**ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

113.     Bawany's control of DRE and the breach of DRE's duties, at his direction and as described herein, are the proximate cause of all Berkley's injuries and unjust losses. These injuries include providing the Initial Deposit but extend to include all losses and damages proximately caused by the fact that Berkley never received the Product to which it was entitled under the terms of the SPA or Addendum and for which it deposited $3,000,000.

**ANSWER:** In response to this Paragraph, DRE and Bawany deny the allegations.

## **AFFIRMATIVE DEFENSES**

In further response to Counterclaims against DRE and Bawany, DRE and Bawany hereby assert the following affirmative defenses, without conceding that they bear the burden of persuasion as to any of them.

1.     Berkley's allegations fail to state a claim upon which relief can be granted.

2.     Berkley's contract claims are barred as it was the first to materially breach said contracts at issue.

3.     Berkley's contract claims are barred by its own breaches of said contracts.

4.     Berkley's equitable counterclaims, third-party claims and demands for damages fail as a matter of law because Berkley has an adequate remedy at law for any damages sustained.

5.     Berkley's counterclaims and third-party claims alleging any causes of action outside of breach of contract fail under the economic loss doctrine because enforceable agreements govern the conduct alleged by Berkley in its counterclaims and third-party claims.

6.     Berkley's counterclaims and third-party claims may not be used to recover lost profits or other consequential damages because the agreements of the parties specifically limited or barred Berkley from recovering the available damages Berkley alleges itself to have sustained and limits Berkley to direct damages only. Therefore, Berkley has already waived all rights to consequential, incidental, or punitive damages by explicit waiver.

7.     Berkely has failed to mitigate its damages and any damages it may be entitled to are limited to those damages that it could not have reasonably mitigated.

8.     Berkley's counterclaims, third-party claims and each claim for relief therein are barred by the unclean hands of Berkley as well as those of Lyons and Berkley's other officers and directors.

9.      Berkley's counterclaims and third-party claims are barred to the extent any damages alleged to have been suffered by Berkley were, at least in part, caused by the actions of Berkley itself and of its officers and directors or third parties' own negligence which equaled or exceeded any alleged negligence or wrongdoing by DRE or Bawany.

10.     Berkley's tort claims are barred by its own assumption of the risk.

11.     Berkley's contract claims are barred as DRE executed the contracts at issue under duress.

12.     Berkley's counterclaims and third-party claims are barred to the extent any damages that Berkley alleges itself to have suffered were the direct and proximate result of the conduct of Berkley and the decisions of its officers and directors, including Berkley's refusal to take delivery of any PPE.  Therefore, Berkley is estopped and barred from recovery of any damages.

13.     Berkley's counterclaims and third-party claims fail to state claims for relief for punitive damages or exemplary damages.  Further, Berkley does not allege facts sufficient to rise to the level of conduct required to recover punitive damages or exemplary damages. Berkley's claims for punitive damages also violate the U.S. Constitution and the Constitution of the State of Missouri.

14.     Berkley's request for attorneys' fees against DRE and Bawany is not supported by Missouri law in that there is no contractual provision for the recovery of attorneys' fees in each agreement with DRE at issue nor is there any statutory authority for Berkley to recover attorneys' fees against DRE.

15.     DRE's and Bawany's liability, if any, is limited by the agreement of the parties to fulfillment of its obligations under the SPA and to the delivery of the PPE which it has already offered.

16.     DRE and Bawany's liability, if any, is limited by the agreement of the parties wherein the parties agreed that Berkley would indemnify and hold harmless DRE and Bawany because all of Berkley's alleged damages resulted from the decisions of Berkley and its directors and officers.

17.     DRE's liability and that of its officer and director Bawany, if any, is limited by the agreement of the parties to the amount of compensation actually paid by Berkley to DRE, and by express agreement of the parties Berkley may not collect any damages from DRE exceeding such amount.

18.     In the event Berkley  is entitled to recover damages against Bawany or DRE, which DRE specifically denies, DRE and Bawany are  entitled to have any such amounts offset or set off by the amounts owed to DRE or for which DRE has been damaged by Berkley's tortious conduct, comparative or contributory fault, unclean hands, bad faith or breaches of contracts.

19.     Berkley's contract claims are barred by its fraudulent inducement and false promises to DRE that were relied upon by DRE in executing each contract document.

20.     Pursuant to the contract terms, including the DRE terms and conditions, Berkley's claims are barred or limited by the limitation of liability language and other language establishing the rights and remedies of the parties to the contract.

21.     Berkley's claim for abuse of the corporate form/alter ego fails because Bawany lacked corporate authority and the requisite control over DRE.

22.     Berkley's claims fail as Berkley is not the real party in interest to pursue affirmative claims against both DRE and Bawany.  Berkley is a shell company not authorized to do business and is a shell company/entity created by Anthony Lyons to engage in risky or fraudulent transactions without employees or appropriate resources to carry out the transactions.

23.     DRE and Bawany reserve the right to seek leave to amend their  Answer and Affirmative Defenses to the extent additional information becomes known.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaim Defendants prays as follows:

(1)     That Berkley take nothing by virtue of its counterclaims and third-party claims, and that all such actions be dismissed in their entirety;

(2)     For costs of suit and attorneys' fees incurred; and

(3)     For such other and further relief as the Court may deem just and proper.


Dated:  February 10, 2023

Respectfully submitted,

**JAMES SOBBA, LLC**

*/s/     G. Edgar James*
G. EDGAR JAMES            MO# 49585

4435 Main Street, Suite 910
Kansas City, Missouri 64111
Telephone:  (816) 623-0544
ejames@jamessobba.com

 **ATTORNEYS FOR**
**DRE HEALTH CORPORATION AND**
**AHMED "ISAAC" BAWANY**

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ G. Edgar James
Attorney for DRE Health Corporation and
Ahmed "Isaac" Bawany