**IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

**DRE HEALTH CORPORATION,**

   **Plaintiff,**

 **v.**

          **Case No.: 4:22-cv-00031-RK**

**BERKLEY EQUITY LIMITED &
ANTHONY LYONS,**

   **Defendants.**

_____

**BERKLEY EQUITY LIMITED,**

   **Counterclaim-Plaintiff,**

 **v.**

**DRE HEALTH CORPORATION &
AHMED "ISAAC" BAWANY,**

   **Counterclaim-Defendants.**

_____

**DRE HEALTH CORPORATION'S RESPONSE TO DEFENDANTS
MOTION FOR PARTIAL SUMMARY JUDGMENT AND, IN THE
ALTERNATIVE, MOTION UNDER RULE 56(D) TO DEFER
<u>RULING AND SUGGESTIONS IN SUPPORT</u>**

# TABLE OF CONTENTS

I.    **INTRODUCTION** ................................................................................................. 1

II.   **DRE'S RESPONSE TO BERKLEY AND LYON'S STATEMENT OF UNCONTROVERTED MATERIAL FACTS** ............................................................ 2

III. **DRE's STATEMENT OF ADDITIONAL UNCONTROVERTED MATERIAL FACTS** . 15

IV. **STANDARD FOR SUMMARY JUDGMENT** ...................................................... 21

V.   **DRE'S REPLY TO BERKLEY AND LYON'S LEGAL ARGUMENT** ............................... 22

    1.   Genuine Issues of Material Facts Exist to Preclude Summary Judgment. ......................... 22

    2.   The Economic Loss Doctrine does not bar DRE's Tort Claims Against Berkley and Lyons. .................................................................................................................24

    3.   DRE's Fraud Claims Include Claims Arising from Alleged Misrepresentations That are Outside of and Collateral to Parties' Contractual Agreements. ........................................... 25

    4.   Neither the Economic Loss Doctrine nor Any Theory of Agency Shield Defendant Lyons from Liability for his Own Tortious Conduct ...................................................... 31

    5.   Defendant Lyons is Liable on DRE's Account Stated Claim as an Agent for an Undisclosed Third Party .................................................................................................... 34

    6.   DRE's Civil Conspiracy Claim Arises from an Actionable Wrong Perpetrated by a Principal and an Agent with an Independent Personal Stake in the Object of the Conspiracy ........... 35

VI. **CONCLUSION** ......................................................................................... 37

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*8000 Maryland, LLC v. Huntleigh Fin. Servs., Inc.*, 292 S.W.3d 439, 452 (E.D. Mo. 2009) ...... 36

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S. Ct. 1598, 26 L. Ed. 142 (1970)) ....... 22

*AKA Distrib. Co. v. Whirlpool Corp.*, 137 F.3d 1083, 1086 (8th Cir. 1998)................................. 25

*American Mortgage Inv. Co. v. Hardin-Stockton Corp.*, 671 S.W.2d 283, 293 (Mo. App. W.D. 1984) ........................................................................................................................................ 28

*Anderson v. Ford Motor Co.*, No. 17-3244-CV-S-BP, 2017 U.S. Dist. LEXIS 213132, at *11 (W.D. Mo. Dec. 29, 2017) ......................................................................................................... 25

*Autry Morlan Chevrolet Cadillac, Inc. v. RJF Agencies, Inc.*, 332 S.W.3d 184, 192 (Mo. Ct. App 2010). ............................................................................................................................... 24, 28

*Boyd v. Wimes*, 664 S.W. 2d 596, 598 (Mo. App. 1984) ............................................................ 33

*Carlone v. The Lion & The Bull Films, Inc.*, 861 F. Supp. 2d 312, 326 (S.D.N.Y. 2012) ........... 23

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d (1986) .............. 22

*Chrysler Fin. Co., LLC. v. Flynn*, 88 S.W.3d 142, 151 (Mo. App. 2002) ............................. 29, 34

*Compass Bank v. Eager Rd. Assocs., LLC*, 922 F. Supp. 2d 818, 827 (E.D. Mo. 2013).. 25, 26, 29

*Curlee v. Donaldson*, 223 S.W. 2d 746, 754 (Mo. App. 1950) .................................................. 31

*Curt Ogden Equip. Co. v. Murphy Leasing Co.*, 895 S.W.2d 604, 609 (Mo. Ct. App. 1995)...... 30

*David v. Shippy*, 684 S.W.2d 586, 587-88 (Mo. App. E.D. 1985) .............................................. 35

*Elkhart Metal Fabricating, Inc. v. Martin*, No. 14-CV-705 JCH, 2014 U.S. Dist. LEXIS 89286, at *2 (E.D. Mo. July 1, 2014) ................................................................................................... 32

*Hardwood Lumber, Inc. v. Brewco Inc.*, No. 3:18-05088-CV-RK, 2020 U.S. Dist. LEXIS 109110 at *5 (W.D. Mo. June 22, 2020) ............................................................................................... 25

*Hill v. Bank of Am.*, 2016 U.S. Dist. 150871, at *21 (E.D. Mo. 2016)....................................... 26

*Lee v. Allen*, 120, 175 S.W.2d 172 (Mo. App. 1938) ................................................................. 32

iii

*Lee v. Southwestern Bell Tel. Co.*, No. 6:15-CV-03428-BCW, 2017 U.S. Dist. LEXIS 221516, *5-6 (W.D. Mo. Feb. 10, 2017) ............................................................................ 22

*Marvin Lumber & Cedar Co. v. PPG Indus.*, 223 F.3d 873, 885 (8th Cir. 2000) ................. 25, 27

*Maxwell v. Springfield*, 705 S.W.2d 90, 94 (Mo. App. 1986) ................................................. 31, 32

*Mika v. Central Bank of Kansas City*, 112 S.W.3d 82, 94 (Mo. App. 2003) .............................. 36

*Mo. Ozarks Radio v. Baugh*, 598 S.W.3d 154, 162 (Mo. App. 2020) ......................................... 29

*Murray-Kaplan v. Nec Ins., Inc.*, 617 S.W.3d 485, 496 (Mo. App. 2021) ................................... 32

*OneBeacon Ins. Co. v. Deere & Co.*, 778 F. Supp. 2d 1005 (E.D. Mo. 2011) ............................ 33

*Pietoso, Inc. v. Republic Servs.*, No. 4:19-CV-00397-JAR, 2021 U.S. Dist. LEXIS 215480, at *17 (E.D. Mo. Nov. 8, 2021) ................................................................................... 32, 33

*Rehabcare Grp. E., Inc. v. Stratford Health Care Props., LLC*, No. 14-0886-CV-W-FJG, 2017 U.S. Dist. LEXIS 160699, at *27 (W.D. Mo. Sep. 29, 2017)................................................. 36

*RightCHOICE Managed Care, Inc. v. Hosp. Partners, Inc.*, No. 5:18-cv-06037-DGK, 2019 U.S. Dist. LEXIS 10671, at *27 (W.D. Mo. Jan. 23, 2019) ....................................... 31, 34

*Rucker v. US Fidelis, Inc.*, No. 4:09CV670 CDP, 2009 U.S. Dist. LEXIS 67051, at *4 (E.D. Mo. July 31, 2009)........................................................................................................ 36

*Scott Salvage Yard, LLC v. Gifford*, 382 S.W.3d 134, 138 (Mo. Ct. App. 2012)........................ 29

*Smith v. Goodyear Tire & Rubber Co.*, 856 F. Supp. 1347, 1350 (W.D. Mo. 1994). ................. 32

*Spring Lake Pork v. Great Plains Mgmt.*, No. 2:19 CV 18 CDP, 2020 U.S. Dist. LEXIS 114438 at *9 (E.D. Mo. June 30, 2020). ................................................................................. 24

*State ex rel. Doe Run Res. Corp. v. Neill*, 128 S.W.3d 502, 505 (Mo. 2004)........................ 31, 33

*State ex rel. Shell Petroleum Corp. v. Hostetter*, 348 Mo. 841, 156 S.W.2d 673 (1941)............ 32

*State ex rel. William Ranni Assocs., Inc. v. Hartenbach*, 742 S.W.2d 134, 140 (Mo. 1987) ....... 32

*Superior Edge, Inc. v. Monsanto Co.*, 44 F. Supp. 3d 890, 907 (D. Ct. Minn. 2014). .......... passim

*Unisource Worldwide, Inc. v. Barth*, 109 S.W.3d 252, 253 (Mo. App. 2003) ............................ 35

iv

*Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 774 (8th Cir. 2020) ................................. 25, 28, 33

*Web Innovations & Tech. Servs. v. Bridges to Digital Excellence, Inc.*, 69 F. Supp. 3d 928, 934
   (E.D. Mo. 2014). ........................................................................................................... passim

*White v. McCoy Land Co.*, 101 S.W.2d 763, 766 (Mo. App. 1936) ............................................ 33

Treatises

Restat. 3d of Agency, § 7.02 ...................................................................................................... 32

## I.    INTRODUCTION

Defendants' Motion for Partial Summary Judgment (Doc. 69) ("Defendants' Motion") should be denied. In the alternative, and consistent with the attorney affidavit attached as Exhibit B, and pursuant to Federal Rule of Civil Procedure 56(d), DRE moves the Court defer considering the motion for summary judgment (or deny it all together); or (2) allow more time for the nonmoving party to obtain additional discovery. Critical issues of material fact permeate the motion, and Defendants' interpretation of the applicable law is, at best, questionable, barring the grant of Defendants Motion. Defendants Anthony Lyons ("Lyons") and Berkley Equity Ltd. ("Berkley") (collectively, ("Defendants")) made repeated representations to Plaintiff DRE ("DRE"), emphasizing the existence of myriad agreements with PPE end-buyers, ostensibly to lure DRE into a massive Sales and Purchase Agreement. DRE, in reliance on these assurances and in anticipation of a robust business relationship, allocated considerable resources. Only later did it become clear not only that many of these agreements never existed, but also that Berkley was utterly incapable of securing such agreements.

Despite being irrelevant to the terms of the contract between the parties, the Defendants repeatedly leveraged their own failure to secure end-buyers as an excuse not to perform under the terms of their contracts with DRE, even after sending DRE a screen shot of over a billion dollars in an account they claimed as evidence of their ability to perform. Time after time, Defendants cloaked their inability to perform with statements and promises regarding forthcoming payment. Similarly, Defendants' Motion and related Suggestions (Doc. 70) mischaracterizes this dispute as revolving around misrepresentations regarding Defendants' intent to perform under the contracts. But Defendants fail to address the fact that DRE's damages were caused by the reasonable, but mistaken, belief that Defendants *could* perform under the contracts.

Defendants' Motion for Summary Judgment seeks to bar DRE's fraud claims by application of the economic loss doctrine, but as set forth herein there is no valid basis to do so. Additionally, they ambitiously seek summary judgment on the Accounts Stated and Civil Conspiracy claims, glossing over factual disputes that squarely fall within the jury's purview. These claims are intertwined with crucial factual disputes that warrant jury consideration. For the reasons set forth in these Suggestions in Opposition and the accompanying statements of additional facts, this Court should deny Defendants Berkley and Lyons' efforts at summary judgment and deny their motion in full.

## II. DRE'S RESPONSE TO BERKLEY AND LYON'S STATEMENT OF UNCONTROVERTED MATERIAL FACTS

1. DRE is a corporation organized and incorporated under the laws of the State of Missouri. (Berkley's Amended Counterclaim and Third-Party Complaint ("Counterclaim") ¶ 14 [ECF No. 49]; DRE Health Corporation and Ahmed "Isaac" Bawany's First Amended Answer and Affirmative Defenses ("DRE Answer") ¶ 14 [ECF No. 53]).

**RESPONSE: Uncontroverted**

2. Incorporated solely by Bawany on or about October 4, 2018, who is the company's President, CEO, and sole director, DRE purports to be a medical supply business that manufactures, distributes, and/or provides Personal Protective Equipment (PPE) to various medical entities and other medical suppliers. (DRE Health Corporation's Complaint ("Complaint") ¶ 9; DRE Health Corporation's Second Amended Responses to Berkley Equity Limited's and Anthony Lyons' First Set of Interrogatories and Second Request for Production of Documents ("DRE Interrogatory Responses") ¶ 1; Counterclaim-Defendant Ahmed "Isaac" Bawany's Objections and Responses to Berkley Equity Limited and Anthony Lyons' First Requests For Admission ("Bawany RFA") Response Nos. 1-7).

2

**RESPONSE: DRE controverts any suggestion made by the word "purports." The remainder of ¶ 2 is uncontroverted**

3.      Berkley is a foreign corporation with its principal place of business in the British Virgin Islands. (Complaint ¶ 2; Berkley Equity Limited's and Anthony Lyons' Amended Answer ("Berkley Answer") ¶ 2 [ECF No. 49]).

**RESPONSE: Uncontroverted**

4.      Lyons is an individual with a residence in Avon, Colorado. (Complaint ¶ 3; Berkley Answer ¶ 3.

**RESPONSE: Uncontroverted**

5.      Lyons serves as the Chairman and President of Berkley (Complaint, Ex. A, C, D, E).

**RESPONSE: Uncontroverted**

6.      In August 2021, representatives of Berkley, NativeAero, DK Houck, and DRE engaged in the negotiation of a Sales and Purchase Agreement to facilitate Berkley's anticipated purchase of PPE which was to be manufactured by DRE. (Counterclaim ¶ 22; DRE Answer ¶ 22).

**RESPONSE: Uncontroverted for the purposes of this motion, but the negotiations addressed both the supply and manufacture of PPE.**

7.      On September 2, 2021, Lyons, in his capacity as Chairman of Berkley, electronically signed a document provided by DRE titled "DRE Health New Customer Application." (Complaint ¶ 4(b), Ex. A; Berkley Answer ¶ 4(b)).

**RESPONSE: DRE controverts the legal conclusion that Lyons signed "in his capacity as" Chairman of Berkley. The document cited by Defendants states that he signed it as "Principal,**

3

Owner, or Authorized Agent." Defendant Lyons' "capacity" is a legal conclusion for the Court to resolve.

8. On September 2, 2021, DRE as "Producer" and Berkley as "Buyer," as well as NativeAero Industries as "Seller," executed a document titled "Sale & Purchase Contract Package Structure Agreement" (the "SPA") under which Berkley would purchase large quantities of "DRE Health Total Defense 200" protective masks. (Complaint ¶ 7, Ex. C; Berkley Answer ¶ 7; Bawany RFA ¶¶ 27, 31-33).

**RESPONSE: Uncontroverted that such terms exist in the SPA, but the SPA and the related contract documents must be read as a whole.**

9. The SPA provides: "WHEREAS, the Buyer with full corporate authority and responsibility hereby confirms that it is ready, willing, and able to purchase the Products under the terms and conditions of this Agreement." (SPA at p. 1).

**RESPONSE: Uncontroverted that such terms exist in the SPA, but the SPA and the related contract documents must be read as a whole.**

10. On September 3, 2021, Berkley made, and DRE received, the anticipated Initial Deposit in the amount of $3 Million. (Complaint ¶ 11; Bawany RFA ¶ 39).

**RESPONSE: Uncontroverted**

11. DRE subsequently issued Invoice 279722 and Invoice 279723 (the "Invoices"). (Complaint ¶ 14; Berkley Answer ¶ 14; Complaint ¶ 33; Berkley Answer ¶ 33; Bawany RFA ¶¶ 55, 58).

**RESPONSE: Uncontroverted**

4

12.     Both Invoices are unsigned and addressed as follows: "Attention: LEE SNIDER,
PRESIDENT, NATIVEAERO" with a "CC:" to "ANTHONY LYONS, CHAIRMAN, BERKLEY
EQUITY, LTD. [NASSAU, BS]." (Complaint, Ex. E, H; Bawany RFA ¶¶ 55, 58).

**RESPONSE: Uncontroverted that such terms exist in Invoices 279722 and 279723 but the
Invoices and the related contract documents must be read as a whole.**

13.     Invoice 279722, sometimes referred to as the "US production deal" relates to the
DRE Health Total Defense 200 protective masks DRE agreed to manufacture and which Berkley
agreed to purchase from NativeAero under the SPA. (Complaint, Ex. E; Complaint ¶ 14; Bawany
RFA ¶ 57).

**RESPONSE: DRE controverts the legal characterization that the Invoice 279722 states that
DRE would manufacture the products since the Invoice attached as Exhibit E to the
Complaint and the incorporated Terms and Conditions (Exhibit B to the Complaint) describe
the delivery of products and do not detail that DRE would be the manufacturer or the place
of manufacture. Further, the Addendum to the SPA attached to the Complaint as Exhibit D
describes the parties to the SPA as DRE and Berkley on page 1 of the Addendum in the first
"Whereas" clause which was incorporated into the Addendum in paragraph 1 of the
Addendum.**

14.     Invoice 279723, sometimes referred to as the "China Production Contract," relates
to certain DRE Health Total Defense 200 protective masks originating in China that DRE had
agreed to order and provide to Berkley. (Complaint, Ex. H; Complaint ¶ 33; Bawany RFA ¶ 60).

**RESPONSE: Uncontroverted**

5

15.     On or about October 19, 2021, DRE and Berkley executed a document titled "Addendum to Sale and Purchase Contract Package Structure Agreement" (the "Addendum"). (Complaint, Ex. D; Counterclaim ¶ 42; DRE Answer ¶ 42; Bawany RFA ¶ 80).

**RESPONSE: Uncontroverted**

16.     The "Recitals" section of the Addendum provides, in part, that "the Parties entered into that certain Sale and Purchase Contract Package Structure Agreement dated September 2, 2021, as referenced by that certain e-mail agreement dated October 8, 2021 (collectively, the 'SPA') the terms of which are further modified below."

**RESPONSE: Uncontroverted that such terms exist in the Addendum, but the Addendum and the related contract documents must be read as a whole.**

17.     Section 2(a)(i) of the Addendum provides:

On or before October 22, 2021 (the "Payment Date"), Producer [DRE] shall wire Buyer [Berkley], in immediately available funds, to the escrow account designated by Buyer, the amount of One Million Five Hundred Thousand and 00/100 ($1,500,000.00) Dollars (the "Payment") in consideration for the additional 10MM masks waiting to arrive in the port of Los Angeles that Producer is repurchasing from Buyer. In the event the First Payment is not made on or before the Payment Date, as liquidated damages, Producer shall pay to Buyer the amount of One Hundred Fifty Thousand and 00/100 ($150,000.00) Dollars per day for every day that the Payment is not made following the Payment Date, until the Payment is received by Buyer. Any damages are contingent upon Buyer's continued full performance under the SPA.

(Complaint, Ex. D).

**RESPONSE: Uncontroverted that such terms exist in the Addendum, but the Addendum and the related contract documents must be read as a whole.**

18.     Section 3(a) of the Addendum provides: "Except as herein amended, the SPA is hereby ratified and confirmed and shall continue in full force and effect, and all of the terms, covenants and conditions contained in the SPA shall remain in full force and effect." (Complaint, Ex. D).

6

**RESPONSE: Uncontroverted that such terms exist in the Addendum, but the Addendum and the related contract documents must be read as a whole.**

       **1.**     **DRE's Claims Against Berkley and Lyons and DRE's Alleged Damages**

19.     By Complaint dated January 18, 2022, DRE commenced this action against Berkley and Lyons asserting the following claims:

    (i)     Count I – Actions for Account Stated against DRE and Lyons;

    (ii)    Count II – Breach of Contract – Boxed Production Contract against Berkley;

    (iii)   Count III – Promissory Estoppel against Berkley;

    (iv)   Count IV – Specific Performance – Boxed Production Contract against Berkley;

    (v)    Count V – Breach of Contract – China Production Contract against Berkley;

    (vi)   Count VI – Negligent Misrepresentation against Berkley and Lyons;

    (vii)   Count VII – Fraudulent Inducement against Berkley and Lyons;

    (viii)  Count VIII – Fraudulent Misrepresentation against Berkley and Lyons, and

    (ix)   Count IX – Civil Conspiracy against Berkley and Lyons.

(*See* Complaint, ¶¶ 65-165).

**RESPONSE: Uncontroverted for the purposes of this motion.**

       **a.**    **The Contract Claims**

20.     In support of its claim for "Account Stated" against both Berkley and Lyons, DRE alleges that "DRE and Defendants had various open accounts, including open accounts related to" Invoice 279722 and Invoice 279723 and that Berkley and Lyons "have repeatedly acknowledged the propriety of the accounts stated in DRE's invoices and have likewise repeatedly stated their unconditional intention to pay the same." (Complaint ¶¶ 65-83).

**RESPONSE: Uncontroverted**

21.     DRE further alleges that "Defendants are therefore foreclosed from contesting the transactions reflected in the accounts stated in DRE's Invoices" and thus seeks judgement against Berkley and Lyons for the total invoiced amount of $195,000,000.00. (Complaint ¶ 83).

**RESPONSE: Uncontroverted**

22.     In support of its Breach of Contract claim against Berkley, DRE alleges that "Berkely entered into a contract with DRE," namely, Invoice 279722, "whereby DRE agreed to sell large quantities of equipment . . . in exchange for Berkley's promise to pay for same." (Complaint ¶ 85).

**RESPONSE: Uncontroverted**

23.     DRE further alleges that it "relied on the promises of Berkley that it had a stable of [*sic*] ready and willing buyers for the medical masks who desperately wanted to purchase the masks." (Complaint ¶ 90).

**RESPONSE: DRE controverts any suggestion made by the "[*sic*]" as the allegation speaks for itself. A "stable of" is a common colloquialism used to indicate "a large number of," and is used as such.**

24.     Additionally, DRE alleges that "Berkley breached its contract with DRE by failing to pay the required amounts pursuant to the parties' agreement and by failing to fulfill Berkley's obligations pursuant to the parties' agreement." (Complaint ¶ 93).

**RESPONSE: Uncontroverted**

25.     DRE alleges that, due to Berkley's breach, DRE sustained "and continues to sustain substantial damages." (Complaint ¶ 95).

**RESPONSE: Uncontroverted**

26.     In Count III alleging a claim of promissory estoppel against Berkley only, which is asserted in the alternative to DRE's breach of contract count, DRE alleges that "Berkley made a promise to DRE that Berkley would pay for the millions of boxes of masks set forth in" Invoice 279722. (Complaint ¶ 95).

**RESPONSE: Uncontroverted**

27.     DRE alleges that it "reasonably relied on Defendants' continued reassurances that Berkley would pay for and pick up the PPE" and that "Defendants [*sic*] breached its promise by failing to pay for the products to be supplied by DRE." (Complaint ¶¶ 99-100).

**RESPONSE: Uncontroverted**

28.     DRE further alleges that, in reliance on Berkley's promise to pay for the masks, "in addition to monetary losses . . . , DRE also sustained additional damages to its reputation within the industry as a trusted supplier of PPE supplies." (Complaint ¶ 102).

**RESPONSE: Uncontroverted**

29.     In Count IV seeking specific performance against Berkley only, which is also asserted in the alternative, DRE alleges that DRE and Berkley entered into an agreement and that Berkley "breached the parties' agreement by failing to pay the required funds, refusing to pay amounts admittedly due and owing to DRE unless DRE agreed to changes to the terms of the parties' agreement, and by failing to fulfill Berkley's obligations pursuant to the parties' agreement." (Complaint ¶¶ 104-108). DRE seeks specific performance of that agreement. (Complaint ¶¶ 110-111).

**RESPONSE: Uncontroverted**

9

30.     DRE alleges that Berkley's failure to perform caused DRE to sustain damages "to its reputation in the marketplace" and in the form of "lost opportunities to provide PPE to entities with heightened needs for PPE." (Complaint ¶ 111).

**RESPONSE: Uncontroverted**

31.     In Count V alleging breach of contract against Berkley only, DRE alleges that, "[t]hough not called for by the SPA Agreement, DRE first raised with Berkley the notion of selling them the China Production, and made them an offer regarding same." (Complaint ¶ 113).

**RESPONSE:  Uncontroverted**

32.     DRE alleges that "Berkley accepted the offer via text message, agreeing to purchase the China Production for $11 Million with certain amounts offset as agreed to by the Parties" and that, in connection with such agreement, "DRE sent Berkley an Invoice no. 279723, dated September 10, 2021." *Id.* ¶ 114-15. DRE further alleges that Berkley breached Invoice 279723. (Complaint ¶ 118).

**RESPONSE:  Uncontroverted**

33.     DRE alleges that, "[i]n reliance on Berkley's agreement to purchase the China Production," it was precluded from producing more masks to be sold to other buyers.  (Complaint ¶ 117).

**RESPONSE:  Uncontroverted**

**b.     The Tort Claims**

34.     In support of Counts VI through VIII alleging negligent misrepresentation, fraudulent inducement, and fraudulent misrepresentation, DRE alleges that Berkley and Lyons made various misrepresentations to DRE relating to: (i) Berkley's intention of abiding by its agreements with DRE; (ii) Berkley's intention of making payments under its agreements with

10

DRE; and (iii) the anticipated third-party buyers secured by Berkley. (*See generally* Complaint ¶¶ 119-160).

**RESPONSE: DRE controverts that it alleges misrepresentations relating to "anticipated third-party buyers secured by Berkley," but rather alleges misrepresentations regarding Berkley having already secured third-party buyers. <u>SOAF ¶ 39</u> The remainder of ¶ 34 is uncontroverted.**

35.     For example, DRE alleges that "[d]uring the time period of September – December, 2021, the Defendants have repeatedly made statements to DRE indicating that they intended to abide by and honor both the terms of [Invoice 279722] and SPA [*sic*] and the agreement to sell the China Production." (Complaint ¶ 41).

**RESPONSE: Uncontroverted that DRE alleges the facts contained in ¶ 35; however, DRE controverts any implication that these statements and the subject matter thereof are the sole misrepresentations giving rise to DRE's Fraud Claims.**

36.     By way of further example, DRE alleges that Defendants "repeatedly advised DRE's management . . . that payment would be forthcoming for both the PPE under" Invoice 279722 and Invoice 279723. (Complaint ¶ 46).

**RESPONSE: Uncontroverted that DRE alleges the facts contained in ¶ 36; however, DRE controverts any implication that these statements and the subject matter thereof are the sole misrepresentations giving rise to DRE's Fraud Claims.**

37.     Additionally, DRE alleges that "Defendants at all times informed DRE that both contracts . . . remained in place and that Defendants intended to honor them, repeatedly informing DRE that payment would be sent." (Complaint ¶ 49; *see also id.* ¶¶ 50-59, 62-63).  DRE alleges

11

payment was never sent and promises to pay were false. (Complaint ¶¶ 123, 127, 131, 138, 139, 142, 146, 156).

**RESPONSE: Uncontroverted that DRE alleges the facts contained in ¶ 37; however, DRE controverts any implication that these statements and the subject matter thereof are the sole misrepresentations giving rise to DRE's Fraud Claims.**

38.     In connection with its negligent misrepresentation and fraudulent inducement claims, DRE alleges that "Defendants made repeated representations to DRE that they intended to honor" Invoice 279722 and Invoice 279723 and "continued informing DRE that they had buyers lined up and that DRE should continue working toward meeting the production requirements each [*sic*] contract." (Complaint ¶¶ 120, 135).

**RESPONSE: It is uncontroverted that in reliance on Berkley's representations regarding its intent to uphold both invoices between the parties, DRE continued working toward meeting the production requirements in each contract.**

39.     DRE alleges that, in relying on Berkley's representation to uphold the parties' agreement, DRE held the China Production masks for Berkley, thereby losing the opportunity to sell those masks elsewhere. (Complaint ¶¶ 125, 140).

**RESPONSE: It is uncontroverted that in reliance on Berkley's representations regarding its intent to uphold both agreements between the parties, DRE held the China Production masks for Berkley, thereby losing the opportunity to sell those masks elsewhere.**

40.     DRE further alleges that Defendants never informed DRE that it viewed Invoice 279722 as terminated or no longer binding, and that Defendants repeatedly represented that they intended to follow through on Invoice 279723. (Complaint ¶¶ 121, 124, 136, 139).

**RESPONSE: Uncontroverted that DRE alleges the facts contained in ¶ 40; however, DRE controverts any implication that these statements and the subject matter thereof are the sole misrepresentations giving rise to DRE's Fraud Claims.**

41.     DRE alleges that "[t]he statements, promises and representations made by Defendants . . . were a misrepresentation of the truth designed to induce Plaintiff's agreement to the Addendum and designed to buy time so Defendants could try to find buyers that they falsely claimed they already had in place." (Complaint ¶¶ 128, 143). DRE alleges that all such representations were in fact false. (Complaint ¶¶ 123, 127, 131, 138, 142, 146).

**RESPONSE: Uncontroverted**

42.     In connection with its fraudulent misrepresentation claim, DRE similarly alleges "Defendants repeatedly misrepresented to Plaintiff: a. that Defendants would be ready to buy and pick up the PPE under [Invoice 279722] on a weekly basis and that they had customers locked down. b. that payment was imminent and would be forthcoming." (Complaint ¶ 153). DRE further alleges that such representations were false. (Complaint ¶¶ 154, 156).

**RESPONSE: Uncontroverted**

43.     DRE alleges that, as a result of these "false" representations, it undertook "the detrimental actions aforementioned" and "has sustained and incurred direct and proximate harm and damages." (Complaint ¶¶ 159-160). Finally, in connection with its civil conspiracy claim, DRE alleges that "Defendants conspired together to defraud Plaintiff." (Complaint ¶ 162). This allegedly caused DRE to sustain "substantial damages." (Complaint ¶ 165).

**RESPONSE: Uncontroverted**

44.     DRE alleges that "[t]he Defendants as co-conspirators committed one or more acts in furtherance of the conspiracy, including the causing or inducing a breach of contract or business

13

expectancy of Plaintiff, and/or to injure or destroy the trade and business of Plaintiff." (Complaint ¶ 164).

**RESPONSE: Uncontroverted**

        **c.**      **DRE's Alleged "Damages"**

45.      In the "Facts Common to All Counts" section of its Complaint, DRE alleges that it sustained "continued" and "substantial" damages by relying on Defendants' "contractual obligations," including "massive storage fees, equipment costs, payroll costs, consultant costs, and borrowing costs," as well as damages associated with two separate lawsuits filed by non-parties against DRE and Bawany. (Complaint ¶¶ 60, 64).

**RESPONSE: The complaint is a document that speaks for itself; to the extent any paraphrased quotations differ from the complaint as a whole, DRE controverts them.**

46.      Each count of the Complaint "incorporates the averments made" in the preceding paragraphs "as if the same were fully stated [therein]." (Complaint ¶¶ 65, 84, 96, 103, 112, 119, 134, 151, 161).

**RESPONSE: Uncontroverted that each count of the Complaint includes the quoted text; however, DRE controverts any legal conclusion implied in ¶ 46.**

47.      In sum, in connection with its contractual causes of action, DRE alleges that, due to Berkley's alleged breaches, DRE sustained "substantial damages" (*see* Complaint ¶¶ 95, 109, 118), including damages to its reputation (*see id.* ¶¶ 102, 111) and lost opportunities (*see id* ¶¶ 111, 117).

**RESPONSE: Uncontroverted**

48.      In connection with its fraudulent inducement and misrepresentation claims, DRE alleges that, in relying on Berkley's and Lyons' representations that Berkley would uphold the agreement, which DRE alleges was a tortious act, DRE sustained harm and damages (*see* Complaint

14

¶¶ 113, 133, 150, 160; *see also* ¶ 165), lost opportunities (*see id.* ¶¶ 125, 140), and costs to meet the obligations under the agreement (*see id.* ¶¶ 122, 130, 145, 155).

**RESPONSE: DRE controverts that the scope of Berkley's and Lyons' representations was limited to whether "Berkley would uphold the agreement;" specifically, Berkley and Lyons made false representations to DRE prior to the contract and throughout the relevant period regarding then-existing agreements with end-buyers of PPE upon which DRE relied. Defendants' assertions regarding then-existing agreements with end-buyers of PPE were the principal reason DRE ultimately entered into the agreement. SOAF ¶¶ 2-7.**

49. In its initial disclosures, DRE identifies its damages as follows: "DRE asserts that its damages are set forth in its detailed Complaint, which include those resulting from breaches from the obligations of the invoices, DRE's terms and conditions, and the Purchase Order dated September 2, 2021 and Addendum, as well as attorney fees and costs of suit." (Plaintiff DRE Health Corporation's and Counterclaim Defendant A.I. Bawany's Rule 26(a)(1) Initial Disclosures ("Initial Disclosures"), p. 4.)

**RESPONSE: Uncontroverted**

## III. DRE's STATEMENT OF ADDITIONAL UNCONTROVERTED MATERIAL FACTS

1. Defendants Berkley and Lyons allege that DRE's performance under the contract "resulted in lost opportunities with Berkley's end-users." (Berkley Equity Limited's and Anthony Lyons' Amended Answer ("Combined Answer") ¶¶ 44, 120, 135 [ECF No. 49]).

2. Prior to the execution of the SPA on September 2, 2021, Defendants by and through Max Dobi and Anthony Lyons, verbally assured DRE's Isaac Bawany that they secured sufficient End Buyers for the massive amounts of PPE to be supplied under the SPA. Affidavit of Ahmed "Isaac" Bawany ("Bawany Affidavit")("Bawany Affidavit is attached as Exhibit A) ¶¶ 4, 8-9.

15

3.    Prior to the execution of the SPA, Defendants through Max Dobi and Anthony Lyons told Isaac Bawany that Berkley or its agents had money from End Buyers already in escrow accounts. Exhibit A, Bawany Affidavit ¶¶ 5, 10.

4.    Specifically, in a meeting in Miami on September 2, 2021, Max Dobi gave his phone to DRE's Isaac Bawany, saying that Defendant Lyons wanted to speak with Bawany. Exhibit A, Bawany Affidavit ¶ 6.

5.    During Bawany's conversation with Defendant Lyons, and subsequently with Max Dobi on the same date, Defendants claimed to have end buyers lined up and monies in escrow, giving as an example Baptist Health, who Dobi and Lyons said they had existing agreements with End Buyers of PPE with monies in escrow. Exhibit A, Bawany Affidavit ¶¶ 7-10.

6.    DRE's Bawany googled Baptist Health at the meeting and was excited upon seeing that Baptist Health was a major healthcare provider. Exhibit A, Bawany Affidavit ¶¶ 11-12.

7.    DRE would not have entered into an agreement with Defendants were it not for those representations and assurances that Defendants already had End-Users, including Baptist Health. Exhibit A, Bawany Affidavit ¶¶ 7, 12-14, 17, 29.

8.    In discovery, Defendants produced no agreements with Baptist Health and produced only a few documents where Baptist Health is even referenced. Affidavit of G. Edgar James ("James Affidavit")("James Affidavit is attached as Exhibit B) ¶¶ 6-8.

9.    DRE served a subpoena upon Baptist Health for documents related to the agreements alleged by Defendants. Exhibit B, James Affidavit ¶¶ 2-3.

10.    Baptist Health advised they had no documents responsive to DRE's subpoena. Exhibit B, James Affidavit ¶¶ 4-5.

16

11. After the execution of the SPA but before the issuance of the Addendum or the Invoices, Defendants by and through Max Dobi and Anthony Lyons, again verbally assured DRE's Isaac Bawany that Defendants had secured sufficient End-Buyers for the large amounts of PPE to be supplied under the SPA. Exhibit A, Bawany Affidavit ¶¶ 18, 20.

12. After the execution of the SPA but before the issuance of the Addendum or the Invoices, Defendants by and through Max Dobi and Anthony Lyons, verbally assured DRE's Isaac Bawany that Berkley or its agents had money from End Buyers already in escrow accounts. Exhibit A, Bawany Affidavit ¶ 19, 20.

13. DRE would have exercised its contractual right to terminate under the Invoices and mitigate its losses had Defendants not made continuing representations about the End-Buyers. Exhibit A, Bawany Affidavit ¶¶ 24-27.

14. In support of its counterclaim, Berkley alleges that DRE's actions "resulted in numerous end-users canceling their agreements with Berkley." (Berkley's Amended Counterclaim and Third-Party Complaint ("Berkley Counterclaim") ¶ 50 [ECF No. 49])

15. Anthony Lyons represented to DRE's Isaac Bawany that the funds forming the initial deposit of $3,000,000.00 wired to DRE on September 3, 2021 came from Lyons' personal bank account. Berkley Counterclaim ¶ 34; Exhibit A, Bawany Affidavit ¶ 30-31.

16. On or about October 27, 2021, DRE deposited $1,000,000 into escrow with Sunnyside Title Agency. Exhibit B, James Affidavit ¶ 10.

17. On October 28, 2021, Sunnyside Title Agency wired $500,000.00 of these funds to an account held by Anthony Lyons. Exhibit B, James Affidavit ¶ 11.

18. On October 28, 2021, Sunnyside Title Agency wired $500,000.00 of these funds to an account held by NVIE Media, LLC. Exhibit B, James Affidavit ¶ 12.

17

19.     On September 28, 2021, in response to Isaac Bawany's request that he needed assurance of funds or proof of monies in escrow, Max Dobi, as agent of Defendants, sent Bawany a screenshot of a bank account balance in the amount of $1,916,751,863.78. Exhibit A, Bawany Affidavit ¶ 33.

20.     Defendants Berkley and Lyons were considering entering a business relationship with DRE before September 2021. Berkley Equity Limited's and Anthony Lyons' Responses to DRE Health Corporation's First Request for Admissions ("Berkley and Lyons' RFA" attached as Exhibit C) ¶ 4.

21.     Max Dobi communicated and negotiated on behalf of Defendant Berkley and Defendant Lyons during the Relevant Period. Exhibit C, Berkley and Lyons' RFA ¶ 23, 26, 27.

22.     Defendant Berkley (by and through Anthony Lyons) informed DRE that DRE should interact directly with Max Dobi. Exhibit C, Berkley and Lyons' RFA ¶ 30. Exhibit A, Bawany Affidavit ¶ 35.

23.     Max Dobi attended the 2021 Florida International Medical Expo (FIME) conference in Miami, Florida, for the purposes of, among other things, meeting DRE. Exhibit C, Berkley and Lyons' RFA ¶ 6.

24.     On September 2, 2021, Defendant Lyons received from Max Dobi a partially executed copy of the SPA. Exhibit C, Berkley and Lyons' RFA ¶ 33.

25.     On September 2, 2021, Defendant Lyons signed DRE's New Customer Application. Berkley Equity Limited's and Anthony Lyons' Answer ("Berkley and Lyons' Answer") ¶ 4(b); Doc. 1-2.

26.     On DRE's New Customer Application, Defendant Lyons represented that the customer had 20 years in business. Berkley and Lyons' Answer ¶ 4(b); Doc. 1-2.

18

27.     Berkley Equity Limited was incorporated on November 28, 2017. Exhibit C, Berkley and Lyons' RFA ¶ 32.

28.     Defendant Lyons was Berkley's Chairman during the Relevant Period and is presently Berkley's Chairman. Exhibit C, Berkley and Lyons' RFA ¶¶ 11, 12.

29.     Defendant Lyons was the sole owner of Berkley during the Relevant Period and is presently the sole owner of Berkley. Exhibit C, Berkley and Lyons' RFA ¶¶ 13, 14.

30.     Defendant Lyons was involved in Berkley's day-to-day operations during the Relevant Period and remains so at present. Exhibit C, Berkley and Lyons' RFA ¶¶ 15, 16.

31.     On September 2, 2021, Defendant Lyons executed the SPA. Exhibit C, Berkley and Lyons' RFA ¶ 35; Berkley and Lyons' Answer ¶ 7.

32.     The SPA executed by Lyons incorporates DRE Health's New Customer Application. Exhibit C, Berkley and Lyons' RFA ¶ 38; Berkley and Lyons' Answer ¶ 7; Complaint Exhibit C (Doc. 1-4).

33.     The SPA executed by Lyons incorporates DRE's Terms and Conditions. Exhibit C, Berkley and Lyons' RFA ¶ 39; Berkley and Lyons' Answer ¶ 7; Complaint Exhibit C (Doc. 1-4).

34.     Defendants never rejected DRE's Terms and Conditions during the Relevant Period. Exhibit C, Berkley and Lyons' RFA ¶ 40; Exhibit A, Bawany Affidavit ¶ 22.

35.     Article 17 of DRE's Terms and Conditions state that:

"[I]n the event that there is serious doubt as to the Customer being able to fulfil his contractual obligations towards the Company . . . the Company shall have the right, without notice of default or judicial intervention, either to suspend the performance or execution of the agreement for a maximum of three (3) months, or to partially or wholly dissolve the agreement, such without being liable to any compensation or guarantee, and without prejudice to any of its other rights."

Exhibit C, Berkley and Lyons' RFA ¶ 48.

19

36.     The SPA does not specify a location for the manufacture of the Product. Exhibit C, Berkley and Lyons' RFA ¶¶ 35, 36.

37.     The SPA makes no reference to End Buyers of the Product. Exhibit C, Berkley and Lyons' RFA ¶ 51.

38.     The SPA does not reference any obligations of DRE Health in regard to any End Buyers of the Product. Exhibit C, Berkley and Lyons' RFA ¶ 35, 36.

39.     Under the SPA, Berkley's failure to secure End Buyers does not excuse Berkley's refusal to pick up product. Exhibit C, Berkley and Lyons' RFA ¶ 35, 36.

40.     After DRE informed Defendants that the Products were ready for pickup, Defendants retained an inspector, Donavin Heard, to inspect the Products. Exhibit C, Berkley and Lyons' RFA ¶ 88.

41.     Defendants' inspector Donavin Heard inspected the Products on December 7, 2021. Exhibit C, Berkley and Lyons' RFA ¶ 89.

42.     Donavin Heard produced "Inspector Notes" pursuant to his December 7, 2021 inspection of the Products. Exhibit C, Berkley and Lyons' RFA ¶ 92-97.

43.     Matthew Ortolani communicated and/or negotiated on behalf of Defendant Berkley during the Relevant Period. Exhibit C, Berkley and Lyons' RFA ¶¶ 20-22.

44.     Although the SPA lists Defendant Berkley as "Buyer," Defendants intended for End Buyers to pay for the Product. Exhibit C, Berkley and Lyons' RFA ¶ 110.

45.     In December 2021, Matthew Ortolani, Max Dobi, and/or others who communicated and negotiated on behalf of Defendant Berkley were still attempting to secure End Buyers, sending Donavin Heard's "Inspector Notes" to numerous prospective customers, including: Greg Caglione at ICON International Inc., Michelle at World Hero Foundation, Virgil at

Pitbullmortgage@yahoo.com, Consortium-6 LLC, ddabbs@anm-us.com. Exhibit C, Berkley and Lyons' RFA ¶¶ 95-97, 100, 101, 103.

46.     In December 2021, Matthew Ortolani and/or others who communicated and negotiated on behalf of Defendant Berkley represented to prospective End Buyers that Berkley and its team were the owners of the Products. Exhibit C, Berkley and Lyons' RFA ¶¶ 99.

47.     Defendants made statements to DRE suggesting that Defendants had End Buyers lined up to pay for the Products under the SPA. Exhibit C, Berkley and Lyons' RFA ¶ 123; Exhibit A, Bawany Affidavit ¶¶ 4-5, 8-10, 18-19, 24-26, 36.

48.     Defendants were soliciting contracts for End Buyers after the execution of the SPA and Addendum. Exhibit C, Berkley and Lyons' RFA ¶ 95-97, 100, 101, 103; Exhibit A, Bawany Affidavit ¶ 38.

49.     Certain of Defendants' prospective End Buyers refused to purchase the Product without certificates for the Product. Exhibit C, Berkley and Lyons' RFA ¶ 114.

50.     DRE Health was under no obligation to provide certificates for the product. Exhibit C, Berkley and Lyons' RFA ¶ 49.

51.     Defendant Lyons and Defendant Berkley's agent Max Dobi told Isaac Bawany that Berkley or its agents had money from End Buyers in escrow accounts. Exhibit A, Bawany Affidavit ¶¶ 5, 8, 10, 13, 19, 26.

52.     Defendants continue to aver that they had no issues in being able to fulfill their contractual obligations. Exhibit C, Berkley and Lyons' RFA ¶ 125.

## IV.     STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment should not be granted unless the moving party presents evidence demonstrating the absence of a genuine issue of material fact for trial and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548,

21

91 L. Ed. 2d (1986). "In reviewing a summary judgment motion, the Court must scrutinize evidence in the light most favorable to the nonmoving party, affording to the nonmoving party the benefit of every factual inference and resolving any doubts as to the existence of any material fact against the moving party." *Lee v. Southwestern Bell Tel. Co.*, No. 6:15-CV-03428-BCW, 2017 U.S. Dist. LEXIS 221516, *5-6 (W.D. Mo. Feb. 10, 2017)(citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S. Ct. 1598, 26 L. Ed. 142 (1970)).

Summary judgment is particularly stringent with regard to fraud claims because those claims involve the "somewhat closely drawn distinctions between claims for fraud arising out of inducement to contract versus performance of that contract." *Superior Edge, Inc. v. Monsanto Co.*, 44 F. Supp. 3d 890, 907 (D. Ct. Minn. 2014). With regard to the economic loss doctrine defense raised by Defendants, "Parsing which misrepresentations will fail under the doctrine of economic loss is a task best undertaken after discovery." *Web Innovations & Tech. Servs. v. Bridges to Digital Excellence, Inc.*, 69 F. Supp. 3d 928, 934 (E.D. Mo. 2014).

## V.     DRE'S REPLY TO BERKLEY AND LYON'S LEGAL ARGUMENT

### 1.     Genuine Issues of Material Facts Exist to Preclude Summary Judgment.

Despite Defendants' assertion to the contrary, a dense thicket of material facts remains to be traversed. Prior to the contracts, Defendants Berkley and Lyons misrepresented to DRE that Berkley had agreements with numerous end-users for the masks DRE was to supply and that monies were in escrow. SOAF ¶¶ 2-5, 47, 52. On September 2nd, 2021, Lyons and Berkley representative Max Dobi advised DRE's Isaac Bawany that customers were lined up and they had monies in escrow. SOAF ¶¶ 2-5. Dobi and Lyons went so far as to identify Baptist Health as an end-buyer under an agreement for PPE and with monies in escrow. SOAF ¶¶ 5, 7. These representations were the bedrock upon which DRE's trust was constructed; in reliance on the same, Mr. Bawany signed the SPA that day. SOAF ¶ 6, 7. Throughout the events at issue in this lawsuit,

Defendants Berkley and Lyons continually reasserted these claims of end-buyers, and in fact they revisit them in their combined answer and in Berkley's counterclaim. SOAF ¶¶ 1-5, 11-12, 14, 47, 52.

Discovery has revealed that such representations were false. No agreements with Baptist exist in the documents produced by Berkley. SOAF ¶ 8. In the documents produced by Berkley there is not even a single email proposal or correspondence with Baptist. SOAF ¶ 8. Further, when Baptist Heath received a subpoena for documents or communications relating to Berkley, its in-house lawyers advised they had no such materials. SOAF ¶¶ 9-10. Additionally, based upon the failure of Defendants to pick up PPE when it had been inspected and cleared by their inspector, and the failure of Defendants to produce such agreements in discovery, and based upon at least one purported End-Buyer (Baptist Health) a jury could infer these agreements never existed and at a minimum did not exist to support the quantity of materials ordered by the contract documents. SOAF ¶¶ 8-10, 45-46, 48-49. These misrepresentations, which convinced DRE of Berkley's ability to perform under the contract, induced DRE to enter a contract it would have avoided entirely had it known the underlying truth – that Berkley's cupboard was bare. SOAF ¶¶ 7, 11-12.

Courts have found that the "somewhat closely drawn distinctions between claims for fraud arising out of inducement to contract versus performance of that contract" render summary judgment on such claims inappropriate. *Superior Edge, Inc. v. Monsanto Co.*, 44 F. Supp. 3d 890, 907 (D. Ct. Minn. 2014)(citing *Carlone v. The Lion & The Bull Films, Inc.*, 861 F. Supp. 2d 312, 326 (S.D.N.Y. 2012)(finding that summary judgment on fraudulent inducement claims was inappropriate)). Similarly, "[p]arsing which misrepresentations will fail under the doctrine of economic loss is a task best undertaken after discovery." *Web Innovations & Tech. Servs. v.*

*Bridges to Digital Excellence, Inc.*, 69 F. Supp. 3d 928, 934 (E.D. Mo. 2014). Consequently, summary judgment on DRE's tort claims would be improper and premature.

Here, there are facts indicating that Defendants Lyons and Berkley made misrepresentations concerning Berkley's ability to perform to lure DRE into a contract it never would have signed had the truth been revealed. SOAF ¶¶ 2-8, 42, 46. Even if this Court were to find that some of the Defendants' lies centered on their intent to perform, at least some of DRE's allegations are facially independent of the Agreements and support a viable claim for fraudulent inducement, thus summary judgment at this stage would be inappropriate. *See Spring Lake Pork v. Great Plains Mgmt.*, No. 2:19 CV 18 CDP, 2020 U.S. Dist. LEXIS 114438 at *9 (E.D. Mo. June 30, 2020). Furthermore, even if this Court were to find that DRE did not suffer additional damages outside the contract as the result of Defendants' fraud, "failure to identify special damages alone is not dispositive at this stage." *Spring Lake Pork* at *8 (citing *Web Innovations & Tech. Servs., Inc. v. Bridges to Digital Excellence, Inc.*, 69 F. Supp. 3d 928, 933 (E.D. Mo. 2014)).

### 2. The Economic Loss Doctrine does not bar DRE's Tort Claims Against Berkley and Lyons.

There are numerous exceptions to the economic loss doctrine's general bar on tort claims arising from contractual disputes. Notably, DRE's claims for fraudulent misrepresentation (Count VIII), fraudulent inducement (Count VII), and negligent misrepresentation (Count VI) – collectively referred to as the "Fraud Claims" – align with well-established exceptions to the economic loss doctrine, thereby safeguarding them against summary judgment.

Under Missouri's economic loss doctrine, a party may not "recover in tort for economic losses that are contractual in nature." *Autry Morlan Chevrolet Cadillac, Inc. v. RJF Agencies, Inc.*, 332 S.W.3d 184, 192 (Mo. Ct. App 2010). Despite this general language of prohibition, "Missouri courts have never extended the economic loss doctrine beyond [its] traditional moorings as

24

policing the boundaries between warranty and negligence." *Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 774 (8th Cir. 2020); *See also, Marvin Lumber & Cedar Co. v. Ppg Indus.*, 223 F.3d 873, 884 (8th Cir. 2000). "[M]ost courts have allowed tort claims to go forward where they are based upon a misrepresentation that was outside of or collateral to the contract, such as many claims of fraudulent inducement." *Hardwood Lumber, Inc. v. Brewco Inc.*, No. 3:18-05088-CV-RK, 2020 U.S. Dist. LEXIS 109110 at *5 (W.D. Mo. June 22, 2020)(citing *Superior Edge* at 903); *see also, Anderson v. Ford Motor Co.*, No. 17-3244-CV-S-BP, 2017 U.S. Dist. LEXIS 213132, at *11 (W.D. Mo. Dec. 29, 2017)("Claims that a plaintiff was fraudulently induced to enter the contract are widely interpreted to present an exception to the economic loss doctrine)(citing *AKA Distrib. Co. v. Whirlpool Corp.*, 137 F.3d 1083, 1086 (8th Cir. 1998)). The Fraud Claims at issue in the present case are independent of the contracts, thus are precisely the types of claims courts have allowed to go forward.

> ### 3. DRE's Fraud Claims Include Claims Arising from Alleged Misrepresentations That are Outside of and Collateral to Parties' Contractual Agreements.

In determining whether fraud claims are independent of a contract, Courts have looked to two factors:

> 1) Whether the subject matter of the alleged misrepresentations was incorporated into the parties' contract; <u>and</u>
> 2) Whether the plaintiff suffered additional damages outside the contract as a result of the alleged fraud.

*Superior Edge* at 904 (quoting *Compass Bank v. Eager Rd. Assocs., LLC*, 922 F. Supp. 2d 818, 827 (E.D. Mo. 2013))(the "*Compass* factors"). Courts in this jurisdiction have applied the economic loss doctrine to bar fraud claims where the claims have failed both *Compass* factors. *See e.g. Hardwood Lumber* at *6 (finding plaintiff's claims, which centered around the quality or character of goods sold and failed to allege separate damages, were not independent of contract).

25

However, where claims satisfy even one factor, they are deemed valid. *Web Innovations* at 933 (finding claims were outside the contract despite no allegation of additional damages); *Hill v. Bank of Am.*, 2016 U.S. Dist. 150871, at *21 (E.D. Mo. 2016) (although dispute was contractual in nature, because "plaintiffs pleaded a claim for damages beyond that of just pecuniary damages . . . the economic loss doctrine [did] not apply."). Defendants seem to misconstrue this nuanced evaluation, suggesting that even a single unmet *Compass* factor would warrant summary judgment on DRE's Fraud Claims – a perspective unsupported by case law. Here, DRE's Fraud Claims satisfy both *Compass* factors because the subject matter of the Defendants' misrepresentations was not incorporated into the contract, and DRE suffered additional damages outside the contract.

Courts carefully distinguish between misrepresentations regarding a party's *intent* to perform and those regarding a party's *ability* to perform, the latter of which go to the inducement of the contract rather than the performance of its terms. *Superior Edge* at 905. Misrepresentations regarding a party's ability to perform under the contract do not implicate the economic loss doctrine. *Id.* "It is not enough to warrant dismissal on the basis of the economic loss doctrine for the subject matter of the misrepresentation to merely be referenced in the parties' contract." *Superior Edge* at 904. "Rather than looking generally to whether the subject matter of the alleged misrepresentations and the at-issue contract are the same, most courts have focused more precisely on whether a contract term conflicts with or contains the alleged misrepresentation." *Id.*

Here, the subject matter of Defendants' misrepresentations – the existence of agreements between Defendants and end-buyers of DRE's masks and monies in escrow from such end-buyers – does not appear in the four corners of the SPA or the Addendum or the Invoices. SOAF ¶ 2-5, 32-34, 44, 46, 47-48. Prior to entering into the contract, Defendants Berkley and Lyons represented to DRE that Berkley had secured end buyers for the Products, going so far as to claim they had

26

moneys in escrow. SOAF ¶¶ 2-5. Put differently, Defendants falsely represented to DRE that Defendants had the ability to perform their obligations so as to induce DRE to enter into a contract that it would not have otherwise agreed to had it not been for those representations. SOAF ¶ 7. Defendants continued these representations and assurances after the execution of the SPA but prior to the execution of the Addendum. SOAF ¶¶ 11-12. Defendant Lyons made further such misrepresentations at times when DRE's performance under the contract was excused by Defendants' breach in an attempt to persuade DRE to continue to perform under the agreement. SOAF ¶ 11-13, 32-35, 47. These statements were in fact false, as Berkley's agents were still trying to secure end buyers well into December, 2021. SOAF ¶¶ 21, 43, 45-46, 48. Although material to DRE's decisions to enter into a contract with Defendants and to refrain from dissolving the agreement when dissolution was warranted, the existence or non-existence of these end-buyer agreements is not mentioned in the contract documents. SOAF ¶ 7, 13, 32-34, 37-39. The SPA mentions that Defendants are "able to purchase the Products," but the Defendants themselves classify the subject matter of the misrepresentations at issue as "the availability of buyers" rather than Defendants' ability to purchase the products. (Doc. 70). As in *Web Innovations*, the "misrepresentations alleged go to [Defendants'] ability to perform its obligations under the contract, but the subjects of at least some of the misrepresentations, including the quantity of [Defendants' end-buyers], are not contractual terms." *Web Innovations* at 933. Such passing mention is, as a matter of law, insufficient to invoke the economic loss doctrine.

Additionally, DRE suffered damages outside the contract – as a matter of law, DRE's damages do not flow directly and exclusively from the alleged breaches of contract. Many courts have found that claims of Fraudulent Inducement are necessarily outside of the contract, thus any damages arising therefrom are also outside the contract. *See Marvin Lumber*, at 885. In another

27

case from a federal court in Minnesota, a court applying Missouri law found that the subject matter of the Defendant's alleged misrepresentations was incorporated into the parties' contract, thus failing to satisfy the first Compass factor. *Future Proof Brands, LLC v. BevSource, Inc.*, 2021 U.S. Dist. LEXIS 232888, 2021 WL 5771201 (D. Minn. 2021), at *13. However, because the Plaintiff's negligent misrepresentation claim alleged that, but for the Defendant's misrepresentations concerning its ability to perform under the contract Plaintiff would not have entered into a contract with the Defendant, the court held that the Plaintiff damages were "outside the contract," thus satisfying the second Compass factor, and allowed the claims to go forward. *Id*. Here, DRE would never have contracted with Berkley in the first place had it known the truth underlying Berkley's misrepresentations about existing agreements with end-buyers. SOAF ¶ 7. Following the holding in *Future Proof Brands*, the damages suffered by DRE are, as a matter of law, outside of the contract.

Defendants' Motion for Summary Judgment takes great pains to highlight the similarities between the allegations supporting DRE's Fraud and Contract Claims, arguing that the "'mirror image' facts asserted in the same suit" require a finding that DRE's Fraud Claims are not viable. This assertion has no basis in law. "Missouri law is clear that a single act can constitute both a breach of contract and a tort without the tort being barred by the economic loss doctrine." *Vogt v. State Farm Life Ins. Co.*, No. 2:16-cv-04170-NKL, 2017 U.S. Dist. LEXIS 63309, at *6 (W.D. Mo. Apr. 26, 2017); *See also*, *Autry Morlan* at 192 ("[T]he complained of act or omission which breaches the contract may also be a negligent act which would give rise to liability in tort.")(Citing *American Mortgage Inv. Co. v. Hardin-Stockton Corp.*, 671 S.W.2d 283, 293 (Mo. App. W.D. 1984)); *Carpenter v. Chrysler Corp.*, 853 S.W.2d 346, 359 (Mo. Ct. App. 1993)("The same evidence deemed sufficient to establish a material representation of fact to support [Plaintiff's]

28

claim for breach of express warranty also supports their claim for fraudulent misrepresentation."); *Mo. Ozarks Radio v. Baugh*, 598 S.W.3d 154, 162 (Mo. App. 2020) ("If the act, independent of the contract, would result in tort liability, it would continue to do so even in the presence of a contract.")(citing *Chrysler Fin. Co., LLC. v. Flynn*, 88 S.W.3d 142, 151 (Mo. App. 2002)). Defendant's arguments in favor of this meritless proposition of law are equally flawed.

In support thereof, Defendants describe the holding in *Compass Bank v. Eager Rd. Assocs.* with a misleading parenthetical: "(alleged misrepresentations regarding a party's 'ability to perform obligations that become part of the parties' contract . . . are insufficient to state a claim for fraud')". 922 F. Supp. 2d 818, 827 (E.D. Mo. 2013). Defendants imply that if a party's misrepresentation goes to that party's ability to perform an obligation, and that obligation eventually becomes part of the parties' contract, such a misrepresentation is insufficient to state a claim for fraud. In *Superior Edge*, the court specifically rejected this formulation, stating that "such an interpretation would unduly restrict the types of fraudulent inducement claims that could be brought, . . . as, in order to present a fraudulent inducement claim at all, the misrepresentations must be material to the contract." *Superior Edge* at 904 (citing *Scott Salvage Yard, LLC v. Gifford*, 382 S.W.3d 134, 138 (Mo. Ct. App. 2012)).

Furthermore, Defendants' proposed reading of *Compass* mischaracterizes the reasoning in that case. In *Compass*, the misrepresentations *themselves* "correspond[ed] precisely with the terms of the contract," thus invoking the economic loss doctrine. *Compass* at 827. The test is not whether the obligations become part of the contract, but rather the much narrower test of whether "a contract term conflicts with or contains the alleged *misrepresentation*." *Superior Edge* at 904 (emphasis added); *see also*, *Web Innovations* at 933 (allowing a claim where the

misrepresentations went to defendant's "ability to perform its obligations under the contract, [but where] the subjects of at least some of the misrepresentations . . . [were] not contractual terms.")

Defendants' citation to *Curt Ogden Equip. Co. v. Murphy Leasing Co.,* 895 S.W.2d 604, 609 (Mo. Ct. App. 1995) is puzzling at best. Contrary to their assertion, *Curt Ogden* does not support the generalized rule that "a fraudulent inducement claim fails as a matter of law where the claim is based on 'identical allegations of fraudulent inducement and breach of contract.'" (Doc. 70). In *Curt Ogden*, Murphy Leasing asserted affirmative defenses of Fraudulent Inducement and Breach of Contract and counterclaims of Fraudulent Inducement and Breach of Contract, each supported by identical allegations. *Id* at 607. Notably, the *Curt Ogden* court did not invoke the economic loss doctrine at all. *Id.* Analyzing the affirmative defenses first, the court found that both failed on the grounds that the alleged misrepresentations were so minor as to be considered immaterial. *Id.* at 609. Because the counterclaims rested on the same factual allegations as the failed affirmative defenses, the court declined to analyze them, stating that, "[i]n view of our holding that those affirmative defenses failed as a matter of law, [the] counterclaims also must fail as a matter of law." *Id.* In essence, *Curt Ogden* illustrates that it is not improper for a court to consider Fraud Claims and Contract Claims concurrently, even if they are supported by identical allegations.

Simply put, Defendants do not offer any support for the bare the assertion that similarities between the allegations supporting DRE's Fraud and Contract Claims are a sufficient basis for holding that the Fraud Claims fail as a matter of law. In accord with well-settled law, the precedent Defendants cite supports the contrary proposition – that "a single act can constitute both a breach of contract and a tort without the tort being barred by the economic loss doctrine." *Vogt* at *6. Any

30

purported similarities between the allegations underlying DRE's Fraud and Contract Claims do not bar DRE's Fraud Claims.

### 4. Neither the Economic Loss Doctrine nor Any Theory of Agency Shield Defendant Lyons from Liability for his Own Tortious Conduct

There is little doubt that Lyons participated in and directed the misrepresentations of Berkley employees and agents. As previously discussed, the Fraud Claims against Berkley are not barred by the economic loss doctrine; to at least the same degree, the economic loss doctrine is inapplicable to DRE's Fraud Claims against Lyons. Defendant Lyons' attempts to escape liability under *respondeat superior* are equally unavailing, as under that doctrine "the master's liability is secondary and derivative, the servant's primary." *Maxwell v. Springfield*, 705 S.W.2d 90, 94 (Mo. App. 1986)(internal citation omitted). Moreover, "an individual is not protected from liability simply because the acts constituting the tort 'were done in the scope and course, and pertained to, the duties of his employment.'" *State ex rel. Doe Run Res. Corp. v. Neill*, 128 S.W.3d 502, 505 (Mo. 2004)(quoting *Curlee v. Donaldson,* 223 S.W. 2d 746, 754 (Mo. App. 1950)). Rather, a corporate officer can be liable "for tortious corporate conduct if he or she had 'actual or constructive knowledge of, and participated in, an actionable wrong.'" *Id.* Finally, even if this court should find that the economic loss doctrine bars DRE's claims against Defendant Berkley, a finding that there is no privity between DRE and Defendant Lyons requires a finding that the economic loss doctrine is "inapplicable here, [as] [n]o contract governs the relationship between Plaintiffs and Defendants, and the case involves fraud." *RightCHOICE Managed Care, Inc. v. Hosp. Partners, Inc.*, No. 5:18-cv-06037-DGK, 2019 U.S. Dist. LEXIS 10671, at *27 (W.D. Mo. Jan. 23, 2019).

Any agency relationship between Defendant Lyons and Defendant Berkley is insufficient to shield Lyons from liability for his own torts. Under the well-established doctrine of *respondeat*

*superior*, a master is liable "for the torts of his servant which are committed within the scope of employment." *Smith v. Goodyear Tire & Rubber Co.*, 856 F. Supp. 1347, 1350 (W.D. Mo. 1994). It is equally well-established that "[u]nder this doctrine, the master's liability is secondary and derivative, the servant's primary." *Maxwell v. Springfield*, 705 S.W.2d 90, 94 (Mo. App. 1986)(Citing *State ex rel. Shell Petroleum Corp. v. Hostetter*, 348 Mo. 841, 156 S.W.2d 673 (1941)). Consequently, *respondeat superior* provides no shelter to Lyons with respect to his own conduct.

Furthermore, Defendants' cherry-picking of *State ex rel. William Ranni Assocs., Inc. v. Hartenbach*, 742 S.W.2d 134, 140 (Mo. 1987) is misguided. The court's holding in *Ranni* turned on the fact that "the agent's only wrong is an alleged breach of duties owed to his principal." *Id*. This fact-specific holding is inapplicable here. The relevant rule is that "an agent is subject to tort liability to a third party . . . when the agent's conduct breaches a duty that the agent owes to the third party." *Murray-Kaplan v. Nec Ins., Inc.*, 617 S.W.3d 485, 496 (Mo. App. 2021)(quoting Restat. 3d of Agency, § 7.02). The proper question is whether Lyons' misrepresentations would "create liability to another person if no relationship of . . . principal and agent existed between him and someone else." *Lee v. Allen*, 120, 175 S.W.2d 172 (Mo. App. 1938). Courts have been clear that "[t]he duty not to fraudulently or negligently make factual misrepresentations to induce another person to form a contract is a duty that exists independently of any contractual obligations ultimately formed." *Pietoso, Inc. v. Republic Servs.*, No. 4:19-CV-00397-JAR, 2021 U.S. Dist. LEXIS 215480, at *17 (E.D. Mo. Nov. 8, 2021)(quoting *Elkhart Metal Fabricating, Inc. v. Martin*, No. 14-CV-705 JCH, 2014 U.S. Dist. LEXIS 89286, at *2 (E.D. Mo. July 1, 2014)).

DRE's Fraud Claims involve Defendant Lyons' independent tortious conduct, thus *Ranni* is inapplicable. As a matter of law, DRE's tort claims against Lyons reflect the breach of a duty

32

owed to DRE. On numerous occasions, Defendant Lyons verbally misrepresented to DRE's Isaac Bawany that Defendants had secured sufficient End Buyers for the Products, in order to coax DRE into an unfavorable contract with Defendants. SOAF ¶¶ 2-7, 11-12, 40-41, 47-48. Lyons' misrepresentations would give rise to liability in tort whether or not there was a principal-agent relationship. *Pietoso* at *17. Thus, any principal-agent relationship between Berkley and Lyons does not shield Lyons from liability.

Additionally, Lyons is a principal and officer of Berkley. SOAF ¶¶ 28-30. Under longstanding precedent, "the directors or officers of a corporation are liable for their fraudulent acts and representations to persons who are injured thereby." *White v. McCoy Land Co.*, 101 S.W.2d 763, 766 (Mo. App. 1936). Simply put, corporate officers and directors are on the hook for their fraudulent actions, especially when they inflict harm on others. *Id.* This doctrine is supported by strong policy considerations. *See E.g., Doe Run* at 505 ("If the rule were otherwise, 'the agent of a corporation could shield himself from liability for almost every kind of wrong, provided he was acting in the capacity of agent. . .'") (quoting *Boyd v. Wimes*, 664 S.W. 2d 596, 598 (Mo. App. 1984)(quoting *Rauch v. Brunswig*, 155 Mo. App. 367, 137 S.W. 67, 68 (Mo. App. 1911)). As a principal and officer of Berkley, Lyons is not shielded from liability for his fraudulent acts and representations to DRE.

Defendants' argument regarding the application of the economic loss doctrine in the absence of contractual privity is contrary to Missouri law. The only Missouri case cited involves claims made by a stranger to the contract, wherein the court held the economic loss doctrine applied to those third party claims to the same extent it would apply to an original purchasing party. *OneBeacon Ins. Co. v. Deere & Co.*, 778 F. Supp. 2d 1005 (E.D. Mo. 2011) (finding that

the economic loss doctrine barred secondhand purchaser's claims to the same extent it would bar those of original purchaser).

Here, the purported stranger to the contract, Defendant Lyons, is an engaged tortfeasor. The present case is much more akin to *RightCHOICE Managed Care Partners v. Hosp. Partners, Inc.*, 2019 U.S. Dist. LEXIS 10671. In *RightCHOICE*, Plaintiff health insurance plan had a contractual relationship with Hospital, of which Defendant Byrns was President and CEO. *Id.* at *6. The court found the economic loss doctrine was inapplicable to Plaintiff's fraud claims against the principal of a contracting party, on the grounds that "[n]o contract govern[ed] the relationship between Plaintiffs and Defendants, and the case involve[d] fraud." *Id* at *27. If Lyons is as independent of the contracting parties as the Defendants argue, then under Missouri law no contract governs the relationship between DRE and Lyons. *Id.* Consequently, DRE's Fraud Claims against Lyons would not sound in contract at all, but clearly arise in tort. *Chrysler Fin. Co. v. Flynn*, 88 S.W.3d 142, 150 (Mo. App. 2002)("If the act, independent of the contract, would result in tort liability, it would continue to do so even in the presence of a contract"). Again, with respect to DRE's Fraud Claims against Defendant Lyons, "it is the act itself that serves as the basis of any tort liability, not the breach." *Id.* The amount of effort Defendants expend arguing this spurious no-privity-requirement theory should not distract from the legal fact that Lyons' ties with Berkley do not absolve him of liability for his own alleged misdeeds.

### 5.    Defendant Lyons is Liable on DRE's Account Stated Claim as an Agent for an Undisclosed Third Party

DRE's Account Stated claim against Lyons establishes a contractual relationship between DRE and Lyons. Defendant Lyons can be held liable on DRE's contract claims because Lyons entered the agreements as an agent for an undisclosed principal. "The general rule with respect to agent liability provides that one who, as an agent for another, enters into a contract with a third

34

party without disclosing his agent status, or discloses his agent status without disclosing the identity of his principal, can be held liable on the contract at the third party's election." *Unisource Worldwide, Inc. v. Barth*, 109 S.W.3d 252, 253 (Mo. App. 2003) (citing *David v. Shippy*, 684 S.W.2d 586, 587-88 (Mo. App. E.D. 1985)). "The duty is on the agent to inform the third party of the actual identity of the principal in order to avoid liability; 'it is not enough for the agent to disclose or for the third party to know the agent is acting for another.'" *Id.* (internal citation omitted).

Here, there are sufficient facts to support a jury's finding that Defendant Lyons was acting as an agent for an undisclosed third party. Half of the funds wired by DRE pursuant to the Addendum was wired directly to Lyons, while the other half was wired to NVIE Media. SOAF ¶ 16-18. At no point in time was DRE informed that Defendant Lyons was acting for the benefit of NVIE Media LLC, nor is NVIE Media LLC a party to any agreement at issue. SOF ¶¶ 17-18. This stands in apparent contradiction with Defendants' claim that Lyons only did business on behalf of Berkley. Defendants make much of the fact that DRE's complaint references "Berkley enter[ing] into a contract with DRE" (e.g., SOF ¶ 22); however, as a matter of law, it is "not enough to know the agent is acting for another." *Unisource* at 253. These findings are sufficient to support a holding that Defendant Lyons is liable on DRE's Account Stated claims and stand in contradiction to Defendants' claim that that Lyons was not party to any agreement with DRE.

### 6. DRE's Civil Conspiracy Claim Arises from an Actionable Wrong Perpetrated by a Principal and an Agent with an Independent Personal Stake in the Object of the Conspiracy

For the reasons set forth at length above, the Economic Loss Doctrine is not applicable to DRE's Fraud Claims, thus there is an actionable wrong underlying DRE's civil conspiracy claim. Additionally, Defendant Lyons has an independent personal stake in the object of the civil

conspiracy. Consequently, the argument that there can be no civil conspiracy between agent and principal is of no avail to Defendants.

"As a general rule, there can be no conspiracy between an agent and a principal." *8000 Maryland, LLC v. Huntleigh Fin. Servs., Inc.*, 292 S.W.3d 439, 452 (E.D. Mo. 2009) (citing *Mika v. Central Bank of Kansas City*, 112 S.W.3d 82, 94 (Mo. App. 2003)). Courts have carved out an exception to the general rule "when an agent has an 'independent personal stake' in achieving the object of the conspiracy." *Id.* A finding that an agent is an owner of, and financially invested in, a principal company is sufficient to sustain a holding that such an agent has an "independent personal stake." *Rucker v. US Fidelis, Inc.*, No. 4:09CV670 CDP, 2009 U.S. Dist. LEXIS 67051, at *4 (E.D. Mo. July 31, 2009). Whether an agent received a personal benefit in an exchange, giving them an independent personal stake in an alleged conspiracy is a question of fact. *Rehabcare Grp. E., Inc. v. Stratford Health Care Props., LLC*, No. 14-0886-CV-W-FJG, 2017 U.S. Dist. LEXIS 160699, at *27 (W.D. Mo. Sep. 29, 2017).

Here, Defendant Lyons received a personal benefit from the transaction, and thus has an independent personal stake in the conspiracy. Lyons is the principal owner of Berkley Equity Ltd. SOAF ¶ 29. Lyons represented to DRE's Isaac Bawany that Lyons personally funded the $3,000,000 initial deposit to DRE made September 3, 2021. SOAF ¶ 15. Additionally, of the money DRE wired to Berkley under the Addendum, $500,000 went directly into Defendant Lyons' personal bank account. SOAF ¶¶ 16-17. This direct connection between the events at issue and Lyons' personal bank account is sufficient to support a jury's finding that Lyons is independently and personally benefiting from the agreed upon course of action. Consequently, DRE's civil conspiracy claim is viable as a matter of law.

36

## VI.    CONCLUSION

For the reasons noted above, this Court should enter an order denying Defendants Berkley Equity Limited's and Anthony Lyons' motion for partial summary judgment (Doc. 69). In the alternative, and consistent with the attorney affidavit attached as Exhibit B, and pursuant to Federal Rule of Civil Procedure 56(d), DRE moves the Court defer considering the motion for partial summary judgment; or (2) allow more time for the nonmoving party to obtain additional discovery, and grant Plaintiff DRE Health Corporation all such further and additional relief as this Court deems just.

Dated: September 14, 2023.                    Respectfully submitted,

                                              **JAMES SOBBA, LLC**

                                              */s/    G. Edgar James*
                                              G. EDGAR JAMES            MO# 49585
                                              4435 Main Street, Suite 910
                                              Kansas City, Missouri 64111
                                              Telephone: (816) 623-0544
                                              ejames@jamessobba.com

                                              **ATTORNEYS FOR PLAINTIFF
                                              DRE HEALTH CORPORATION AND
                                              COUNTERCLAIM DEFENDANT
                                              ISAAC BAWANY**


## CERTIFICATE OF SERVICE

I hereby certify that on September 14, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

                                              */s/ G. Edgar James*
                                              Attorney for Plaintiff DRE Health Corporation
                                              and Counterclaim Defendant Isaac Bawany