# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI WESTERN DISTRICT

DRE HEALTH CORPORATION,

        Plaintiff,

    v.

BERKLEY EQUITY LIMITED &
ANTHONY LYONS,

        Defendants.

BERKLEY EQUITY LIMITED,

        Counterclaim-
        Plaintiffs,

    v.

DRE HEALTH CORPORATION & AHMED
"ISSAC" BAWANY,

        Counterclaim-
        Defendants.

Case No.: 4:22-cv-00031-RK

---

## BERKLEY EQUITY LIMITED AND ANTHONY LYONS' REPLY SUGGESTIONS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

---

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ..................................................................................................... 1

BERKLEY AND LYONS' RESPONSE TO DRE'S STATEMENT OF ADDITIONAL
UNCONTROVERTED MATERIAL FACTS .............................................................. 2

LEGAL ARGUMENT ............................................................................................... 13

    I.      THE PURPORTED MISREPRESENTATIONS ASSERTED BY
            DRE CORRESPOND DIRECTLY with THE TERMS OF THE
            SPA AND THUS CANNOT SERVE AS A BASIS FOR AN
            ACTIONABLE CLAIM. ................................................................... 13

    II.     CONTRARY TO DRE'S CONTENTIONS, THE ECONOMIC
            LOSS DOCTRINE APPLIES WITH EQUAL FORCE TO
            CLAIMS ASSERTED AGAINST MR. LYONS AS AN AGENT
            OF BERKLEY. ................................................................................ 16

    III.    THE EXISTENCE OF A WRITTEN AGREEMENT, IN AND OF
            ITSELF, BARS DRE's RELIANCE ON ANY PURPORTED
            MISREPRESENTATIONS THAT PREDATE THE EXECUTION
            AND DELIVERY OF THE SPA AND ADDENDUM ....................... 17

    IV.    ANY LOSSES ALLEGEDLY SUSTAINED BY DRE WERE
            SELF-INFLICTED AND NOT ATTRIBUTABLE TO ANY
            ALLEGED ACT OR OMISSION ON THE PART OF BERKLEY
            OR MR. LYONS. ............................................................................ 19

    V.     THAT DRE ALLEGES AN AGENCY RELATIONSHIP
            EXISTED BETWEEN MR. LYONS AND NVIE MEDIA LLC IS
            A RED HERRING. ......................................................................... 20

    VI.    DRE'S CIVIL CONSPIRACY CLAIM MUST BE DISMISSED,
            AS THERE IS NO ACTIONABLE UNDERLYING TORT UPON
            WHICH A CONSPIRACY CLAIM CAN BE BASED. ..................... 21

CONCLUSION ......................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ben-Yishay v. Mastercraft Dev., LLC*,
553 F. Supp. 2d 1360 (S.D. Fla. 2008) ...................................................................16

*Cafe Agave, Inc. v. Crown Valley Winery, Inc.*,
1:23-CV-32-SNLJ, 2023 WL 4623057 (E.D. Mo. July 19, 2023) .........................15

*Cioni v. Globe Specialty Metals, Inc.*,
618 Fed. Appx. 42 (3d Cir. 2015) ............................................................................16

*Compass Bank v. Eager Rd. Associates*,
LLC, 922 F. Supp. 2d 818 (E.D. Mo. 2013) .......................................................13, 14

*Lion Petroleum of Missouri, Inc. v. Millennium Super Stop, LLC*,
4:06CV0698 AGF, 2008 WL 3010789 (E.D. Mo. Aug. 1, 2008) ......................2, 18

*Estate of Miller*,
551 S.W.3d 625 (Mo. Ct. App. 2018) ......................................................................21

*OneBeacon Ins. Co. v. Deere & Co.*,
778 F. Supp. 2d 1005 (E.D. Mo. 2011) ....................................................................16

*Pietoso, Inc. v. Republic Servs., Inc.*,
4:19-CV-00397-JAR, 2021 WL 5177357 (E.D. Mo. Nov. 8, 2021) .......................17

*Prime Aid Pharmacy Corp. v. Express Scripts, Inc.*,
4:16-CV-1237, 2017 WL 2021082 (E.D. Mo. May 12, 2017) ...............................16

*RightCHOICE Managed Care, Inc. v. Hosp. Partners, Inc.*,
5:18-CV-06037-DGK, 2019 WL 302515 (W.D. Mo. Jan. 23, 2019)......................17

*Superior Edge, Inc. v. Monsanto Co.*,
44 F. Supp. 3d 890 (D. Minn. 2014) ........................................................................14

*Toghiyany v. AmeriGas Propane, Inc.*,
309 F.3d 1088 (8th Cir. 2002) ..................................................................................18

*Trademark Med., LLC v. Birchwood Labs., Inc.*,
22 F. Supp. 3d 998 (E.D. Mo. 2014)........................................................................15

*W. Blue Print Co., LLC v. Roberts*,
367 S.W.3d 7 (Mo. 2012) .........................................................................................22

# **INTRODUCTION**

DRE contends that the transaction and agreements underlying this dispute involved just two parties – DRE and Berkely. Berkely and Mr. Lyons agree completely. It was never agreed, requested, or contemplated that Anthony Lyons – Berkley's President – would assume personal responsibility for the transactions at issue. In that regard, Mr. Lyons did not deliver any guaranties, indemnities, or other personal undertakings relative to the transactions, nor was Mr. Lyons ever asked to do so. Indeed, it is now beyond dispute that Mr. Lyons has been improperly named in this lawsuit and must be dismissed immediately.

Notwithstanding DRE's acknowledgment that this dispute is between DRE and Berkely (and no one else), DRE has nevertheless pursued a shameful and frivolous litigation strategy that involves leveling unfounded accusations and claims against Mr. Lyons personally. As made clear in Berkley's initial moving papers, and as will be briefly elaborated upon below, these personal attacks on Mr. Lyons are entirely without merit. For example, DRE is pursuing "fraud" and "misrepresentation" claims against Mr. Lyons and Berkely that are entirely predicted on Berkely's contractual obligations under the SPA. Missouri's economic loss doctrine makes clear, however, that these purely contractual claims cannot be recast as fraud claims to impose liability on a non-party to the underlying contract. DRE's opposition is utterly devoid of any legal or factual basis to avoid dismissal of its fraud claims.

DRE's opposition brief also misapplies basic agency concepts, including the "undisclosed principal" doctrine to try and substantiate a baseless "Account Stated" claim against Mr. Lyons personally notwithstanding the absence of any contractual privity between Lyons and DRE (a necessary predicate to the claim). DRE fails establish even the basic elements of an account stated claim against Mr. Lyons, which must also be dismissed.

Likewise, DRE's self-serving contentions that Mr. Lyons "induced" DRE to agree to the transaction based on oral promises that DRE described as "crucial" to the deal are wholly without merit

or legitimate factual basis. It is quite telling, for example, that neither DRE nor its counsel bothered to include these "crucial" assurances in the parties' agreement. Regardless, insofar as those purported representations are ***not*** included in the parties' ***fully-integrated*** agreement, they cannot serve as a basis for DRE's misrepresentation claims. *Lion Petroleum of Missouri, Inc. v. Millennium Super Stop, LLC*, 4:06CV0698 AGF, 2008 WL 3010789, at *6 (E.D. Mo. Aug. 1, 2008) ("A party cannot allege reliance on promises made in the course of negotiations whether written or oral, true or false, if the party subsequently enters into a written agreement silent on the matter.").

Beyond the legal deficiencies underlying DRE's defective claims, the fact remains that the parties' transaction cratered not because of any act or omission of Berkley or Mr. Lyons – but rather due to the incompetence and deceptive business practices of DRE and Bawany. There exists no rational basis for DRE to advance any claims – whether based in contract or tort – against Berkley and Mr. Lyons, when it was DRE that undisputedly failed to make a single mask available to Berkley in the months following its fraudulent receipt and retention of Berkley's $3 million dollars.

Berkley and Mr. Lyons respectfully urge the Court to grant their motion for partial summary judgment and put an end to these frivolous claims against Mr. Lyons by dismissing all claims asserted against Lyons, as well as DRE's claims for Negligent Misrepresentation (Count VI), Fraudulent Inducement (Count VII), Fraudulent Misrepresentation (Count VIII), and Civil Conspiracy (Count IX) against Berkley.

## BERKLEY AND LYONS' RESPONSE TO DRE'S STATEMENT OF ADDITIONAL UNCONTROVERTED MATERIAL FACTS

1.     Defendants Berkley and Lyons allege that DRE's performance under the contract "resulted in lost opportunities with Berkley's end-users." (Berkley Equity Limited's and Anthony Lyons' Amended Answer ("Combined Answer") ¶¶ 44, 120, 135 [ECF No. 49]).

**Reply:** Immaterial to the instant motion but uncontroverted.

2

2.      Prior to the execution of the SPA on September 2, 2021, Defendants by and through Max Dobi and Anthony Lyons, verbally assured DRE's Isaac Bawany that they secured sufficient End Buyers for the massive amounts of PPE to be supplied under the SPA. Affidavit of Ahmed "Isaac" Bawany ("Bawany Affidavit") ("Bawany Affidavit is attached as Exhibit A) ¶¶ 4, 8-9.

**Reply:**  Immaterial to the instant motion but CONTROVERTED.  Berkley and Lyons dispute the allegation that Berkley, by and through Dobi and Lyons, promised a certain number of end buyers or that same was intended to form the basis for the agreements.

3.      Prior to the execution of the SPA, Defendants through Max Dobi and Anthony Lyons told Isaac Bawany that Berkley or its agents had money from End Buyers already in escrow accounts. Exhibit A, Bawany Affidavit ¶115, 10.

**Reply:**  Immaterial to the instant motion but CONTROVERTED.  Berkley and Lyons dispute DRE's characterization of Dobi and Lyon's statements and refute its suggestion that any such alleged information was intended to form the basis for the agreements.

4.      Specifically, in a meeting in Miami on September 2, 2021, Max Dobi gave his phone to DRE's Isaac Bawany, saying that Defendant Lyons wanted to speak with Bawany. Exhibit A, Bawany Affidavit ¶ 6.

**Reply:**  Immaterial to the instant motion but uncontroverted.

5.      During Bawany's conversation with Defendant Lyons, and subsequently with Max Dobi on the same date, Defendants claimed to have end buyers lined up and monies in escrow, giving as an example Baptist Health, who Dobi and Lyons said they had existing agreements with End Buyers of PPE with monies in escrow. Exhibit A, Bawany Affidavit ¶¶ 7-10.

**Reply:**  Immaterial to the instant motion but CONTROVERTED.  Berkley and Lyons dispute DRE's characterization of Dobi and Lyon's statements and refute its suggestion that any such alleged information was intended to form the basis for the agreements.

63945/0001-46145981

6.     DRE's Bawany googled Baptist Health at the meeting and was excited upon seeing that Baptist Health was a major healthcare provider. Exhibit A, Bawany Affidavit ¶¶ 11-12.

**Reply:**   Immaterial to the instant motion but uncontroverted.

7.     DRE would not have entered into an agreement with Defendants were it not for those representations and assurances that Defendants already had End-Users, including Baptist Health. Exhibit A, Bawany Affidavit ¶¶ 7, 12-14, 17, 29.

**Reply:**   Immaterial to the instant motion but CONTROVERTED.  At no time did Berkley intend for the provision of any such alleged information to form the basis of the parties' agreements.

8.     In discovery, Defendants produced no agreements with Baptist Health and produced only a few documents where Baptist Health is even referenced. Affidavit of G. Edgar James ("James Affidavit") ("James Affidavit is attached as Exhibit B) ¶¶ 6-8.

**Reply:**   Immaterial to the instant motion but uncontroverted.

9.     DRE served a subpoena upon Baptist Health for documents related to the agreements alleged by Defendants. Exhibit B, James Affidavit ¶¶ 2-3.

**Reply:**   Immaterial to the instant motion but uncontroverted.

10.     Baptist Health advised they had no documents responsive to DRE's subpoena. Exhibit B, James Affidavit ¶¶ 4-5.

**Reply:**   Immaterial to the instant motion but uncontroverted.

11.     After the execution of the SPA but before the issuance of the Addendum or the Invoices, Defendants by and through Max Dobi and Anthony Lyons, again verbally assured DRE's Isaac Bawany that Defendants had secured sufficient End-Buyers for the large amounts of PPE to be supplied under the SPA. Exhibit A, Bawany Affidavit ¶¶ 18, 20.

4

**Reply:** Immaterial to the instant motion but CONTROVERTED. Berkley and Lyons dispute DRE's characterization of Dobi and Lyon's statements and refute its suggestion that any such alleged information was intended to form the basis for the agreements.

12. After the execution of the SPA but before the issuance of the Addendum or the Invoices, Defendants by and through Max Dobi and Anthony Lyons, verbally assured DRE's Isaac Bawany that Berkley or its agents had money from End Buyers already in escrow accounts. Exhibit A, Bawany Affidavit ¶ 19, 20.

**Reply:** Immaterial to the instant motion but CONTROVERTED. Berkley and Lyons dispute DRE's characterization of Dobi and Lyon's statements and refute its suggestion that any such alleged information was intended to form the basis for the agreements.

13. DRE would have exercised its contractual right to terminate under the Invoices and mitigate its losses had Defendants not made continuing representations about the End-Buyers. Exhibit A, Bawany Affidavit ¶¶ 24-27.

**Reply:** Immaterial to the instant motion but CONTROVERTED. Berkley and Lyons dispute DRE's characterization of Defendants' representations and refute its suggestion that any such alleged information was intended to form the basis for the agreements.

14. In support of its counterclaim, Berkley alleges that DRE's actions "resulted in numerous end-users canceling their agreements with Berkley." (Berkley's Amended Counterclaim and Third-Party Complaint ("Berkley Counterclaim") ¶ 50 [ECF No. 49])

**Reply:** Immaterial to the instant motion but uncontroverted.

15. Anthony Lyons represented to DRE's Isaac Bawany that the funds forming the initial deposit of $3,000,000.00 wired to DRE on September 3, 2021 came from Lyons' personal bank account. Berkley Counterclaim ¶ 34; Exhibit A, Bawany Affidavit ¶ 30-31.

**Reply:** Immaterial to the instant motion but uncontroverted.

5

16.     On or about October 27, 2021, DRE deposited $1,000,000 into escrow with Sunnyside Title Agency. Exhibit B, James Affidavit ¶ 10.

**Reply:**   Immaterial to the instant motion but uncontroverted.

17.     On October 28, 2021, Sunnyside Title Agency wired $500,000.00 of these funds to an account held by Anthony Lyons. Exhibit B, James Affidavit ¶ 11.

**Reply:**   Immaterial to the instant motion but uncontroverted.

18.     On October 28, 2021, Sunnyside Title Agency wired $500,000.00 of these funds to an account held by NVIE Media, LLC. Exhibit B, James Affidavit ¶ 12.

**Reply:**   Immaterial to the instant motion but uncontroverted.

19.     On September 28, 2021, in response to Isaac Bawany's request that he needed assurance of funds or proof of monies in escrow, Max Dobi, as agent of Defendants, sent Bawany a screenshot of a bank account balance in the amount of $1,916,751,863.78. Exhibit A, Bawany Affidavit ¶ 33.

**Reply:**   Immaterial to the instant motion but uncontroverted.

20.     Defendants Berkley and Lyons were considering entering a business relationship with DRE before September 2021. Berkley Equity Limited's and Anthony Lyons' Responses to DRE Health Corporation's First Request for Admissions ("Berkley and Lyons' RFA" attached as Exhibit C) ¶ 4.

**Reply:**   Immaterial to the instant motion but uncontroverted.

21.     Max Dobi communicated and negotiated on behalf of Defendant Berkley and Defendant Lyons during the Relevant Period. Exhibit C, Berkley and Lyons' RFA ¶ 23, 26, 27.

**Reply:**   Immaterial to the instant motion but uncontroverted.

6

22.     Defendant Berkley (by and through Anthony Lyons) informed DRE that DRE should interact directly with Max Dobi. Exhibit C, Berkley and Lyons' RFA ¶ 30. Exhibit A, Bawany Affidavit 1135.

**Reply:**   Immaterial to the instant motion but uncontroverted.

23.     Max Dobi attended the 2021 Florida International Medical Expo (FIME) conference in Miami, Florida, for the purposes of, among other things, meeting DRE. Exhibit C, Berkley and Lyons' RFA ¶ 6.

**Reply:**   Immaterial to the instant motion but uncontroverted.

24.     On September 2, 2021, Defendant Lyons received from Max Dobi a partially executed copy of the SPA. Exhibit C, Berkley and Lyons' RFA ¶ 33.

**Reply:**   Immaterial to the instant motion but uncontroverted.

25.     On September 2, 2021, Defendant Lyons signed DRE's New Customer Application. Berkley Equity Limited's and Anthony Lyons' Answer ("Berkley and Lyons' Answer") ¶ 4(b); Doc. 1-2.

**Reply:**   Immaterial to the instant motion but uncontroverted.

26.     On DRE's New Customer Application, Defendant Lyons represented that the customer had 20 years in business. Berkley and Lyons' Answer ¶ 4(b); Doc. 1-2.

**Reply:**   Immaterial to the instant motion but CONTROVERTED.  Defendant Lyons represented on the New Customer Application that he, as principal owner of Berkley, has had twenty years in the wholesale business.

27.     Berkley Equity Limited was incorporated on November 28, 2017. Exhibit C, Berkley and Lyons' RFA ¶ 32.

**Reply:**   Immaterial to the instant motion but uncontroverted.

28.     Defendant Lyons was Berkley's Chairman during the Relevant Period and is presently Berkley's Chairman. Exhibit C, Berkley and Lyons' RFA ¶¶ 11, 12.

**Reply:** Immaterial to the instant motion but uncontroverted.

29.     Defendant Lyons was the sole owner of Berkley during the Relevant Period and is presently the sole owner of Berkley. Exhibit C, Berkley and Lyons' RFA ¶¶ 13, 14.

**Reply:** Uncontroverted.

30.     Defendant Lyons was involved in Berkley's day-to-day operations during the Relevant Period and remains so at present. Exhibit C, Berkley and Lyons' RFA ¶¶ 15, 16.

**Reply:** Uncontroverted.

31.     On September 2, 2021, Defendant Lyons executed the SPA. Exhibit C, Berkley and Lyons' RFA ¶ 35; Berkley and Lyons' Answer ¶ 7.

**Reply:** On September 2, 2021, Defendant Lyons executed the SPA in his capacity as President of Berkley. Any suggestion by DRE that Lyons signed the SPA in his individual capacity is CONTROVERTED.

32.     The SPA executed by Lyons incorporates DRE Health's New Customer Application. Exhibit C, Berkley and Lyons' RFA ¶ 38; Berkley and Lyons' Answer ¶ 7; Complaint Exhibit C (Doc. 1-4).

**Reply:** Immaterial to the instant motion but uncontroverted.

33.     The SPA executed by Lyons incorporates DRE's Terms and Conditions. Exhibit C, Berkley and Lyons' RFA ¶ 39; Berkley and Lyons' Answer ¶ 7; Complaint Exhibit C (Doc. 1-4).

**Reply:** Immaterial to the instant motion but uncontroverted.

34.     Defendants never rejected DRE's Terms and Conditions during the Relevant Period. Exhibit C, Berkley and Lyons' RFA ¶ 40; Exhibit A, Bawany Affidavit ¶ 22.

**Reply:** Immaterial to the instant motion but uncontroverted.

35.     Article 17 of DRE's Terms and Conditions state that:

"[I]n the event that there is serious doubt as to the Customer being able to fulfil his contractual obligations towards the Company . . . the Company shall have the right, without notice of default or judicial intervention, either to suspend the performance or execution of the agreement for a maximum of three (3) months, or to partially or wholly dissolve the agreement, such without being liable to any compensation or guarantee, and without prejudice to any of its other rights."

Exhibit C, Berkley and Lyons' RFA ¶ 48.

**Reply:**   Immaterial to the instant motion but uncontroverted.

36.     The SPA does not specify a location for the manufacture of the Product. Exhibit C, Berkley and Lyons' RFA ¶¶ 35, 36.

**Reply:**   Immaterial to the instant motion but uncontroverted.

37.     The SPA makes no reference to End Buyers of the Product. Exhibit C, Berkley and Lyons' RFA ¶ 51.

**Reply:**   Immaterial to the instant motion but uncontroverted.

38.     The SPA does not reference any obligations of DRE Health in regard to any End Buyers of the Product. Exhibit C, Berkley and Lyons' RFA ¶ 35, 36.

**Reply:**   Uncontroverted.

39.     Under the SPA, Berkley's failure to secure End Buyers does not excuse Berkley's refusal to pick up product. Exhibit C, Berkley and Lyons' RFA ¶ 35, 36.

**Reply:**   Any suggestion that Berkley's alleged failure to secure End Buyers resulted in its refusal to pick up the product is CONTROVERTED.  DRE was in default with regard to the schedule of deliveries or delivery date of the product.

40.     After DRE informed Defendants that the Products were ready for pickup, Defendants retained an inspector, Donavin Heard, to inspect the Products. Exhibit C, Berkley and Lyons' RFA ¶ 88.

**Reply:**   Immaterial to the instant motion but uncontroverted.

41.     Defendants' inspector Donavin Heard inspected the Products on December 7, 2021. Exhibit C, Berkley and Lyons' RFA ¶ 89.

**Reply:**   Immaterial to the instant motion but uncontroverted.

42.     Donavin Heard produced "Inspector Notes" pursuant to his December 7, 2021 inspection of the Products. Exhibit C, Berkley and Lyons' RFA ¶ 92-97.

**Reply:**   Immaterial to the instant motion but uncontroverted.

43.     Matthew Ortolani communicated and/or negotiated on behalf of Defendant Berkley during the Relevant Period. Exhibit C, Berkley and Lyons' RFA ¶¶ 20-22.

**Reply:**  Immaterial to the instant motion but uncontroverted.

44.     Although the SPA lists Defendant Berkley as "Buyer," Defendants intended for End Buyers to pay for the Product. Exhibit C, Berkley and Lyons' RFA ¶ 110.

**Reply:**   Immaterial to the instant motion but uncontroverted.

45.     In December 2021, Matthew Ortolani, Max Dobi, and/or others who communicated and negotiated on behalf of Defendant Berkley were still attempting to secure End Buyers, sending Donavin Heard's "Inspector Notes" to numerous prospective customers, including: Greg Caglione at ICON International Inc., Michelle at World Hero Foundation, Virgil at Pitbullmortgage@yahoo.com, Consortium-6 LLC, ddabbs@anm-us.com. Exhibit C, Berkley and Lyons' RFA ¶¶ 95-97, 100, 101, 103.

**Reply:**   Immaterial to the instant motion but uncontroverted.

46.     In December 2021, Matthew Ortolani and/or others who communicated and negotiated on behalf of Defendant Berkley represented to prospective End Buyers that Berkley and its team were the owners of the Products. Exhibit C, Berkley and Lyons' RFA ¶¶ 99.

**Reply:**   Immaterial to the instant motion but uncontroverted.

47.     Defendants made statements to DRE suggesting that Defendants had End Buyers lined up to pay for the Products under the SPA. Exhibit C, Berkley and Lyons' RFA ¶ 123; Exhibit A, Bawany Affidavit ¶¶ 4-5, 8-10, 18-19, 24-26, 36.

**Reply:**   CONTROVERTED as to DRE's characterization of the subject representations and its suggestion that any such alleged information was intended to form the basis for the agreements.

48.     Defendants were soliciting contracts for End Buyers after the execution of the SPA and Addendum. Exhibit C, Berkley and Lyons' RFA ¶ 95-97, 100, 101, 103; Exhibit A, Bawany Affidavit ¶ 38.

**Reply:**  Immaterial to the instant motion but uncontroverted.

49.     Certain of Defendants' prospective End Buyers refused to purchase the Product without certificates for the Product. Exhibit C, Berkley and Lyons' RFA ¶ 114.

**Reply:**   Immaterial to the instant motion but uncontroverted.

50.     DRE Health was under no obligation to provide certificates for the product. Exhibit C, Berkley and Lyons' RFA ¶ 49.

**Reply:**   Immaterial to the instant motion but CONTROVERTED.  Under the Payment Terms set forth in the SPA, Berkley was entitled to "[a]ny other documentation reasonably requested by Buyer in connection with the purchase, delivery, or specifications of the Product[.]"

51.     Defendant Lyons and Defendant Berkley's agent Max Dobi told Isaac Bawany that Berkley or its agents had money from End Buyers in escrow accounts. Exhibit A, Bawany Affidavit ¶¶ 5, 8, 10, 13, 19, 26.

**Reply:**   Immaterial to the instant motion but CONTROVERTED.  Berkley and Lyons dispute DRE's characterization of their representations and refute any suggestion that such alleged information was intended to form the basis for the agreements.

11

52.     Defendants continue to aver that they had no issues in being able to fulfill their contractual obligations. Exhibit C, Berkley and Lyons' RFA ¶ 125.

**Reply:**  Uncontroverted.

63945/0001-46145981

## LEGAL ARGUMENT

## I. THE PURPORTED MISREPRESENTATIONS ASSERTED BY DRE CORRESPOND DIRECTLY WITH THE TERMS OF THE SPA AND THUS CANNOT SERVE AS A BASIS FOR AN ACTIONABLE CLAIM.

DRE is merely attempting to impose personal liability on Mr. Lyons through contrived tort-based claims that are rooted purely in contract. DRE alleges two primary theories of purported misrepresentations: (i) that Berkley "had already secured sufficient buyers . . . for the massive amounts of PPE to be supplied under the SPA," and (ii) "that Berkley or its agents had money from End Buyers already in escrow accounts." Bawany Aff. ¶¶ 4, 5. These alleged misrepresentations relate directly to Berkley's ability and willingness to perform under the parties' agreement. ***DRE concedes as much in its opposition brief***. *See* Opp. at 27 ("Put differently, Defendants falsely represented to DRE that Defendants had the ability to perform their obligations so as to induce DRE to enter into a contract . . . ."). The issue of Berkley's ability and willingness to perform, however, is squarely addressed in the SPA by virtue of the representation that Berkely is "ready, willing, and able to purchase Products under the terms and conditions of this Agreement." SPA at 1. The economic loss doctrine therefore precludes DRE from alleging any misrepresentation claims that relate, either directly or indirectly, to Berkley's willingness and ability to purchase product from DRE.

DRE's attempt to distinguish *Compass Bank v. Eager Rd. Associates*, LLC, 922 F. Supp. 2d 818 (E.D. Mo. 2013) is unpersuasive. There, the court concluded that the plaintiffs' fraudulent inducement claim was precluded by Missouri's economic loss doctrine because ***"[t]he misrepresentations asserted by [the] [p]laintiffs correspond[ed] precisely with the terms of the contract and with what [the] [p]laintiffs . . . claim[ed] [was] due to them thereunder."*** *Id.* at 827 (emphasis added). Significantly, the court reasoned that the plaintiffs' allegations concerned "pre-contract misrepresentations *with respect to* [the defendants'] ability to perform obligations that became part of the parties' contract." *Id.* (emphasis added). The exact same situation exists here.

13

Any alleged misrepresentations by Berkley regarding agreements with end-buyers and/or any purported assurances concerning escrowed funds relate *directly* to Berkley's ability and willingness to pay for and purchase product from DRE.[1]  Critically, not only was Berkely obligated under the SPA to pay, but Berkley expressly represented in the SPA that it was *"ready, willing, and able to purchase the Products under the terms and conditions of this Agreement."*  SPA at 1 (emphasis added).  The alleged misrepresentations here are virtually indistinguishable from those in *Compass*.  *Compare id.* at 826 (representation underlying fraudulent inducement claim was that the defendants "collectively had $4.15 million [i.e., the amount of the Developer Settlement Payment] available in cash that would be paid to Plaintiffs in advance of the Bond Refinancing"), *with* Bawany Aff. ¶ 26 (representations underlying fraudulent inducement claim are "that Berkley or its various agents had money from end buyers already in escrow accounts" which it intended to use to satisfy its contractual obligations).  Thus, here, as in *Compass*, DRE's claims are precluded by the economic loss doctrine.

DRE attempts to avoid the economic loss doctrine by arguing that only those misrepresentations that bear on a party's *intent* to perform – as opposed to a party's *ability* to perform – are precluded by the economic loss doctrine.  Opp. at 26 (citing *Superior Edge, Inc. v. Monsanto Co.*, 44 F. Supp. 3d 890, 904 (D. Minn. 2014).).  DRE's argument misses the mark.  As the court explained in *Spring Lake Pork, LLC v. Great Plains Mgmt., L.L.C.*, regardless of whether the representation concerns ability to perform, ***"[w]here an alleged misrepresentation is explicitly incorporated into the contract or*** pertains to a party's intent to perform under a contract, the misrepresentation is more properly construed as a breach of contract claim[.]  2:19 CV 18 CDP, 2020 WL 3542292, at *3 (E.D. Mo. June 30, 2020); *see also Superior Edge*, 44 F. Supp. 3d at 904 (where, as here, a contract term "contains . . . an alleged

---

[1] Any suggestion by DRE that the parties' anticipated business relationship amounted to something other than a mere contractual relationship (*see* Bawany Aff. ¶ 16) is belied by the express terms of the SPA, which provide that "[n]othing in this Agreement creates any agency, joint venture, partnership or other form of joint enterprise, employment or fiduciary relationship between the Parties."  SPA § 11(n).

14

misrepresentation" – "the contract term controls, and there is no fraudulent misrepresentation claim."). Here, irrespective of whether the promises and assurances relate to Berkley's intent or its ability to perform its contractual obligations, such representations were explicitly incorporated into the SPA. Thus, in either case, the alleged misrepresentations are subject to the economic loss doctrine.

The recently-issued decision in *Cafe Agave, Inc. v. Crown Valley Winery, Inc.*, 1:23-CV-32-SNLJ, 2023 WL 4623057 (E.D. Mo. July 19, 2023), is also instructive. In dismissing the plaintiff's fraudulent inducement claim based on the economic loss doctrine, the court applied the "subject matter" requirement broadly: "[T]he parties agreed on contract terms involving quality assurance, and thus the subject matter of the alleged misrepresentations was part of the contract. There can be no fraudulent inducement claim under those facts." *Id.* In this case, too, the subject matter of each alleged misrepresentation identified by DRE—namely, Berkley's ability and willingness to pay for and purchase product from DRE is squarely addressed in the parties' agreement both through its payment terms Berkley's express representation that it was "ready, willing, and able to purchase the Products under the terms and conditions of this Agreement." SPA at 1.

Equally unavailing is DRE's assertion that it has suffered damages outside of the parties' contractual relationship. To support that contention, DRE incorrectly contends that damages resulting from fraudulent inducement claims necessarily fall outside of the scope of contractual damages. Mr. Bawany contends that DRE sustained "opportunity costs and reputational damage" Bawany Aff. ¶ 39. Those categories of alleged damages, however, fall directly within the purview of the economic loss doctrine. "[T]he economic loss doctrine encompasses consequential economic loss such as loss of profits and loss of good will or business reputation." *See Trademark Med., LLC v. Birchwood Labs., Inc.*, 22 F. Supp. 3d 998, 1004 (E.D. Mo. 2014). Accordingly, summary judgment is warranted dismissing DRE's misrepresentation claims against Berkley and Mr. Lyons as embodied in Counts VI, VII, and VIII.

## II. CONTRARY TO DRE'S CONTENTIONS, THE ECONOMIC LOSS DOCTRINE APPLIES WITH EQUAL FORCE TO CLAIMS ASSERTED AGAINST MR. LYONS AS AN AGENT OF BERKLEY.

DRE has the temerity to suggest that a contracting party's agent can be liable in tort notwithstanding that the very same claims asserted against its principal are barred under the economic loss doctrine. This flawed theory is premised on the misconception that direct privity of contract is necessary to invoke the doctrine. DRE's argument is disingenuous and, if accepted, would wholly undermine the purpose and policy objectives underlying the economic loss doctrine.

Despite DRE's attempt to distinguish *OneBeacon Ins. Co. v. Deere & Co.*, 778 F. Supp. 2d 1005 (E.D. Mo. 2011), DRE cannot dispute the general principle that direct privity of contract is ***not*** required to invoke the economic loss doctrine. *See id.* at 1008. Although it does not appear that any Missouri court has squarely addressed the issue of whether the economic loss doctrine extends to agents of contracting parties, other courts have concluded the doctrine applies to agents for the same policy reasons it applies to their principals. *See, e.g.*, *Cioni v. Globe Specialty Metals, Inc.*, 618 Fed. Appx. 42, 47 (3d Cir. 2015) (affirming dismissal of fraud and negligent misrepresentation claims against company's CFO under the economic loss doctrine on the basis that the CFO's alleged promise was "the very same promise that [company] contracted to perform"); *Ben-Yishay v. Mastercraft Dev., LLC*, 553 F. Supp. 2d 1360, 1371 (S.D. Fla. 2008) (noting that the economic loss doctrine analysis "is not affected by the fact that Lap, a member of Mastercraft and officer of MS, was not a signatory of the Agreements" because "[t]he rationale of the economic loss rule is to limit 'a party to the recovery of purely economic damages suffered in a contractual setting.'").

Significantly, the jurisdictions referenced above share the same policy rational for the economic loss doctrine as recognized by the Missouri district courts. *See Prime Aid Pharmacy Corp. v. Express Scripts, Inc.*, 4:16-CV-1237 (CEJ), 2017 WL 2021082, at *4 (E.D. Mo. May 12, 2017) (economic loss doctrine designed "to protect the integrity of the bargaining process, through which the parties have

16

allocated the costs and risks").  This policy would be undermined completely if a party could circumvent the doctrine simply by asserting a misrepresentation claim directly against an agent of a contracting party.  Yet that is precisely the perverse outcome that DRE urges this Court to endorse.[2]

## III.  THE EXISTENCE OF A WRITTEN AGREEMENT, IN AND OF ITSELF, BARS DRE'S RELIANCE ON ANY PURPORTED MISREPRESENTATIONS THAT PREDATE THE EXECUTION AND DELIVERY OF THE SPA AND ADDENDUM.

Separate and apart from the economic loss doctrine, DRE's fraud and misrepresentation claims fail on the independent basis that those claims are based on purported misrepresentations that were superseded by fully integrated written agreements.   In his Affidavit, Bawany contends that Berkley and Lyons misrepresented Berkley's ability to perform under the SPA and Addendum for purposes of inducing DRE to proceed with the transaction.  These alleged misrepresentations supposedly concerned assurances that Berkley had secured end buyers to purchase product and furthermore, that those end buyers deposited funds in escrow.  *See, e.g.*, Bawany Aff. ¶¶ 5, 18-19, 24, 26.  Putting aside the fact that these alleged misrepresentations are neither included in DRE's Complaint nor its interrogatory answers, DRE is barred from asserting these purported pre-contract misrepresentations as basis for its fraud and misrepresentation claims due to the existence of the parties' fully integrated written agreements, namely the SPA and the Addendum.

Under settled Missouri law, "[a] party cannot allege reliance on promises made in the course of negotiations whether written or oral, true or false, if the party subsequently enters into a written

---

[2] DRE's reliance on the unpublished decision in *Pietoso, Inc. v. Republic Servs., Inc.*, 4:19-CV-00397-JAR, 2021 WL 5177357, at *6 (E.D. Mo. Nov. 8, 2021) is misplaced.  In the first instance, the defendant in that case did not invoke the economic loss doctrine.  Although the court noted in *dicta* the doctrine would be inapplicable if raised under the specific facts of that case, it did so on the basis the dispute did not involve the sale of goods – unlike this matter.  *Id.* at *6 n.4.  Similarly unavailing is DRE's reliance on *RightCHOICE Managed Care, Inc. v. Hosp. Partners, Inc.*, 5:18-CV-06037-DGK, 2019 WL 302515, at *10 (W.D. Mo. Jan. 23, 2019).  Although not apparent from DRE's highly misleading description of that case (*see* Opp. at 34), the Court in *RightCHOICE* concluded the economic loss doctrine was inapplicable due to the absence of a written agreement.  The court determined that "[n]o contract governs the relationship between Plaintiffs and Defendants, and the case involves fraud and not the sale of goods or disappointed commercial expectations."  *Id.*  Thus, because none of the circumstances identified by the court as a basis for finding the economic loss doctrine inapplicable exist here, *RightCHOICE* actually supports Mr. Lyons' position here.  DRE's fraud and misrepresentation claims against Mr. Lyons are plainly ripe for dismissal at this juncture.

agreement silent on the matter." *Lion Petroleum of Missouri, Inc. v. Millennium Super Stop, LLC*, 4:06CV0698 AGF, 2008 WL 3010789, at *6 (E.D. Mo. Aug. 1, 2008) (citing *Toghiyany v. AmeriGas Propane, Inc.*, 309 F.3d 1088, 1092 (8th Cir. 2002)).

The Eight Circuit's decision *Toghiyany* is instructive.  In that case, the Court of Appeals affirmed summary judgment dismissing the plaintiff's fraudulent inducement claim where, as here,  the plaintiff alleged that it entered into a contract in reliance on a pre-contractual promise. Insofar as the alleged promise was absent from parties' written contract, the court dismissed plaintiff's misrepresentation claim.  The court reasoned:

> *If the presence of a term of years was in fact the factor upon which Toghiyany had relied in entering into the January 1998 agreement with AmeriGas, one would not expect that such a term would have been absent from a document prepared and signed by Toghiyany*.

*Toghiyany*, 309 F.3d at 1092-93 (emphasis added).

The court's decision in *Toghiyany* is fatal to DRE's fraud and misrepresentation claims.   This is particularly so considering that Bawany contends that "***such assurances were crucial in influencing DRE's decision to enter into the SPA***." Bawany Aff. ¶ 12 (emphasis added).  Indeed, if such pre-contractual representations and assurances were as crucial to Bawany as he now claims, "one would have expected [Bawany and DRE] to have made sure the term[s] w[ere] included in the written agreement." *Lion Petroleum*, 2008 WL 3010789, at *6.  But DRE did not do so.  Instead, DRE negotiated (with the assistance of counsel) and entered into the SPA, which expressly provides that there exist no understandings or agreements between the parties other than those embodied therein.  *See* SPA § 11(a). This provision is especially relevant considering the agreements are silent on the matters underlying the so-called misrepresentations.

63945/0001-46145981

## IV. ANY LOSSES ALLEGEDLY SUSTAINED BY DRE WERE SELF-INFLICTED AND NOT ATTRIBUTABLE TO ANY ALLEGED ACT OR OMISSION ON THE PART OF BERKLEY OR MR. LYONS.

To the extent DRE sustained any economic losses as a result of the transaction, such financial fallout was self-inflicted. Any alleged losses sustained by DRE were not, by DRE's own admissions and based on the documentary evidence attached to Dre's own Complaint, proximately caused by Berkley or Lyons. It was DRE that undisputedly failed to make a single mask available to Berkley in the months following its fraudulent receipt and retention of Berkley's $3 million dollars. *See* SOF ¶ 10; Complaint, Ex. F. 16.

The SPA required DRE to make available to Berkley five (5) million boxes of masks within ten (10) days of payment of deposit monies. *See* SPA § 3(d). The SPA further provides that subsequent allocations of product, in the amount of six (6) million boxes of masks per week, would be made available by DRE in accordance with an agreed upon schedule. *Id.* § 5(a). Thus, between mid-September 2021 and October 31, 2021, at least four (4) allocations of product—***totaling 23 million boxes of masks***—were required to be made available to Berkley based on the written schedule prepared by DRE. *See* Complaint, Ex. E. During that time, DRE failed to perform not just once – but every single time. *Id.*, Ex. F. DRE dropped the preverbal ball on each and every scheduled allocation of product. *Id.*

It was not until November 1, 2021, after DRE had acknowledged in the Addendum a default on its part due to its inability and failure to timely deliver product as agreed upon, that counsel for DRE advised, in writing, that DRE finally had the initial allotment of product ready – months after the agreed upon availability date. Complaint, Ex. F. ***Not once before this time***, and despite the agreed-upon delivery schedule and the initial commitment for delivery of six (6) million boxes of masks in September as embodied in the SPA, was a single mask made available to Berkley. Yet, DRE has the temerity to complain about non-payment and portrays itself as the victim in this ordeal due to the millions of dollars it has supposedly lost. In pointing blame, however, DRE should look no further than itself. If it did, in

fact, sustain losses as a result of this venture, that is because it failed miserably to abide by its agreement. Accordingly, based on these undisputed facts, no reasonable fact finder could conclude that acts or omissions of Berkley or Mr. Lyons were the proximate cause of any losses allegedly sustained by DRE.

## V.    THAT DRE ALLEGES AN AGENCY RELATIONSHIP EXISTED BETWEEN MR. LYONS AND NVIE MEDIA LLC IS A RED HERRING.

Relying on the "undisclosed principal" theory, DRE wrongly contends that its Account Stated claim should extend not only to Berkley, with whom it expressly contracted to sell PPE, but also to Mr. Lyons in his personal capacity.  While not clear from its opposition brief, DRE appears to suggest the alleged fact that a payment owed by DRE to Berkley was routed to NVIE Media LLC ("NVIE"), somehow creates a fact issue as to whether NVIE was Mr. Lyons' undisclosed principal.  In its opposition DRE argues "Defendant Lyons was acting as an agent for an undisclosed third party[,] . . . NVIE Media."  Opp. at 35.

First and foremost, even if it were true that NVIE was a recipient of certain funds originating from DRE, that does not, in any manner, establish an agency relationship between Mr. Lyons and NVIE, and similarly does not demonstrate that Mr. Lyons was acting for the benefit of NVIE.  Nor can an agency relationship be reasonably inferred from such accusations.  Such allegations establish only that NVIE received money – and nothing more.  Additionally, absent from the Complaint is any allegation that Lyons was an agent of NVIE nor are any facts alleged in the Complaint from which an agency relationship could reasonably be inferred.

Second, even if an undisclosed agency relationship existed between Mr. Lyons and NVIE, it would be insufficient to extend personal liability to Mr. Lyons.   Mr. Lyons was not a counterparty to the SPA, nor did he hold an account with DRE.  This alone is fatal to DRE's Account Stated Claim against Mr. Lyons.  Berkley agrees agree with DRE's recitation of the law as it appears on pages 34-35

of its opposition brief.[3]  DRE fails to appreciate that Mr. Lyons never "enter[ed] into a contract with a third party."   It was Berkley – and not Mr. Lyons – that entered into the contract with DRE.  In fact, DRE concedes, as it must, that the contractual relationship at issue – and the corresponding account created as a result – exists only between DRE and Berkley.  *See, e.g.*, Complaint ¶¶ 10, 14, 17, 33.  Not once has DRE alleged that it sold (or agreed to sell) product to Mr. Lyons or that Mr. Lyons agreed to personally purchase product from DRE.  Because Mr. Lyons was not the holder of the account or the party with whom DRE expressly contracted, DRE's reliance on the undisclosed principal doctrine to impose liability against Mr. Lyons falls flat.

Third, beyond these fatal deficiencies, DRE fails to address in its opposition any element of the Account Stated cause of action.  For instance, DRE identifies no evidence whatsoever establishing that Berkley, much less Lyons, ever recognized "a fixed and certain sum to be due." *Estate of Miller*, 551 S.W.3d 625, 629 (Mo. Ct. App. 2018).  Nor could DRE ever establish that any alleged promises to pay were "unconditional," as any obligations of Berkley's to pay was of course contingent on DRE providing product.  *Id.* ("[T]he debtor's acknowledgment of liability and agreement to pay a debt then owed may not be contingent on future events.").  In short, DRE has failed to identify any genuine issue of material fact sufficient to avoid summary judgment in favor of Mr. Lyons dismissing DRE's Account Stated claim.

## VI.    DRE'S CIVIL CONSPIRACY CLAIM MUST BE DISMISSED, AS THERE IS NO ACTIONABLE UNDERLYING TORT UPON WHICH A CONSPIRACY CLAIM CAN BE BASED.

Finally, DRE's attempt to salvage its civil conspiracy claim fails.  As explained at length herein and in Berkley and Mr. Lyons' initial moving brief, there is no underlying tort that could support a civil conspiracy claim.  As DRE's fraud and misrepresentation claims are ripe for dismissal, so too is its claim

---

[3] *See* Opp. at 34-35 ("The general rule with respect to agent liability provides that one who, as an agent for another, enters into a contract with a third party without disclosing his agent status, or discloses his agent status without disclosing the identity of his principal, can be held liable on the contract at the third party's election.").

21

for civil conspiracy. *W. Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 22 (Mo. 2012) ("In Missouri, if tortious acts alleged as elements of a civil conspiracy claim fail to state a cause of action, then the conspiracy claim fails as well."). For this reason, the Court should grant summary judgment in favor of Berkley and Mr. Lyons dismissing DRE's civil conspiracy claim.

## CONCLUSION

For all of the foregoing reasons as well as the reasons set forth in Berkley and Mr. Lyons' initial moving brief, it is respectfully requested that the Court enter an order (i) dismissing all claims against Mr. Lyons, and (ii) dismissing DRE's claims for Negligent Misrepresentation (Count VI), Fraudulent Inducement (Count VII), Fraudulent Misrepresentation (Count VIII), and Civil Conspiracy (Count IX) against Berkley.

Dated: September 28, 2023          Respectfully submitted,

*/s/ Joseph Barbiere*
Joseph Barbiere (admitted *Pro Hac Vice*)
Michael R. Yellin (admitted *Pro Hac Vice*)
Eric T. Vissichelli (admitted *Pro Hac Vice*)
COLE SCHOTZ P.C.
25 Main Street
Court Plaza North
Hackensack, New Jersey 07601
Email: jbarbiere@coleschotz.com
Email: evissichelli@coleschotz.com
Telephone: (201) 525-6213
Facsimile: (201) 678-6213

-and-

Michael S. Hargens (MO #51077)
HUSCH BLACKWELL LLP
4801 Main Street, Suite 100
Kansas City, Missouri 64112
Telephone: (816) 283-4636
Facsimile: (816) 983-8080
Email: Michael.hargens@huschblackwell.com

*Attorneys for Berkley Equity Limited and Anthony Lyons*

22

## CERTIFICATE OF SERVICE

I certify that on the 28th day of September, 2023, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the ECF registrants.

*/s/ Michael S. Hargens*
Attorney

63945/0001-46145981