# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

DRE HEALTH CORPORATION,    )
   )
            Plaintiff,    )
   )
            v.    )    Case No. 4:22-cv-00031-RK
   )
BERKLEY EQUITY LIMITED and    )
ANTHONY LYONS,    )
   )
            Defendants.    )

## <u>ORDER</u>

This case culminated in a ten-day jury trial and a jury verdict in favor of the defense which was poisoned from the outset and throughout nearly the whole trial by defense counsel Stuart N. Kaplan's improper trial strategy and trial conduct. Mr. Kaplan's severe and pervasive misconduct—(1) continually relitigating the Court's Summary Judgment Order by presenting a breach of contract defense, (2) ambushing Plaintiff DRE Health Corporation and the Court with never-before-argued and constantly shifting defense theories, and (3) making countless false and misleading statements to both the jury and the Court throughout the trial—leaves the Court with no doubt that DRE was unfairly prejudiced. Letting the jury verdicts stand would result in a clear miscarriage of justice. Allowing the pervasive and blatant misconduct of counsel to stand without proper and just sanction would be to ignore the standards of professionalism and legal advocacy expected of counsel not only appearing before the Court as an officer of the court but also as a member of the legal profession. The Court does not reach this conclusion lightly. But for all the reasons the Court explains below, this conclusion is required to protect and uphold the principles of justice, fairness, and due process that underly our justice system.

Now before the Court are Plaintiff DRE Health Corporation's (1) Omnibus Post-Judgment Motion brought pursuant to Federal Rules of Civil Procedure 50, 58, 59, and 60, (Doc. 308); and (2) Motion for Sanctions against Defendants Berkley Equity Limited and Anthony Lyons; defense counsel Stuart N. Kaplan and Thomas J. Ali; and defense counsel's law firm Stuart N. Kaplan, P.A.; (Doc. 298). The motions are fully briefed. (Docs. 309, 335, 336, 341, 229, 331, 332, 340.) After careful consideration, and for the reasons explained below, the Court **ORDERS** as follows:

1. DRE's Rule 50(b) renewed motion for judgment as a matter of law on Count 2 and Count 5 is **GRANTED**, and the Court awards DRE benefit-of-the-bargain damages in the amount of **$165,428,171**;

2. DRE's Rule 59 motion for new trial is **CONDITIONALLY GRANTED** on Count 2 and Count 5 and is **GRANTED** as to Counts 6-9;

3. DRE's Rule 58 and Rule 60 motion to amend or correct the judgment is **DENIED without prejudice**; and

4. DRE's motion for sanctions is **GRANTED in part** as to counsel Stuart N. Kaplan and the law firm of Stuart N. Kaplan, P.A, and **DENIED in part** as to Defendants Berkley Equity Limited and Anthony Lyons and counsel Thomas J. Ali.

**Background and Procedural Posture**

**I.    Factual Background and Legal Claims**

This case arises from a business dispute between Plaintiff DRE Health Corporation ("DRE"), a producer and seller of medical and healthcare-related products including personal protective equipment, and Berkley Equity Limited ("Berkley") and Berkley's owner-operator Anthony Lyons, who sought to purchase millions of face masks from DRE in the midst of the COVID-19 pandemic to sell to end-users.

On September 2, 2021, the parties entered a "Sale & Purchase Contract Package Structure" ("SPA") pursuant to which DRE would sell to Berkley five million boxes of blue masks and one million boxes of black masks per week over a period of six months.  (Pl. Ex. 1 at 2.)[1]  Prior to signing the SPA, Lyons completed and signed DRE's "New Customer Application" on behalf of Berkley.  (Pl. Ex. 37.)

Under the SPA, Berkley was required to pay a $3,000,000 initial deposit to DRE, which it did on or around September 2, 2021.  (Pl. Ex. 1 at 3.)  The SPA incorporated by reference DRE's New Customer Application and Terms and Conditions found on its website.  (Pl. Ex. 1 at 7, ¶ 11(a); Pl. Ex. 37; Pl. Ex. 2.)  The SPA also included provisions that "[i]n the event of any conflict between the terms of this Agreement and the terms of any Invoice or Purchase Order, the terms of the Invoice or Purchase Order shall govern," and that "[b]uyer agrees to abide by and be bound by the terms of the New Customer Application it has executed."  (Pl. Ex. 1 at 9, ¶¶ o, p.)

---

[1] "Pl. Ex." refers to Plaintiff's exhibits admitted at trial before the jury.  "Pl. Proposed Ex." refers to exhibits Plaintiff included in its exhibit list for trial but did not move to admit during the trial.  "Pl. Proffer Ex." and "Def't Proffer Ex." refer to exhibits admitted at trial during proffer testimony outside the presence of the jury.

In connection with the SPA, DRE subsequently sent Berkley two invoices on September 10, 2021, totaling $195,800.00. Invoice 279723 (the "smaller invoice") provided that DRE would supply 10,000,000 masks for a total price of $11,000,000. (Pl. Ex. 3.) Under the terms of the smaller invoice, "100% payment [was] due upon customs clearance in USA." (*Id.*) Invoice 279722 (the "larger invoice"), which was also sent September 10 but revised on September 15, 2021, provided that DRE would supply 120,000,000 blue masks and 24,000,000 black masks for a total price of $184,800,000. (Pl. Ex. 4.) Under the larger invoice's terms, payment was "due in full upon cargo being available for pickup." (*Id.*)

At trial, the parties presented different accounts of what led to the signing of the "Addendum to Sale and Purchase Contract Package Structure Agreement" ("Addendum") on October 19, 2021. (Pl. Ex. 5.) Suffice it to say, the parties' contractual relationship quickly became somewhat strained. As executed, the Addendum amended the SPA, which remained in full force and effect except as amended. (Pl. Ex. 5 at ¶ 3(a).) The Addendum's terms required DRE to return $1,500,000 of Berkley's initial deposit by October 22, 2021, contingent on Berkley's continued full performance under the SPA. (Pl. Ex. 5 at ¶ 2(a)(i).) DRE returned $1,000,000 of the deposit to Berkley but did not return the remaining $500,000 contemplated by the Addendum; thus, DRE retained $2,000,000 of the initial deposit. (Doc. 318 at 463:13-15.)[2] The Addendum also estimated that deliveries of the masks by DRE would begin on or before October 31, 2021. (Pl. Ex. 5 at ¶ 2(a)(ii).) Berkley never paid for or picked up any masks.

DRE filed this case on January 18, 2022. (Doc. 1.) In its complaint, DRE asserted the following counts against Berkley (Counts 1-9) and Anthony Lyons (Counts 1, 6-9):

- Count 1 – Actions for Account Stated
- Count 2 – Breach of Contract, Invoice 279722 (larger invoice)
- Count 3 – Promissory Estoppel
- Count 4 – Specific Performance
- Count 5 – Breach of Contract, Invoice 279723 (smaller invoice)

---

[2] The trial transcript appears in ten volumes on the Court's case management and electronic filing system at Docs. 317-326. When referring to the trial transcript, the Court references the Doc. number assigned in the CM/ECF filing system, for example Doc. 317 for January 13, 2025 (the first day of trial). The Court does not reference the page number assigned by CM/ECF, however. Instead, the references to page numbers in the trial transcript refer to the consecutive pagination across all ten volumes of the transcript.

- Count 6 – Negligent Misrepresentation
- Count 7 – Fraudulent Inducement
- Count 8 – Fraudulent Misrepresentation
- Count 9 – Civil Conspiracy

(*See generally* Doc. 1.) Berkley and Mr. Lyons filed an amended answer, affirmative defense, counterclaim, and third-party complaint jointly against DRE and Isaac Bawany containing the following counterclaims:

- Count 1 – Breach of Contract (SPA)
- Count 2 – Breach of Contract (Addendum)
- Count 3 – Breach of the Implied Covenant of Good Faith and Fair Dealing
- Count 4 – Unjust Enrichment
- Count 5 – Declaratory Judgment
- Count 6 – Fraudulent Inducement
- Count 7 – Imposition of Constructive Trust/Equitable Lien
- Count 8 – Abuse of the Corporate Form/Alter Ego

(Doc. 49.)

## II. December 6, 2024 Summary Judgment Order [3] and January 6, 2025 Reconsideration Order

On October 16, 2024, DRE moved for summary judgment on its breach of contract claims (Counts 2 and 5), its fraud claims (Counts 6-8), and all of Defendants' counterclaims and third-party claims. (Doc. 184.) On December 6, 2024, the Court issued its Summary Judgment Order which (1) granted summary judgment in favor of DRE and Mr. Bawany on all of Defendants' counterclaims and third-party claims; (2) granted summary judgment in favor of DRE on its breach of contract claims as to liability, found uncontroverted breach-of-contract damages in the amount of $14,400,000, and denied summary judgment as to any other remaining damages on Count 2 and Count 5; and (3) denied summary judgment on DRE's fraud claims.

---

[3] The Court previously denied Defendants' earlier motion for partial summary judgment in a separate Order on March 26, 2024. (Doc. 121.) That summary judgment order is irrelevant to the forthcoming analysis. References to the "Summary Judgment Order" are to the Court's December 6, 2024 Summary Judgment Order.

In so ruling, the Court found as a matter of law that Berkley breached the parties' agreement as to both the larger invoice and smaller invoice. (Doc. 217 at 9-12.)[4] Based on the uncontroverted facts, the Court found that an agreement existed between the parties which consisted of the signed SPA, the larger invoice, the smaller invoice, and the Addendum. (Doc. 217 at 9.) Further, in a prior order on a motion to dismiss, the Court found that "the SPA itself incorporates both the New Customer Application that Berkley completed and the terms and conditions of DRE's website . . . ." (Doc. 160 at 4.) The Court also concluded that DRE performed under the agreement, and Berkley did not. DRE performed under the smaller invoice because the masks covered by that invoice cleared customs in the United States and performed under the larger invoice by making available masks for pick-up. (*Id.*) The Court found that Defendant Berkley was first to breach under the SPA by failing to *pay* the smaller invoice upon the masks *clearing customs*. The Court further found that Defendant Berkley was first to breach under the Addendum by failing *to pick up* the larger invoice masks *as they became available*. (*Id.*)[5]

The Court further found that DRE suffered damages because of Berkley's breaches. In relation to the smaller invoice, the Court found that "DRE is entitled . . . to benefit-of-the-bargain damages totaling $11,000,000." (Doc. 127 at 11.) This was the undisputed value of Berkley's performance under that contract, payment for which was due "upon customs clearance." (*Id.*) As to the larger invoice, which stated that payment was due "upon cargo being available to pickup," the Court found that "DRE made available at least $5,400,000 worth of masks" and thus suffered damages in that amount. (*Id.*) The Court then deducted $2,000,000 from the damages award to reflect Berkley's initial $3,000,000 deposit paid to DRE, $1,000,000 of which was returned to Berkley after the parties signed the Addendum. (Doc. 217 at 12.) The Court found that, as to any

---

[4] Though not explicitly addressed in the Summary Judgment Order, the Court found Berkley (and not DRE) breached the invoices despite the contract language included in the Addendum that DRE "has remained unable to satisfy its obligations under the SPA . . . ," i.e., that DRE defaulted on the product to be delivered on or before September 15, 2021. (Pl. Ex. 5.)

[5] Although Defendants' summary judgment brief asserted in opposition that "DRE Health Corporation materially breached" both the SPA and the Addendum, the brief does nothing more than simply make this conclusion after citing the applicable legal standard and merely cites to the allegations in its answer asserting as affirmative defenses that "DRE's claims are barred . . . because DRE was the first to materially breach the parties' contracts, and its prior breaches of the material terms of such contracts precludes its claims," and that "DRE's claims are barred, in whole or in part, because DRE failed to perform all obligations and conditions precedent and/or subsequent under the parties' contracts." (Doc. 194 at 3-5.) Defendants' summary judgment brief did not provide any further substantive legal analysis of this issue.

other contract damages, DRE was not entitled to summary judgment but could seek further contract damages at trial.

As part of the Summary Judgment Order, the Court rejected Defendants' argument that the masks DRE provided were non-conforming with the parties' agreement, as follows:

> Berkley's next argument is that masks DRE provided were non-compliant or otherwise unacceptable because they were produced in whole or in part in China, rather than solely in the United States. (Doc. 194 at 9-11.) But Berkley has not identified any contractual provision or other source of authority that requires the masks DRE provided to have been produced solely in the United States, and such a requirement would be contrary to the SPA's Annex A, which expressly stated that the masks' "country of origin" would be "USA/PRC."[6] (Doc. 188-1 at 12.)

(Doc. 217 at 10.) While Defendants did not clearly argue any other issues of non-conformity of the masks at the summary judgment stage, the Court clearly addressed the issue of non-conformity of the masks in the context of Defendant's breach of contract defense and rejected it.

DRE also moved for summary judgment on its misrepresentation-based claims—Count 6, negligent misrepresentation; Count 7, fraudulent inducement; and Count 8, fraudulent misrepresentation. DRE's theory on its misrepresentation claims was that Berkley, its agents, and/or Mr. Lyons made particular misrepresentations which induced DRE to enter the SPA and the Addendum. As to the SPA, DRE argued that Berkley and Mr. Lyons represented that they had end buyers and money in escrow. As to the Addendum, DRE relies on a $1.9 billion proof of funds which was sent to Mr. Bawany by Max Dobi, an agent of Berkley. Here, the Court concluded that DRE was not entitled to summary judgment because the record contained a genuine issue of material fact as to whether such misrepresentations were made to DRE. (Doc. 219 at 12-13.)

Defendants subsequently filed a motion for reconsideration of the Court's Summary Judgment Order. (Doc. 239.) In this motion, Defendants again argued that whether "the product was conforming or nonconforming, or even available, are material fact issues." (*Id.* at 3.) Defendants raised the issue of masks being produced in packages (versus boxes) and again argued that Defendants contracted for masks manufactured in the United States (rather in China). (*Id.* at 3-4.) The Court denied Defendants' motion for reconsideration. (Doc. 248.)

As a result of the Court's Summary Judgment Order and subsequent Reconsideration Order, the claims remaining for trial included only (1) additional damages for breach of contract

---

[6] "PRC" refers to the People's Republic of China.

(Count 2 and Count 5), and (2) liability and damages as to Plaintiff's misrepresentation-based claims (Counts 6-9).

## III. Pretrial Conferences

In preparation for the jury trial in this case, the Court conducted an initial pretrial conference by telephone on December 6, 2024, (Docs. 218, 224), and a final pretrial conference in person on January 10, 2025, (Docs. 257, 316).

During the initial pretrial conference, the parties indicated to the Court that they agreed to put each witness on the stand only once to streamline the presentation of evidence and because of the overlap in witnesses the parties intended to call:

> MR. STANSFIELD: Mr. Kaplan and Mr. Ali and I spoke yesterday. I think there was agreement that, with the Court's permission, we would call witnesses one time in the case. For example, go outside the scope on cross-examination so we don't have to call witnesses back and forth.
> . . . .
> THE COURT: Mr. Kaplan, do you want to weigh in on only calling witnesses one time . . . .
>
> MR. KAPLAN: . . . . Mr. Stansfield is correct. Him and I did discuss yesterday and I have no objection. In fact, I would recommend that the witnesses would be taken in total during whenever they're seated. So I have no objection to that.

(Doc. 224 at 24:6-25.) The parties reaffirmed their intention to call witnesses only once during the final pretrial conference. (*See* Doc. 316 at 21:11-19 ([MR. STANSFIELD:] "[W]e have agreed the witnesses, in order to expedite this, will only be called one time. And so defense will have the opportunity to cross-examine any witness in our case outside the scope of direct, if they choose. So we hope that that will, you know, expedite the week and we won't be putting witnesses on more than once.").) Accordingly, the Court indicated that it would give leeway to the parties regarding the scope of direct- and cross-examination, because the parties would only be calling witnesses once at trial. (Doc. 224 at 24:14-17; Doc. 316 at 21:20-23.)

The Court also discussed the expected length of trial during the initial pretrial conference. DRE estimated that its case "would be three days." (Doc. 224 at 24:13.) Defense counsel then indicated that, in total, the trial should last approximately five days. (Doc. 224 at 25:3-5.) Plaintiff counsel agreed that five days, or a week, was a good estimate. (*Id.* at 7-10.)

7

## IV. Joint Stipulation of Uncontroverted Facts

Preceding trial, the parties also filed with the Court a joint stipulation of uncontroverted facts for use in trial. (Doc. 227.) At the final pretrial conference on January 10, 2025, the Court confirmed with both parties that the stipulation of uncontroverted facts was still valid:

> THE COURT: . . . . And then on the stipulations of facts, are those still valid – stipulation of uncontroverted facts, document 227. Mr. Stansfield?
>
> MR. STANSFIELD: Yes, Your Honor.
>
> THE COURT: Mr. Ali, are those still valid?
>
> MR. ALI: Yes, Your Honor.

(Doc. 316 at 36:25-37:5.)

For purposes of resolving DRE's Omnibus Post-Judgment motion and motion for sanctions, the Court notes the following relevant facts, which both parties stipulated as uncontroverted:

> 4. Berkley is a "shell company."
>
> . . . .
>
> 8. Norbert "Max" Dobi ("Dobi"), Matthew Ortolani ("Ortolani"), and Stephen Forrest ("Forrest") were agents of Berkley.
>
> 9. On September 2, 2021, Lyons executed the Sale and Purchase Agreement on behalf of Berkley pursuant to which Berkley would purchase large quantities of blue and black surgical DRE DMF17 masks from DRE.
>
> . . . .
>
> 16. Berkley provided third-parties "proofs of funds" from accounts that were not owned by or affiliated with Berkley or Lyons.
>
> 17. On September 10, 2021 at 6:14 a.m., Bawany sent Invoice No. 279722 . . . and Invoice No. 279723 . . . to Lyons, Forrest, Dobi, and Ortolani. Lyons and Forrest acknowledged both Invoices sent by Bawany in the same message thread, and Defendants later admitted that they received both Invoices.
>
> . . . .
>
> 24. On September 28, 2021 at 1:26 p.m., Dobi sent a screenshot of a "London & Regional Properties" bank account balance in the amount of approximately $1.9 billion.
>
> 25. Dobi subsequently deleted the screenshot of the "London & Regional Properties" bank account.
>
> . . . .
>
> 27. The goods under the [smaller invoice] cleared customs on October 1, 2021.

28.     Bawany produced the "Customs Clearance Forms" on or before October 1, 2021, along with photographs, to both Lyons and Forrest.

. . . .

33.     On November 1, 2021, DRE's former-counsel sent a letter via email to former-counsel for Berkley indicating that the first shipment under the SPA was available and ready for pickup.

34.     DRE took a video on November 13, 2021, showing masks packed in DRE boxes and loaded in columns on pallets in a warehouse.

. . . .

38.     On November 19, 2021, Dobi sent a WhatsApp message stating "Isaac been begging me daily to go inspect."

39.     On November 19, 2021, Witkin videotaped his inspection of the DRE masks in which he cut open boxes of masks pre-loaded onto a number of trucks.

40.     In the video described above Witkin states that there are "masks as far as the eye can see" and that "these are trucks of masks, I had them pick one trailer randomly and that's what we just picked out, the rest are all containers full of masks . . . these are all masks" and that there is a "total of 63 containers, total of about 5 million boxes."

(*See generally* Doc. 227.)

## V.     Unopposed Motion in Limine

DRE filed motion in limine prior to trial.  (Doc. 210.)  Defendants did not file any response, and the Court granted DRE's motion in limine as unopposed.  (Doc. 230; *see also* Doc. 224 at 19:1-2 ("MR. KAPLAN: . . . . Mr. Stansfield is correct.  We did not make any responses to the motion in limine . . . .").)  Thus, the following prohibitions were established by Order of the Court:

- Motion in Limine No. 1 "prohibit[ed] Defendants from claiming at trial that the Sale and Purchase Agreement ("SPA") . . . contains written terms fraudulently added without Defendants' knowledge or consent or that the Invoices . . . were fraudulently backdated." (Doc. 210 at 7.)

- Motion in Limine No. 2 "prohibit[ed] any argument, evidence, or reference to any criminal charge or conviction" of Mr. Bawany.  (*Id.* at 12.)

- Motion in Limine No. 3 "exclude[d] undisclosed evidence and witnesses."  (*Id.* at 14.)

- Motion in Limine No. 4 "exclude[d] any request by Defendants for liquidated damages." (*Id.* at 17.)

## VI. Jury Trial and Post-Trial Motions

The jury trial began on January 13, 2025, and continued through January 27, 2025. At the ten-day trial,[7] Defendants Berkley and Mr. Lyons were represented by Stuart N. Kaplan and Thomas J. Ali, of Stuart N. Kaplan, P.A. Plaintiff DRE was represented by Wayne Stansfield, Nicholas Rodriguez, Amy Kerlin, and Devan Dal Col, of Reed Smith LLP, and Edgar James, of James Sobba, LLC.

DRE presented a case to the jury as to breach of contract damages on Counts 2 and 5, and as to liability and damages on Counts 6-9 (negligent misrepresentation, fraudulent inducement, fraudulent misrepresentation, and civil conspiracy, together "Fraud Counts").[8] On January 27, 2025, the jury returned verdicts in favor of Defendants on all claims that proceeded to trial. (*See generally* Doc. 281.) In other words, the jury concluded that DRE did not prove that it suffered any damages because of Berkley's breaches of contract (Count 2 and Count 5), and that Berkley and Mr. Lyons were not liable on Counts 6-9. (*Id.*)

Following the jury trial, DRE filed a number of post-trial motions including (1) its "Omnibus Post-Judgment Motion brought pursuant to Federal Rules of Civil Procedure 50, 58, 59, and 60," which includes a Rule 50(b) motion for renewed judgment as a matter of law as to Count 2 and Count 5 on breach of contract damages, a Rule 59 motion for new trial on the Fraud Counts, and a Rule 58 and Rule 60 motion to amend or correct the final judgment to reflect the $14,400,000 Summary Judgment Award; and (2) its motion for sanctions against Defendants and defense counsel, both of which the Court takes up now.[9]

Further facts are set forth as necessary below.

---

[7] The Court did not conduct trial on January 20, 2025, because of the Court's closure for a federal holiday.

[8] At trial, DRE chose not to pursue its claims for actions for account stated (Count 1), promissory estoppel (Count 3), and specific performance (Count 4).

[9] After trial, DRE also filed a motion to pierce Berkley Equity Limited's corporate veil. (Doc. 306.) The Court will address this motion in a separate order.

**Discussion**

The Court's discussion proceeds in two parts:  Part One addresses DRE's post-trial omnibus motion seeking judgment as a matter of law, a new trial, and amended judgment.  Part Two addresses DRE's post-trial motion for sanctions.  There is some overlap in the Court's consideration of these issues.  In the discussion below, however, the Court is mindful of the important differences in the Court's analysis of these issues and considers the facts, statements, and interactions discussed below only when appropriate in the context of the specific issue being analyzed.  As an example, in considering DRE's post-trial motion seeking judgment as a matter of law, a new trial, and amended judgment, the Court generally focuses only on misconduct by Mr. Kaplan that occurred in front of the jury, except where noted otherwise.

## Part One:  DRE's Post-Trial Motions Seeking Judgment as a Matter of Law, New Trial, and Amended Judgment

### I.  Rule 50(b) Motion for Judgment as a Matter of Law on Count 2 and Count 5 Breach of Contract Damages

DRE moves under Federal Rule of Civil Procedure 50(b) for judgment as a matter of law on Count 2 (breach of the larger invoice 279722) and Count 5 (breach of the smaller invoice 279723) on the issue of damages.  DRE argues that at trial it conclusively established benefit-of-the-bargain damages of $169,928,171 or, in the alternative, out-of-pocket damages of $67,389,025, as a result of Berkley's breaches of contract.  Defendants, instead of pointing to any evidence which would support a verdict of no damages, argue that the jury was free to believe or disbelieve any witness—including DRE's damages expert, Gary Durham—and did so in rejecting DRE's damages presentation in whole.

### A.  Rule 50(b) Legal Standard

When deciding a renewed motion for judgment as a matter of law, "the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law."  Fed. R. Civ. P. 50(b).[10]  The Court may direct entry of judgment

---

[10] Under Federal Rule of Civil Procedure 50(b), a party may file a renewed motion for judgment as a matter of law based only on positions asserted in a motion previously made under Rule 50(a).  *See Conseco Fin. Servicing Corp. v. N. Am. Mortg. Co.*, 381 F.3d 811, 821 (8th Cir. 2004) ("The grounds for the renewed motion under Rule 50(b) are limited to those asserted in the earlier Rule 50(a) motion.").  Here, the parties do not contest that DRE satisfied this requirement, and the Court finds that DRE properly asserted its

11

as a matter of law against the nonmoving party where "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a); *see also ContiTech USA, Inc. v. McLaughlin Freight Servs., Inc.*, No. 3:20-cv-00075-SMR-SBJ, 2023 WL 2300398, at *3 (S.D. Iowa Jan. 25, 2023) ("The substantive standards for a Rule 50(a) motion and Rule 50(b) motion are the same." (citing *Walmart, Inc. v. Cuker Interactive, LLC*, 949 F.3d 1101, 1108 (8th Cir. 2020))).

The Court "should review all of the evidence in the record and draw all reasonable inferences in favor of the nonmoving party, without making credibility determinations or weighing the evidence." *Duban v. Waverly Sales Co.*, 760 F.3d 832, 835 (8th Cir. 2014). In other words, judgement as a matter of law is appropriate "when all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the non-moving party." *Hortica-Florists' Mut. Ins. v. Pittman Nursery Corp.*, 729 F.3d 846, 854 (8th Cir. 2013). Generally, "this can occur in two situations: (1) where the party with the burden of proof on that issue fails to present evidence sufficient to support a finding for it on that issue; and (2) where the evidence on an issue is so overwhelming that a reasonable jury could reach only one result." Fed. R. Civ. P. 50 (Practice Commentary). The Eighth Circuit has equated the Rule 50 standard to the Rule 56 summary judgment standard, stating "the inquiry is the same: '[W]hether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Linden v. CNH Am., LLC*, 673 F.3d 829, 834 (8th Cir. 2012) (quoting *Kinserlow v. CMI Corp.*, 217 F.3d 1021, 1025 (8th Cir. 2000)).

**B.  A Verdict of No Damages Is Contrary to the Summary Judgment Order and Missouri Contract Law**

Apart from and prior to considering whether the evidence on the issue of damages presented at trial is so one-sided that a verdict in favor of DRE is the only result a reasonable jury could reach, the Court notes that a verdict of no damages on Count 2 and Count 5 is contrary to the Summary Judgment Order in this case on its face and under Missouri contract law.

The Court's December 6, 2024 Summary Judgment Order concluded that DRE was entitled to judgment as a matter of law on Count 2 and Count 5 for breach of contract. Under Missouri law, a breach of contract claim has four elements: "(1) the existence and terms of a contract;

---

argument that it is entitled to damages on Counts 2 and 5 as a matter of law in a Rule 50(a) motion prior to the Court submitting the case to the jury. (*See* Doc. 273.)

(2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Keveney v. Mo. Mil. Acad.*, 304 S.W.3d 98, 104 (Mo. 2010). (*See also* Doc. 217 at 9 (citing *Keveney*).) Thus, a finding of "damages suffered by the plaintiff" was a necessary component of the Court's December 6, 2024 Summary Judgment Order concluding that Berkley breached (Count 2 and Count 5) and that DRE suffered $14,400,000 in benefit-of-the-bargain damages as a result.[11] (*See* Doc. 217 at 9.) Therefore, the jury's verdicts on Count 2 and Count 5 in favor of Berkley on the issue of whether DRE suffered damages as a result Berkley's breach of contract are inconsistent with the Court's Summary Judgment Order.

Additionally, the jury's verdict that DRE sustained no damages is inconsistent with the Summary Judgment Order in the context of Missouri contract law. Under Missouri law, a judgment of liability for breach of contract and a verdict of zero damages for breach are inconsistent. *See Hadley v. Burton*, 265 S.W.3d 361, 368 (Mo. Ct. App. 2008) ("In Verdict A, the [*Hadley*] jurors found for Hadley [on breach of contract], but they expressly determined that [Hadley] had sustained no damages. In light of that finding, the jury should have returned a verdict in favor of the Burtons. Therefore, Verdict A was facially inconsistent to the point of being self-destructive."). As in *Hadley*, here DRE prevailed on breach of contract liability, but the jury determined that DRE sustained no damages. The jury's verdict is therefore inconsistent with the Court's Summary Judgment Order.

Even if the Court had not already determined as a matter of law that DRE suffered damages in the amount of $14,400,000, the Court also notes that a finding of breach of contract entitles the recovering party to at least nominal damages under Missouri law. *See Luebbert v. Glob. Control Sys.*, 987 F.3d 771, 779 (8th Cir. 2021) ("Missouri courts have sustained breach of contract actions even in the absence of actual damages, awarding nominal damages instead." (citing *Emerald Pointe, L.L.C. v. Jonak*, 202 S.W.3d 652, 664 (Mo. Ct. App. 2006))); *Glenn v. HealthLink HMO, Inc.*, 360 S.W.3d 866, 872 (Mo. Ct. App. 2012) ("[N]ominal damages are available where a contract and its breach are established." (quoting *Dierkes v. Blue Cross & Blue Shield of Mo.*, 991 S.W.2d 662, 669 (Mo. banc 1999))); *Kincaid Enters., Inc. v. Porter*, 758 S.W.2d 503, 504-05

---

[11] The Court found that "[a]s to any other damages that DRE seeks in Counts 2 and 5, the Court concludes DRE is not entitled to summary judgment." (Doc. 217 at 12.) However, the Court made clear that DRE was entitled to seek further damages as to Counts 2 and 5 at trial. (*Id.* at 19.)

13

(Mo. Ct. App. 1988) ("Where actionable injury is shown, there is a right to damages and a court may not direct a verdict for the defendant because the plaintiff is at least entitled to recover nominal damages."). Therefore, the jury's verdict of no damages is further inconsistent with the Court's finding of liability because DRE was entitled to at least nominal damages under Missouri contract law.[12]

### C. The Evidence of Damages Is So One-Sided a Reasonable Jury Would Have to Find for DRE on the Issue of Damages

Distinct and independent of the jury verdict's inconsistency with this Court's Summary Judgment Order and with Missouri law, the Court finds that DRE is entitled to judgment as a matter of law on Counts 2 and 5 on the issue of damages under the Rule 50(b) standard.

Plaintiff DRE had "the burden of proving 'the existence and amount of . . . damages with reasonable certainty.'" *Cole v. Homier Distrib. Co.*, 599 F.3d 856, 864 (8th Cir. 2010) (quoting *Ullrich v. CADCO, Inc.*, 244 S.W.3d 772, 779 (Mo. Ct. App. 2008)). As the burden-bearing party at trial, DRE must now show that the evidence on the issue of damages is so overwhelming a reasonable jury could only conclude that DRE suffered damages. *See* Fed. R. Civ. P. 50 (Practice Commentary). This is admittedly a high standard, but this is an extraordinary case wherein DRE presented *unrebutted* documentary evidence establishing the existence and amount of benefit-of-the-bargain damages. Defendants did not present any rebuttal evidence on DRE's damages calculations, and even tended to corroborate the benefit-of-the-bargain damages values.[13] Nor did Defendants present any evidence to establish any affirmative defense as to contract damages, such as failure by DRE to mitigate its damages.[14] Therefore, the evidence of damages in the record

---

[12] The issue of nominal damages was not addressed by either side at trial whether in the presentation of their respective case or in their proposed jury instructions. Defense counsel argued that DRE should receive zero damages. DRE requested benefit-of-the-bargain damages or actual, out-of-pocket, damages.

[13] Defendants' damages expert, G. Matt Barberich, was the subject of a motion to exclude. (Doc. 213.) Defendants did not file any opposition to DRE's motion to exclude Mr. Barberich, and indicated to the Court during the initial pretrial conference that their expert was now "a moot point." (Doc. 224 at 19:6-9.) Therefore, the Court granted DRE's motion to exclude Mr. Barberich, (Doc. 231), and Defendants did not have a damages expert testify at trial.

[14] Defendants' defense as to benefit-of-the-bargain damages seemingly relied only upon Mr. Kaplan's closing argument in which he argued to the jury that "there should be no damages awarded in this case," (Doc. 325 at 2259:11-12), and that "[j]ust because you breach a contract doesn't automatically give the person who's on the other side the right to damages because there's a common sense element as to what is right and what is fair and whether or not maybe someone's scammed," (*id.* at 2271:15-19). However, attorney's comments and argument are not evidence; DRE's evidence as to benefit-of-the-bargain damages is unrebutted.

does not present sufficient disagreement for submission to a jury; rather, it "is so one-sided" that DRE "must prevail as a matter of law." *Linden*, 673 F.3d at 834.

### 1. Benefit-of-the-Bargain Damages

Under Missouri law, "[d]amages for . . . breach of contract are measured by the 'benefit of the bargain' rule." *Dierkes*, 991 S.W.2d at 669; *see also Timber Ridge Escapes, LLC v. Quality Structures of Ark., LLC*, No. 6:17-cv-03169-MDH, 2019 WL 2060949, at *5 (W.D. Mo. Feb. 28, 2019) (citing Missouri caselaw). Benefit-of-the bargain damages should place the injured party "in the same position had the contract been performed." *Timber Ridge*, 2019 WL 2060949, at *5. In this case, the measure of benefit-of-the-bargain damages is the full value of Berkley's performance of the contracts, *Turner v. Shalberg*, 70 S.W.3d 653, 658 (Mo. Ct. App. 2002), less any costs avoided by DRE when it stopped performing after Berkley's breach and any mitigation of damages, such as through selling masks to other buyers, *see* Restatement (Second) of Contracts § 347 (Comment d); *Bus. Men's Assurance Co. of Am. v. Graham*, 891 S.W.2d at 438, 448 (Mo. Ct. App. 1994).[15]

### 2. Unrebutted Value of Berkley's Performance

At trial, DRE presented unrebutted evidence establishing the full value of Berkley's performance of the SPA and invoices. The undisputed value of Berkley's full performance under the smaller invoice is $11,000,000. (Pl. Ex. 3.) Defendants stipulated the admissibility of Plaintiff's Exhibit 3, reserving only the right to object under Federal Rule of Evidence 403. (Doc. 253 (Joint Stipulation of Admissibility of Evidence).) Defendants did not make any FRE 403 objection upon DRE's introduction of this exhibit at trial. (Doc. 317 at 156-57.) Further, during Mr. Lyons' testimony at trial he acknowledged that the value of Berkley's payment under the smaller invoice was $11,000,000:

> [MR. STANSFIELD:] Q. So why didn't you pay DRE the $11 million it was due just weeks after you entered into this contract?
>
> [MR. LYONS:] A. I – I'd have to ask Matt and I'd have to ask Max and I'd have to refer back to my lawyers who dealt with this at the time.
>
> Q. So as you sit here today, you honestly don't know why you didn't pay them?
>
> A. Sitting here today, no.

---

[15] DRE's motion for summary judgment sought damages for "the loss of the benefit of the bargain of the Agreement ($193,800,000.00), . . . as well as the incurrence of millions of dollars of out of pocket losses . . . ." (Doc. 184 at 2, ¶ 3.)

(Doc. 320 at 869:16-23; *see also* Doc. 324 at 1794:6-11 ("[MR. KAPLAN:] Q. . . . did you have the capacity to pay $11 million? [MR. LYONS] A. Yes. Q. All right. So the payment—the ability to pay that invoice, you had? A. Correct.").)

The undisputed value of Berkley's full performance under the larger invoice is $184,800,000. (Pl. Ex. 4.) Defendants stipulated before trial that "[t]he total value of the Boxed Production Invoice was $184,800,000." (Doc. 227 at 3, ¶ 19.)[16] As with the smaller invoice, Defendants stipulated to the admissibility of Plaintiff's Exhibit 4, (Doc. 253), and did not object when it was introduced at trial, (Doc. 317 at 157). Further, Mr. Lyons' trial testimony concedes that Berkley was committing to purchasing $190 million worth of masks. (Doc. 320 at 822:16-22 ("[MR. STANSFIELD:] Q. . . . [Y]ou understood that you and Berkley were committing to purchase $190 million worth of masks. Correct? [MR. LYONS:] A. Over a period of six months. Correct. Q. Okay. But you understood you were committed to that when you entered into the agreement. Correct? A. Absolutely.").)

Defendants do not contest the value of Berkley's full performance in their suggestions in opposition to DRE's omnibus post-judgment motion. Nor could they considering the foregoing. The evidence as to the value of Berkley's performance is not only uncontradicted, but it is agreed upon and corroborated by Defendants' own stipulations and witness testimony. *See Serv. Auto Supply Co. v. Harte & Co.*, 533 F.2d 23, 27-28 (1st Cir. 1976) (affirming directed verdict for plaintiff on the issue of liability where defense witnesses' testimony "not only . . . fail[ed] to contradict plaintiff's witnesses . . . it corroborated it"). Thus, the evidence is completely one-sided showing that Berkley's full value of performance of the SPA and invoices is $195,800,000.[17]

### 3. Avoided Costs

The second step of calculating damages is to subtract any avoided costs from the full value of performance. Avoided costs are "[t]he benefit a terminating party receives by saving on expenditures it would have incurred absent termination of the contract." *Fire Sprinklers, Inc. v. Icon Contracting, Inc.*, 279 S.W.3d 230, 234 (Mo. Ct. App. 2007) (citing Farnsworth, Contracts, 794, § 12.9). A plaintiff cannot be put in a better position than they would be in had the contract

---

[16] The parties' stipulation of uncontroverted facts was also admitted as a trial exhibit. (Pl. Ex. 163.)

[17] Invoice 279723 (the "smaller invoice") provided that DRE would supply 10,000,000 masks for a total price of $11,000,000. (Pl. Ex. 3.) Invoice 279722 (the "larger invoice"), provided that DRE would supply 120,000,000 blue masks and 24,000,000 black masks for a total price of $184,800,000. (Pl. Ex. 4.)

16

been performed.  *See Forney v. Mo. Bridge & Concrete, Inc.*, 112 S.W.3d 471, 475 (Mo. Ct. App. 2009) ("To award [plaintiff] damages that included compensation for expenses that were actually avoided as a result of the breach would create a windfall.").   As a result, a plaintiff has some burden to present evidence of avoided costs in its damages presentation.  *See id.* at 474-75 (finding plaintiff failed to establish damages "with reasonable certainty" where it "failed to present evidence of the costs [it would have incurred] to complete the subcontract").

DRE introduced evidence of avoided costs through the testimony of CEO Isaac Bawany. Mr. Bawany testified that DRE would have spent up to an additional $20,000,000 to complete its performance under the contract.  (Doc. 318 at 313:1 ("We would have had to spend another $20 million to finish."); 313:15-18 ("There was about another 15 to $20 million left for us to spend to finish the project, deliver all product . . . and move forward.").)  "Generally a business owner's testimonial evidence is sufficient to provide the trier of fact with a rational basis for estimating damages to the plaintiff . . . ."  *Eagle Fuels, LLC v. Perrin*, No. 10-cv-00811-W-SWH, 2014 WL 12601079, at *8 (W.D. Mo. Sept. 12, 2014) (citing *Williams Constr., Inc. v. Wehr Const., LLC*, 403 S.W.3d 660, 666 (Mo. Ct. App. 2012)); *see also Craig Outdoor Adver., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1016 (8th Cir. 2008) ("A business owner may be permitted to testify to the damage he perceives has been done to his business as a result of another's actions.").

Defendants did not present any conflicting evidence at trial as to the costs avoided by DRE. Nor did defense counsel cross-examine Mr. Bawany on this issue.  Therefore, the evidence is completely one-sided as to DRE's avoided costs.  While Mr. Bawany provided a range of potential avoided costs of $15 to $20 million, the Court adopts his $20 million estimate, as it must view the evidence in the light most favorable to the nonmoving Defendants.

### 4.     Mitigation

A damages award should also omit the value of any affirmative mitigation, for example here, selling masks to other buyers.  "The rule of mitigation of damages only bars recovery as to those damages which could have been avoided if reasonable precautions, reasonably known to the injured party, were exercised."  *Bus. Men's Assurance Co. of Am.*, 891 S.W.2d at 448.  Affirmative defenses, such as failure to mitigate damages, must be proven by the defendant.  *See Carpenters' Dist. Council v. Com. Woodworking & Constr., Inc.*, No. 4:11-cv-169-HEA, 2012 WL 1025203, at *6 (E.D. Mo. Mar. 26, 2012) ("The burden of proof of mitigation of damages is on the defendant who must show the opportunity the injured party had to mitigate and the reasonable prospective

17

consequences." (citing Missouri caselaw)); *see also Dollar v. Smithway Motor Xpress, Inc.*, 710 F.3d 798, 805 (8th Cir. 2013) (noting it was defendant's "burden to prove any failure to mitigate damages"); *Eisenmann v. Podhorn*, 528 S.W.3d 22, 37 n.12 (Mo. Ct. App. 2017) ("Mitigation of damages is an affirmative defense which reduces the amount of damages recoverable by an injured party who failed to make some reasonable effort to minimize her damages after the injury occurred."). Therefore, Defendants had the burden at trial to prove an affirmative defense of failure to mitigate damages.

DRE, through its expert witness Gary Durham, concedes that it mitigated its damages in part by selling masks obtained to fulfill Berkley's order to other buyers. (Doc. 309 at 19; Doc. 319 at 680:15-681:10.) Mr. Durham concluded that the value of DRE's mitigation by selling masks originally obtained for Berkley is $3,871,829. (*Id.*) At trial, in addition to the mitigation evidence DRE presented, Defendants pointed to mitigation of damages from a deal DRE entered with a third party, Crystal Ware. Under this deal, Crystal Ware agreed to purchase 5 million poly bagged masks obtained by DRE to fulfill Berkley's smaller invoice for $4.5 million. (Doc. 317 at 308:21-24; Pl. Ex. 144.) Mr. Bawany testified that this deal was contingent on Crystal Ware being able to sell the masks; if it did not sell the masks, DRE would be required to repay the $4.5 million. (Doc. 318 at 310:12-21.) Mr. Durham did not include the $4.5 million in DRE's mitigation amount because his "understanding is that Crystal Ware is demanding its money back." (Doc. 319 at 681:15-18.) However, at trial, Crystal Ware's demand for repayment was only established through Mr. Bawany's testimony, which could be disbelieved by the jury particularly in the face of Defendants' questioning regarding the Crystal Ware deal.[18] *See Willis v. State Farm Fire & Cas. Co.*, 219 F.3d 715, 720 (8th Cir. 2000). Thus, viewing the evidence in the light most favorable to Defendants, the Court finds that Defendants established mitigation in the value of $3,871,829 + $4,500,000, or $8,371,829 total. Defendants presented no other evidence which would establish that DRE failed to further mitigate its damages.

---

[18] While DRE's proposed exhibit list included Crystal Ware Demand Emails (stating that Crystal Ware had been unable to sell the masks and was requesting its money back), that exhibit was not introduced into evidence at trial. (Pl. Proposed Ex. 117; Doc. 283 at 15 (Plaintiff's Trial Exhibit Index).) The only exhibit concerning Crystal Ware which was admitted, (Pl. Ex. 144), is a purchase order for $4,500,000 worth of masks; this purchase order does not contain the condition that DRE must repay Crystal Ware if Crystal Ware is unable to sell those masks.

### 5. Berkley's Unreturned Initial Deposit

Finally, DRE concedes (and the Court previously recognized in its Summary Judgment Order) that any damages award DRE receives should be offset by the $2,000,000 of Berkley's initial deposit that DRE did not return. (Doc. 309 at 19; Doc. 217 at 12.) Max Dobi, who Defendants stipulated was an agent of Berkley, (Doc. 227 at ¶ 8), corroborated that $2 million of the initial deposit was not returned to Berkley. (Doc. 324 at 1972:19-22 ("[MR. DOBI:] A. [Bawany]'s still being paid $3 million. He also – we did another deal where he signed an addendum for paying Berkley 1 1/2 million dollars. He paid a million dollar. He never paid the remaining 500,000.").)

### 6. Conclusion

Therefore, taking the unrebutted value of Berkley's full performance of the SPA and invoices, less DRE's avoided costs, mitigation efforts, and unreturned initial deposit, the Court concludes that DRE suffered the following benefit-of-the-bargain damages as a result of Berkley's breaches of contract in Count 2 and Count 5:

| | |
|---|---|
| Small Invoice Value | + $11,000,000 |
| Large Invoice Value | + $184,800,000 |
| DRE's Avoided Costs | – $20,000,000 |
| Value of DRE's Mitigation | – $8,371,829 |
| Value of Berkley's Initial Unreturned Deposit | – $2,000,000 |
| Total Benefit-of-the-Bargain Damages | = **$165,428,171** |

DRE's Rule 50(b) renewed motion for judgment as a matter of law on Count 2 and Count 5 for its unrebutted benefit-of-the-bargain damages as a result of Berkley's breaches of contract is **GRANTED**, and the Court awards DRE damages in the amount of **$165,428,171**.[19]

---

[19] In the alternative to benefit-of-the-bargain damages, DRE presented evidence of out-of-pocket (or actual) damages. Unlike the benefit-of-the-bargain damages, which were established through stipulated documents and values corroborated by Defendants' witnesses, DRE's case for out-of-pocket damages depends largely on the testimony and report of expert Gary Durham. Defendants argue that the jury could choose to believe or disbelieve Mr. Durham's testimony. While some courts in this circuit have questioned whether a jury can choose to disbelieve an expert who has not been contradicted or impeached, *see ResCap Liquidating Tr. v. Home Loan Ctr., Inc.*, 399 F. Supp. 3d 804, 810-11 (D. Minn. 2019), the Eighth Circuit has confirmed that "[d]etermining the credibility of a witness is the jury's province, whether the witness is

## II.     Rule 59 Motion for New Trial

DRE moves for a new trial in the alternative to a Rule 50(b) judgment as a matter of law as to the breach-of-contract counts (Count 2 and Count 5) and for a new trial as to the fraud counts (Counts 6-9).  In general, DRE argues that it is entitled to a new trial because (1) the jury verdicts are against the great weight of the evidence, (2) defense counsel's improper remarks at trial prejudiced DRE, and (3) evidentiary and legal errors prejudiced DRE.  Defendants respond that DRE has waived its claim for a new trial by failing to move for a mistrial at any time and that, as a result, a "plain error" standard applies to the motion for new trial.  Apart from Defendants' argument that the case turned on credibility determinations, they offer no other argument that responds to the substantive bases of DRE's motion for new trial.  For the reasons explained below, the Court concludes that due to Mr. Kaplan's improper remarks and conduct at trial, DRE was unable to receive a fair trial on the issues properly before the jury and that a new trial is warranted on all counts to prevent a miscarriage of justice.

### A.     Rule 59 Legal Standard

Under Rule 59, the Court may "grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  "The key question in determining whether a new trial is warranted is whether it is necessary to prevent a miscarriage of justice."  *Haigh v. Gelita USA, Inc.*, 632 F.3d 464, 471 (8th Cir. 2011).  Unlike considering a Rule 50(b) motion for judgment as

---

lay or expert," *DiCarlo v. Keller Ladders, Inc.*, 211 F.3d 465, 468 (8th Cir. 2000).  *See also Willis*, 219 F.3d at 720 ("[A] jury is free to disbelieve any witness, even if the testimony is uncontradicted or unimpeached.").

Here, the Court need not rely on DRE's presentation for out-of-pocket damages in ruling on the Rule 50(b) motion.  The evidence establishing DRE's benefit-of-the-bargain damages is so one-sided that DRE must prevail as a matter of law as to that amount.  As previously stated, benefit-of-the-bargain damages are the proper and preferred measure of damages for breach of contract under Missouri law. *Dierkes*, 991 S.W.2d at 669.  Out-of-pocket, or actual, damages are an alternative theory of damages.  *See Catroppa v. Metal Bldg. Supply*, Inc., 267 S.W.3d 812, 818 (Mo. Ct. App. 2008) (describing "actual damages," "consequential damages," and "benefit-of-the-bargain damages").  While a party may proceed upon multiple theories of damages, a plaintiff "may not . . . be made whole more than once."  *Curators of the Univ. of Mo. v. Suppes*, 583 S.W.3d 49, 61 (Mo. Ct. App. 2019) (citing *Catroppa*, 267 S.W.3d at 817). In this case, the Court need not rely on the out-of-pocket damages because those damages overlap with benefit-of-the-bargain damages and DRE cannot recover twice.  *See H&R Block E. Enters. v. Sanks*, No. 16-cv-00206-W-GAF, 2017 WL 4570803, at *5 (W.D. Mo. June 6, 2017) ("[B]ecause this alternative measure of damages . . . overlap[s] with the benefit-of-the-bargain damages . . . the out-of-pocket damages award is subsumed by that award . . . .").

20

a matter of law, in determining whether a new trial is warranted the "district court can rely on its own reading of the evidence—it can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." *Lincoln Composites, Inc. v. Firetrace USA, LLC*, 825 F.3d 453, 459 (8th Cir. 2016) (internal quotation marks omitted).

A court may grant a new trial to prevent a miscarriage of justice when the verdict is against the great weight of the evidence. *See Shaffer v. Wilkes*, 65 F.3d 115, 117 (8th Cir. 1995). "A new trial should be granted only if the evidence weighs heavily against the verdict." *Maxfield v. Cintas Corp.*, 563 F.3d 691, 694 (8th Cir. 2009) (citing *United States v. Rodriguez*, 812 F.2d 414, 417 (8th Cir. 1987)). However, "[e]ven when *substantial* evidence supports a verdict, the trial court may conclude that there has been a miscarriage of justice." *Leichihman v. Pickwick Int'l*, 814 F.2d 1263, 1267 (8th Cir. 1987). A new trial may also be granted based on shockingly inadequate damages. *See Bavlsik v. GM, LLC*, 870 F.3d 800, 809 (8th Cir. 2017) (citing *Riordan v. Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints*, 416 F.3d 825, 833 (8th Cir. 2005)). Other bases for granting a new trial to avoid a miscarriage of justice include improper remarks by counsel, *see Ventura v. Kyle*, 825 F.3d 876 (8th Cir. 2016), and evidentiary or legal errors which affect a party's substantive rights, *see* Fed. R. Civ. P. 61.

**B.     Defendants Incorrectly Argue DRE Waived the Right to Move for New Trial Under Rule 59**

Prior to reaching the merits of DRE's motion for new trial, the Court addresses Defendants' argument that DRE waived its right to seek new trial—unless there is plain error—because DRE did not object to every instance of alleged error or prejudice and it did not move for mistrial at any time. In so arguing, Defendants improperly rely on cases applying the Federal Rules of Criminal Procedure[20] and a case predating Rule 59 and the Federal Rules of Civil Procedure.[21]

---

[20] For example, Defendants cite *United States v. Davis*, 867 F.3d 1021 (8th Cir. 2017), which holds that a criminal defendant waived the right to appeal the denial of a motion for mistrial where he intentionally and voluntarily rejected a curative instruction. (Doc. 336 at 12-13 (citing *United States v. Davis*).) Defendants also cite *United States v. Petrovic*, 701 F.3d 849 (8th Cir. 2012), and *United States v. Edwards*, 111 F.4th 919 (8th Cir. 2024), which are criminal cases concerning waiver in the context of failing to object to curative instructions and Federal Rule of Criminal Procedure 30, which requires specific objections to jury instructions to preserve an issue for appeal.

[21] *See Union Elec. Light & Pac. Co. v. Snyder Estate Co.*, 15 F. Supp. 379 (8th Cir. 1936). (Doc. 335 at 7.)

21

A party moving for a new trial "based on the overwhelming evidence contrary to the verdict" may do so "without ever previously raising such an objection." *Pulla v. Amoco Oil Co.*, 72 F.3d 648, 656 (8th Cir. 1995) (citing *Harris v. Zurich Ins. Co.*, 527 F.2d 528, 529-30 (8th Cir. 1975)); *see also Bank of Am., N.A. v. JB Hanna, LLC*, 766 F.3d 841, 851 (8th Cir. 2014) ("A litigant may seek a new trial under Rule 59 based on the great weight of the evidence without having moved previously for judgment as a matter of law.").[22] In *Pulla*, the Eighth Circuit held that the district court erred in holding the moving party waived its right to move for new trial by not objecting because the motion "rested on evidentiary—as opposed to legal—grounds." *Id.* at 654, 656 n.13. Thus, DRE's Rule 59 motion for new trial on the grounds that the jury verdicts are against the great weight of the evidence is proper, even in the absence of prior objection or motion for mistrial.

Where a party moves for a new trial based on opposing counsel's improper remarks, however, "counsel must either make an objection or . . . move for mistrial at the time of the alleged misconduct . . . ." *Ventura*, 825 F.3d at 884. Here, DRE objected frequently to Mr. Kaplan's improper or misleading remarks and statements at trial. The Court is not convinced by Defendants' argument that DRE waived its right to move for a new trial on the basis of defense counsel's remarks because it did not object to every single instance of alleged misconduct. *See Salt Lake City v. Smith*, 104 F. 457, 470 (8th Cir. 1990) ("There was no reason or call for further objections to evidence of this character, and their only effect would have been to annoy the court and to delay the trial. When a question has once been fairly presented to the trial court, argued, and decided, and an exception to the ruling has been recorded, it is neither desirable nor seemly for counsel to continually repeat their objections to the same class of testimony, and their exceptions to the same ruling which the court has advisedly made as a guide for the conduct of the trial."). Nor is the Court persuaded that DRE was required to move for mistrial; objecting was sufficient. *See Ventura*, 825 F.3d at 884.

---

[22] In fact, a party need not ever move for a new trial on the grounds of great weight of the evidence. A court may, within 28 days of the judgment, *sua sponte* order a new trial on this basis. *See Barfield v. Sho-Me Power Elec. Coop.*, No. 2:11-cv-04321-NKL, 2017 U.S. Dist. LEXIS 160694, at *2 (W.D. Mo. Sept. 29, 2017) (granting new trial *sua sponte* where the Court found the amount of damages awarded against the weight of the evidence). However, here, DRE has properly moved for new trial on the grounds of the great weight of the evidence; the Court does not do so *sua sponte*.

Similarly, where a party moves for a new trial based on jury instruction error, it must object to the instruction during trial. *Pulla*, 72 F.3d at 656 n.13; *see also* Fed. R. Civ. P. 51(c). "A proper instruction objection requires a party to identify 'distinctly the matter objected to and the grounds for the objection in order to give the district court an opportunity to correct errors before submission, and, relatedly, to prevent a losing party from obtaining a new trial by pointing out an error only after receiving an unfavorable verdict.'" *Channel v. Gates & Sons Barbeque of Mo., Inc.*, No. 4:14-cv-00248-BCW, 2016 WL 6908107, at *2 (W.D. Mo. June 2, 2016) (quoting *Moore v. Am. Fam. Mut. Ins.*, 576 F.3d 781, 786 (8th Cir. 2009)). DRE's argument for new trial based on jury instruction error centers around two particular instructions—(1) the curative instruction the Court provided after Mr. Kaplan implied that Mr. Bawany deleted WhatsApp messages and (2) the "Title Instruction" given during jury deliberations. DRE objected to the Court's instructions in both of these instances. Therefore, it may argue for new trial on those bases.

Accordingly, Defendants' argument that DRE has waived its right to move for a new trial on any of the foregoing grounds is rejected. The general standard under Rule 59 discussed above applies, and the Court considers DRE's Rule 59 motion for new trial on the merits.

### C.     Count 2 and Count 5 – Conditional Ruling on New Trial

Above, the Court granted DRE's Rule 50(b) renewed motion for judgment as a matter of law on Count 2 and Count 5 for breach of contract damages. "If the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed." Fed. R. Civ. P. 50(c)(1). Therefore, the Court proceeds to consider whether it would grant a new trial on Count 2 and Count 5 on the issue of breach of contract damages. The Court finds that a new trial on Count 2 and Count 5 would be necessary to prevent a miscarriage of justice because the jury verdict in favor of Berkely on the issue of damages is against the great weight of the evidence and the damages award is shockingly inadequate.

"A court may grant a new trial on the basis that the verdict is against the weight of the evidence, if the first trial results in a miscarriage of justice." *Shaffer*, 65 F.3d at 117 (quoting *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992)). In *Shaffer*, the Eighth Circuit affirmed the district court's ruling granting a new trial based on the weight of the evidence where the district court rejected the plaintiff's testimony and credited the defendant's witness' testimony. *Shaffer*, 65 F.3d at 118. Additionally, a court may grant a new trial where the damages awarded are shockingly

inadequate. *See, e.g.*, *Grodsky v. Consol. Bag Co.*, 26 S.W.2d 618, 623 (Mo. 1930); *Bavlski*, 870 F.3d at 809. Whether the verdict is against the weight of the evidence, or whether damages are shockingly inadequate, is a question of state substantive law. *See Bank of Am.*, 766 F.3d at 851.

In *Bavlski*, the Eighth Circuit affirmed the district court's ruling conditionally granting a new trial on the issue of damages where, in a personal injury action, the jury awarded $0 in future damages to a plaintiff who succeeded in showing liability and at trial established that he was a quadriplegic in need of permanent medical care as a result of the accident underlying the case. *Bavkski*, 870 F.3d at 809 (noting "[t]he trial court first referenced Missouri law and recognized reversal on damages was warranted if the jury's award was 'shockingly inadequate.'"). In *Grodsky*, the Missouri Supreme Court similarly reversed a jury verdict and ordered a new trial where the damages awarded were shockingly inadequate. There, the court stated that

> we are presented with the amazing spectacle of an award of less than $ 200 as adequate compensation for serious, extraordinarily painful, and probably permanent injuries accompanied by many months of total disability and suffering, shown by an abundance of competent, disinterested testimony, fair on its face, of probative value, and wholly uncontradicted. The verdict is shockingly inadequate.

*Grodsky*, 26 S.W.2d at 623.

DRE's damages presentation at trial asserted benefit-of-the-bargain damages in the amount of $169,928,171, and alternatively actual (or out-of-pocket) damages in the amount of $67,389,025. As discussed in depth above, DRE relied on uncontroverted documentary evidence to establish benefit-of-the-bargain damages at trial including avoided costs and some mitigation. In support of direct damages, DRE relies on the testimony of expert Gary Durham and his expert report, (Pl. Ex. 43). Defendants did not put on a rebuttal expert witness on damages, nor did they put on any evidence establishing an affirmative defense to damages—such as failure to mitigate. Instead, Defendants relied on cross-examination to attempt to impeach and contradict DRE's damages evidence.

### 1. Benefit-of-the-Bargain Damages

The evidence establishing benefit-of-the-bargain damages is so one-sided as to entitle DRE to judgment as a matter of law. In light of this finding, the Court concludes that the jury verdicts on Count 2 and Count 5 are also against the great weight of the evidence, as the uncontroverted documentary evidence and corroborating testimony establish that DRE suffered benefit-of-the-bargain damages. This alone is sufficient to conditionally grant a new trial on Count 2 and Count 5.

## 2. Actual, or Out-of-Pocket, Damages

Further, the verdict of no damages is against the great weight of the evidence as it pertains to DRE's presentation of actual damages, which it established through the testimony of expert Gary Durham. Mr. Durham majored in finance, obtained a master's degree in business administration with a focus in accounting, and has been a certified public accountant for approximately 30 years. (Doc. 319 at 659:6-21.) Mr. Durham reviewed documents which included invoices, purchase orders, bank statements, credit card statements, contracts, and correspondence. (Doc. 319 at 666:24-667:2.)

Mr. Durham conducted his analysis by reviewing the different vendors DRE engaged to fulfill the Berkley mask production, and concluded that the following amount of damages existed:

| | |
|---|---|
| JoinWe Electronic Co. Ltd. Liabilities | $44,446,395 <br><br> (Doc. 319 at 669:25-670:1.) (Pl. Ex. 43 at 2, 3.) |
| UFun Medical International Trade Co. Ltd. Liabilities | $18,678,260 <br><br> (Doc. 319 at 673:8-10) (Pl. Ex. 43 at 2, 3-4.) |
| All-Ways Forwarding Charges to AMCO Liabilities | $1,028,778 <br> (Doc. 319 at 675:4-12.)[23] |
| Cash Paid to JoinWe, UFun, and All-Ways Forwarding | $7,276,623 <br> (Doc. 319 at 669:18-21, 670:19, 670:23-25.)[24] |
| YQNLINK Liabilities | $850,799 <br> (Doc. 319 at 678:13-20.) (Pl. Ex. 43 at 6.) |

---

[23] The Court notes a discrepancy in Mr. Durham's trial testimony and expert report on the amount of damages related to All-Ways Forwarding/AMCO. The expert report attributed $543,737 in liabilities to AMCO/All-ways. (Pl. Ex. 43 at 4.) This discrepancy was not explained in the trial record. This discrepancy explains the slightly higher total out-of-pocket loss Mr. Durham testified to at trial ($69,389,025) versus in his expert report ($68,903,984).

[24] These amounts, taken from bank and credit card statements, differ slightly from reported payments in the Joinwe and UFun demand letters, which indicate payments of $4,675,605 and $1,345,740 respectively. (Pl. Exs. 120, 148.) Mr. Durham attributes the difference in the JoinWe credit to "transaction fees and/or other similar charges." (Pl. Ex. 43 at 3 n.4.) However, in determining cash payments, he uses the more conservative amounts to conclude how much cash was paid to JoinWe, Ufun, and All-Ways Forwarding.

25

| | |
|---|---|
| JINC/Nathan Corn Liabilities | $950,000<br>(Doc. 319 at 679:17-20.) (Pl. Ex. 43 at 6.) |
| Rudolph Quick Cash Payment | $30,000<br>(Doc. 319 at 680:2-7.) |
| Total | **$73,260,855** |

Having concluded that the ultimate amount of out-of-pocket damages is $73,260,885, Mr. Durham then deducts a mitigation amount of $3,871,829 for masks that were sold to other buyers. (Doc. 319 at 680:15-681:10.)  Therefore, the net economic damages found by Mr. Durham at trial are $69,389,025.  Mr. Durham also testified that a damages award in this case would be offset by $2,000,000 due to the unreturned initial deposit Berkley paid to DRE.  (Doc. 319 at 723:21-724:1.) And as previously discussed herein, the evidence reflects that DRE received $4,500,000 from the Crystal Ware deal, but that Mr. Durham did not account for this amount.  Deducting these two values as mitigation would bring DRE's actual, out-of-pocket, damages to around $62,889,025. Even if Defendants had put on some further evidence of an affirmative defense such as failure to mitigate or a valid and applicable limitation of liability provision, this would not preclude granting a new trial based on the verdict being against the great weight of the evidence.  *See Am. Bank*, 766 F.3d at 854 (granting plaintiff new trial on breach of contract because the court concluded the verdict of no liability was against the great weight of the evidence, despite some evidence in the record supporting affirmative defenses).

The Court finds Mr. Durham's testimony on actual damages credible and supported by documentary evidence.  He used reasonable methods to connect liabilities arising from the Berkley deal in particular, and his opinion is supported by the documents he relies on.  For example, to determine the JoinWe liability Mr. Durham reviewed two JoinWe purchase orders, "Purchase Order 279722" and "Purchase Order 279723," which correspond to the invoice numbers at issue in the DRE/Berkley deal.  (Pl. Ex. 120 (demand letter); Pl. Exs. 84, 85 (purchase orders).)  As further example, as to UFun, Mr. Durham reviewed a demand letter from UFun dated June 1, 2023, which references "Purchase Order ("PO") 279722," which reflects the larger invoice number.  (Pl. Ex. 148.)  As to All-Ways Forwarding, he connected shipping container numbers from All-Ways invoices to the demand letters from Joinwe and UFun, which provided container numbers related to the DRE/Berkley deal.  (Doc. 319 at 720:3-13.)  Mr. Durham drew similar connections in regard

to the other vendors and only included costs that could definitively be connected to the DRE/Berkley deal in his damages calculation.

While Defendants argue that the jury was free to disregard any or all of Mr. Durham's testimony, this is not a case where the Court is usurping the jury's domain of weighing *conflicting* credible testimony. In *White v. Pence*, 961 F.2d 776 (8th Cir. 1992), the Eighth Circuit distinguished between cases in which there is "a conflict between simple testimony," in which the choice "between the two stories [i]s essentially a credibility determination for a jury rather than a weight of the evidence issue," and cases in which "more is presented than a simple conflict between the testimony of two witnesses." *Id.* at 781. *White* recognized that a district judge deciding a Rule 59 motion for new trial can weigh evidence, assess credibility, and even reject testimony on the basis of lack of credibility. *Id.*; *see also Shaffer*, 65 F.3d at 117 (affirming grant of new trial where district court rejected testimony of one witness after finding it uncredible).

Here, the Court need not resolve any conflict between simple testimony. There simply is no conflicting testimony on the issue of damages for breach of contract. Therefore, the Court is well within its authority to make a credibility determination to resolve DRE's motion for a new trial and concludes that Mr. Durham's testimony and expert report are credible on the issue of actual damages, as he is qualified in the field of accounting, reviewed an extensive cache of documents related to the Berkley deal, and methodically connected DRE's liabilities to vendors providing materials for the Berkley deal, mainly through references to the invoice numbers.

While defense counsel thoroughly cross-examined Mr. Durham, many of the areas of questioning have limited impact on the type of damages calculation Mr. Durham conducted. For example, defense counsel questioned whether a judgment had been obtained against DRE in a court of law reducing each liability to judgment. (*See* Doc. 319 at 689:16-20.) However, Mr. Durham explained that liabilities are not required to be reduced to judgment for purposes of calculating out-of-pocket or actual damages. (Doc. 319 at 715:23-24 ("[T]he liability exists regardless of whether the lawsuit exists.").) Additionally, defense counsel questioned whether DRE's vendors had contracts with Berkley or Anthony Lyons directly. Mr. Durham explained that having a contract between a vendor and an ultimate user "doesn't have anything to do with whether or not DRE is on the hook to make the payments to the parties that it owes money to" as a result

of fulfilling the Berkley deal. (Doc. 319 at 713:24-714:4.)[25] The Court may rely on its own reading of the evidence to determine whether new trial is warranted. Here, Defendants' cross-examination of Mr. Durham did not diminish his credibility.

### 3. Conclusion

Overall, the Court finds that Mr. Durham's testimony and expert report, (Pl. Ex. 43), are credible and provide ample evidence of the existence and amount of actual damages. Thus, given DRE's uncontroverted presentation of benefit-of-the-bargain damages and credible presentation of actual damages, the Court finds that the jury verdict of no damages for Berkley's breaches of contract is against the great weight of the evidence, the damages verdict of $0 is shockingly inadequate, and that a new trial would be necessary to prevent a miscarriage of justice. *See Bavkski*, 870 F.3d at 809; *Grodsky*, 26 S.W.2d at 623. Therefore, DRE's Rule 59 motion for new trial on Count 2 and Count 5 for breach of contract damages is **conditionally GRANTED**.[26]

### D. Fraud Counts (Counts 6-9) – Ruling on New Trial

DRE also presented evidence on four additional claims at trial for which the jury was tasked with determining the issue of liability in the first instance. These claims include (1) fraudulent inducement against Berkley and Mr. Lyons, separately (Count 6); (2) fraudulent misrepresentation against Berkley and Mr. Lyons, separately (Count 7); (3) negligent misrepresentation against Berkley and Mr. Lyons, separately (Count 8); and (4) civil conspiracy against Berkley and Mr. Lyons, jointly (Count 9) (together the "Fraud Counts").

DRE argues that it is entitled to a new trial on the Fraud Counts under Rule 59 because (1) the verdicts are against the great weight of the evidence, (2) defense counsel's improper remarks at trial prejudiced DRE, and (3) the Court committed evidentiary and instructions errors during trial. The same Rule 59 standard applies as discussed above in regard to the breach of contract damages verdicts, mainly whether new trial is necessary to prevent a miscarriage of justice. The Court finds a new trial is necessary to prevent a miscarriage of justice because of the

---

[25] Defendants also argue that Mr. Durham was unsure about DRE's prior earning history and did not review all tax returns. However, DRE's prior earning history and tax returns do not impact a calculation of outstanding liabilities.

[26] The Court would additionally grant a new trial on Counts 2 and 5 for all the forthcoming reasons in support of granting a new trial on Counts 6-9.

pervasive improper remarks by defense counsel Stuart N. Kaplan during trial and the admission of irrelevant evidence and exclusion of relevant evidence.

### 1. Great Weight of the Evidence

First, DRE argues that it is entitled to a new trial on the Fraud Counts because the jury verdict is against the great weight of the evidence. To start, the Court recognizes that the jury verdict pertaining to the Fraud Counts appears to turn on an issue of credibility, unlike the jury verdict pertaining to Counts 2 and 5 for breach-of-contract damages for the reasons explained above. Each of the Fraud Counts required DRE to prove a misrepresentation was made by an agent of Berkley (to establish liability against Berkley) or by Mr. Lyons himself (to establish liability against Mr. Lyons). *See Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 132, 134 (Mo. banc 2010) (fraudulent misrepresentation and negligent misrepresentation elements); *Midwest Printing, Inc. v. AM Int'l, Inc.*, 108 F.3d 168, 170 (8th Cir. 1997) (fraudulent inducement elements). (Doc. 286 at 43 (civil conspiracy jury instruction).)[27] There was conflicting trial testimony as to what representations Berkley and its agents made to DRE which may have induced DRE to enter the SPA and Addendum. "The possibility that the jury could have found Plaintiff['s witnesses] more credible than Defendant's witnesses, which may have resulted in a different result, is not a sufficient basis for granting a new trial." *Mukherjee v. Children's Mercy Hosp.*, No. 16-cv-01291-ODS, 2018 WL 3352663, at *5 (W.D. Mo. July 9, 2018) (citing *Blake v. J.C. Penney Co.*, 894 F.2d 274, 281 (8th Cir. 1990)).

Moreover, an important element of each Fraud Count is some sort of reasonable reliance. (Doc. 286 at 31, 34 (fraudulent inducement); 36, 38 (fraudulent misrepresentation); 38, 40 (negligent misrepresentation).)[28] "Generally, whether a party has justifiably relied on a misrepresentation is an issue of fact for the jury to decide." *ABC Seamless Siding v. Ward*, 398 S.W.3d 27 27, 35-36 (Mo. Ct. App. 2013). Whether it was reasonable for DRE to rely on any representations by Berkley and its agents, in particular whether it was reasonable to rely on a $1.9

---

[27] Establishing civil conspiracy in this case depended on proving a fraudulent misrepresentation. (Doc. 286 at 43.) Therefore, while proving a misrepresentation is not an element of a civil conspiracy generally, because the underlying basis for the conspiracy in this case was fraudulent misrepresentation, it follows that the jury verdict on the civil conspiracy claim was also dependent on whether DRE proved a misrepresentation.

[28] DRE does not challenge the jury instructions requiring reasonable reliance or reasonable belief in its omnibus post-judgment motion.

billion proof of funds which did not contain Berkley's or Mr. Lyons' name, was a question the jury could reasonably decide in favor of Defendants.

Considering all the evidence in the record, in combination with what DRE had to prove in the Fraud Counts, the Court cannot conclude that the verdicts in favor of Berkley and Mr. Lyons on Counts 6-9 are against the great weight of the evidence so as to constitute a miscarriage of justice. Nevertheless, the Court may "grant a new trial even where there is substantial evidence to sustain the verdict." *Lincoln Composites, Inc. v. Firetrace USA, LLC*, 825 F.3d 453, 459 (8th Cir. 2016) (internal quotation marks omitted). The Court finds that Mr. Kaplan's improper and misleading remarks and evidentiary errors raised by DRE are sufficient to justify a new trial on the Fraud Counts to prevent a miscarriage of justice.

### 2. Defense Counsel Stuart N. Kaplan's Improper Remarks

Second, DRE argues that it is entitled to a new trial on the Fraud Counts because defense counsel's improper remarks at trial prejudiced DRE and resulted in a miscarriage of justice. "When deciding whether to grant a new trial due to improper remarks by counsel, we consider whether: (1) the remarks in question were . . . minor aberrations made in passing; (2) the district court took specific curative action; and (3) the size of the damage award . . . suggest[s] that counsel's comment had a prejudicial effect." *Ventura*, 825 F.3d at 885 (citations omitted).

The statements that DRE contends are improper are too numerous to reproduce fully herein. (*See* Doc. 341-1 (Updated Appendix A – 185 examples of improper conduct at trial).) In broad strokes, DRE argues that defense counsel, mostly Mr. Kaplan, continuously and throughout the trial (1) made improper remarks about previously dismissed counterclaims asserting fraud against DRE and Mr. Bawany and issues previously decided by the Court, such as Berkley's breach and DRE's conformity of performance to the contract terms, and (2) made other false or inaccurate arguments, statements, and comments that DRE later showed were untrue through testimony and stipulated facts, such as that Mr. Lyons did not sign the SPA or that DRE fraudulently added provisions to the SPA.

The Court independently notes that Mr. Kaplan frequently made false or misleading statements. Five blatant misrepresentations by Mr. Kaplan presented throughout the trial—which proved untrue during the course of the trial—bear mentioning at the outset:

1. Mr. Kaplan argued that provisions were fraudulently added to the SPA and that the invoices were fraudulently backdated;

2. Mr. Kaplan requested that the jury compare the SPA to a draft version of the SPA in order to have the jury read a limitation of liability provision which was inapplicable to the damages sought in the case because DRE's terms and conditions override the provision and because the provision only barred "special, indirect or consequential damages";

3. Mr. Kaplan used two full days of proffer testimony to attempt to establish a good-faith basis to assert theories of defense which were contrary to DRE's motion in limine, stipulations of fact, and the record before the Court;

4. Mr. Kaplan accused Mr. Bawany of violating China law by exporting surgical masks; and

5. Mr. Kaplan contradicted the stipulation of fact that Berkley, through Max Dobi, an agent of Berkley, sent a $1.9 billion proof-of-funds screenshot to Mr. Bawany and DRE.

The Court will return to each of these examples in its analysis of DRE's request for new trial on the Fraud Counts or its analysis of DRE's sanctions motion below. By the end of trial, it was clear that many of Mr. Kaplan's representations were false and unsupported by the record. Thus, it was highly unfair to DRE for Mr. Kaplan to place these issues in front of the jury. Taken together, Mr. Kaplan's misrepresentations rendered it impossible for DRE to receive a fair trial on the issues remaining for the jury's determination.[29]

### a.     Mr. Kaplan's Opening Statement

Mr. Kaplan set the stage for the jury trial with an opening statement of which most all the points are false, inaccurate, misleading, previously ruled upon, and/or not relevant to the issues remaining for trial.

***First,*** Mr. Kaplan played a DRE Health promotional video which boasted of being "the largest American manufacturer here in the USA." He then told the jurors that the "video was played in Miami in August of 2021" at the Florida International Medical Exhibition ("FIME") and

---

[29] The Court emphasizes here, as recognized at the outset, that more than half of the 185 instances of alleged misconduct identified in DRE's Appendix A attached to its omnibus motion did not occur in front of the jury. The Court does not consider Mr. Kaplan's false statements or misrepresentations made outside the jury's hearing as to whether DRE is entitled to a new trial on the Fraud Counts. *Cf. Ventura*, 825 F.3d 876 (improper statements during closing argument); *Gilster*, 747 F.3d 1007 (same); *Silbergleit v. First Int'l Bank of Fargo, N.A.*, 37 F.3d 394 (8th Cir. 1994) (improper lay witness questioning); *Pavemetrics Sys., Inc. v. Tetra Tech, Inc.*, 652 F. Supp. 3d 1098 (C.D. Cal. 2023) (improper expert questioning). However, nearly 80 instances of alleged improper comments remain which did occur in the presence and hearing of the jury, beginning with Mr. Kaplan's opening statement.

that "[r]epresentatives of Mr. Lyons did, in fact, see that video." (Doc. 317 at 76:12-13.) First, the FIME conference took place from September 1 to September 3, 2021. Thus, Mr. Kaplan's statement that the video was playing in August is blatantly incorrect. Moreover, Mr. Bawany testified that "[t]he video wouldn't have been playing at the FIME conference because it was recorded there at that time" and "[t]he video didn't come out until after" the FIME conference. (Doc. 31 at 122:10-13.) In other words, Mr. Lyons' representatives could not have seen the referenced video at the FIME conference or elsewhere before Mr. Lyons executed the SPA on behalf of Berkley on September 2, 2021, which occurred during the FIME conference itself. Mr. Kaplan's suggestion that the video was part of Berkley's decision to enter the SPA was inaccurate and counter-factual.

*Second,* Mr. Kaplan stated that the evidence would show that Mr. Bawany "is the fraudster here, is the person that misrepresented and committed fraud." (Doc. 317 at 76:9-11.) This statement improperly attempted to paint DRE's most important witness as uncredible from the outset in the eyes of the jury, when the facts presented throughout trial did not support Mr. Kaplan's statement that Mr. Bawany committed fraud. Moreover, the Court had previously granted summary judgment in favor of DRE on Defendant Berkley and Mr. Lyons' fraud claims against Mr. Bawany and DRE.

*Third,* Mr. Kaplan represented that during the COVID-19-era when the DRE/Berkley mask deal was entered, "there was a shortage of getting American made masks, not masks that were made in China or some other [country]." (Doc. 317 at 76:16-17.) Mr. Kaplan stated that jurors would "hear that Mr. Lyons had, in fact, entered into negotiations with various end users, such as JetBlue. But what is the one thing those end buyers wanted? Not Chinese masks. They wanted American manufactured masks." (*Id.* at 76:22-25.) Counsel suggested to the jury that this case is a "classic bait and switch scenario" and reiterated that Mr. Lyons "want[ed] to buy three-ply surgical masks manufactured in America, in the USA, not masks that are imported in China." (*Id.* at 77:11-13.) Mr. Kaplan thus began to imply from the start that Mr. Lyons and Berkley only bargained for masks that were made in the United States and that Chinese-made masks were not acceptable under the parties' agreement. This argument was foreclosed by the Court's Summary Judgment Order and Reconsideration Order. (Doc. 217 at 10; Doc. 248.) Moreover, it is blatantly contradicted by Annex A of the SPA which shows that the "country of origin" as "USA/PRC."

(Pl. Ex. 1.)  Communications sent by or to Mr. Lyons show that he understood that masks would be coming from China.  (Pl. Exs. 10, 40; *see also* Pl. Proffer Exs. B, D.)[30]

**Fourth,** Mr. Kaplan said that Americans were "concerned about the integrity, about the reliability of those masks being FDA approved" and that was why it was important that the masks be from the United States.  (Doc. 317 at 76:18-20.)  However, Mr. Kaplan's comment is misleading because Mr. Bawany obtained FDA releases in relation to the masks coming from China and these FDA releases were sent to Berkley and Mr. Lyons at the same time the customs clearance forms were sent.  (Doc. 318 at 271:1-5; *see also* Pl. Ex. 10.)  Thus, to the extent Mr. Lyons wanted FDA-approved masks, DRE fulfilled this request.

**Fifth,** Mr. Kaplan accused DRE of repackaging and representing Chinese masks "as if DRE Health made those masks in the USA.  That's nonsense."  (Doc. 317 at 77:15-16.)  Again, Mr. Kaplan's argument is foreclosed by the Summary Judgment Order and blatantly contradicted by the record.  DRE had no reason to attempt to "pass off" Chinese masks as American masks because the contract permitted DRE to fulfill Berkley's order with Chinese masks.  (Pl. Ex. 1; *see also* Pl. Ex. 10, 40.)  Additionally, there was no evidence presented at trial that DRE attempted to pass off Chinese masks as being made in the United States.  DRE's mask packaging included phrases such as "USA/PRC," "product of PRC," and "proudly designed in USA."  (Pl. Ex. 1; Pl. Proffer Ex. B.)

**Sixth,** Mr. Kaplan stated that DRE Health's maximum capacity to make masks in Kansas City as of September 2, 2021, was 700 boxes of masks a week (which is 35,000 masks a day, and 245,000 masks a week).  (Doc. 317 at 78:4-9.)  He then promised the jurors that "Mr. Bawany, you will hear—because he testified in a deposition—he suggested that his factory in Kansas City" could manufacture "1 billion masks a week."  (*Id.* at 78:10-14.)  Mr. Kaplan implied that Mr. Bawany's testimony was false because he tied it to the present production capacity of the Kansas City plant as of September 2, 2021.  As Mr. Bawany later explained:

> I said in my testimony we could have been making a billion masks.  That doesn't mean we were making them.  It doesn't mean we're sitting on the materials.  It doesn't mean we're sitting on the labor.  It means that theoretically, we get an order

---

[30] Moreover, trial testimony indicated that having United States masks was actually important to Mr. Lyons because of how *quickly* they could be gotten, not because of the *country of origin*.  (Doc. 322 at 1258:13-14 ("In terms of whether the goods came from China or whether they came from America, to me, the key was timing."); id. at 1269:18-19 ("And being made in America meant we could have them within two weeks.").

of this scale, we could bring in the materials, we can bring in the workers.   And that's what we did.

(Doc. 317 at 185:20-186:1.)   Wholly separate from misrepresenting Mr. Bawany's deposition testimony, in making this statement Mr. Kaplan inserted the issue of DRE's Kansas City factory's production capacity.  This issue was not relevant to the remaining Fraud Counts pending against Berkley and Mr. Lyons.

*Seventh,* Mr. Kaplan told the jurors they would "hear from a witness who used to work for Mr. Bawany.  His name is Ryan Wheeler.  Ryan Wheeler was their engineer." (Doc. 317 at 79:3-5.)  The Court instructed the parties at the final pretrial conference that "[i]f there is a pending issue that you don't know what the final ruling is going to be, do not get into it in your opening or elicit testimony that refers to your expected testimony of that witness." (Doc. 316 at 23:2-5.)   In DRE's trial brief, DRE requested that the Court exclude the testimony of Ryan Wheeler because his testimony was not relevant to the issues that remained for trial.  (Doc. 254 at 3-9.)  On the first day of trial, the Court took up the issue of whether to exclude Ryan Wheeler's testimony regarding "production, lack of capacity, lack of production, lack of manufacturing plant," etc., (Doc. 317 at 9:20-21), and concluded that these areas "do[] not seem to be relevant for the jury at this point," (*id.* at 29:11).  Thus, although the Court had not made a final ruling whether Ryan Wheeler would be permitted to testify, the Court had indicated that his testimony did not appear relevant. Nevertheless, Mr. Kaplan mentioned Ryan Wheeler in his opening despite the Court's instruction not to mention a witness if there was a pending issue the parties do not have a final ruling on.  In the end, Mr. Kaplan chose not to call Ryan Wheeler.

*Eighth,* Mr. Kaplan accused DRE Health of lying about setting up a factory in California to manufacture and produce masks:

> Now why is California important? Because the plaintiffs in their complaint—and you will hear about their complaint—said that we were setting up a factory in California, Lake Buena Vista, to manufacture masks, to produce masks.
>
> I promise to you the evidence will tell you and prove, that was an absolute bald-faced lie.  It absolutely never, ever happened.  There wasn't one mask that was ever produced or manufactured—and you're going to hear Mr. Bawany—he's going to play the juggling game.  Mr. Kaplan, manufacturing versus producing.  Ladies and gentleman, you know what I mean.  I mean taking raw goods, raw materials and making a mask here in the USA.  They didn't make one mask in California.

(Doc. 317 at 79:7-20.)  First, as became abundantly clear during the course of the trial, DRE did in fact rent and set up a factory warehouse in California to facilitate fulfilling the Berkley mask

34

deal. (*See, e.g.*, Doc. 318 at 335:4-18; 432:6-434:19; 607:19-609:6.) Second, Mr. Kaplan's statement to the jury here is misleading as to the proper operative definition of manufacture or produce pursuant to the FDA.[31] Third, the issue of what constitutes manufacturing or assembling of masks was not an issue in this case.

**Ninth,** Mr. Kaplan stated that Mr. Bawany rented or subleased some warehouse in California and that his employees "sat in a parking lot outside this warehouse with glue guns and assembled the boxes and put the masks in the boxes" and that "[y]ou're going to see videos of DRE Health's employees doing that." (*Id.* at 80:1-7.) No such videos were ever played during the trial. Moreover, to the extent that Mr. Kaplan here admits that there were masks packaged and ready in boxes, this statement shows that Defendants' claims that there were never boxed masks available to pick up were inaccurate and made in bad faith.

**Tenth,** Mr. Kaplan states that "Mr. Bawany would like you to believe and will try to suggest that he was setting up a factory in California to meet the demand of Mr. Lyons' order." (*Id.* at 80:8-10.) As already discussed, DRE did in fact rent and set up a factory warehouse in California to facilitate fulfilling the Berkley mask deal. (*See, e.g.*, Doc. 318 at 335:4-18; 432:6-434:19; 607:19-609:6.) Mr. Kaplan's misleading statement to the contrary harmed DRE not only because it was misleading as to the facts but also because Mr. Kaplan cast doubt on the credibility of Mr. Bawany—DRE's most important witness with regard to proving its claims against Defendants—without any basis in fact for doing so.

**Eleventh,** Mr. Kaplan claims that "[i]t was absolutely impossible for [DRE] to fulfill that contract. [Mr. Bawany] didn't tell Mr. Lyons that. He didn't tell their representatives that. He grabbed the money. And what did he do? He ran to China to try to buy Chinese masks." (*Id.* at 81:7-10.) Again, to the extent Mr. Kaplan accurately points out that Mr. Bawany bought some masks from China to fulfill the Berkley deal, this is because *the SPA specified that the product would come from "USA/PRC."* Mr. Kaplan's persistent attempts to insert the issue of China versus

---

[31] Throughout trial, Mr. Kaplan encouraged a "common sense" definition of manufacturing, suggesting raw materials must be used to make the masks from scratch to be considered manufacturing. DRE noted for the Court that the FDA defined "manufacturer" more broadly. The FDA's definition of "manufacturer" includes "any person who designs, manufactures, fabricates, assembles, or processes a finished device. Manufacturer includes, but is not limited to, those who perform the functions of contract sterilization, installation, relabeling, remanufacturing, repacking, or specification development, and initial distributors of foreign entities performing these functions." 21 C.F.R. § 820.3(b). Thus, DRE argued that relabeling and repacking the masks in California met the definition of manufacturing masks. Regardless, this was not an issue in the trial because of the Court's Summary Judgment Order.

35

United States masks was improper, confusing, and misleading to the jury. In this statement, Mr. Kaplan also asserts that Mr. Bawany and DRE were unable to fulfill the contract. This too was not an issue in the trial for the jury to determine.

*Twelfth,* Mr. Kaplan accused Mr. Bawany of violating Chinese law by importing Chinese surgical masks in boxes mislabeled "nonsurgical, nonmedical." (Doc. 317 at 81:15-82:7.) Apart from his opening statement, Mr. Kaplan never addresses this accusation again or provides any support for it.

*Thirteenth,* Mr. Kaplan stated that Mr. Lyons paid the $3 million initial deposit and then DRE was supposed to "within 10 days, start delivering masks." (Doc. 317 at 82:14-17.) This statement is contrary to the plain text of the SPA and the Court's Summary Judgment Order interpreting the SPA—as a matter of law[32]—as follows:

> Reading the SPA in full, it clearly states DRE was to provide an estimated delivery schedule, (Doc. 188-1 at 4 ¶ 2(a)), and that delivery schedule—rather than the masks themselves—was due 10 business days after Berkley paid the SPA's deposit, (*id.* at 8 ¶ 11(d)).

(Doc. 217 at 10.) The Court concluded that *the delivery schedule* was due within ten days of the deposit, not the first delivery of masks. Mr. Kaplan's statement to the contrary misled the jury as to issues previously decided by the Court as a matter of law.

*Fourteenth,* Mr. Kaplan said as a result of not delivering masks within 10 days of the payment of the deposit, "They breached. They violated the terms of the contract. And so a month later, on October 19th, they entered into an addendum." (Doc. 317 at 82:18-20.) This statement, as well, is directly contrary to the Court's Summary Judgment Order.

> [W]ithin 10 business days DRE provided the China Production Invoice and the Boxed Production Invoice, each of which contained more specific delivery schedules, thus indicating DRE did not breach the SPA.

(Doc. 217 at 10.) Even if Mr. Kaplan was displeased with the Court's Summary Judgment ruling as to breach of contract liability, a jury trial limited to contract damages and determination of liability on the Fraud Counts was an improper avenue to challenge these already decided issues. It left the jury with irrelevant and confusing information that no doubt impacted their consideration of the issues properly before them.

---

[32] The interpretation of a contract is an issue of law for the Court to decide, and the language of a contract is to be given its plain meaning. *See Allen v. Cont'l W. Ins. Co.*, 436 S.W.3d 548, 553-54 (Mo. 2014).

***Fifteenth,*** Mr. Kaplan brazenly claimed:

> So—common sense. Mr. Lyons breach? He didn't breach. Here's the contract. Here's the addendum. Who breached? That man right over there [indicating Mr. Bawany]. His company. He—he breached. Took my client's $3 million. He knew it was impossible. He didn't have the capacity. He didn't have the equipment. He didn't have the people. It was a sham. It was a straight up fraud.

(Doc. 317 at 83:12-18.) Mr. Kaplan claimed to the jury precisely the opposite of what this Court found in its Summary Judgment Order—that Berkley breached and DRE did not.

***Sixteenth,*** Mr. Kaplan stated that Mr. Bawany then made an "accommodation" for Mr. Lyons and Berkley (presumably by entering the Addendum) "[b]ecause [Mr. Bawany] knew he had already ordered Chinese masks for another buyer." (*Id.* at 83:19-21.) This statement is controverted by the contract documents which show that the masks from China were always for the Berkley deal, from before the signing of the Addendum. (*See, e.g.*, Pl. Ex. 3 (smaller invoice); Pl. Ex. 85 (Joinwe invoice for materials for smaller invoice).)

***Seventeenth,*** Mr. Kaplan told the jurors that "you'll get to see the whole SPA. On the limitations of liability, neither party shall be liable directly or indirectly for any special indirect or consequential–" (*Id.* at 95:2-5.) The limitation of liability provision was not in play in this case because DRE's terms and conditions supplanted the limitation of liability in the SPA; additionally, even if the limitation of liability were applicable it only barred consequential or special damages which DRE was not seeking in the jury trial.

Much of Mr. Kaplan's opening statement was false, inaccurate, misleading, and improper in different respects. Mr. Kaplan's opening statement set the stage for the ten-day trial that was to follow, as he continued to interject and to raise many of these same issues throughout the trial, poisoning the trial from the outset and necessarily preventing DRE from receiving a fair trial.

### b. Relitigating Summary Judgment

As previewed in his opening statement, a large part of Mr. Kaplan's trial strategy from the start was to present a defense primarily by relitigating issues decided by the Court at the summary judgment stage, even after the Court denied Defendants' motion for reconsideration. At nearly every turn, Mr. Kaplan refused to disclose a cognizable trial strategy and for good reason: had the Court been aware at the beginning of trial that Mr. Kaplan's intention was simply to relitigate summary judgment issues, the Court would have more forcefully tried to establish clear parameters for the issues at trial. As it was, when Mr. Kaplan's trial strategy became more clear and the Court attempted to establish guardrails and parameters as the trial went forward, this did little to put the

trial back on track as Mr. Kaplan continued to persist in trying to litigate these issues at trial anyway.[33]  Mr. Kaplan's strategy, which he now attempts to frame merely as "zealous advocacy," caused numerous interruptions and required numerous curative instructions to address issues being presented to the jury that were simply not to be decided by the jury in this case.

The Court's December 6, 2024 Summary Judgment Order clearly found that Berkley was liable for breach of contract in Counts 2 and 5 of the complaint and that DRE did not breach.  The Court specifically found that Berkley was first to breach under the SPA by failing to *pay* the smaller invoice upon the masks *clearing customs*.  (Doc. 217 at 9.)  The Court further found that Berkley was first to breach under the Addendum by failing to *pick up* the larger invoice masks *as they became available*.  (*Id.*)[34]  The Court also granted DRE summary judgment as to all of Defendants' counterclaims, including breach of contract and fraud claims.  Further, the Court addressed and rejected Defendants' argument as to the conformity of the masks to the agreement as it related to the issue of whether masks would be from the United States or China.  (Doc. 217 at 10.)  In denying Defendants' motion for reconsideration, the Court once again rejected Defendants' argument that the masks were to be produced in the United States rather than China and also rejected Defendants' additional argument that masks were to be made available in boxes, rather than packages or plastic bags.  (Docs. 239, 248.)[35]  Despite these findings by the Court, Mr. Kaplan denied Berkely's breach of contract and throughout the trial argued that the masks DRE made available to Berkley were non-conforming in various ways.

---

[33] This is key.  Not only did Mr. Kaplan disregard the Court's Summary Judgment Order with his persistent attempts to introduce evidence and elicit testimony that was relevant, if at all, only to the defense's position on issues decided by the Court on summary judgment, doing so also violated the Court's other trial orders, such as DRE's unopposed motion in limine and oral rulings on relevancy of evidence.  All counsel are of course expected and obligated to zealously represent and advocate for their client.  Zealous advocacy, however, does not include the intentional and continual violation of the Court's orders, no matter how much counsel may believe the Court has wrongly decided a question.  This is especially true as here when the matter proceeds to a jury trial in which the Court's role is to ensure a full and fair trial for both sides.

[34] At trial, it was Mr. Kaplan's position that DRE was first to breach the SPA on September 30, 2021, when bagged, rather than boxed, masks arrived at the port, and the masks remained floating in the port so that no inspection could be conducted. (Doc. 322 at 1302:18-1304:9.)  Mr. Kaplan asserted that the first breach of the Addendum was by DRE on October 22, 2021, when DRE remitted $1,000,000 to Berkley, and not $1,500,000.  (*Id.* at 1311:19-1316:7.)

[35] Moreover, at the final pretrial conference Mr. Kaplan attempted to persuade the Court to change its summary judgment ruling, which the Court again denied.  (Doc. 316 at 11:8-12:14.)

38

As discussed above, Mr. Kaplan blatantly disregarded the Court's summary judgment findings in his opening statement by claiming that Mr. Lyons and Berkley did not breach, and that Mr. Bawany and DRE did breach. (Doc. 317 at 83:12-18.) This was merely the beginning. What follows is another example of Mr. Kaplan challenging the Court's finding that Berkley breached and DRE did not:

> [MR. KAPLAN:] Q. Does that paragraph identify who was in default?
>
> [MR. BAWANY:] A. It doesn't say Berkley didn't default first.
>
> Q. Okay. Who does it say defaulted?
>
> A. Second, DRE Health.
>
> Q. It says you defaulted, meaning you as the producer. Correct?
>
> A. It doesn't specify who defaulted first.
>
> Q. Mr. Bawany, it says with respect to such default by producer. Did I read that correctly?
>
> A. Berkley defaulted first –
>
> Q. Did I read that correctly, Mr. Bawany?
>
> THE COURT: I – we're getting to the point that I think you've made your point that this document says this was defaulted. The Court has found that pursuant to the agreement that the first to default after and upon this reset of October 19th as a matter of law was defense.
>
> MR. KAPLAN: Thank you.
>
> THE COURT: I have not seen your relevance as to what the significance of this is.

(Doc. 318 at 451:2-20; *see also* Doc. 319 at 645:5-647:18; Doc. 320 at 988:14-995:9.) Mr. Kaplan continued to question Mr. Bawany about whether DRE defaulted on the SPA first, despite the fact the Court rejected this exact argument by Defendants in its Summary Judgment Order finding that Berkley was first to breach. (Doc. 217 at 10-11.)

As to the conformity of the masks, Mr. Kaplan argued throughout trial in front of the jury that (1) the masks were supposed to be from the United States, rather than China;[36] (2) the masks

---

[36] (*See, e.g.*, Doc. 317 at 77:11-16 (Mr. Kaplan's opening statement); Doc. 318 at 369:17-370:5 (Eid cross-examination); Doc. 318 at 474:25-475:20 (Bawany cross-examination); Doc. 320 at 960:19-961:24 (Lyons examination by Kaplan).)

were supposed to be boxed, rather than bagged;[37] and (3) the masks were merely assembled or boxed in the United States, rather than manufactured in the United States.[38]  Further, Mr. Kaplan frequently argued and elicited testimony that DRE did not have the capacity to fulfill the Berkely contracts in the Kansas City or California locations.[39]  These comments and lines of questioning were improper and irrelevant to the issues remaining for trial, as each goes to a breach of contract *liability* defense theory, and liability was already determined by the Court.

While the previous footnotes provide citations to many instances of Mr. Kaplan improperly eliciting testimony about issues resolved in the Summary Judgment Order, the Court includes the following interaction in whole as an example of Mr. Kaplan clearly attempting to elicit testimony regarding DRE's production capacity and whether the masks were supposed to be boxed.  This interaction also shows the extensive amount of time Mr. Kaplan dedicated to rearguing such issues during the trial, in part due to the repetitive nature of his questioning:

> [MR. KAPLAN:] Q. And so asking it again. Back in September of 2021, did DRE Health have the capacity or the ability at their Kansas City facility to meet the requirements of Berkley's contract?
>
> [MR. EID:] A. Like I said, it wouldn't have been feasible to manage all the pickups from there.
>
> Q. Is that a no?
>
> A. Correct.
>
> Q. Now, Mr. Eid, were you aware or made aware that the Berkley order was a box order, meaning that masks were actually required to be put into boxes?
>
> A. Yes.
>
> Q. And so there was no understanding by you that Berkley had entered into a contract to receive and accept masks that were in plastic bags?
>
> A. I think that was a separate deal if I'm not mistaken.

---

[37] (*See, e.g.*, Doc. 317 at 77:11-16 (Mr. Kaplan's opening statement); Doc. 318 at 353:2-16, 361:14-362:17 (Eid cross-examination); 437:15-441:20 (Bawany cross-examination); Doc. 320 at 957:2-960:17 (Lyons examination by Kaplan); Doc. 324 at 1881:6-21 (Lyons re-examination by Kaplan).)

[38] (*See, e.g.*, Doc. 317 at 75:12-15, 76:25-77:1, 79:7-20 (opening statement); Doc. 318 at 347:13-20, 363:18-364:16 (Eid cross-examination); 376:23-380:14 (Eid post-jury question examination); 473:3-475:25 (Bawany cross-examination); Doc. 320 at 960:19-961:24 (Lyons examination by Kaplan); Doc. 324 at 1927:11-1928:12 (Blackham cross-examination).)

[39] (*See, e.g.*, Doc. 317 at 81:6-9 (Mr. Kaplan's opening statement); Doc. 318 at 351:9-15 (Eid cross-examination); 426:19-432:5, 472:18-21 (Bawany cross-examination); Doc. 320 at 976:8-978:1 (Lyons examination by Kaplan); Doc. 325 at 2258:9-2259:5 (Mr. Kaplan's closing statement).)

Q. What separate deal?

A. I believe Stephen Forrest had said that he had a buyer for – for masks that were not boxed. I think that was a completely separate agreement from the SPA that you mentioned earlier, but – this deal, like you said, I remember it being about boxed goods, yes.

Q. I'm talking about the Berkley/Anthony Lyons deal. Were they supposed to be boxed?

A. Yes.

Q. Mr. Eid, you have – I think you have their volume up there?

A. Yes.

Q. Okay. Just give me a second. Would you take a look at Plaintiff's Exhibit 3 in that binder, sir?

A. So just go to the tab?

Q. Yes, sir.

A. I see it. I see an invoice.

Q. That's an invoice?

A. Yeah.

Q. Okay. And can you give – can you tell the jurors what invoice you're referring to that's Plaintiff's Exhibit 3?

A. Invoice 279723.

Q. Okay. And are you familiar with this document? Have you ever seen this document before?

A. I believe I have, but it's been a very long time.

Q. Okay. Let me ask you a question. And if I need to help you, I'll assist you, but I bet you you can figure it out. Looking at this invoice and looking under UOM, does it tell the reader as to whether or not those masks are supposed to be in bags or boxes?

A. Boxes.

Q. Thank you. Would you take a look at the next exhibit. That's Plaintiff's Exhibit 4. And by the way, just go back to tab 3. I'm sorry, Mr. Eid.

A. All right.

Q. How many – what was the quantity of that invoice?

A. 10 million boxes.

Q. 10 million. Okay. Now go to Plaintiff's Exhibit 4. Same question. Were those masks supposed to be in bags or boxes?

A. Boxes.

Q. And how many?

A. 120 million.

Q. 120 million?

A. In addition to 24 million black boxes. So 120 million blue, 124 [sic] million black, a total of 144 million boxes.

Q. Now, have you ever seen any other invoices to your knowledge in connection with any deal, separate deal, third deal, fourth deal, fifth deal, sixth deal, or is this the invoice that you are familiar with?

A. I believe this is the invoice that I'm familiar with.

Q. So looking at these invoices, the masks that were supposed to be produced were supposed to be in boxes. Is that correct?

A. I remember the – I remember masks coming in bagged. I'm not sure if – if – if this was one of the invoices for them or not. I just remember that certain bagged masks had came, a plethora, actually, of bagged masks. And I remember those were supposed to be delivered bagged, not boxed as a short-term option until the boxes were boxed. I'm not sure if this is the same invoice or if it was a different invoice. I'm not sure.

Q. We're looking at these invoices, these two invoices.

A. These two invoices both dictate that the masks should be boxed.

Q. And just for the jurors, we're talking about invoice 279723. Correct?

A. Yes.

Q. And that's for 10 million masks – or 10 million boxes?

A. Yes.

Q. And then 279722, that's for 144 million boxes. Is that correct?

A. Yes.

(Doc. 318 at 351:9-354:22.)

Mr. Kaplan argued to the Court that these issues were relevant to the jury's liability determination on the Fraud Counts because it went to what Berkley and Mr. Lyons understood about the agreement and whether they committed fraud. The Court thus provided leeway to defense counsel to address these topics during the opening days of trial, but after defense failed to demonstrate how these topics were relevant to the Fraud Counts the Court eventually precluded further discussion of these topics and provided curative instructions to the jury.

As to Mr. Kaplan's arguments regarding manufacturing masks (rather than merely assembling or packaging masks), the Court provided the following instruction during Mr.

Blackham's cross-examination following a series of questions Mr. Kaplan posed related to the issue:

> [MR. KAPLAN:] Q. When did you go out to Buena Park in California? What month?
>
> [MR. BLACKHAM:] A. November.
>
> Q. Okay. November what year?
>
> A. 2021.
>
> Q. Were they actually manufacturing, producing, meaning making masks in California in that facility?
>
> A. Yes.
>
> Q. They had – and so they weren't reboxing? They were actually manufacturing the masks?
>
> MR. RODRIGUEZ: Objection, Your Honor. We're going down –
>
> THE COURT: Sustained. That's not an issue. I think your question was were they reboxing or actually manufacturing the masks.
>
> MR. KAPLAN: I believe Mr. Blackham said that they were producing masks in California.
>
> BY MR. KAPLAN:
>
> Q. Is that what you said, Mr. Blackham?
>
> A. The FDA's definition of manufacturing includes relabeling, remanufacturing, and repacking. So, yes, we were manufacturing masks in California.
>
> Q. Were they actually creating the mask itself –
>
> MR. RODRIGUEZ: Your Honor, can we have a sidebar?
>
> THE COURT: We put up the parameters.
>
> MR. KAPLAN: Your Honor, I'll move on.
>
> THE COURT: Please approach.
>
> MR. KAPLAN: I'll move on, Your Honor. It's okay. I'm going to withdraw the question.
>
> THE COURT: It's confusing. And I would ask the jury to disregard questions regarding manufacturing, producing as that is not an issue that will be a jury determination.

(Doc. 324 at 1927:6-1928:12.) As to the other issues, the Court provided a curative instruction at the end of evidence and prior to closing arguments (this instruction was also provided to the jury as part of their written instructions packet):

Instruction Number 19.

1. The jury is instructed that the law of the case and the contract documents dictate that evidence of whether the masks were manufactured in China or the United States is not to be given any weight by the jury and is not an issue in the case. The Court has determined that the contract (SPA – Plaintiff's Exhibit 1) provides that the masks under either the SPA or either of the invoices (Plaintiff's Exhibits 3 and 4) may come from either the People's Republic of China or the United States.

2. The jury is instructed that the capacity of the Kansas City plant or the California facility or facilities is not an issue to be considered by the jury as the contract (SPA – Plaintiff's Exhibit 1) provides that the masks may come from either the People's Republic of China or the United States.

3. You may have heard argument concerning whether the masks at issue should have been made available in boxes or plastic bags/packs as to invoice 279723 (the smaller September 10 invoice – Plaintiff's Exhibit 3). Whether masks were made available in boxes or plastic bags/packs is not an issue in this case as to invoice 279723 (the smaller September 10 invoice – Plaintiff's Exhibit 3). Any testimony or argument regarding masks made available in boxes versus plastic bags/packs should be disregarded and given no weight as to those masks and that invoice ending in 23.

4. You may have heard the term FOB or free on board used during the parties' respective cases. This is a term of art, and any questions concerning this term shall be resolved by the Court and not the jury.

5. Any purported right to inspect is not at issue in this case and should be disregarded and given no weight.

(Doc. 325 at 2160:6- 2161:12; Doc. 287 at 24.) Mr. Kaplan's comments and questioning concerning issues resolved in the Summary Judgment Order were pervasive. Despite the Court's best efforts to instruct the jury as to the issues properly before it, in light of the pervasive nature of Mr. Kaplan's comments the Court is not confident that its instructions were sufficient to overcome the prejudice DRE faced from Mr. Kaplan's strategy to relitigate summary judgment at trial.

### c.      Accusing DRE and Mr. Bawany of Fraud

Mr. Kaplan also attempted to frame DRE's CEO Isaac Bawany as a fraudster from the beginning to the end of the trial, despite the Court dismissing all counterclaims that Defendants brought against DRE and Mr. Bawany, including those asserting allegations of fraud, in the Summary Judgment Order. A portion of such statements are discussed herein.

As previously discussed, in Mr. Kaplan's opening statement, he stated "[a]nd Mr. Bawany, the evidence is going to show, is the fraudster here, is the person that misrepresented and

committed fraud." (*See* Doc. 317 at 76:9-11.) This, among other comments in Mr. Kaplan's opening statement, caused plaintiff counsel to request a sidebar[40] to object to Defendants implying that there were any contract or fraud claims pending against DRE or Mr. Bawany and requesting a curative instruction. (Doc. 317 at 84:9-85:10.) After a long delay at the bench, (Doc. 317 at 84:9-92:15), the proceedings returned to open court and the Court gave a curative instruction to the jury:

> There was an objection to Mr. Kaplan's statement regarding, quote, "Mr. Lyons' breach," question mark? He didn't breach.
>
> There are no pending claims against the plaintiff for fraud or breach of contract. And the contract at issue in this case is collectively the SPA, two invoices, and the October 19th, 2021, addendum. The Court has found that there was a breach of contract after the contract was revised in the addendum. There was a breach of contract by the defense.

(*Id.* at 92:16-24.)

During Mr. Bawany's cross-examination by Mr. Kaplan, Mr. Kaplan implied that Mr. Bawany was deceptive, asking him if he had deleted WhatsApp or text messages:

> [MR. KAPLAN:] Q. Okay. And those text messages that you saved, did you ever turn them over to your attorney?
>
> [MR. BAWANY:] A. Yes.
>
> Q. Okay. And did you turn them over in its complete – meaning did you cherry pick or delete texts?
>
> A. Absolutely not.
>
> . . . .
>
> Q. Did you delete any text messages?
>
> A. Never.
>
> Q. Never.

---

[40] Throughout trial, plaintiff counsel was forced to raise many objections and request a multitude of sidebars to address misconduct by Mr. Kaplan. These frequent objections and lengthy sidebars by plaintiff counsel placed DRE in an unfair position. Pursuant to this Court's standard practice in jury trials, the Court administered a short survey to each juror after the verdict was returned. Even though plaintiff counsel's objections were the direct result of *Mr. Kaplan's misconduct*, the jury held these delays against *plaintiff counsel and DRE*. Multiple jurors commented that the number of sidebars were the "least affective aspect[]" of plaintiff counsel's performance. Additionally, one juror commented that they "felt [plaintiff counsel] tried to hide a lot of things," and another commented that plaintiff counsel was "too hard trying to silence the defense." The Court does not rely substantively on these informal post-trial juror surveys but includes reference to them herein anecdotally to demonstrate the effect that Mr. Kaplan's conduct had on the jurors' perception of plaintiff counsel.

A. Not in this regard.

Q. Okay. And did you delete any text messages within the text? Meaning, for example, let's say you're texting and line 4 or line 5, it jumps to line 7. Would you have deleted any text messages in between?

A. No. Only Mr. Dobi did that.

Q. I asked you whether or not you did that?

A. No. Only Mr. Dobi did that.

. . . .

(Doc. 319 at 536:20-540:12.) The truth of the matter was Mr. Kaplan failed to realize that the trial exhibit he was referring to, (Pl. Ex. 11), and which was created by DRE for use in its case, did not contain consecutively paginated Bates numbers. (Doc. 319 at 540:18-541:19.)

During the following sidebar, Mr. Kaplan first claimed that the defense never received the full range of Bates numbers reflecting the WhatsApp messages chain. (Doc. 319 at 543:16, 544:18-23.) This assertion was incorrect. The Court then took a long break, during which DRE's counsel found metadata from discovery production showing the full range of Bates numbers was produced to the defense on August 23, 2024. (Doc. 319 at 548:23-549:4.) Mr. Kaplan then conceded he was no longer claiming he did not receive those documents. (Doc. 319 at 549:10-12.) Mr. Kaplan then argued that he was not suggesting to the jury that anything was deleted by Mr. Bawany, despite asking precisely that question to Mr. Bawany multiple times. (*Compare* Doc. 319 at 550:3 ("I'm not suggesting deleted."), *with* 537:13 ("Did you delete any text messages?").) Here, Mr. Kaplan improperly accused Mr. Bawany of deleting evidence in front of the jury due to Mr. Kaplan's own misunderstanding of the exhibit, and then Mr. Kaplan attempted to mislead the Court that he had not suggested that the texts were deleted. After a sidebar and a nearly two-hour recess,[41] the Court gave the jury a curative instruction as follows:

> I want to give you an oral instruction to please disregard any questions related to whether Mr. Bawany deleted the contents of any text messages in connection with communications with Mr. Dobi as it relates to Exhibit Number 11. Any such questions to Mr. Bawany that infer or imply that Mr. Bawany deleted text messages should be disregarded as it is not part of this record. Mr. Kaplan was mistaken in his belief that Mr. Bawany deleted messages. And this mistake should not be attributed to Berkley Equity Corporation or Mr. Anthony Lyons.

---

[41] The entirety of the sidebar concerning Mr. Kaplan's improper accusation of deleting messages can be found at Doc. 319 at 540:14-591:23. This interaction and break from trial testimony lasted nearly two hours, from 8:54am to 10:37am.

(Doc. 319 at 592:4-13.)

Finally, during closing arguments, Mr. Kaplan once again attempted to frame Mr. Bawany as a fraudster. (Doc. 325 at 2216:17-2217:2 ("Let me tell you what this case is really all about. Deception. Deception. This case is about deception. The act of convincing one of untrue information. An example, giving false impressions. Fabrication of facts. . . . And that is why this case boils down to Mr. Bawany, his company, they're not entitled to any damages because of their deception.").)[42] These baseless and mistaken accusations of fraud and deception against DRE's CEO Isaac Bawany in front of the jury prejudiced DRE by improperly impugning the credibility of one of its most important witnesses.

### d.      Other False Statements

DRE also argues that Mr. Kaplan made other false or inaccurate arguments, statements, and comments to the jury that DRE showed were untrue through testimony and stipulated facts, such as that DRE fraudulently added provisions to the SPA or that the invoices were fraudulently backdated, which DRE correctly notes were defenses and arguments that this Court previously rejected in its Summary Judgment Order. (Doc. 217 at 5.)[43] Many of these statements occurred outside of the hearing of the jury (for example, during proffer testimony on January 21 and 22, 2025). To the extent these statements were not heard by the jury, they do not serve as bases for granting a new trial.[44] However, in front of the jury Mr. Kaplan misleadingly cross-examined Mr. Bawany about whether Mr. Lyons or anyone else approved the addition of paragraphs o and p in the SPA by initialing the document which drew objection from DRE's counsel. (Doc. 318 at 393:17-395:24.) Then, on recross examination, Mr. Kaplan again attempted to cast doubt on the contract documents, asking Mr. Bawany if Mr. Lyons' signature is affixed on the invoices. (Doc. 319 at 601:14-21.)

---

[42] Mr. Kaplan used an easel during his closing argument. At this point, he wrote "Deception" in large letters and left it in front of the jury for the remainder of his closing argument.

[43] "Upon review, the Court finds Lyons's affidavit presents some sham testimony that must be disregarded. First, the Court disregards Lyons's testimony denying the version of the SPA he signed for Berkley contained a paragraph 11(o), which is the provision stating that any conflicts between the SPA and an invoice would be governed by the invoice." (Doc. 217 at 5.)

[44] However, the Court may consider the instances outside of the jury's presence when ruling upon Plaintiff's pending motion for sanctions against DRE. Thus, the Court returns to this issue in its forthcoming analysis on Plaintiff's sanction motion.

47

The Court provided curative instructions to the jury after Mr. Kaplan injected these false theories such as questioning the validity of the SPA, invoices, and the lack of initials or signatures on various documents that make up the complete agreement. For example, after Mr. Kaplan asked Mr. Bawany whether changes to the SPA were initialed, the Court read the jury the parties' stipulation that "[o]n September 2nd, 2021, Lyons executed the sale and purchase agreement on behalf of Berkley pursuant to which Berkley would purchase large quantities of blue and black surgical masks from DRE," (Doc. 318 at 399:6-9), and instructed the jury that "the Court has found as a matter of law that this document, Exhibit 1, is a significant portion of the agreement." (Doc. 318 at 399:22-24.) The Court also, without waiting for an objection from DRE, directed defense counsel to move on from questioning Mr. Bawany about whether Mr. Lyons' signature was on either invoice, stating in front of the jury that "[i]f your point is that that's not part of the contract, there's a ruling of law that the contract is the SPA, the terms and conditions, the invoice of 22, the invoice of 23, and the addendum . . . [and] [c]ustomer onboarding." (Doc. 318 at 601:22-602:2.)

### e.      Other Improper Remark Factors

In light of the foregoing, it is abundantly clear that Mr. Kaplan's improper remarks were pervasive rather than "minor aberrations made in passing." *Ventura*, 825 F.3d at 885. Thus, the first improper remark factor weighs heavily in favor of granting a new trial. The Court next considers whether "(2) the district court took specific curative action; and (3) the size of the damage award . . . suggest[s] that counsel's comment had a prejudicial effect." *Id.*

As included more fully above, the Court provided curative instructions to the jury in many instances, but not all. Moreover, given how pervasive Mr. Kaplan's improper remarks were, the Court is not confident that the curative instructions were sufficient to allay the prejudice caused to DRE. Generally, "[j]urors are presumed to follow the court's instructions." *Farrington v. Smith*, 707 F.3d 963, 972 (8th Cir. 2013). However, in this case the record reflects—through juror-asked questions[45]—that the jury continued to consider issues it was told were not for its consideration. (*See* Doc. 319 at 630:14-22 (juror asking why changes to the SPA were not initialed; question not

---

[45] This Court permits jurors to ask questions of witnesses during trial. The procedure is as follows: after the lawyers finish asking questions of a witness, each juror fills out a notecard writing their questions, or if the juror has no questions, they write "no questions." Counsel is then given an opportunity outside of the jury's hearing to review the submitted questions and object or agree to the asking of each question. After determining which questions will be read, the Court asks those questions to the witness and permits counsel for each side to ask follow-up questions as necessary.

read to witness Isaac Bawany)); Doc. 324 at 1893:10-15 (juror asking if a new SPA/Addendum was signed after masks were discovered to be bags and not boxes; question not read to witness Anthony Lyons).)  The juror-asked questions indicate confusion and show that the jury was still considering theories which Mr. Kaplan improperly asserted despite the Court's instructions that such things were not for the jury's determination.  Because the Court was compelled to give multiple curative instructions, occasionally repeating the same point, and because the record reflects that the jury continued to consider improper remarks after curative instructions were given, the second factor weighs in favor of granting a new trial on the Fraud Counts.

Finally, DRE argues that the lack of damages awarded suggests that defense counsel's remarks had prejudicial effect on the Fraud Count verdicts.  The Court agrees.  The jury returned a verdict of zero damages in this case, as well as verdicts of not liable on each of the Fraud Counts. *See Burke v. Regalado*, 935 F.3d 960, 1026-27 (10th Cir. 2019) (considering "whether the apportionment of liability and size of the damage award" indicate the remarks had a prejudicial effect.").  The defense verdict across the board in this case indicates that Mr. Kaplan's pervasive improper remarks had a prejudicial effect.

Ultimately, while the Court did its best to ensure a fair trial and to provide curative instructions when necessary, Mr. Kaplan's persistent misconduct resulted in an unfair trial and a jury verdict that cannot stand.  *See Young v. Corr. Healthcare Co.*, 721 F. Supp. 3d 1209, 1252 (N.D. Okla. 2024) (granting new trial based on attorney misconduct where counsel's "litigation strategy [was] infecting the trial at every turn with misconduct").  Here, each factor supports granting a new trial in this case based on the improper remarks made by Mr. Kaplan.

### 3. Evidentiary Errors

Third, DRE argues that it is entitled to a new trial on the Fraud Counts because the Court erred in admitting irrelevant evidence, particularly evidence related to legal issues already decided by the Court's Summary Judgment Order and DRE's unopposed motion in limine.[46]  In hindsight, the Court agrees that some irrelevant evidence was erroneously admitted and that some relevant

---

[46] DRE also argues that the Court failed to issue adequate curative instructions, particularly the curative instruction the Court provided after Mr. Kaplan accused Mr. Bawany of deleting WhatsApp messages and the "Title Instruction" given during jury deliberations.  The Court need not reach this issue in light of its conclusion that new trial is warranted because of the improper remarks of defense counsel and because of evidentiary errors.

49

evidence may have been erroneously barred.[47]  Evidentiary rulings may serve as a basis for a new trial "when an improper evidentiary ruling affected the [moving party]'s substantive rights or had more than a slight influence on the verdict."  *Am. Bank of St. Paul v. TD Bank, N.A.*, 713 F.3d 455, 464 (8th Cir. 2013); *see also* Fed. R. Civ. P. 61.  As discussed in depth above, Mr. Kaplan's trial strategy was to relitigate issues decided by the Court at the summary judgment phase.  This strategy caused the Court—in the heat of trial—to admit evidence regarding multiple issues (China/USA, boxes/bags, production/assembly, production capacity) which were not issues for the jury in determining liability on the Fraud Counts.  Because of Mr. Kaplan's insistence on litigating a breach of contract trial, DRE was unable to receive a fair trial on its Fraud Counts.

The irrelevant evidence, in addition to Mr. Kaplan's conduct, in all likelihood affected the jury's determination in this case, affecting DRE's substantive rights.  *See Universal Power Sys., Inc. v. Godfather's Pizza, Inc.*, 818 F.2d 667, 671 (8th Cir. 1987) (remanding for new trial on damages issue where court admitted evidence that improperly induced the jury's damages award).  Additionally, because Mr. Kaplan continued to introduce irrelevant evidence, DRE had to object in front of the jury, which then played into defense counsel's argument in closing that DRE and its counsel were attempting to "stifle" defense witnesses and hide evidence.[48]  (Doc. 309 at 42-43 & n.115.)  Therefore, the Court's admission of irrelevant evidence throughout trial also supports granting a new trial on the Fraud Counts.

### 4.    Conclusion

Ultimately, DRE is entitled to a new trial on the Fraud Counts (Counts 6-9) to prevent a miscarriage of justice because of Mr. Kaplan's pervasive improper remarks and the admission of irrelevant evidence and exclusion of relevant evidence, which largely occurred because of Mr.

---

[47] For example, as to improperly barred testimony, upon reflection the Court notes that communications and potential deals for the purchase of masks which occurred between the signing of the SPA and the Addendum are likely relevant to DRE's Fraud Counts.  In particular, the Court notes that there was a deal made on October 8, 2021, with Mr. Lyons, DRE, and Carlin Capital, wherein Carlin Capital appears to be purchasing 2.5 million masks for $4,000,000.  (*See* Doc. 213-7.)  Upon retrial of the Fraud Counts, evidence such as this should be considered relevant and admissible.  Additionally relevant are Berkley's continued representations of having contracts and money in escrow with end-buyers between the execution of the SPA and the signing of the Addendum.

[48] As previously mentioned, several jurors in the Court's post-trial questionnaire wrote that plaintiff counsel was ineffective because of the number of sidebars they requested and because it appeared that plaintiff counsel was trying to hide things or silence the defense.  This lends credence to DRE's argument and the Court's conclusion herein.

Kaplan's improper trial strategy.[49]  Therefore, DRE's motion for a new trial on Counts 6-9 is **GRANTED**.

### III.  Rule 58 and 60 Motion to Amend or Correct the Judgment

DRE alternatively moves under Rule 58[50] and Rule 60[51] of the Federal Rules of Civil Procedure and requests that the Court "correct the judgment to reflect its Summary Judgment Order," and "enter a final judgment on the Summary Judgment Order awarding DRE $14,400,000 . . . ." (Doc. 309 at 44.)  The clerk's judgment entered after the jury trial, (Doc. 219), omits the $14,400,000 summary judgment award.  Defendants argue that this is not an error and that the Court vacated the portion of the Summary Judgment Order awarding $14,400,000.  The Court did not intend to vacate the damages award; rather, the Court removed mention of the summary judgment damages award from the jury trial to avoid jury confusion, *see* Fed. R. Evid. 403, and to avoid having to determine whether certain damages awarded by the jury were double-dipping, had the jury found any damages, (Doc. 321 at 1134:2-21).

Summary judgment orders are interlocutory in nature and "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b); *Langford v. Norris*, 614 F.3d 445, 456 (8th Cir. 2010).  Such relief is "generally warranted to correct manifest errors of law or fact, to present newly-discovered evidence, or where there has been significant change in the law or facts since the submission of the issues to the Court."  *Black & Veatch Corp. v. Strongwell Corp.*, No. 4:12-cv-00119-BCW, 2015 WL 12804271, at *1 (W.D. Mo. Apr. 13, 2015).  When deciding, or revising, an order on a motion for summary judgment, "[t]he court should state on the record the reasons for granting or

---

[49] The Court provided a five-part instruction to the jury before closing arguments and in their physical instructions packet which clarified that the issues of boxes versus bags, China versus United States, production capacity, "FOB" or free on board, and right of inspection were not issues for the jury.  (Doc. 325 at 2160:6-2161:12; Doc. 287 at 24.)  These issues were resolved at the summary judgment phase and were not relevant to the trial because the jury was not to decide breach of contract liability.  In hindsight, these parameters should have been in place prior to the trial beginning and will be in place upon retrial.  In other words, at retrial of the Fraud Counts, counsel will **not** be permitted to discuss these issues or elicit testimony about these issues in front of the jury.

[50] Rule 58 states that "[e]very judgment and amended judgment must be set out in a separate document," and "[a] party may request that judgment be set out in a separate document as required by Rule 58(a)." Fed. R. Civ. P. 58(a), (b).

[51] Rule 60 gives the district court authority to "correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record."  Fed. R. Civ. P. 60(a).

51

denying the motion." Fed. R. Civ. P. 56(a).  Here, the Court did not modify its Summary Judgment Order in writing or provide any reasons which would justify modification of the interlocutory order as would be required by Rule 54(b) and Rule 56(a).  Instead, the Court explicitly denied Defendants' motion for reconsideration.  (Doc. 248.)  The Court also reaffirmed the Summary Judgment Order during trial.  (*See, e.g.*, Doc. 320 at 1033:5-10.)

Regardless, the Court need not reach a decision on DRE's motions under Rule 58 and Rule 60 because they were asserted only in the alternative, and DRE states that "[t]o the extent the Court grants the relief sought under Rule 50 or Rule 59, DRE does not request a ruling on the relief DRE seeks in the alternative under Rule 58(d) or 60."  (Doc. 309 at 44 n.126.)  Moreover, a partial interlocutory order, like the Summary Judgment Order in this case, merges into the final judgment. *See* Fed. R. Civ. P. 54(b); *Acadian Diagnostics Lab'ys, LLC v. Quality Toxicology, LLC*, 965 F.3d 404, 415 (5th Cir. 2020) (citing Fed. R. Civ. P. 54(b)); *Montgomery v. City of Ardmore*, 365 F.3d 926, 934 (10th Cir. 2004); *Hook v. Ariz. Dep't of Corr.*, 107 F.3d 1397, 1401 (9th Cir. 1997).  The Court, as a result of this Order, will enter a judgment awarding DRE its benefit-of-the-bargain damages in the amount of $165,428,171.  The Summary Judgment Order's $14,400,000 award (also based on the benefit-of-the-bargain for breach of contract) is subsumed by the benefit-of-the-bargain award granted herein.

Therefore, DRE's motion to amend or correct the final judgment pursuant to Rule 58(b) and Rule 60 is **DENIED without prejudice**.

## Part Two:  DRE's Motion for Sanctions

### I.    Motion for Sanctions

DRE moves for sanctions invoking the Court's inherent authority and authority under 28 U.S.C. § 1927.  DRE seeks sanctions for various trial-related allegations of misconduct against Defendants Berkley and Anthony Lyons, as well as defense counsel Stuart N. Kaplan and Thomas J. Ali, and their law firm Stuart N. Kaplan, P.A.  (Doc. 298 at 1.)  DRE requests that the Court (1) strike Defendants' pleadings, (2) enter a default judgment against Defendants on Counts 2, 5, and 6-9, and (3) to the extent necessary, hold further proceedings to determine the damages DRE is entitled to upon entry of default judgment.  (*Id.*)  DRE also requests that the Court "award DRE its attorneys' fees and costs for litigating the entirety of the first trial," holding Defendants and

defense counsel jointly liable for such amounts. (*Id.* at 2-3.) Defendants and defense counsel do not meaningfully contest the factual basis for DRE's motion for sanctions. Nor could they given the reality of what transpired at trial as recorded in the official trial transcript. Rather, Defendants and defense counsel defend against imposition of sanctions by arguing that their actions were in good faith and consistent with zealous advocacy, and that DRE has not met the high standard for imposing sanctions.

### A. Legal Standard for Sanctions

The Court's authority to sanction arises from its inherent authority as well as from authority-granting legislation. "The court's [inherent] powers include the ability to supervise and discipline attorneys who appear before it and discretion to fashion an appropriate sanction for conduct which abuses the judicial process, including assessing attorney fees or dismissing the case." *Vallejo v. Amgen, Inc.*, 903 F.3d 733, 749 (8th Cir. 2018) (internal quotation marks omitted). The Court's inherent power to sanction extends to law firms. *See Enmon v. Prospect Cap. Corp.*, 675 F.3d 138, 147 (2d Cir. 2012); *In re Mroz*, 65 F.3d 1567, 1576 (11th Cir. 1995) ("[T]here is nothing preventing a federal court from exercising its inherent power to sanction an attorney, a party, or a law firm . . . .").

"Before a Court can dismiss a case, or enter a default judgment, as a sanction under its inherent powers it must find that there is clear and convincing evidence of bad faith conduct." *Ascentium Cap. LLC v. Littell*, No. 2:20-cv-4215-NKL, 2021 WL 6095550, at *2 (W.D. Mo. Dec. 22, 2021) (citing *Shepherd v. Am. Broad. Cos., Inc.*, 62 F.3d 1469, 1472 (D.C. Cir. 1995) and *Martin v. DaimlerChrysler Corp.*, 251 F.3d 691, 694-95 (8th Cir. 2001)). A court may assess attorney fees as a sanction under its inherent authority "for the willful disobedience of a court order" or "when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991) (internal quotation marks omitted). However, "a finding of bad faith is not always necessary to the court's exercise of its inherent power to impose sanctions." *Duranseau v. Portfolio Recovery Assocs., LLC*, 644 F. App'x 702, 707 (8th Cir. 2016) (quoting *Stevenson v. Union Pac. R.R.*, 354 F.3d 739, 745 (8th Cir. 2004)).

Title 28 U.S.C. § 1927 provides statutory authority for the Court to impose sanctions against attorneys as follows:

> Any attorney or other person admitted conducting cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the

53

excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

"Courts should construe § 1927 strictly and impose sanctions only when attorney conduct, viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court." *SPV-LS, LLC v. Transamerica Life Ins. Co.*, 912 F.3d 1106, 1113 (8th Cir. 2019) (internal quotation marks omitted). The Court's authority to sanction under § 1927 is limited to sanctioning attorneys for attorney conduct. *Id.* (finding district court did not abuse discretion in denying sanctions under § 1927 having found "any multiplication of proceedings in this case stemmed not from the attorneys' conduct but from their clients' conduct"). Circuits disagree whether a law firm may be sanctioned pursuant to § 1927. *Compare Enmon*, 675 F.3d at 147 (permitting § 1927 sanctions against law firm) (citing D.C. Circuit and 11th Circuit), *with Kaass Law v. Wells Fargo Bank, N.A.*, 799 F.3d 1290, 1295 (9th Cir. 2015) ("The district court abused its discretion by sanctioning Kaass Law, a law firm, pursuant to 28 U.S.C. § 1927.").[52]

### B.     Defendants and Defense Counsel Thomas J. Ali

Under both the Court's inherent authority to sanction and 28 U.S.C. § 1927, the Court's decision to impose sanctions is discretionary. *See Wolfchild v. Redwood County*, 824 F.3d 761, 770-71 (8th Cir. 2016) (noting appellate courts review the imposition of sanctions for abuse of discretion, whether imposed pursuant to the court's inherent authority or under § 1927). Defendants correctly argue that the standard for imposing sanctions is high. As to the Defendants—Berkley and Mr. Lyons—the Court may only sanction under its inherent authority (as § 1927 applies only to attorney conduct). DRE points to alleged perjury and violation of witness sequestration orders in support of sanctioning Defendant Anthony Lyons. While the Court does not condone Mr. Lyons' more unsavory conduct during trial,[53] it finds in its discretion that Mr. Lyons' conduct does not meet the high standard for imposing sanctions. Similarly, as to co-

---

[52] It does not appear that the Eighth Circuit has weighed in on this issue.

[53] For example, Mr. Lyons, as a sequestered witness, spoke to Max Dobi, another sequestered witness, along with Mr. Lyons' personal attorney, Mr. Yoni Anijar, in the hallway right outside the courtroom during a break in Mr. Dobi's proffer testimony on the seventh day of trial. (Doc. 323 at 1603:22-1607:21). Mr. Lyons' testimony also frequently controverted summary judgment findings and the parties' joint stipulations of fact. (*See, e.g.*, Doc. 324 at 1845:21-1847:1.) However, much of this testimony was elicited by Mr. Lyons' counsel—Mr. Kaplan—as demonstrated throughout this Order.

defense counsel Mr. Ali, the Court finds that his advocacy—though unkempt at times[54]—does not meet either sanction standard. Unlike Mr. Kaplan's conduct discussed below, the Court finds that Mr. Ali's conduct does not rise to the level of vexatiously increasing the proceedings or bad faith misconduct.

### C.      Defense Counsel Stuart N. Kaplan

Therefore, the Court proceeds to consider DRE's motion for sanctions only as to defense counsel Stuart N. Kaplan and his law firm Stuart N. Kaplan, P.A. The Court's forthcoming analysis attempts to highlight some of the more egregious conduct of Mr. Kaplan during the course of the jury trial or to provide examples of a particular category of conduct by Mr. Kaplan which was pervasive and which was improper and warrants appropriate sanction by the Court. The examples highlighted herein are far from exhaustive. In addition to the Court's written order, the Court has prepared a chart which sets forth trial transcript more fully encompassing Mr. Kaplan's improper and sanctionable conduct.[55] The Court also incorporates here the conduct of Mr. Kaplan discussed above in support of granting a new trial on the Fraud Counts, *see supra* Part One, Section II.D.2, which also supports granting DRE's motion for sanctions against Mr. Kaplan. The Court addresses eight categories of misconduct, below: (1) shifting defense theories, (2) failing to answer the Court's questions, (3) unprofessional and rude conduct, (4) poor knowledge of important facts, (5) challenging or ignoring stipulated facts, (6) violating the Court's *in limine* order, (7) violating the Court's orders during trial, and (8) relitigating summary judgment.

Mr. Kaplan's improper conduct led to countless delays during trial, the most significant of which the Court includes in the chart below:

---

[54] For example, Mr. Ali (like Mr. Kaplan) elicited testimony which controverted stipulated facts, (Doc. 324 at 2041:2-9), and violated the Court's guardrails regarding United States versus China manufactured masks, (*id.* at 2047:4-11). However, Mr. Ali's conduct was far less pervasive than Mr. Kaplan's, with Mr. Kaplan taking on the great bulk of responsibility of counsel at trial. Moreover, the Court notes that Mr. Ali's presentations to the Court during sidebars and conferences were somewhat more reasoned, presented with some cited authority in support, and that he conducted himself with due respect and decorum before the Court at most times. The contrast between Mr. Ali's representation at trial in this manner and that of Mr. Kaplan is meaningful, as consistent with the Court's discussion below.

[55] *See* Attachment 1 – Appendix: Chart of Trial Misconduct.

| (TRIAL DAY 1) Mon 1/13/25 | |
|---|---|
| <u>Witnesses:</u> Opening Statements<br>     I. Bawany (Direct) | <u>Delays:</u> 15 min (1:27-1:42) Opening Objection<br>    6 min (1:46-1:52) Opening Objection<br>    11 min (2:22-2:35) Argue |
| (TRIAL DAY 2) Tues 1/14/25 | |
| <u>Witnesses:</u> I. Bawany (Direct; Cross)<br>    M. Eid (ALL) | <u>Delays:</u> 1hr 4 min (8:55-9:59) Argue<br>    7 min (3:21-3:28) Argue<br>    7 min (4:29-4:36) Bawany Objection<br>    39 min (4:55-5:34) Argue |
| (TRIAL DAY 3) Wed 1/15/25 | |
| <u>Witnesses:</u> I. Bawany (End)<br>    G. Durham (ALL)<br>    A. Lyons (Direct) | <u>Delays:</u> 22 min (8:00-8:22) Argue<br>    23 min (8:54-9:17) Bawany Objection<br>    1 hr (9:36-10:36) Bawany Objection<br>    24 min (3:24-3:48) Argue |
| (TRIAL DAY 4) Thur 1/16/25 | |
| <u>Witnesses:</u> A. Lyons (Direct; Cross) | <u>Delays:</u> 50 min (8:32-9:22) Argue<br>    13 min (1:17-1:30) Argue<br>    17 min (3:12-3:29) Argue<br>    2 hrs 47 min (3:49-6:36) Lyons Objection |
| (TRIAL DAY 5) Fri 1/17/25 | |
| Court order St. Louis local counsel to attend trial on Tues 1/21/25 | <u>Delays:</u> 2 hrs 27 min (9:30-11:57) Argue |
| (TRIAL DAY 6) Tues 1/21/25 | |
| <u>Witnesses:</u> A. Lyons (PROFFER)<br>    M. Ortolani (PROFFER) | <u>Delays:</u> 24 min (8:36-9:00) Argue<br>    2 hrs (9:00-1:00) Lyons PROFFER<br>    44 min (1:00-1:44) Argue<br>    2 hrs 22 min (2:32-4:54) Ortolani PROFFER<br>    4 hrs 47 min (4:54-9:41) Argue |
| (TRIAL DAY 7) Wed 1/22/25 | |
| <u>Witnesses:</u> M. Dobi (PROFFER) | <u>Delays:</u> 1 hr 17 min (8:30-9:47) Argue<br>    2 hrs 16 min (9:47-12:03) Dobi PROFFER<br>    6 hrs 47 min (12:03-6:50) Argue |
| (TRIAL DAY 8) Thur 1/23/25 | |
| <u>Witnesses:</u> A. Lyons (End)<br>    C. Blackham (ALL)<br>    M. Dobi (ALL)<br>    S. Torres (ALL)<br>    M. Ortolani (ALL) | <u>Delays:</u> 20 min (8:33-8:53) Argue<br>    12 min (9:37-9:49) Lyons Objection<br>    12 min (1:19-1:31) Lyons Objection<br>    21 min (1:54-2:15) Lyons Argue Jury Quest. |
| (TRIAL DAY 9) Fri 1/24/25 | |
| Closings Arguments | <u>Delays:</u> 1 hr 6 min (12:49-1:55) Closing Objection |

## 1. Defense Shifting Theories of the Case

Mr. Kaplan's refusal to state his theory of the case or the relevance of the defenses he was pursuing led to days of delay in the middle of the jury trial while the Court screened the testimony Mr. Kaplan wanted to elicit for relevancy through witness proffers. Over the course of this litigation, the defense continuously shifted theories of the case, leading to a trial by ambush in which each day presented another new theory that the Court and DRE had no warning about.

### a. Early Stages of Litigation

To fully demonstrate the extent of the defense's shifting theories at trial, the Court starts with Defendants' baseline theory set out in the answer to the complaint.[56] On February 2, 2022, Defendants filed an answer which admitted "that DRE and Berkley entered the Sale & Purchase Agreement attached as Exhibit C to the Complaint (the "SPA") and refer the Court to the said document for an accurate reflection of its contents." (Doc. 7 at 4, ¶ 7.)[57] Exhibit C to the complaint is the SPA executed by Isaac Bawany on behalf of DRE and Anthony Lyons on behalf of Berkley on September 2, 2021. It includes a provision that the "Entire Agreement" is "This Agreement and the executed DRE Health New Customer Application and the Incorporated Terms and Conditions of DRE at www.drehealth.com/terms-conditions-of-sale." (Doc. 1-4 at 7.) On page 9, it also includes paragraph o: "In the event of any conflict between the terms of this Agreement and the terms of any invoice or Purchase Order, the terms of the Invoice or Purchase Order shall govern," and paragraph p: "Buyer agrees to abide by and be bound by the terms of the New Customer Application it has executed." (*Id.* at 9.)

Defendants again attested to the accuracy of the SPA, including these provisions, in their motion to compel arbitration. (Doc. 140.) Defendants stated that "attached hereto is a true, authentic, and genuine copy of each agreement [referring to the SPA and Addendum] as composite Exhibit 'A' to this motion." (*Id.* at 2, ¶ 6.) This attachment included an identical version of the SPA as was attached to DRE's complaint, which included the terms and conditions provision and paragraphs o and p. (Doc. 140-1 at 7, 9.) Thus, during the early stages of this litigation, Defendants

---

[56] The Court notes that Mr. Kaplan did not appear on behalf of Defendants until April 8, 2024, at a later stage of this litigation, around the close of discovery. (*See* Doc. 127.)

[57] Defendants later filed a motion to amend/correct the answer, (Doc. 143), which the Court granted, (Doc. 147). Defendants amended the answer only to add an affirmative defense invoking the limitation of liability provision in the SPA. This amendment in no way affected Defendants' admission regarding the accuracy of the SPA attached to DRE's complaint.

admitted and attested to the accuracy of the SPA and relied on it in their own answer and motion to compel arbitration. At trial, DRE admitted into evidence as Plaintiff Exhibit 1 the same version of the SPA that it attached to its complaint, which included the aforementioned provisions, and which Defendants admitted the accuracy of in their answer and motion to compel arbitration.

### b. Summary Judgment

At the summary judgment phase,[58] Defendants relied heavily on an affidavit submitted by Anthony Lyons, (Doc. 193), which in part directly contradicted the record and Defendants' own litigation position up until that point. In relevant part, Mr. Lyons' affidavit stated:

> 65. That affiant nor BERKLEY ever executed a SPA of September 2, 2021 that on page 7, paragraph 11, stated the executed DRE HEALTH new customer application and the incorporated terms and conditions of DRE at www.drehealth.com terms and conditions of sale which was fraudulently added by DRE HEALTH and BAWANY after affiant and BERKLEY signed the SPA without their consent or permission (BERKLEY0000962).

> 66. That affiant nor BERKLEY executed or agreed to on September 2, 2021 or at any time the following on page 9 of the SPA:

> "O. In the event of any conflict between the terms of this Agreement and the terms of any invoice or purchase order, the terms of the invoice or purchaser order shall govern."

> "P. Buyer agrees to abide by and be bound by the terms and conditions of the New Customer Application it has executed."

> These provisions were added without affiant or BERKLEY'S consent or permission by DRE HEALTH and BAWANY after ANTHONY LYONS and BERKLEY executed the agreement, SPA, on September 2, 2021.

> 67. That affiant nor BERKLEY ever timely received invoices 279722 from DRE HEALTH dated September 10, 2021 (BERKLEY 0008585) or 279723 dated September 5, 2021 (BERLEY 0002772) [sic] which both upon information and belief, were back dated fraudulently by DRE and BAWANY prior to the October 19, 2021 Addendum.

(Doc. 193 at ¶¶ 65-67.) The Court concluded that Mr. Lyons' denials above were contrary to the record and Defendants' prior litigation position, and rejected these arguments in its Summary Judgment Order. (Doc. 217 at 5.) *See Gustafson v. Bi-State Dev. Agency of Mo.-Ill. Metro. Dist.*, 29 F.4th 406, 410 (8th Cir. 2022) ("Whenever a party takes a position in a legal proceeding and succeeds in maintaining that position, the doctrine of judicial estoppel operates to prevent that party from later assuming a contrary position.").

---

[58] Mr. Kaplan filed Defendants' summary judgment response.

58

Defendants' summary judgment argument that there were provisions fraudulently added to the SPA or that the invoices were fraudulently backdated was also the subject of an unopposed motion in limine by DRE which was granted as unopposed prior to trial. Defendants and defense counsel were thus barred from making this argument again at trial, though Mr. Kaplan did so anyway.[59]

### c.    Trial

Finally, the Court proceeds to consider the various theories of defense asserted during the jury trial, some of which were raised for the first time at trial.

Mr. Kaplan did not file a trial brief with the Court on behalf of Defendants. DRE timely filed a trial brief with the Court setting forth the issues remaining for trial. (Doc. 254.) One of these issues was whether Ryan Wheeler, a proposed defense witness, would be allowed to testify.[60] At the final pretrial conference, Mr. Kaplan claimed that Mr. Wheeler, whom DRE objected to testifying, was "a critical witness that we think is absolutely relevant and necessary and material to our defense." (Doc. 316 at 29:17-19.) Mr. Kaplan also asserted in opening statements that the jury would hear from Ryan Wheeler. (Doc. 317 at 79:3-11.) Accordingly, the Court provided time throughout the first three days of trial for defense counsel to demonstrate Mr. Wheeler's relevancy to the case. (Doc. 317 at 8:20-12:2; Doc. 318 at 219:2-239:6; Doc. 319 at 504:4-514:6, 725:3-738:18.[61]) After spending substantial time on the issue, on Day 4 of trial the parties informed the Court that they reached an agreement and that Mr. Kaplan would not be calling Ryan Wheeler as a witness. (Doc. 320 at 802:13-16.) Suddenly, Mr. Kaplan dropped the Ryan Wheeler issue and (without a Court ruling) opted not to call this "critical" witness.

---

[59] Defendants also argued that the masks were non-conforming to the terms of the agreement because they were from China instead of the United States. The Court rejected this argument as a matter of law in its Summary Judgment Order, as well.

[60] Defendants submitted Ryan Wheeler as a witness in their proposed witness list on December 11, 2024. (Doc. 223.) DRE argued that Mr. Wheeler should not be allowed to testify because he was never identified on Defendant's Rule 26(a) disclosures and because his testimony was not relevant for any issues remaining for trial. (Doc. 254.)

[61] In this last interaction, the Court and Mr. Kaplan were discussing Mr. Wheeler's deposition testimony which the Court reviewed. The Court noted on the record that Mr. Kaplan's interpretation of the deposition testimony was "very misleading." (Doc. 319 at 736:4-10.)

59

Mr. Kaplan's various undisclosed defenses were unclear and shifted throughout the trial.[62] On the first day of trial, Mr. Kaplan's defense seemed to largely concern the conformity of the masks to the agreement—for example, whether they were to come from the United States or China or be in boxes or bags. (*See, e.g.*, Doc. 317 at 48:10-51:9, 76:12-79:20.) Mr. Kaplan attempted to convince the Court that these breach-of-contract liability issues were somehow relevant to liability on the remaining misrepresentation-based claims; accordingly, the Court provided some leeway to defense counsel in this regard at the beginning stages of the trial. Thus, this initial phase of defense theories centered on the importance of Ryan Wheeler as a witness and the non-conformity of masks.

However, as trial progressed, and the Court became aware of Mr. Kaplan's core strategy to relitigate summary judgment, the Court set guardrails prohibiting testimony in these areas. And so Mr. Kaplan's theories shifted. In this phase of defense theories, the Court and plaintiff counsel were confronted with never-before-argued theories. On Day 3, Mr. Kaplan—for the first time during this years-long litigation—asserted a new theory that instead of two transactions between the parties (the SPA and the Addendum) that there "were actually three transactions, not two," and that Berkley was going to help DRE sell masks as a broker. (Doc. 319 at 580:15-582:25; *see also* Doc. 320 at 989:23-990:1 ("[T]he Court has never heard this, but Mr. Lyons is going to explain what this agreement really was addressing because they were not buying these masks."); *id.* at 994:3-16 ("Berkley Equity was not buying those masks. Berkley Equity's acting as a broker to assist Bawany. And the agreement was they would share in the profits if Berkley Equity could assist them in selling those masks.").)[63] Mr. Kaplan also inserted the issue of a right of inspection on Day 3 of trial. (Doc. 319 at 567:21-568:4; *see also* Doc. 321:20-25; Doc. 323 at 1681:8-15; Doc. 325 at 1830:13-1831:20.)

---

[62] The Court concedes that Mr. Kaplan did proceed with a few consistent theories—mainly the non-conformity of the masks and that there was language fraudulently added to the SPA. (*See, e.g.*, Doc. 318 at 498:2-4 (arguing terms were added to the SPA); Doc. 323 at 1563:3-13 (telling Court Mr. Dobi's testimony would be needed to show that terms were added to the SPA).) For all the reasons explained herein, however, those defenses were improper in light of the Court's Summary Judgment Order and order granting DRE's motion in limine.

[63] Mr. Lyons also asserted new theories regarding the transactions between DRE and Berkley, testifying that the "smaller deal" was a track record to show his bank that the deals were good so that he would be able to get a loan to assist making the full payment on the larger invoice. (Doc. 320 at 872:13-24.)

On Day 6 of trial, during proffer testimony, Mr. Kaplan inserted the issue of "FOB" or "free on board" for the first time.[64] (Doc. 322 at 1300:1-1306:12; *see also* Doc. 323 at 1681:15-17 ("[Y]ou cannot in any way ignore on page 2 of this invoice where is says freight FOB Kansas City.").)[65] And Mr. Lyons began to attempt to distance himself from the actions and conduct of Max Dobi, Matt Ortolani, and Stephen Forrest, who were all stipulated agents of Berkley. (Doc. 320 at 900:2-904:20 (Mr. Lyons testifying no proof of funds was sent; Mr. Kaplan arguing difference between Mr. Dobi being an agent and Mr. Lyons ratifying Mr. Dobi's actions); *id.* at 1056:13-1057:3 ("[MR. KAPLAN:] I don't think there's any evidence so far, quite frankly, that Mr. Lyons ratified, adopted, or instigated, or whatever the word is, authorized these changes."); Doc. 321 at 1070:2-1072:23 (Mr. Ali arguing Mr. Lyons did not ratify all of the communications of Mr. Dobi, Mr. Ortolani, and Mr. Forrest); Doc. 324 at 1804:12-1808:21, 1848:21-1853:19 (Mr. Lyons repeatedly responding that plaintiff counsel would need to ask questions to Mr. Dobi or Mr. Ortolani because Mr. Lyons was not involved).)[66] This phase of defense theories was disorganized and confusing, with Mr. Kaplan blindsiding the Court and plaintiff counsel with new theories daily.

Mr. Kaplan's position on various concepts—such as that of customs clearance—was a moving target and his shifting theories indicated bad faith and an attempt to twist the facts on any given day of trial to best fit his need. Mr. Kaplan first attempted to argue that what Mr. Bawany did when he imported the smaller invoice masks was actually something called "pre-customs clearance," (Doc. 319 at 518:8-14), an argument that was not supported by evidence and which was largely irrelevant because the Court's Summary Judgment Order concluded that the masks

---

[64] At the summary judgment phase, Defendants did not argue that the term "FOB" or "Free on Board" entitled them to relief. To the extent Defendants failed to raise certain arguments at the summary judgment phase, or did not develop certain arguments, the Court notes that those arguments were waived. *See, e.g.*, *Cole v. Int'l Union, UAW*, 533 F.3d 932, 936 (8th Cir. 2008) (noting that "the party opposing summary judgment waived arguments by failing to present them to the district court"); *Bosch v. Thurman*, No. 4:22-cv-00677-LPR, 2024 WL 841252, at *16 (E.D. Ark. Feb. 28, 2024) (noting in resolving summary judgment motion that "undeveloped arguments are waived just like completely omitted arguments are").

[65] Mr. Lyons testified that he "never knew what FOB even meant." (Doc. 322 at 1270:14-15.)

[66] Mr. Lyons frequently answers plaintiff counsel's questions by responding that counsel would have to ask someone else about that. (*See, e.g.*, Doc. 1832:16, 19, 22 ("You'd have to ask Matt Ortolani."); 1833 ("[Y]ou have to ask Matt Ortolani."); 1835:23, 25 ("You'd have to ask Matt Ortolani); 1836:10 ("You'd have to ask Matt Ortolani."); 1837:12-13 ("Ask Matt Ortolani or your logistics guy, Michael Eid."); 1840:1 (You'd have to ask Matt Ortolani."); 1846:3, 5 (You'd have to ask Max Dobi."); 1852:13 ("You'd have to ask Matt Ortolani why."); 1857:9-11 ("And again, I – I refer this to Matt – sorry, to Max Dobi as he would have been dealing with the day to day, not me.").)

had cleared customs.  Mr. Kaplan also argued that Mr. Lyons' understanding was that "clearing customs means the masks are available to him to pick up."  (Doc. 319 at 591:11-13.)  Mr. Lyons' unfamiliarity with the industry, its standards, and its specialized terminology, however, does not give rise to a defense against the claims in this case.[67]  Then, after this argument failed, Mr. Kaplan conflictingly argued that the invoice would not have been accepted by Defendants because "Matt Ortolani, who is someone who is very versed in logistics, he immediately recognized and understood that clearing customs – and especially when he was tracking the boats that he knew clearing customs would not allow them to offload the ship, make the physical inspections, and actually retrieve it . . . ."  (Doc. 321 at 1099:23-1100:3.)

The Court gave Mr. Kaplan every opportunity to establish a good-faith basis for the confusing and shifting theories of defense.  Mr. Kaplan, at each opportunity, responded indignantly that the Court would require such an initial showing,[68] went off on lengthy tangents which did not address the Court's questions, and failed to make any good-faith showings.  (*See, e.g.*, (Doc. 320 at 1021:9-1033:11 ("[THE COURT:] You have failed to make a good faith showing.").)[69]  On the

---

[67] Mr. Lyons further testified that though he received the customs clearance forms, they "[w]ould have been meaningless to me" and that he did not read them because he "wouldn't know what I was reading."  (Doc. 324 at 1860:24-1862:2.)

[68] The Court only required an "initial showing" in the sense that it required Mr. Kaplan to make a good-faith showing that any last-minute and changed defense theory he sought to bring into the case during trial had some evidentiary and factual basis.  To the extent these discussions occurred in the context of DRE's nominal case-in-chief, it was necessary (and appropriate) for the Court to do so because the parties had agreed to try the case jointly by only calling witnesses once.  In other words, the defense's cross-examination of DRE's witnesses functioned as both the defense's cross-examination *and* (if desired) the defense's direct-examination of that witness.  The defense's theory was therefore at play in a substantive sense even though DRE had not rested its case.  Mr. Kaplan's insistence in this regard that he had "not had an opportunity to present any evidence whatsoever in connection with my defense on my direct case," (Doc. 320 at 809:8-13), when the Court sought a good-faith basis for any particular last-minute defense theory is difficult to understand and is simply not valid, given that the parties had agreed to try the case jointly and to only call all witnesses once.

Nonetheless, Mr. Kaplan moved for a mistrial *ad nauseam* often attempting to misconstrue the Court's words or its intentions and often after his inability (or refusal) to explain the defense's theory or to make a good faith showing of the last-minute defense being discussed.  (*See* Doc. 320 at 815:25-818:11, 1021:21-25, 1032:2-10; Doc. 322 at 1443:5-1445:13, 1449:19-20, 1475:12-17; Doc. 323 at 1552:16-23.)

[69] This particular instance was on Day 4 of trial and is part of a longer discussion which began when plaintiff counsel objected to Mr. Kaplan eliciting testimony from Mr. Lyons that the masks for the larger invoice were to be manufactured in the United States.  (*See* Doc. 320 at 988:20-989:3.)  The conversation began at 3:49pm.  The Court excused the jury from the courtroom to the jury room, and then eventually excused them for the evening.  The Court and parties continued to discuss this issue and others until 6:36pm, nearly three hours later, when the Court recessed for the evening.

62

morning of Day 5 of trial, the Court permitted defense counsel "to make any further record or clarify your good faith basis in moving forward with the cross-examination of Mr. Lyons and calling other witnesses[.]" (Doc. 321 at 1064:2-4.)[70] Mr. Ali proceeded to address the Court and stated that he discussed with Mr. Lyons what their defense boiled down to and that "he boiled it down to some very simple terms. And [Mr. Lyons] said, [m]y defense is that I didn't get boxed products," and again that "I did not get boxed product in a box with a label manufactured or designed in the USA." (*Id.* at 1065:4-9.) Mr. Ali said "[a]ll he wanted is boxed goods, boxed, products, the right to look at them and know that what he was about the pay . . . was what he thought he was getting. That's all – that's his defense." (*Id.* at 1074:19-24.)[71]

After Mr. Ali's presentation, Mr. Kaplan addressed the Court and asked "Can I just add one last detail, Your Honor?" (*Id.* at 1075:22-23.) Mr. Kaplan proceeded to repeat what Mr. Ali said and then added the issue of masks sitting in the port unloaded, the right to inspect, and that the Addendum admitted DRE breached the SPA because of a delay in making masks available to pickup.[72] (*Id.* at 1075:25-1077:9.) The Court admonished Mr. Kaplan:

> THE COURT: Well, the problem is that you're adding yet another aspect of the defense' theory now today that you didn't mention yesterday and that Mr. Ali didn't mention. I was – would have thought you all would have been coordinated to have one presentation today

---

[70] Day 5 of trial was Friday January 17, 2025. Due to the Court's schedule, Day 5 was supposed to be a half-day of trial testimony before the jury. Instead, it was two and a half hours (from 9:33am to 11:57am) of argument by defense counsel attempting to provide a good faith basis for their defenses, all while the jury was held in the jury room from 8:30am until 11:00am. While no witnesses were proffered on Day 5, the Court requested that Defendants prepare to proffer witnesses on Day 6, which was Tuesday January 21, 2025.

[71] Plaintiff counsel controverted the defense theory that they were not aware that the product to fulfill the smaller invoice was coming from China in plastic poly bags by showing WhatsApp message chains Mr. Lyons was party to with pictures of masks in bags attached and texts referring to China product as early as September 11, 2021. (*See* Doc. 321 at 1108:9-1114:8; *see also* Pl. Proffer Ex. B.) Defense witness Matt Ortolani also testified that the smaller invoice was "related to bagged Chinese masks being imported into the United States by DRE Health." (Doc. 322 at 1339:7-9.) And, finally, Mr. Lyons conceded that the smaller invoice masks were coming from China. (Doc. 322 at 1218:19-23 ("[MR. LYONS:] Okay. They were coming from China. Q. Okay. So there's no – now there's no dispute about that. You now – your testimony is you 100 percent knew the whole time they were coming from China? A. As it manifests itself later, yes. At the time, I didn't know what Los Angeles Port was, which I know what it is.").)

[72] Mr. Kaplan returned to this argument on Day 7 of trial. (*See* Doc. 323 at 1680:19023 ("And it was solidified in the SPA that within September – on or before September 15th, 6 million boxes were supposed to be available. The weeks went on and Berkley – and DRE couldn't perform. And by their own admission in the addendum, it speaks to that.").)

63

(*Id.* at 1077:10-14.)

At trial, the Court must make quick decisions with the information it has when it comes to the admissibility of evidence.  Mr. Kaplan's inability or unwillingness to disclose any concrete and cognizable theory of the case required two days of proffer testimony (Day 6 and Day 7 of trial) outside the presence of the jury in the middle of trial to attempt to determine what—if any—of the testimony Mr. Kaplan intended to elicit was relevant and proper for the jury.  On Day 6, the Court stated that:

> I have allowed a great deal of latitude up to this point with defense going outside what appears to be the trial issues.  And it just keeps culminating into more significant concerns to the point that I had to, of course, stop and have a proffer.

(Doc. 322 at 1438:15-19; the two days of proffer testimony, in whole, can be found at Doc. 322 at 1144-1527 (Day 6 – 8:36am to 9:41pm, *over 12 hours*) and Doc. 323 at 1528-1745 (Day 7 – 8:30am to 6:50pm).)

The Court requested that Mr. Kaplan proffer witnesses for any of the points the defense wanted to make a good faith showing on, and Mr. Kaplan proceeded to proffer witness testimony for the entirely of Day 6 of trial.  Despite spending the entirety of Day 6 proffering witnesses, on Day 7 of trial defense counsel claimed that Max Dobi (a witness Mr. Kaplan previously represented to the Court that he would not be calling)[73] had essential information to the defense.  Thus, the Court provided Mr. Kaplan an opportunity to proffer Mr. Dobi:

> [THE COURT:] So when I tell you to make an offer of proof, you don't put on the one witness that goes to the heart of this?  Let's have an offer of proof of Dobi.  Is he here today?  Let's get this done before the jury comes in.  Is Mr. Dobi here today?
>
> MR. ALI: He can be here in 15 minutes.
>
> THE COURT: All right.  Let's get Mr. Dobi here.  We've got to put this to a rest.  The defense is just a moving target.  And this is about fairness to you – and I've bent over backwards to give you every opportunity . . . .

(Doc. 323 at 1559:5-15.)  At the end of these proffers, the Court imposed guardrails prohibiting much of the proffer testimony that Mr. Kaplan elicited.  These prohibited areas of inquiry included the issues of (1) US/China masks, (2) boxes versus bags, (3) manufacturing versus assembling,

---

[73] "MR. KAPLAN: As far as I'm concerned, Your Honor, it was not necessarily my intention – it was not necessarily my intentions to call Mr. Dobi in our case.  So we had told Mr. Stanfield we would make him available should Mr. Stansfield call him as a witness."  (Doc. 322 at 1324:22-24.)

Mr. Kaplan also showed uncertainty throughout trial as to whether he would be calling Matt Ortolani.  (Doc. 320 at 803:3-6.)

(4) the production capacity of DRE's United States locations, and (5) the right of inspection. (Doc. 323 at 1666:5-1670:20 (Court addressing guardrails after two days of proffer testimony).)

After the Court's ruling on Day 7 of trial prohibiting discussion of the foregoing areas, (Doc. 323 at 1666:5-1670:20), Mr. Kaplan forged ahead with another phase of defense theories. In this final phase, Mr. Kaplan resorted back to advancing a form of his previously excluded bogus theories that had been proven false by plaintiff counsel during trial. Even though this revised theory was a slight variation from the bogus theory excluded pretrial, Mr. Kaplan continued to advance false statements made in Mr. Lyons' affidavit submitted at the summary judgment phase. Mr. Kaplan's theory was merely a slight revision to the 11th hour defense argued in summary judgment, and Mr. Kaplan proceeded to challenge facts surrounding whether Mr. Lyons signed the SPA, whether there were other drafts of the SPA and comparing those drafts to the executed version, and he improperly placed the limitation of liability provision in the SPA in front of the jury. For example, on Day 7 during proffer testimony, Mr. Kaplan argues that Mr. Lyons only signed the SPA one time and that he signed it prior to the addition of DRE's terms and conditions and paragraphs o and p. (Doc. 323 1619:6-16.) Mr. Kaplan then conducts a handwriting analysis in an attempt to demonstrate that Mr. Lyons' signature on the SPA, (Pl. Ex. 1), is further above the line than in a draft version of the SPA Mr. Lyons signed, (Def't Proffer Ex. 3). He then compared the two and stated, "the proffer exhibit is inconsistent and very different than the signature that Mr. Lyons allegedly signed." (*Id.* at 1620:19-23.) Mr. Kaplan then claims that the signature page of the SPA was altered. (*Id.* at 1621:7-9.) Then, Mr. Kaplan concedes that Mr. Lyons may have signed two different versions of the SPA—including Plaintiff Exhibit 1—but that when Mr. Lyons signed the SPA the second time, he did not review the SPA fully and only noticed that Danny Houck's signature was no longer included on the signature page. (*Id.* at 1644:11-1645:6.)[74]

On Day 8, Mr. Kaplan improperly placed the limitation of liability provision in front of the jury by asking Mr. Lyons—directly—"were you operating under the belief that there was a limitation of liability within any of those documents that may have limited your liability?" to which Mr. Lyons responded, "[i]t's crystal clear." (Doc. 324 at 1802:15-18.) Later that day, Mr. Kaplan

---

[74] (*See also* Doc. 324 at 1822:19-24 ("[MR. KAPLAN:] So it creates a situation for me quite frankly, Your Honor, I have to now go back and compare the draft with what has been stipulated to and maybe start to ask Mr. Lyons about the terms and conditions and all of the language in the draft as to how it differs in the signed contract.").)

65

asked Mr. Lyons to read for the jury paragraph L on page 8 of the SPA, which is the limitation of liability provision.  Plaintiff counsel objected, and the Court sustained the objection.  (The Court had previously ruled that the limitation of liability provision was "not relevant for purposes of the findings by the jury" and therefore off limits.  (*See* Doc. 323 at 1743:16-19.))

Despite these rulings, Mr. Kaplan again returned to the limitation of liability provision in closing arguments, urging the jurors to "read on page 8, paragraph L.  I want you to read that and compare – ," at which point plaintiff counsel requested a sidebar to object to Mr. Kaplan deceiving the jury by having them read the limitation of liability provision.[75]  (Doc. 325 at 2223:5-18.)  What followed was a sidebar discussion spanning over 15 pages of trial transcript during which Mr. Kaplan attempted to claim that the exhibit being shown to the jury merely "happened to stop" on paragraph L, the limitation of liability provision, "because that's when [Mr. Stansfield] stood up and objected."  (Doc. 325 at 2235:7-11.)[76]  This was a blatant misrepresentation to the Court.  Mr. Kaplan clearly intended to put paragraph L on the screen in front of the jury and clearly requested that they read that provision.  It was no happenstance that it ended up on the screen, and Mr. Kaplan's attempts to represent otherwise to the Court show bad faith.[77]

Had Mr. Kaplan been forthcoming with his theories and been prepared to make a good-faith showing to present his defenses, the length of the trial would have been far shorter.  Moreover, if Mr. Kaplan had not continued to assert defense theories which had been previously rejected and barred by the Court, much of the time spent proffering witness testimony or in discussions with the Court would have been unnecessary.  For these reasons, the Court concludes that Mr. Kaplan's shifting arguments, failure to establish good-faith bases for his defenses, and continued pursuit of barred theories of defense, show bad faith and rise to the level of vexatiously increasing the length of the proceedings for purposes of sanctions.

---

[75] The limitation of liability provision, found in the SPA, states that "neither party shall be liable, directly or indirectly, for any (I) special, indirect or consequential damages . . . ."  (Pl. Ex. 1 at 8.)

[76] The entire interaction appears at Doc. 325 at 2223:9-2247:23, and it lasted an hour and 6 minutes. The interruption was so long that the jurors were excused from the courtroom and ate lunch while waiting.

[77] Moreover, in finding for Plaintiff in its Summary Judgment Order, and awarding $14,400,000 in benefit-of-the bargain damages, the Court implicitly found that this limitation of liability provision did not bar those damages.  The Court also denied Defendants' request for a limitation of liability jury instruction. (Doc. 325 at 2147:1-18.)  None of the foregoing stopped Mr. Kaplan from improperly placing the limitation of liability in front of the jury for their consideration and then lying to the Court about his intentions in doing so.

## 2. Failure to Answer Court's Questions

Throughout trial Mr. Kaplan was unable or unwilling to address questions posed to him by the Court. The failure to directly answer questions posed by the Court led to countless delays and further confusion about Mr. Kaplan's theory of the defense.

For example, at the end of Day 2 of trial after the jury left for the night the Court noted that it was trying to determine what is relevant for the jury and asked Mr. Kaplan: "What is the purpose of the line of questioning regarding repackaging, manufacturing, producing, assembling? How does that play into a defense?" (Doc. 318 at 47:19-21.) Mr. Kaplan's answer was long-winded and largely unresponsive to the question, including:

- Mr. Lyons is a businessman – and a very successful businessman and a very savvy businessman, and there's no mistaking it. There's nothing wrong with being an entrepreneur in the United States of America, notwithstanding the last four years that we have endured. And I would applaud Mr. Lyons for seeking an opportunity to make money, because that's what it is.

- But rest assured – I will tell you this. I wouldn't have called Mike Eid. I don't think that helped the plaintiff. But I will give Mr. Eid credit enough to say that Mr. Bawany created a charade. And he orchestrated to pull in people off of Craigslist to try to bamboozle, be deceptive, and to commit straight up fraud to try to suggest in Kansas City that this factory is bustling and busy, and I got all these people running around like chickens without their head on. And Mr. Eid, to his credit, he conceded that and admitted that.

- And also, very importantly – because Your Honor has consistently asked me with respect to the relevancy and the importance of Ryan Wheeler. He put it front and center for you to hear from that witness that I didn't call but the plaintiff called. He told you that Ryan Wheeler is an absolutely credible person. No doubt about it. And he told us that Ryan Wheeler was so taken aback by the deception that he walked out and left because he didn't want to be any part of that. That is what is going on in this case.

- It says unambiguously that the producer, Mr. Bawany, defaulted. He breached. He couldn't comply with his obligation to meet the production contract. What did that – what happened? Mr. Lyons said, okay. Well, we'll renegotiate. And as an accommodation to you breaching, you've got to provide me with an additional 10 million masks. That's what the addendum says. That's what it stands for.

- And the evidence as presented so far – Mr. Lyons, he didn't present – he didn't prepare that proof of funds. You'll hear that. He never even saw it. Do you

67

know when the first time he saw the proof of funds, Your Honor, is at his deposition. He never even was aware of that. And I will tell you this, Your Honor, because I do a lot of criminal defense, and I have been involved in the most notorious PPE –

(Doc. 318 at 476:22-482:23.) During this final comment, the Court interjected that "I think we're getting off base a little bit." (*Id.* at 482:24-25.) Regardless, Mr. Kaplan continued to discuss the proof of funds (which the Court did not ask about to begin with). Mr. Kaplan recognized that "I'm getting afar," but continued to make further argument to the Court. (*Id.* at 483:15.) Eventually, the Court told Mr. Kaplan again that "you're getting off track" and repeated that "[m]y question to you was, what is the purpose of the line of questioning regarding the repackaging versus manufacturing versus producing versus assembling?" (*Id.* at 485:2-5.) Mr. Kaplan's response was hardly more responsive than his first attempt. (*Id.* at 485:14-489:22.)[78]

On Day 3 of trial, the Court had to ask Mr. Kaplan three times what his theory was regarding why masks were not paid for and picked up on October 6th, 2021. (Doc. 319 at 571:15-17 ("So what is the defense' theory why the masks weren't picked up on October 6th or thereafter?"); 572:11-13 ("So what is defense' theory – I'm not clear on why payment wasn't made on October 4th or when it cleared customs or October 6th or thereafter when it was on land."); 573:24-25 ("[G]ive me a theory of why these masks weren't picked up.").) Mr. Kaplan finally explained that he had witnesses who he expected to testify that masks were not, in fact, ready to be picked up, which led to the Court asking about a November 19 inspection by a Berkley inspector, Witkin, and why masks were not picked up at least as of November 19. (*Id.* at 575:3-4.) Mr. Kaplan's response was again long-winded and indirect, and he concluded by claiming that there were three transactions in this case. (*Id.* at 581:22-23.) As previously discussed, this marked a shift in defense's theory of the case which had never been asserted prior to Day 3 of trial.[79]

On Day 5 of trial the Court again asked for a preview of the defense theories so the Court could make intelligent and informed evidentiary rulings, and asked "what are the exhibits? What is the evidence that will be? That you should have – you shouldn't be hiding anyway." (Doc. 321

---

[78] Shortly after this interaction, the Court asked Mr. Kaplan "What was due when there was custom clearance? Why wasn't it due? Why wasn't 100 percent payment due?" to which Mr. Kaplan replied "Assume, Your Honor, that it was due" rather than answering the question. (Doc. 318 at 497:12-14.)

[79] Mr. Kaplan continued to be unresponsive to questions in a similar manner throughout trial. (*See, e.g.*, Doc. 320 at 928:15-930:3; 993:23-994:2; 997:23-1013:7; 1021:9-1024:23.)

at 1078:10-11.)  The jury did not even enter the courtroom on Day 5, which was already a half day due to the Court's calendar.  The day culminated with the Court requesting that defense make a proffer as to any area they wanted to get into that was challenged as an improper or eleventh-hour defense, to which Mr. Kaplan declined and argued that a proffer was unnecessary and inappropriate:

> THE COURT: [T]hey need to make a proffer regarding the areas that we've discussed, your defenses that you all have listed off.  You all – you asked if –
>
> MR. KAPLAN: I'm not interested in proffering these witnesses.  I think it's totally inappropriate.  I think that the plaintiff is seizing an opportunity, taking full advantage –
>
> THE COURT: Well, at a minimum, there's got to be some type of – if you're going to just write out the areas –
>
> MR. KAPLAN: I did.  I've been proffering since yesterday telling you specifically in connection – I'm speaking about Matt Ortolani.
>
> THE COURT: Well, I made a decision that you need to proffer your specific nuances of their testimony on Tuesday.  And so they need to – you need to make a record of what your questions and answers – their questions and answers will be because at this point, you're not getting into a lot of those areas until you make a proffer.

(Doc. 321 at 1139:7-24.)

Mr. Kaplan's refusal to directly answer the Court's questions continued into the second week of trial including the Court asking Mr. Kaplan on Day 6 for evidence that Mr. Lyons or Berkley complained of masks being made available in bags, which Mr. Kaplan was not responsive to.  (Doc. 322 at 1490:1-1491:13.)  And on Day 7 of trial, Mr. Kaplan attempted to claim that "there's a witness that if I can try my case and put on my defense that will bring this all together," but when the Court asked "[w]ho is that witness?" Mr. Kaplan responded "[l]et me finish, Your Honor" and did not answer the question.  (Doc. 323 at 1553:15-19.)

Mr. Kaplan's continued and persistent refusal to directly answer the Court's questions not only showed disrespect for the Court but without question vexatiously increased the length of the trial.  The foregoing behavior supports sanctioning Mr. Kaplan for his conduct under both the Court's inherent authority to sanction and § 1927.

### 3. Unprofessional and Rude Conduct

Beyond Mr. Kaplan's unwillingness or inability to answer the Court's questions, he demonstrated additional conduct that was unprofessional, rude, and unbecoming an attorney appearing before the Court as an officer of the court.

#### a. Late Pretrial Filings

Pursuant to the Court's Fifth Amended Scheduling and Trial Order, proposed jury instructions were due 14 days prior to trial, and trial briefs and proposed voir dire were due 5 days before trial. Mr. Kaplan filed proposed jury instructions on Defendant's behalf on January 8, 2025, only 5 days before trial. At the time of the final pretrial conference on January 10, 2025, three days before trial, Defendants had not filed proposed voir dire or a trial brief. Defendants filed proposed voir dire following the final pretrial conference, (Doc. 259), but never submitted a trial brief to the Court. Defense counsel also belatedly listed Ryan Wheeler as a potential witness, which led to a motion to strike the testimony by DRE. (Doc. 316 at 27:19-23.)

#### b. Interrupting the Court

During trial, Mr. Kaplan interrupted the Court countless times to such a degree requiring direct warnings and admonishments by the Court. From the very beginning, during the discussions held between the Court and parties prior to voir dire, Mr. Kaplan interrupted and spoke over the Court:

> THE COURT: I'm talking about inducement to enter into the addendum. And the addendum says that they defaulted. So my mind is that you had the SPA, you had the two invoices. Things went very badly for both sides. They – defense was not securing –
>
> MR. KAPLAN: There's a letter –
>
> THE COURT: Can you not interrupt? We're on a time crunch. And I want to make sure we get to all the agenda items. I'm just telling you my vision and where I think is relevant. And we can argue some of these points after voir dire. But we've got voir dire starting at 9:00.

(Doc. 317 at 14:22-15:7.) Even Mr. Kaplan's attempts to apologize for interruptions suffer from needlessly speaking over the Court and delaying the proceedings:

> THE COURT: Do you have a witness that's going to say these –
>
> MR. KAPLAN: Well –
>
> THE COURT: Let me ask you – can I –
>
> THE COURT REPORTER: Mr. Kaplan. Mr. Kaplan. I can't –

70

MR. KAPLAN: I'm sorry.  I apologize.

THE COURT: Okay.  I'm going to be the one that can interrupt you all, but you can't interrupt me.  That's the –

MR. KAPLAN: I'm sorry.  I apologize –

THE COURT: – one power –

MR. KAPLAN: – Your Honor.  I apologize.

THE COURT: – that this –

MR. KAPLAN: You're correct.  I'm sorry.

THE COURT: – position has.  Boy, these interruptions just really bog us down.

(Doc. 318 at 487:21-488:11.)  Mr. Kaplan went so far as to refuse to listen to the questions of the Court, attempt to continue questioning the witness, and respond "no" when the Court again sought to ask a question:

> [MR. KAPLAN:] Q. And then you remember – the next paragraph, 22, DRE worked tirelessly to build a new manufacturing facility to meet the PPE production requirements of the boxed production contract.  In this pursuit, DRE spent tens of millions of dollars.  The fact was repeatedly made clear to Berkley, who knew all the time that DRE was acting in reliance on various contracts.
>
> [MR. BAWANY:] A. That's exactly what happened.
>
> Q. All right. And then you remember on paragraph number 23, While DRE was unable to initially –
>
> MR. STANSFIELD: Your Honor, there's no questions being asked.  Counsel is reading a court document into the record.
>
> THE COURT: What is the purpose of your questioning?  I'm –
>
> BY MR. KAPLAN:
>
> Q. Do you remember – let me –
>
> THE COURT: Let me ask you.
>
> BY MR. KAPLAN:
>
> Q. Do you remember –
>
> THE COURT: Let me ask you.  Mr. Kaplan, I'm going to –
>
> MR. KAPLAN: No.  The –
>
> THE COURT: – to trump your –
>
> MR. KAPLAN: The purpose is that the first time that any notification of anything being ready for pickup was November 1st of 2021.

(Doc. 318 at 469:17-470:5.)

There were countless additional interruptions by Mr. Kaplan over the course of the ten-day trial. (*See, e.g.*, Doc. 318 at 412:18-413:20; Doc. 319 at 566:19-567:8, 589:10-19, 734:12-20; Doc. 321 at 1088:19-1089:5, 1095:6-1096:1, 1097:1-1099:22; Doc. 322 at 1522:7-19; Doc. 323 at 1616:6-18; Doc. 325 at 2233:2-12, 2245:10-2246:3.) On Day 4, the Court reprimanded the attorneys' unprofessionalism and warned that there should be no further interruptions of the Court during the trial, that attorneys should take care not to speak over witnesses, and that there would be consequences for further unprofessional and disrespectful behavior.[80] (Doc. 320 at 800:19-802:7.) This was not the only warning or admonishment Mr. Kaplan received from the Court as a result of his conduct. (*See, e.g.*, Doc. 321 at 1103:2-3 ("THE COURT: Okay. Please sit down and let Mr. Stansfield have an opportunity.); Doc. 323 at 1616:12-17 (instructing Mr. Kaplan to "settle down" and "be calm in the courtroom").)

Mr. Kaplan continued to interrupt the Court until the very end of trial, despite the Court's warnings, arguing with the Court at a bench conference in the midst of his closing argument:

THE COURT: All right. Mr. Kaplan –

MR. KAPLAN: Clearly –

THE COURT: Let me just say something. The problem is that you referred to this exhibit – I believe it's 167. You referred to Exhibit 167, said that Mr. Forrest showed up on September 2nd. This was the contract that he presented to Mr. Bawany, which this – we've been through this –

MR. KAPLAN: They're both in –

THE COURT: Let me just finish. The contract that was presented on September 2nd is the one that your client signed that was –

MR. KAPLAN: He wasn't there at the convention center. That's absolutely not true. That –

THE COURT: Mr. Kaplan, you –

MR. KAPLAN: Am I not allowed to ask them to review both documents? I'll just leave it at that, Your Honor.

THE COURT: The problem is, is I don't think the document that you –

MR. KAPLAN: He put it in evidence. He put it in evidence.

---

[80] Not all of Mr. Kaplan's interruptions or distractions were verbal. The trial transcript fails to capture Mr. Kaplan's courtroom demeanor and movements. However, at one point, without Mr. Kaplan verbally interrupting the Court, the Court admonished: "Let me finish. You're getting riled up again. Let me finish. And – every time you do that, Mr. Kaplan, I just lose – that is so distracting, I lose my train of thought." (Doc. 323 at 1628:14-16.)

72

THE COURT: Can you let me – the document that has Mr. Houck's signature on it, that's not Exhibit 167.

MR. KAPLAN: Whatever – it's – it's 167.

THE COURT: That – that has –

MR. KAPLAN: The draft that Mr. Stansfield entered into evidence yesterday that he brought up.

MR. STANSFIELD: He – (Simultaneous cross-talk.)[81]

THE COURT: Let me just – we'll get to the bottom of this. The –

MR. KAPLAN: I'm trying to understand. There's a piece of evidence –

THE COURT: Please don't interrupt. Can you just answer this question. Exhibit 167 that you're referring the jury to –

MR. KAPLAN: That's in evidence.

THE COURT: Please don't interrupt. Is that the exhibit with Mr. Houck's signature, Mr. Lyons's signature on it, but it does not have Bawany's signature on it?

MR. KAPLAN: Yes.

THE COURT: Let me look at 167.

(Doc. 325 at 2223:25-2225:15.)

Ultimately, Mr. Kaplan's interruptions were distracting,[82] wholly unprofessional, disrespectful, and vexatiously increased the length of the trial. The continuous nature of his interruptions rises to a level of bad faith and demonstrates the objective unreasonableness of his conduct, justifying sanctions under § 1927 and this Court's inherent powers. *See Boykin v. Bloomsburg Univ.*, 905 F. Supp. 1335, 1344 (M.D. Pa. 1955) ("Robert S. Mirin's constant, repeated and flagrant interruption of the Court, despite repeated warnings from the Court, unreasonably delayed the sanctions hearing.") (granting sanctions against Mirin pursuant to § 1927, in part because of repeated interruptions).

---

[81] The (Simultaneous cross-talk) indicator is included in the trial transcript by the Court Reporter when people talk at once to such a degree that the Court Reporter cannot take down everything that is being said. This indicator appears in the trial transcript over 20 times. (*See* Doc. 317 at 111:1; Doc. 318 at 323:16; Doc. 319 at 585:11, 775:17, 788:8; Doc. 321 at 1086:19, 1110:12, 1142:14; Doc. 322 at 1219:13; Doc. 323 at 1616:7; Doc. 324 at 1794:18, 1877:22, 1924:15, 1931:15, 1935:5, 1970:25, 1973:6, 1974:10, 1997:24, 2090:7; Doc. 329 at 2225:2, 2233:5.) While not every one of these instances included Mr. Kaplan, the number of times it appears reflects the interruptive nature of this trial, and many of these instances do include Mr. Kaplan speaking over the Court, plaintiff counsel, or a witness.

[82] (Doc. 325 at 2246:2-3 ("[THE COURT:] You always distract me with your interruptions. Let me read the transcript again.").)

73

### c. Language Toward the Court

Even when Mr. Kaplan spoke in turn, without interrupting, his language toward the Court tended to be unprofessional, disrespectful, and needlessly hyperbolic. At one point, when the Court provided Mr. Kaplan with a chance to address a series of topics concerning how the trial would proceed, Mr. Kaplan stated:

> But even more importantly – and more concerning that this Court continues to try to suggest that notwithstanding stipulated evidence that has been introduced by the plaintiff – and *I'm going to force this Court to understand my position right now.* The SPA is in evidence. That's plaintiff's exhibit. The invoices, one ending in 22, one ending in 23, they're both in evidence. The October 8, 2021, emails, they're marked pursuant to a proffer that was given this morning. The Court is aware of those two exhibits, those emails, on October 8th, 2021. Follows also the addendum that is dated twenty – October 19th, 2021.
>
> . . .
>
> This idea that this Court now wants to completely disregard any such evidence that has been introduced by plaintiff to suggest now that this agreement or these agreements had anything to do with plastic bags is – is incredible at this juncture.

(Doc. 322 at 1473:14-1474:11 (emphasis added).) Later that day, Mr. Kaplan referred to the Court as "pissed off" and "hurt" by his failure to include certain facts and arguments in his pleadings and summary judgment motion:

> I know it begrudges you, and I know that's what's pissing you off and hurting you and why you're having a problem with me because you're really saying, Mr. Kaplan, you knew or should have known all of these facts before you filed all of these pleadings – and you didn't do – and you really are pissing me off because maybe had I had the benefit of all these arguments, you and I would not be going back and forth as we are.

(Doc. 322 at 1519:6-13.) Mr. Kaplan's manner of addressing the Court fell far short of the Court's expectations of the advocates who come before it.

### d. Requiring Local Counsel

As a result of Mr. Kaplan's misconduct during the first week of trial (Days 1-5), plaintiff counsel requested on Friday January 17, 2025, that the Court require Defendants' local counsel to appear in Court the next day of trial,[83] which was Tuesday January 21, 2025.[84] (Doc. 321 at

---

[83] Defense counsel are each licensed to practice law in the State of Florida and were granted leave to appear *pro hac vice* pursuant to the Court's Local Rules. (Docs. 127, 129, 130.)

DRE's local counsel is G. Edgar James, who appeared in person on behalf of DRE each day of trial without an order from the Court.

[84] The Court was closed on Monday January 20, 2025, for a federal holiday.

74

1119:18-1119:20.) The Court granted this request after an interaction with Mr. Kaplan where the Court warned him not to get loud and self-righteous. The Court specifically referred to Mr. Kaplan's behavior warranting local counsel, rather than defense counsel more generally, before being interrupted by Mr. Kaplan:

> MR. STANSFIELD: Could I renew my request for them to have local counsel here –
>
> THE COURT: Yes.
>
> MR. STANSFIELD: – someone who's barred in the Eighth Circuit so that we can –
>
> THE COURT: I do want local counsel. (Simultaneous cross-talk.)
>
> MR. STANSFIELD: – have the decorum that's necessary at trial. This is uncomfortable and disrespectful.
>
> THE COURT: Yes. I do want local counsel here for the remainder of the trial since Mr. Kaplan doesn't –
>
> MR. KAPLAN: I have no idea what local counsel's schedule is like, Your Honor. I have no idea.
>
> THE COURT: Well, that's – read the pro hac vice rules.
>
> MR. KAPLAN: I understand. I understand.

(Doc. 321 at 1142:8-23.) Local counsel for Defendants appeared on Day 6 of trial, and the Court noted that having local counsel for the defense was "a good idea, especially in light of me having to reprimand the parties to continue to be professional and to not interrupt and to make this case go more smoothly." (Doc. 322 at 1147:9-13.) Defendants' local counsel was excused from further attendance after Day 6.

### 4.  Poor Knowledge of Important Facts

Mr. Kaplan also showed, at the very least, poor knowledge of (if not intentional misrepresentations of) important facts in the case, which caused confusion and contributed to the delays in trial.[85]

---

[85] The Court does not fully address every such instance in this section, because many appear elsewhere in relation to other misconduct. (*See, e.g.*, Doc. 317 at 78:11-79:2 (misrepresenting Mr. Bawany's deposition testimony in opening statement); Doc. 318 at 256:4-6 (arguing defendants had no knowledge or acceptance of invoices); Doc. 318 at 484:10-11 (claiming proof of funds came way after the Addendum was executed); Doc. 319 at 540:14-542:15 (accusing Mr. Bawany or plaintiff counsel of deleting text messages); Doc. 319 at 736:4-738:12 (Court finding misleading Mr. Kaplan's explanation of Mr. Wheeler's deposition).)

### a. Masks Landed in California Around September 27, 2021

On the first day of trial, Mr. Bawany testified that some 500 million masks that DRE obtained to fulfill the Berkley deal arrived in the port of Long Beach, California, on September 27, 2021. (Doc. 317 at 161:9-162:19.) After the jury left for the day, Mr. Kaplan made a record and requested that Mr. Bawany be held in contempt for committing fraud on the Court:

> Your Honor, I am very, very concerned – and, normally, if I was home, I would probably file an order to show cause or a motion as to why this defendant – I'm sorry, this plaintiff, Mr. Bawany, should not be held in contempt for committing fraud on the Court and committing perjury in open court before you this afternoon. Your Honor has heard under oath by Mr. Bawany that apparently, miraculously, shipments of masks landed in Los Angeles in California on or before September 27th. As you know, the addendum, which is dated October 19th, which is obviously after September 27th – I'm sorry, after September 27th gave rise, obviously, allegedly, to the basis of this litigation. And so I find it incredulous and just completely shocking that this witness took the witness stand today under oath and now, for the first time, has told this jury that masks were landing in California on September 27th – calculate whatever days that is – three weeks before the addendum.

(Doc. 317 at 210:3-19.) Mr. Kaplan appeared shocked by the testimony that masks landed in California on September 27, 2021, and went so far as to accuse Mr. Bawany of perjury and fraud on the Court. However, Mr. Kaplan's accusation of perjury was completely unfounded and displayed a misunderstanding of the facts in light of the documentary evidence in the record, including text messages that show Mr. Bawany sent bills of lading for 5 million packs of masks scheduled to arrive on September 27, 2021, (Pl. Ex. 10), and over 150 pages of customs clearance documents from the U.S. Customs and Border Protection showing that masks were entering the port and cleared customs around September 30, 2021, (Pl. Ex. 13).[86]

### b. Drafting of the SPA

Mr. Kaplan also demonstrated that he was mistaken or confused about which party made the first draft of the SPA, the agreement which was central to this lawsuit. On the second day of trial, the Court asked the parties "who made the first draft of the SPA?" to which Mr. Kaplan responded, "[t]he plaintiff." (Doc. 318 at 253:8-22; *see also id.* at 480:7-9 ("And to try to suggest

---

[86] Despite Mr. Kaplan's claim that "I didn't stipulate to the admission" of these exhibits, (Doc. 317 at 213:21), the admissibility of Plaintiff Exhibits 10 and 13 were in fact stipulated to by the parties prior to trial, except for potential objections under Rule 403 of the Federal Rules of Evidence. (*See* Doc. 253 (Joint Stipulation of Admissibility of Evidence).) Mr. Kaplan did not object to these exhibits being introduced at trial based on Rule 403.

that the SPA was presented by Mr. Lyons with all of that information filled out is just – it flies in the face of common sense.").) He reiterated his argument on Day 4, arguing to the Court that

> There's some story that has been suggested that my clients – and again, Your Honor, these are issues that are going to be addressed in my closing – as to who shows up with a contract with all the terms and conditions and all of the names and addresses and all of the things to a meeting of the first time you actually meet someone in person. That's just craziness.

(Doc. 320 at 926:5-11.)

However, plaintiff counsel and witnesses including Max Dobi made clear that Defendants, though counsel, drafted the first version of the SPA. (Doc. 318 at 253:8-254:16 (plaintiff counsel); Doc. 323 at 1588:14-21 ("[MR. KAPLAN: Q.] Before you got to this convention, did you have a SPA or agreement that you had in your hand? [MR. DOBI:] A. Yes. Q. Oh, okay. Who drafted that? A. Jonathan Goodelman. Q. Okay. And so if I understand correctly, Mr. Goodelman, Mr. Lyons' attorney, prepared this SPA agreement? A. Correct.").) Mr. Lyons also conceded that there was a draft SPA prior to the FIME conference being circulated amongst individuals associated with Berkley, including between Mr. Lyons and Mr. Forrest:

> [MR. LYONS:] This agreement was in circulation. It was in circulation, I believe, prior to this event. And I believe it was created between the names on the – on the signature page here, Danny Houck, who at the time I didn't know; Lee Snider, who apparently was about to become president of DRE Health; myself; and – sorry – and I think the last name was – was Dobi.
>
> Q. Okay.
>
> A. So I – I've never seen this before. It was a document that was created between Lee Snyder, Danny Houck, and Stephen Forrest.
>
> Q. Okay. Now this – when you sent it to Mr. Forrest on August 27th, this is before you'd ever spoken to or met anybody at DRE. Right?
>
> A. I wouldn't have known who DRE were any more than anybody else in this room.
>
> Q. Okay. So we can agree that this draft, at least, that you sent to Mr. Forrest was sent to him by you about five days before they went to the FIME conference. Correct?
>
> A. In context, yes.

(Doc. 324 at 1820:2-20.) The record thus clearly indicated that the SPA was first drafted by Defendants prior to the FIME conference.

As discussed more below, Mr. Kaplan frequently challenged the validity of the invoices and whether they were received by Defendants, in violation of the Order granting DRE's motion in limine and the stipulations of fact.  Beyond this improper conduct, Mr. Kaplan also showed a poor understanding of the two invoices despite their prominent role in the case.  On Day 2 of trial, Mr. Kaplan confirmed that it was "the defense' position that the invoice ending in 23 was to be masks originating only in the United States," (Doc. 318 at 488:13-16), despite the Court's Summary Judgment Order finding that masks could originate from the United States of People's Republic of China and the invoice's language reflecting that payment would be "due upon cargo customs clearing in USA."  (Pl. Ex. 3.)  Additionally, Mr. Kaplan did not know why the larger invoice, Invoice 279722, was amended on September 15, 2021, and what changed in that amendment from the original invoice sent on September 10, 2021.  (Doc. 320 at 1002:2-18.)  And, Mr. Kaplan could not even tell the Court when he believed Mr. Lyons received the invoices.  (*Id.* at 1015:23-24 ("THE COURT: When did they receive the invoices?  MR. KAPLAN: I would have to ask Mr. Lyons.").)[87]  Finally, on Day 8 of trial, while questioning a witness in front of the jury Mr. Kaplan intermingles details of the larger invoice and smaller invoice, leading to a warning by the Court.  (Doc. 324 at 1776:9-1780:2.)

### 5.  Challenging or Ignoring Stipulations of Fact

Mr. Kaplan also ignored, challenged, and even attempted to strike testimony incorporating stipulations of fact.  Prior to trial, the parties entered a joint stipulation of facts.  (Doc. 227.)

"It is well settled that stipulations of fact fairly entered into are controlling and conclusive and courts are bound to enforce them." *Consol. Grain & Barge Co. v. Archway Fleeting & Harbor Serv., Inc.*, 712 F.2d 1287, 1289 (8th Cir. 1983) (quoting *Fenix v. Finch*, 436 F.2d 831, 837 (8th Cir. 1971)).  "[R]elief from such stipulations will be granted only under exceptional circumstances." *Sims v. Wyrick*, 743 F.2d 607, 610 (8th Cir. 1984.).  "The usual purpose of a stipulation is to reduce the proof needed at trial and to narrow the focus of the parties' efforts.  If a party could be relieved of a stipulation on a mere showing of substantial contrary evidence, litigants could not rely on stipulations of fact and would have to be fully prepared to put on their

---

[87] Mr. Kaplan further stated that the invoices were "never received before September 30th."  (Doc. 320 at 1009:6-10.)  This was later directly contradicted by Mr. Lyons' trial testimony where he conceded that he received the invoices "there or thereabouts" September 10, 2021.  (Doc. 322 at 1290:23-24.)

proof." *Id.* at 610-11 (holding that district court erred by setting aside a stipulation of fact at the end of a trial merely because there was a contradiction between the stipulation and some of the evidence).

Here, the parties entered a joint stipulation of facts prior to trial which all parties and the Court were entitled to rely on. The stipulations were reaffirmed by counsel for both sides at the final pretrial conference. *See Sims*, 743 F.2d at 609 ("This stipulation was reaffirmed in a pretrial order signed by counsel for both sides shortly before trial."). Defendants did not seek formal relief from the stipulations of fact. *Id.* at 610 ("Counsel for plaintiff came to the trial believing that the stipulation was still good, and in fact defendants never actually made a formal motion to be relieved from it."). At the final pretrial conference, the Court confirmed with the parties that those stipulations of fact were still valid. (Doc. 316 at 36:25-37:10.) However, as trial proceeded, Mr. Kaplan did not abide by these stipulations of fact.

For example, during Mr. Kaplan's cross-examination of Mr. Isaac Bawany, the following interaction took place:

> [MR. KAPLAN:] Q. I'm asking you who signed [the SPA]? Was it signed on behalf of Berkley Equity?
>
> [MR. BAWANY:] A. Well, Berkley Equity was a shell corporation that had no assets. So in that circumstance, it's the same thing.
>
> MR. KAPLAN: Your Honor, I would ask to strike that last response.
>
> MR. STANSFIELD: Your Honor, that's a stipulated fact. We already agreed to that fact. So you can't strike something that they've already agreed to.
>
> BY MR. KAPLAN: Q. Mr. Bawany, do you want to turn to the last page –
>
> MR. KAPLAN: I'll withdraw the objection. It's of no consequence.
>
> BY MR. KAPLAN:
>
> Q. Mr. Bawany, turn –
>
> THE COURT: Well, you were wanting to strike a stipulation –
>
> MR. KAPLAN: That's all right.
>
> THE COURT: – so I –
>
> MR. KAPLAN: No. I stand corrected. It's okay.
>
> BY MR. KAPLAN:
>
> Q. Mr. Bawany, do you want to look at the last page of the addendum?
>
> A. I'll wait for Your Honor to instruct me to do so.

THE COURT: What is your position?  Is your position that it should not be stricken and it hasn't been stricken? Are we now ready to move on?

MR. STANSFIELD: Yes.  It should be stricken because it was – it's a stipulated fact so – I mean, I don't think it should be stricken.  This is a stipulated fact that the parties agreed to and –

THE COURT: I've lost track of what –

MR. KAPLAN: Your Honor, if I could just proffer.

THE COURT: Give me just one second.  I'm sorry.  I misspoke.  The – Mr. Kaplan asked, I would ask to strike this last response.  And I'm not going to strike that last response.  So you can – are we ready to move on from plaintiff's point of view?

MR. STANSFIELD: Yes, Your Honor.

THE COURT: You can move on.

(Doc. 318 at 447:21-449:11.)  During this interaction, Mr. Kaplan attempted to strike from the record testimony which reflected stipulation of fact No. 2:  "Berkley is a 'shell company'" and No. 9: "On September 2, 2021, Lyons executed the Sale and Purchase Agreement ["SPA"] on behalf of Berkley pursuant to which Berkley would purchase large quantities of blue and black surgical DRE DMF17 masks from DRE."  (Doc. 227 at 1-2.)[88]

Mr. Kaplan also referred to stipulated facts, including the stipulated fact that Max Dobi sent Mr. Bawany a $1.9 billion proof of funds, as "alleged facts" while eliciting testimony on Day 3 of trial:

[MR. KAPLAN:] Q. Can you turn to tab 12, Mr. Bawany.  That's the issue of the proof of funds.

[MR. BAWANY] A. I'm on tab 12.

Q. Thank you.  Now, I think we heard testimony yesterday alleging Mr. Dobi – Max Dobi sent you that?

A. It's not allegedly.  It's in the record.  So, yeah, he sent me that.

Q. He sent you that.  Okay.

(Doc. 319 at 530:5-13.)  Stipulation of fact No. 24 states that "[o]n September 28, 2021 at 1:26 p.m., Dobi sent a screenshot of a 'London & Regional Properties' bank account balance in the amount of approximately $1.9 billion."  (Doc. 227 at 3.)  At trial, DRE introduced an exhibit of

---

[88] The Court further notes that Mr. Kaplan's objection to referring to Berkley as a "shell company" is contrary to Defendants' prior litigation position.  During a discovery hearing on August 21, 2024, Mr. Ali represented to the Court that Berkley "was a shell corporation . . . . It didn't do business."  (Doc. 169 at 41; *id.* at 46 ("It's a shell company.  It's just for this purpose basically.  It has no assets.").)

WhatsApp messages between Max Dobi and Isaac Bawany. (Pl. Ex. 11.) This exhibit included a message sent to Mr. Bawany by Mr. Dobi on September 28, 2021, at 1:23 p.m., which was then deleted at 1:26 p.m., clearly showing that the screenshot referenced in the stipulated fact was sent by Mr. Dobi to Mr. Bawany. (*Id.*) Despite this stipulated fact, Mr. Kaplan and defense witnesses challenged the existence of the proof of funds, whether it was sent to DRE and Mr. Bawany, and who it was sent by. (*See, e.g.*, Doc. 320 at 898:3-900:10, 903:2-9, 906:2-24, 908:1-909:1 (Mr. Lyons' examination by Mr. Stansfield); *id.* at 947:2-949:4 (Mr. Lyons' examination by Mr. Kaplan).)[89]

Mr. Kaplan doubled down on the use of "allegedly" to refer to stipulations of fact on Day 8 of trial:

> [MR. KAPLAN:] Q. And you've heard and I think the jury's heard that there's a stipulation that allegedly this proof of funds came from Max Dobi's phone via WhatsApp?
>
> [MR. LYONS:] A. Allegedly.
>
> MR. STANSFIELD: Objection, Your Honor. Stipulations are not allegedly.
>
> MR. KAPLAN: I'll rephrase my question. I'll withdraw the question.

(Doc. 324 at 1886:5-12.) In addition to referring repeatedly to the proof of funds stipulation as a mere allegation, Mr. Kaplan also misrepresented to the Court the date the proof of funds was sent, despite the stipulated fact that it was sent on September 28, 2021:

> THE COURT: Okay. Well, that's their claim is that that screenshot induced them into signing the addendum.
>
> MR. KAPLAN: But – you heard from Mr. Bawany – Your Honor (inaudible) -- (Construction noise.)
>
> THE COURT REPORTER: Mr. Kaplan –
>
> MR. KAPLAN: That proof of funds came after – way after the addendum had been executed.
>
> MR. RODRIGUEZ: No, it did not.
>
> MR. STANSFIELD: That is not true.

---

[89] Notably, both Mr. Lyons and Mr. Dobi testified that a proof of funds was never sent to DRE, despite the stipulated fact admitting that Mr. Dobi sent the $1.9 billion proof of funds screenshot. (Doc. 320 at 904:16-18 ("Q. Mr. Lyons, you don't – you don't dispute that at least Mr. Dobi sent your proof of funds to DRE. Do you? A. I do. Q. You dispute that – do you dispute that anyone sent it? A. I've never seen this before."); Doc. 324 at 1960:19-1963:4 ("Q. You sent Exhibit 12, the screenshot, right, of the proof of funds, to Mr. Bawany on September 28th, 2021. Right? [MR. DOBI] A. No. I don't recall."); *see also* Doc. 324 at 1864:17-1865:21).)

THE COURT: Okay. Can you hang on just for a second. I'm trying to stay focused. But you, Mr. Kaplan, are getting us so far off, it's hard to rein you in. All right. The evidence, Mr. Kaplan – I think you're mistaken. The evidence, Mr. Kaplan, was that on September 28th, 2021, they received – and you admitted this in your answer – that Berkley sent DRE notice that Berkley had 1.9 funds. So your –

MR. KAPLAN: Let's just assume that's true.

THE COURT: Excuse me. Your comment to the Court was that it happened way after the addendum. I don't think that's accurate.

(Doc. 318 at 4-25.) The Addendum was entered into October 19, 2021. (Pl. Ex. 5.) Therefore, consistent with the stipulation of fact and contrary to Mr. Kaplan's blatant misrepresentation of the facts to the Court, the proof of funds was sent prior to the parties signing the Addendum.[90]

The stipulation of fact regarding the proof of funds was not the only stipulation that Mr. Kaplan directly contradicted. Mr. Kaplan attempted to imply that Mr. Lyons did not sign the operative SPA, despite stipulation No. 9: "On September 2, 2021, Lyons executed the Sale and Purchase Agreement ["SPA"] on behalf of Berkley." While the Court gave defense counsel leeway to explore this contention in the proffer testimony elicited from Mr. Lyons, the Court ultimately found that Mr. Kaplan's claim that Mr. Lyons did not sign the SPA was not supported (in addition to being contrary to the stipulation of fact):

THE COURT: All right. So Mr. Kaplan's point that Anthony Lyons signed the SPA agreement might be a stipulation, but I don't know if they are—I'm not sure what he means by they should be able to – the defense should be able to get out in context because part of the proffer is what good faith basis do you have for, for instance, that claim. And through the proffer, that didn't pan out as the defense claimed. And it actually was the opposite.

(Doc. 323 at 1550:22-1551:4.)

Mr. Kaplan also contradicted stipulation No. 17: "On September 10, 2021 at 6:14 a.m., Bawany sent Invoice No. 279722 (the "Boxed Production Invoice") and Invoice No. 279723 (the "China Production Invoice" and together with the Boxed Production Invoice, the "Invoices") to

---

[90] In addition to directly controverting stipulations of fact, Defendants' trial position that no proof of funds was ever sent to Mr. Bawany and DRE is inconsistent with Defendants' own prior litigation position. Defendants' own retained expert, Mr. G. Matt Barberich relied on the $1.9 billion proof of funds in his expert report to conclude that "Berkley possessed the financial capital necessary to perform its obligations under the SPA" and noted that "[o]n September 28, 2021, Berkley sent DRE Health evidence of adequate funds available of over $1.9 billion." (Doc. 198-1 at 82.) Mr. Barberich's testimony was the subject of a motion to exclude arguing the expert report relied on indisputably false facts provided by Defendants' prior attorney in the case, (Doc. 213), which the Court granted as unopposed, (Doc. 231).

Lyons, Forrest, Dobi, and Ortolani. Lyons and Forrest acknowledged both Invoices sent by Bawany in the same message thread, and Defendants later admitted that they received both Invoices."[91]  In a sidebar with the Court, Mr. Kaplan claimed that Mr. Lyons "never got that invoice, Your Honor.  That invoice is a sham.  It's a complete sham.  It's a unilateral document that was only created after the fact," (Doc. 320 at 1014:25-1015:2), in direct contradiction to the stipulated fact which reflects Mr. Lyons received both the larger and smaller invoices and acknowledged receipt.[92]  At this point, the Court took nearly an hour[93] to address the issues that Mr. Kaplan inserted into the trial regarding Defendants not receiving the invoice.  While plaintiff counsel attempted to facilitate the Court in navigating the issue, the process was made more difficult because plaintiff counsel had not printed certain documents or marked them as exhibits because they thought (rightfully) that they could simply rely on the joint stipulations of fact at trial.[94]

Mr. Kaplan's persistent challenges to the stipulations of fact were improper and vexatiously increased the length of the proceedings.  Courts in this district have sanctioned parties for ignoring stipulations of the admissibility of a document, continuing to lay the foundation of the stipulated document, and thereby increasing the length of the proceedings.  *See Van Deelen v. City of Kansas City*, No. 04-cv-00989-W-GAF, 2006 WL 2077640, at *2-3 (W.D. Mo. July 24, 2006).  Here, Mr. Kaplan did more than ignore the stipulations of fact, he outright challenged them.

Mr. Kaplan's challenges to stipulated facts also required plaintiff counsel to raise objections because Defendants were "reneging on their stipulations," whereas DRE had assumed it could rely

---

[91] Mr. Kaplan also contradicted stipulation No. 8: "Norbert 'Max' Dobi ("Dobi"), Matthew Ortolani ("Ortolani"), and Stephen Forrest ("Forrest") were agents of Berkley."  (Doc. 227 at 2; *see* Doc. 320 at 943:1-944:25; Doc. 324 at 1804:12- 1806:6.)

[92] For the full conversation, *see* Doc. 320 at 1003:11-1021:6.  This was not the only time Mr. Kaplan represented to the Court that Defendants had no knowledge or acceptance of the Invoices.  (*See* Doc. 318 at 256:4-6 ("Okay.  We had no participation nor knowledge nor involvement in the drafting or acceptance of those invoices.").)

[93] "[THE COURT:] My recollection was that he had received it.  So you couldn't provide me with evidence that you should have turned over to support that theory that he never received the invoice.  And so that's when I turned to plaintiff, and I asked, Can you refute this?  So we **took about an hour** for me – for them to get that and me to read it.  And that turned out to not – to show the opposite of a good faith basis."  (Doc. 321 at 1082:1-9 (emphasis added).)

[94] "MR. STANSFIELD: I'm going to find it, Your Honor.  Just a second.  Your Honor, we would have to print it.  It wasn't an exhibit because we had the stipulation, but we will quickly print it."  (Doc. 320 at 1017:17-21.)

83

on the stipulations of fact and cut its exhibit list to half the size it was prior to the stipulations and Summary Judgment Order. (Doc. 321 at 1126:8-23.) This further fed into Mr. Kaplan's argument in closing that DRE and plaintiff counsel were attempting to stifle the defense witnesses and hide facts. Thus, the Court has no difficulty concluding that Mr. Kaplan acted in bad faith in challenging joint stipulations of fact and that his conduct vexatiously increased the length of the proceedings.

### 6. Violating Motion in Limine

During the initial pretrial conference, the Court addressed DRE's pending motion in limine and confirmed with defense counsel that Defendants did not file any response to the motion in limine. (Doc. 224 at 19:1-2.) Thus, the Court granted DRE's motion in limine as unopposed. (Doc. 230.) At trial, however, Mr. Kaplan disregarded the Court's Order granting DRE's unopposed motion in limine, particularly the motion in limine regarding provisions being fraudulently added to the SPA and prohibiting undisclosed evidence from being used at trial.[95]

Mr. Kaplan violated Motion in Limine No. 1 which "prohibit[ed] Defendants from claiming at trial that the Sale and Purchase Agreement ("SPA") . . . contains written terms fraudulently added without Defendants' knowledge or consent or that the Invoices . . . were fraudulently backdated." (Doc. 210 at 7.) On Day 2 of trial, during Mr. Kaplan's cross-examination of Mr. Bawany, Mr. Kaplan asked a series of questions regarding whether certain provisions of the SPA had been initialed, including the provision incorporating DRE's terms and conditions and paragraphs o and p. This led to plaintiff counsel requesting a sidebar and objecting on the grounds that the questioning violated the motion in limine.[96] The Court provided clarifying instructions to the jury as follows:

> THE COURT: All right. There may be some confusion with this line of questioning. The parties have previously stipulated going into this trial – the parties, which is Plaintiff DRE and Defendants Berkley Equity Limited and Anthony Lyons, submit

---

[95] The Court also granted DRE's motion in limine prohibiting Defendants from making a request for liquidated damages. During trial, the Court permitted defense counsel to inquire about the liquidated damages provision over DRE's objections. (*See* Doc. 318 at 459:22-460:10; Doc. 320 at 981:25-984:6.) However, Defendants did not actually request that the jury award liquidated damages.

[96] The entirety of Mr. Kaplan's line of questioning and the following sidebar can be found at Doc. 318 at 393:2-399:24.

For additional examples of trial transcript where defense counsel ran afoul of the motion in limine or the Court reiterated that arguing that provisions were fraudulently added to the SPA was precluded, *see* Doc. 319 at 601:12-602:4; Doc. 321 at 1124:6-15; Doc. 322 at 1248:24-1252:18; Doc. 322 at 1393:11-1394:24; Doc. 323 at 1534:24-1535:10.

84

> the following stipulation of uncontroverted facts: Quote, "On September 2nd, 2021, Lyons executed the sale and purchase agreement on behalf of Berkley pursuant to which Berkley would purchase large quantities of blue and black surgical masks from DRE." So with that clarification, you may proceed.
>
> MR. KAPLAN: Thank you.
>
> MR. STANSFIELD: Can I just ask one further clarification?
>
> THE COURT: Approach because I don't know what you're going to ask.
>
> (Counsel approached the bench and the following proceedings were had:)
>
> MR. STANSFIELD: Just very quickly, given all the rulings and where we are, I think it should be added that this is the agreement.
>
> (The proceedings returned to open court.)
>
> THE COURT: And the Court has found as a matter of law that this document, Exhibit 1, is a significant portion of the agreement.

(Doc. 318 at 399:1-24.)  These provisions that Mr. Kaplan asked whether there were any initials to approve the changes to are the exact provisions which Defendants argued were fraudulently added at the summary judgment phase, which the Court rejected, and which were addressed by DRE's Motion in Limine No. 1.[97]  Despite the Court's clear decision on this issue by granting the motion in limine, Mr. Kaplan continued to argue that there were provision added to the SPA, bringing up the issue again after the jury left for the day.  (*Id.* at 497:16-498:4 ("I'd be damned to think that some lawyer is going to write in above that and sneak in terms and conditions without redoing the contract.  And that's what it's all about here.").)

On Day 7 of trial, the Court confirmed that its Summary Judgment Order (in addition to the motion in limine) precluded defense counsel from arguing that provisions were fraudulently added to the SPA:

> THE COURT: And I – I've tried to articulate the position of the Court, the effect of the [Lyons] affidavit in the [summary judgment] order.  But defense continues to argue that the – that it was fraudulently added.  And I'm not going to allow that. That is so unfair to let the jury hear anything like that when that's not the truth. And you've had to prove that the defense is wrong.  So I'm still not clear on what Mr. Kaplan's point is when he says that – gives the example that Anthony Lyons

---

[97] Mr. Kaplan also elicited testimony that the invoices were fraudulently backdated or not timely received by Defendants, in violation of Motion in Limine No. 1.  (*See, e.g.*, Doc. 320 at 1003:11-1021:6.) The Court previously addressed this argument in relation to Mr. Kaplan violating stipulations of fact.  Thus, the Court finds this conduct particularly egregious in light of the fact it violated the joint stipulations of fact and the Court's in limine ruling.

signed the SPA agreement, but there's other things surrounding that that makes the instruction a miscarriage of justice.

(Doc. 323 at 1552:3-9.) That same day, even after being admonished by the Court for continuing to insert the issue of fraudulently added provisions to the SPA, Mr. Kaplan elicited the following improper testimony during Mr. Dobi's proffer to the Court, further needlessly extending the length of trial:

> [MR. KAPLAN:] Q. Would you do me a favor, sir. Would you turn to page – Plaintiff's Exhibit 1, page 7. If you see underneath where it says paragraph 11. Do you see that, general terms?
>
> [MR. DOBI:] A. Yes, sir.
>
> Q. And do you see under A entire agreement?
>
> A. This agreement – yes.
>
> Q. Okay. Is there any language in that paragraph that you did not recall being part of the documents and the agreement to which Anthony Lyons was – signature was affixed to, which was given by Stephen Forrest to Mr. Bawany?
>
> A. Yes.
>
> Q. And what is that?
>
> A. The condition of DRE Health at a website.
>
> Q. Okay. And tell me about that.
>
> A. Well, I don't know who would be in their right mind signing this because when you connect to a website, those terms and conditions can be changed at any moment.
>
> Q. Specifically, Mr. Dobi, you have an independent recollection that at some point on September 2nd, Mr. Forrest handed you a SPA agreement. Correct?
>
> A. Yes.
>
> . . . .
>
> Q. All right. And the SPA agreement, at some point, before it going to Mr. Forrest, Mr. Lyons had signed it?
>
> A. Yes.
>
> Q. Okay. The agreement that Mr. Goodelman had sent you that was then signed – that had already been signed by Mr. Lyons, is it your testimony that the agreement you reviewed and before you gave it to Mr. Forrest did not have this additional language?
>
> A. No.
>
> Q. Okay. Now, would you go ahead and turn to page 9 of 11. Do you see specifically O and P?

A. Yes.

Q. All right.  Now, this agreement that you referred to that Mr. Jonathan Goodelman had prepared on behalf of Mr. Lyons, which was then signed by Mr. Lyons and then forwarded to you to which you then sent to Mr. Forrest, was this O and P added – was this O and P provisions part of that document?

A. No.

(Doc. 323 at 1587:11-1589:14.)  In this colloquy, Mr. Kaplan elicited testimony that the terms and conditions were not incorporated into the SPA that Mr. Lyons signed and that paragraphs o and p were not part of the document.

Mr. Kaplan also disregarded Motion in Limine No. 3, which "exclude[d] undisclosed evidence and witnesses."  (Doc. 210 at 14.)  For example, on Day 7 of trial—which was a full day of proffer testimony—Mr. Kaplan relied on a document not produced in discovery to attempt (unsuccessfully) to establish a good-faith basis for his defense:

THE COURT: And is this attachment something – I'm assuming it's not in the exhibits.  Correct?

MR. KAPLAN: No, Your Honor.  It was provided by this witness most recently, which is the basis for our proffer this morning as we –

MR. STANSFIELD: Maybe we could take care of an issue.  I've asked that question of them 10 minutes ago.  Why wasn't this produced?  And where does it come from?

THE COURT: All right.  I don't even know what we're talking about.

MR. KAPLAN: And –

THE COURT: So maybe we'll just give Mr. Kaplan a second to get his documents.

MR. KAPLAN: Thank you.  Thank you, Your Honor.  I'd like to give a copy to the Court.

THE COURT: Okay.  And . . . get three copies, one for plaintiff's counsel as well? Unless you have –

MR. KAPLAN: They already have it, Your Honor.

THE COURT: Okay.  Do you have the Bates number or –

MR. KAPLAN: Your Honor, I don't.  And so – I would just prefer to be able to continue my proffer with this witness.  I – I did not have this document until very recently.  It is not Bates stamped, Your Honor, but it is very, very relevant.  I will represent to the Court that it squarely goes to the credibility of Mr. Bawany.  I think it also goes to the absolute credibility of this entire case with respect to Your Honor thinking or the plaintiff trying to suggest that we –

THE COURT: We'll not argue with the witness –

87

MR. KAPLAN: I'm not.  That's fine.

THE COURT: – on the stand.

MR. KAPLAN: That's fine.  If we can just let me have the document, and then I will proceed.

THE COURT: And if the plaintiffs have the document –

MR. KAPLAN: It's been emailed to them.

MR. RODRIGUEZ: Your Honor, they just emailed it to us.

MR. STANSFIELD: As in like five minutes ago.  But as Mr. Kaplan says, apparently, they only claim to have gotten it in recent days.  It was not produced to us, but we have it on our screens. . . .

THE COURT: Your objection is preserved.

(Doc. 323 at 1608:13-1610:8.)  Mr. Kaplan had not discovered this apparently relevant document within the confines of the discovery period, he did not disclose it on his exhibit list, and then he attempted to rely on it on Day 7 of a trial that was only supposed to last a week.  He admitted that he had received the document from Mr. Dobi that morning.  (Doc. 323 at 1612:10-12, 1616:20-1617:1-16.)[98]

In limine rulings are preliminary and "are not binding *on the trial judge*, and *the judge* may always change [her] mind during the course of trial."  *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000) (emphasis added).  Here, however, Mr. Kaplan and Defendants did not request formal relief from the Court's order granting DRE's motion in limine; nor did the Court *sua sponte*

---

[98] For a complete reading of this interaction, *see* Doc. 323 at 1608:5-1622:10.  This was not the only instance where Mr. Kaplan could not readily provide documents in support of his defense:

THE COURT: Can you show me the exhibit after September 10th the first insinuation that this is not acceptable, or do you not know?

MR. KAPLAN: I can't – I don't have the text messages ready here . . . .

MR. KAPLAN: I don't have the text messages right here available to me, meaning, you know, to just –

THE COURT: During the middle of trial is a good time for you to have exhibits for your theory of the case.

MR. STANSFIELD: Your Honor –

THE COURT: The third day –

MR. STANSFIELD: – I would add as well, these are not in their exhibit – whatever it is in the world we're talking about is not on the exhibit list.  This is your classic, I guess, trial by ambush except I don't even know what we're talking about.

(Doc. 319 at 587:21-588:25.)

abandon its in limine ruling during trial. Thus, while a trial court may change its in limine rulings, the Court did not do so here, and Mr. Kaplan was not at liberty to unilaterally disregard the Court's order. The Court's inherent powers to sanction clearly "include[] the power to issue sanctions when a party violates a court order." *Felton v. Jives*, No. 23-cv-467 (DTS), 2024 WL 5494516, at *3 (D. Minn. Dec. 10, 2024) (quoting *Chicago Truck Drivers v. Bhd. Lab. Leasing*, 207 F.3d 500, 505 (8th Cir. 2000)). Moreover, the Court finds that Mr. Kaplan's challenges to or complete disregard of the motion in limine ruling were intentional and in bad faith, and vexatiously increased the length of the proceedings, as indicated by the lengthy discussions during trial regarding these issues.

### 7. Violating Court Trial Orders

Mr. Kaplan violated an array of oral orders made and directions given by the Court during the course of the trial. As discussed immediately above, the Court's inherent powers to sanction clearly "include[] the power to issue sanctions when a party violates a court order." *Felton*, 2024 WL 5494516, at *3. Moreover, the following conduct rises to the level of bad faith by Mr. Kaplan and it vexatiously increased the length of the proceedings.

### a. Instruction to Avoid Testimony and Argument until Objected-to Issues Are Ruled on

As discussed earlier in relation to Mr. Kaplan's opening statement, the Court instructed the parties at the final pretrial conference that "[i]f there is a pending issue that you don't know what the final ruling is going to be, do not get into it in your opening or elicit testimony that refers to your expected testimony of that witness." (Doc. 316 at 23:2-5.) DRE objected to Defendants calling witness Ryan Wheeler on the basis of late designation and relevancy; while the parties and Court began to discuss this issue in the pre-voir dire conference, the Court did not make a final ruling on whether Mr. Wheeler would be permitted to testify.

Despite the fact that this issue was still pending, Mr. Kaplan explicitly referred to Mr. Wheeler in his opening statement. (Doc. 317 at 79:3-7.) On Day 2 of trial, Mr. Kaplan brought up Mr. Wheeler while examining Mr. Eid and asked whether Mr. Wheeler is credible. (Doc. 318 at 356:25-357:16.) Mr. Kaplan's improper references to Mr. Wheeler and his testimony were clearly heard and considered by the jury. On Day 3 of trial, a juror asked (using the Court's procedure for juror-asked questions, *see* note 45 above), "[w]ho exactly did Ryan Wheeler claim was being misled." (Doc. 319 at 633:17-18.) The Court then asked which party brought up Ryan Wheeler and Mr. Kaplan conceded "that Ryan Wheeler only came up during the cross-examination

89

of Michael Eid" by Mr. Kaplan.  (*Id.* at 631:19-632:1.)  This question was not read to the jury.  As previously discussed with regard to defense's shifting theories, Mr. Kaplan on Day 4 of the trial informed the Court that he no longer planned to call Mr. Wheeler as a witness.  (Doc. 320 at 802:13-16.)

Mr. Kaplan also ignored the Court's ruling as to the relevancy or prejudice of discussing another lawsuit that DRE and Mr. Bawany were a part of in which BRM Trades countersued and obtained a $12 million judgment against DRE.  As Mr. Kaplan began to question Mr. Bawany about the BRM Trades judgment, the Court requested that counsel approach the bench.  (Doc. 318 at 415:14-25.)  Plaintiff counsel objected to Mr. Kaplan questioning Mr. Bawany about this lawsuit, arguing that it was prejudicial and would lead to a trial within a trial regarding the BRM Trades claims.  (*Id.* at 419:12-25.)  The Court concluded that:

> I am going to have to learn more about if there's – what relationship, if any, with getting into the details of the BRM lawsuit before we go into any other details.  I'm not precluding that at this point.  But I'm not seeing the relevancy, but I am seeing the prejudicial effect. . . . [and] it's off limits for a variety of reasons.

(*Id.* at 419:16-420:12.)  Despite the Court's ruling here, and defense counsel not requesting further discussion and ruling on the subject, Mr. Kaplan brought up the BRM Trades judgment again in closing arguments, which led to a request for a sidebar from plaintiff counsel and Mr. Kaplan agreeing to move on.  (Doc. 325 at 2259:19-2262:16.)

### b.  Flagrant Violations of Basic Hearsay and Leading Rulings

Mr. Kaplan also violated the Court's trial rulings on DRE's hearsay and leading objections. For example, Mr. Kaplan sought to "ask if [Mr. Lyons] learned about the video with a conversation that he may have had," which DRE objected to on the grounds of hearsay.  (Doc. 320 at 974:18-22.)  The Court asked Mr. Kaplan to provide an exception to the hearsay rule, which he did not, and then ordered that he could not ask the question.  (*Id.* at 974:24-975:3.)  When the jury returned to the courtroom and Mr. Lyons took the stand again, the following interaction occurred and Mr. Kaplan continued to ask the hearsay question, which was posed in a leading manner:

> [MR. KAPLAN:] Q. Did there come a point where you learned about a video that was taken where actors or people that were not actually employed by DRE Health had been brought in to create a scenario as if they were running at capacity to actually manufacture marks?
>
> MR. STANSFIELD: Objection.  Leading.
>
> THE COURT: Sustained, but he's led. I would ask that you not lead since – since he testified he didn't see the video.  You may answer.

90

THE WITNESS: Can we just reconfirm the question?  Sorry.

MR. KAPLAN: Madam court reporter, could you read that back, please?

MR. STANSFIELD: I object.  It was leading.  If he's going to –

THE COURT: If you could stop with, Did you learn about a video regarding the facilities at DRE?

BY MR. KAPLAN:

Q. Are you aware of any scenario where DRE Health brought in people to make it appear as if they were working in a factory?

MR. STANSFIELD: Leading.

THE COURT: It's leading.  I'm going to ask you to follow the rules.

(*Id.* at 976:8-977:5.)  This interaction shows Mr. Kaplan clearly disregarding the Court's order as to leading and hearsay.  Moreover, the Court provided a cure to Mr. Kaplan (asking that he re-ask the question, but limit it to a non-leading question), but instead Mr. Kaplan once again asked whether Mr. Lyons was aware of the video "where DRE Health brought in people to make it appear as if they were working in a factory?"

Though Mr. Kaplan did not explicitly ask the question the Court ruled was hearsay (i.e. whether Mr. Lyons learned of the video through a conversation), this line of leading questions appeared to elicit such hearsay testimony from Mr. Lyons and in fact did as Mr. Lyons shortly thereafter testified:  "So it was agreed that there would be a Zoom video inspection.  I wasn't on it.  I was told about it afterwards.  From memory, Michael Eid was definitely on it." (*Id.* at 977:23-978:1.)  Plaintiff counsel objected to hearsay, and the court sustained the objection telling Mr. Lyons "I'm going to ask if you didn't watch the video that anything that you learned that someone told you is hearsay" and directing Mr. Kaplan to ask his next question.  (*Id.* at 978:2-9.)[99]

### c.     Only Calling Witnesses Once

In this case, the witnesses each party intended to call significantly overlapped.  Therefore, prior to trial, the parties agreed to put on each witness only once.  The Court agreed with this trial procedure and informed the parties that the Court would be lenient with regard to the scope of direct- and cross-examination accordingly.  Thus, once a witness was excused, defense counsel was not at liberty to recall that witness in Defendants' case.  Rather, the only witnesses who would

---

[99] For additional examples of Mr. Kaplan improperly leading defense witnesses and Court admonishments and sustained objections regarding the same, *see* Doc. 320 at 961:25-962:15; Doc. 322 at 1274:3-10, 1276:18-1277:2, 1278:8-1279:8, 1280:10-22; Doc. 324 at 1807:19-1811:1, 1879:19-1880:1, 1891:3-14, 1985:24-1987:21.

be called after DRE's close of evidence would be additional witnesses DRE did not put on. The Court informed the jury of this procedure on the first day of trial. (Doc. 317 at 53:8-17.)

Despite this clear pre-trial agreement between the parties and the Court's adoption of the trial procedure, Mr. Kaplan consistently complained that he had not yet had the opportunity to put on any witnesses:

- I know that it seems so disjointed to you at this particular time because, quite frankly, I haven't had an opportunity to call a witness on behalf of Mr. Lyons. (Doc. 318 at 479:14-16.)

- So several issues, Your Honor. Number one is, obviously, as you know, we haven't had an opportunity to put on our witnesses that I believe are going to contest and – (Doc. 318 at 572:14-17.)

- But what I equate what Your Honor is trying to do now is by analogous that an Assistant United States Attorney is still in the middle of their direct case in the middle of prosecuting my client where I have not had an opportunity to present any evidence whatsoever in connection with my defense on my direct case. (Doc. 320 at 809:8-13.)

- [A]nd again, Your Honor, you know, this is – this is where it's a little bit of a disadvantage is because I haven't had time yet to develop our defenses. (Doc. 321 at 1086:1-3.)

- And again, this is exactly why you are required to issue a mistrial because, again, you are preventing me – and you have absolutely, succinctly, unambiguously, you haven't allowed me to call any witnesses in connection with – my client is not saying that he did not sign the SPA. (Doc. 323 at 16-21.)

These instances are mere snippets of larger conversations with the Court during trial days which limited the time available for actual testimony in front of the jury.

Mr. Kaplan also claimed that he was at liberty to recall witnesses despite the clearly agreed upon trial procedure:

> [MR. KAPLAN:] Mr. Lyons has offered very, very little information to this point. I certainly have not called him as a witness yet. And I can – and Your Honor understands this – I don't even have to get up and redirect Mr. Lyons at this point. I can reserve that and call him after Mr. Stansfield rests his case. I do not need to do any sort of examination while Mr. Lyons is on the witness stand.

(Doc. 320 at 814:17-23; *see also* Doc. 323 at 1686:14-16 ("And even more concerning is if I decide to put Mr. Bawany back on – on the witness stand in my direct case, I can't even make an inquiry of him.").)

92

Ignoring the pre-set procedure for the trial increased the length of the proceedings; that Mr. Kaplan continued to make such arguments after the Court instructed the jury that the trial would proceed in the manner of each witness only being called once shows that his strategy was intentional bad faith toward the Court at worst, but even at best rises to the level of "reckless disregard of the attorney's duties to the court." *SPV-LS, LLC*, 912 F.3d at 1113.

### d. Witness Sequestration Order

Mr. Kaplan also struggled to ensure that defense witnesses followed the Court's trial orders. For example, defense witness Max Dobi violated the Court's witness sequestration order[100] by speaking with Mr. Lyons and Mr. Lyons' personal attorney—Yoni Anijar—in the hallway during trial in the middle of Mr. Dobi's proffer while the Court and counsel took up a legal issue in the courtroom. (*See* Doc. 323 at 1603:22-1607:21.) Mr. Kaplan also admitted that he spoke to Mr. Dobi about Mr. Lyons' testimony during the middle of trial:

> MR. KAPLAN: You're cutting me off, Your Honor. I confronted Max Dobi. And I said, listen, if Mr. Lyons testified and says he got this from you – because Mr. Stansfield –
>
> MR. STANSFIELD: Wait a second. You're telling the Court that you discussed a witness's testimony with a sequestered witness? Are you seriously standing there and saying that?
>
> MR. KAPLAN: (Inaudible) – sequestered witness? (Simultaneous cross-talk.)
>
> MR. STANSFIELD: All witnesses are sequestered. Giving people copies of deposition transcripts –
>
> MR. KAPLAN: I didn't give him any deposition transcripts. I don't have Max Dobi's transcript.
>
> THE COURT: Let's settle down or we'll have to call St. Louis[101] over here.
>
> MR. KAPLAN: Madame –
>
> THE COURT: Can you please –
>
> MR. KAPLAN: Your Honor –
>
> THE COURT: – just be calm in the courtroom, Mr. Kaplan?
>
> MR. KAPLAN: Your Honor, first of all, I don't even have Max Dobi's deposition. Okay. I made a confrontation with Mr. Dobi last night to go back and look at any

---

[100] (*See* Doc. 318 at 420:17-421:13 (confirming that the parties invoked Federal Rule of Evidence 615 excluding witnesses from the courtroom so that they cannot hear other witnesses' testimony).)

[101] Referring to defense counsel's local counsel, who is officed in St. Louis and had a 4-hour drive to the Kansas City Courthouse. After requiring local counsel's presence on the sixth day of trial, the Court excused him from further attendance.

of his stuff that he would have to try to assist me because Mr. Lyons this afternoon was accused of perjury, committing perjury by the submission of his affidavit in connection with paragraph 65.[102]  Mr. Dobi went through his emails or his WhatsApp messages.  And that's why this witness is a credible witness.  And he'll explain that he had assumed that what was on his phone was everything that has ever been discussed.  It wasn't until he opened it up and he went and looked at it with detail did he realize, oh, my God, this is not – this is something I just assumed was the same thing that everybody has already talked about.  And it turns out, Your Honor, that, in fact, this SPA agreement, which is what the Court should be more concerned about as to who's telling the truth here, is Mr. Dobi is going to testify that this agreement that is not only signed by Mr. Lyons but is also signed by Mr. Houck and Lee Snider and has this seal on it – and you can see that seal that's affixed next to Mr. Houck, was, in fact, the actual document that he recalls specifically giving to Mr. Forrest who gave it to Mr. Bawany.  What Mr. Bawany did is he removed Mr. Houck's name.  He removed the seal.  He also then signed the signature page –

MR. STANSFIELD: Your Honor, this is outrageous.

THE COURT: I know it is.  I know it is.  But let's let him finish.  I want him to make a record . . . .

(Doc. 323 at 1615:23-1617:21.)  Mr. Kaplan also attempted to influence Mr. Lyons' testimony while he was on the stand at the end his proffer testimony, when the Court asked Mr. Lyons a few questions:

THE COURT: I guess what I'm trying to say is two months ago, the Court received and analyzed this affidavit.  And if the Court analyzed it improperly, I want to know because you've been challenged by plaintiff on section 65.  My question is, what was the point you were trying to make in section 65?

[MR. LYONS]: Okay. So – thank you, Mr. Kaplan.  If you – if you refer –

MR. STANSFIELD: I'd just like to note for the record that his counsel walked up there and opened a document and pointed to it.

THE COURT: All right.  Thank you.

(Doc. 322 at 1251:6-17.)  This is an additional area of Mr. Kaplan's conduct that ran afoul of the Court's trial orders and that the Court and DRE had to address and deal with in the middle of trial without warning.

---

[102] As previously discussed, paragraph 65 of Mr. Lyons' affidavit, submitted in opposition to Plaintiff's motion for summary judgment, attested "[t]hat affiant nor BERKLEY ever executed an SPA of September 2, 2021 that on page 7, paragraph 11, stated the executed DRE HEALTH new customer application and the incorporated terms and conditions of DRE at www.drehealth.com terms and conditions of sale which was fraudulently added by DRE HEALTH and BAWANY after affiant and BERKLEY signed the SPA without their consent or permission." (Doc. 193 at 16, ¶ 65.)  The Court found that this was a sham affidavit in relevant part.

94

The Court previously discussed Mr. Kaplan's trial strategy of improperly rearguing summary judgment in front of the jury with reference to DRE's motion for new trial. The Court fully incorporates that misconduct herein. In addition to the time Mr. Kaplan spent rearguing issues already decided in the Summary Judgment Order in front of the jury, Mr. Kaplan frequently took time in sidebars and conferences with the Court outside of the presence of the jury to improperly relitigate these issues. For example, on the first day of trial the Court asked Mr. Kaplan to provide the best evidence for his argument that the masks must be manufactured in the United States:

> [THE COURT:] Let's go on the record now. It's now 2:20. Could I ask the defense for a heads up on your argument that really hasn't been briefed. There's been little bobbles of it in the last couple of years. But your position that the masks must be manufactured in the US, what is the most clear exhibit that reflects that?

(Doc. 317 at 104:17-22.) In response, Mr. Kaplan pointed to a promotional video (not incorporated in the contract between the parties) and forthcoming testimony of Max Dobi and Matt Ortolani who understood that the masks would be manufactured in the United States. (Doc. 317 at 104:23-24.) Mr. Stansfield then responded that the Court had already ruled upon the issue in its Summary Judgment Order and that the annex to the SPA clearly stated the masks would be made in the USA or PRC ("People's Republic of China"). (*Id.* at 106:14-25.) In the face of this documentary evidence contrary to his argument, Mr. Kaplan discontinued the discussion of USA/PRC masks and jumped to a new argument:

> [MR. KAPLAN:] There's bundles. There's hundreds of masks in plastic bags. If your Honor will look at the invoice, the invoice doesn't say Chinese masks in bags. It's –
>
> THE COURT: So that's even another issue. And that's not really –
>
> MR. KAPLAN: But, Your, Honor, no, because my client was going to pick up – if you assume Chinese masks – 50 masks to a box. 200 ply, 50 in a box. They never had all of these masks in any boxes. And when Mr. Lyons – you'll hear testimony – when his people called up Mr. Bawany and said, Look, Mr. Bawany, we want to come out and inspect these masks, he always shut them down. He said no. So there were never, ever masks pursuant to the invoice that are in boxes. And I have to tell you, Your Honor, if you think I'm kidding, I'm not kidding. You would –
>
> THE COURT: I know.
>
> MR. KAPLAN: You would need a football stadium ten times over from the bottom to the top to fill up that type of facility with boxes of masks.

THE COURT: And there's also snippets of defense' players acknowledging they're packaged or they're bags. So it's not as clearcut as in your pleadings and presentations that you – both sides appear to make it. And when I ask you a question –

MR. KAPLAN: But the invoice is in evidence. And it's boxes. The invoice speaks for itself. It says box.

MR. STANSFIELD: Different issue.

THE COURT: All right. That's a different issue. You're right. Yes, Mr. Stansfield.

(*Id.* at 107:24-109:2.)

This was typical of Mr. Kaplan's advocacy before the Court—addressing additional or different topics instead of the specific issue or topic of the immediate discussion or question and frequently interrupting the Court to do so.[103] In this example, in addition, the new topic that was inserted was also considered and rejected by the Court in relation to Defendant's motion for reconsideration of the Summary Judgment Order. This particular interaction unnecessarily consumed approximately 15 minutes of the Court's and parties' time, all because Mr. Kaplan's trial strategy fundamentally coalesced around his attempt to relitigate summary judgment issues.[104]

As previously discussed, Mr. Kaplan also continued to assert the theory rejected in the Summary Judgment Order that there were provisions fraudulently added to the SPA, that invoices were backdated, or that Mr. Lyons did not sign the SPA. In its Summary Judgment Order, the Court found in part that Mr. Lyons' affidavit was a "sham affidavit" and contrary to the summary judgment record and the parties' litigation positions from the beginning of the case. At trial, Mr. Lyons' testimony cast further doubt on the validity of the affidavit. When questioned by plaintiff counsel and the Court as to what information he had to "support the contention that the invoices were fraudulently backdated by DRE and Bawany" Mr. Lyons responded "[n]one that I can recall." (Doc. 322 at 1234:20-25.) At another point, Mr. Lyons testified that he was just "told that these [invoices] were backdated," but he had no personal knowledge to support the accusation. (*Id.* at 1256:15-16.) Moreover, Mr. Lyons' testimony provides no support for the contention that provisions were fraudulently added to the SPA after he signed it. (*See* Doc. 322 at 1281:2-

---

[103] The record is replete with similar interactions. (*See, e.g.*, Doc. 317 at 26:3-10, 27:3-23, 48:10-51:9 (pre-voir dire conference); Doc. 318 at 476:14-498:6 (post-jury conference Day 2); Doc. 319 at 561:7-575:2, 576:17-577:21 (mid-day conference Day 3).)

[104] (*See* Doc. 217 at 104:17-18 (going on the record at 2:20 for the foregoing discussion); 111:20-24 (jury returns to courtroom at 2:35).)

1291:11.)  Finally, when the Court followed up Mr. Lyons' proffer with a few questions, he was completely unable to explain paragraph 65 of his affidavit (which stated in part "[t]he affiant nor Berkley ever executed a SPA."). In Mr. Lyons' own words, he was "totally bewildered by actually what that means.  We – we did execute a SPA.  We've got a signed document in the – I don't understand that.  I'm so sorry."  (*Id.* at 1249:20-22.)  Thus, in addition to needlessly prolonging this trial by continuing to argue an issue decided by the Court in its Summary Judgment Order, Mr. Kaplan wholly failed to make a good faith showing for his continued assertions that there were provisions fraudulently added to the SPA, that the invoices were backdated, or that Mr. Lyons did not sign the SPA.

Mr. Kaplan's blatant disregard of this Court's Summary Judgment Order and persistent attempts to relitigate breach of contract and non-conformity of masks during the trial rises to the level of bad faith and vexatiously multiplying the proceedings.  *See Vallejo*, 903 F.3d at 749-50 (affirming imposition of sanctions pursuant to both the district court's § 1927 and inherent authority because "Vellejo's attempts to relitigate already decided issues . . . unreasonably and vexatiously multiplied the proceedings, wasting everyone's time" and Vallejo "fil[ed] multiple motions as barely veiled attempts to relitigate decided issues"); *see also Carlson v. Ameriprise Fin.*, No. 08-5303 (MJD/JJK), 2009 WL 10678283, at *20 (D. Minn. May 21, 2009) ("Here, Carlson has clearly demonstrated bad faith by relitigating claims that have twice been dismissed and persisting in violating Rule 8 and Rule 11 despite previous warnings.") (granting sanctions).

In *Vallejo*, the court warned the plaintiff against relitigating already-decided issues.  In this case, as well, the Court warned the parties against relitigating issues.  (*See* Doc. 224 at 33:21-23 ("And that is a concern of the Court that we're not going to rehash what we've already decided.") (initial pretrial conference).)  Mr. Kaplan's arguments regarding breach of contract and conformity of goods were rejected no less than three times by the Court—in its Summary Judgment Order, Reconsideration Order, and at the final pretrial conference.  Thus, Mr. Kaplan's continued attempt to relitigate those issues before the Court and the jury at trial was wholly inappropriate and can only be construed as acting in bad faith and with disrespect for and intentional non-compliance with the orders of this Court.

**D.      Sanctions Against Mr. Kaplan and Stuart N. Kaplan, P.A.**

In light of the specific instances of misconduct identified above and in the attached Appendix: Chart of Trial Misconduct, the Court concludes that Mr. Kaplan's misconduct poisoned

97

the jury, was in bad faith, and vexatiously increased the length of litigation. Thus, sanctions as to Mr. Kaplan are proper under both the Court's inherent powers to sanction and 28 U.S.C. § 1927. The Court also finds it proper to impose sanctions against Mr. Kaplan's law firm, Kaplan N. Stuart, P.A., under its inherent power to sanction because Mr. Kaplan—whose conduct is at issue—is the founding, named partner of the firm. *See Enmon*, 675 F.3d at 147 (finding sanctions against firm proper where attorney misconduct was perpetrated by founding, named partner). DRE requests that the Court strike Defendants' pleadings and enter default judgment; however, the Court finds that the sanction of DRE's attorney fees is sufficient to address Mr. Kaplan's misconduct.

"Any [sanctions] award should be 'remedial' in nature; that is, it should compensate opposing parties for the fees they incurred as a result of the attorney's misconduct." *Vallejo v. Amgen, Inc.*, No. 8:14CV50, 2017 WL 3037391, at *5 (D. Neb. May 30, 2017) (citing *Lupo v. R. Rowland & Co.*, 857 F.2d 482, 485 (8th Cir. 1988)), *aff'd* 903 F.3d 733 (8th Cir. 2018). "The sanctioning court must 'make an effort to isolate the additional costs and fees incurred,' but 'the task is inherently difficult, and precision is not required.'" *Id.* (quoting *Lee v. First Lenders*, 236 F.3d 443, 446 (8th Cir. 2001)). Here, DRE requests attorney fees and costs associated with the entirety of the ten-day jury trial. Because Mr. Kaplan's extensive misconduct throughout the entirety of the 10-day trial affected nearly every stage of the trial, including contributing in large part to the necessity of a new trial on the Fraud Counts,[105] the Court finds that Mr. Kaplan's sanctionable conduct is directly connected to the costs and fees DRE incurred during the first trial.

However, DRE provided no further documentation of attorney fees and costs which would permit the Court to determine a precise amount of attorney fees to impose as a sanction at this time. Accordingly, the Court requires plaintiff counsel to submit a fee petition within 30 days of this decision for the attorney fees and costs that DRE has reasonably incurred during the course of the ten-day jury trial. Mr. Kaplan shall have 14 days to respond to that fee petition. Upon receipt of the fee petition and Mr. Kaplan's response, the Court will issue a supplemental order setting

---

[105] While only conduct in front of the jury serves as a basis for this Court's new trial ruling, its sanctions ruling relies on Mr. Kaplan's conduct throughout the entirety of the trial. This includes a number of lengthy interactions outside of the jury's presence, discussed more fully throughout this order. (*See* the Court's Chart on page 56.)

forth the amount of attorney fees and costs it determines represent an appropriate sanction of Mr. Kaplan and his law firm.[106]

### Conclusion

Accordingly, after careful consideration and for the reasons explained above, the Court **ORDERS** as follows:

1. DRE's Rule 50(b) renewed motion for judgment as a matter of law on Count 2 and Count 5 is **GRANTED**, and the Court awards DRE benefit-of-the-bargain damages in the amount of **$165,428,171**;

2. DRE's Rule 59 motion for new trial is **CONDITIONALLY GRANTED** on Count 2 and Count 5 and is **GRANTED** as to Counts 6-9;

3. DRE's Rule 58 and Rule 60 motion to amend or correct the judgment is **DENIED without prejudice**; and

4. DRE's motion for sanctions is **GRANTED in part** as to counsel Stuart N. Kaplan and the law firm of Stuart N. Kaplan, P.A, and **DENIED in part** as to Defendants Berkley Equity Limited and Anthony Lyons and counsel Thomas J. Ali.  DRE's fee petition is due within 30 days of this Order.  Mr. Kaplan's response is due within 14 days of DRE's fee petition.

**IT IS SO ORDERED.**


s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT


DATED:  March 20, 2026

---

[106] DRE also argues that it is entitled to its attorney fees and pre-judgment interest under the SPA. The Court does not reach those issues here, as DRE concedes "[t]hose issues can be addressed separately following the Court's rulings on DRE's post-judgment motions."  (Doc. 309 at 16 n.24.)  However, it appears that the sanction contemplated herein may overlap with additional requests for attorney fees contemplated by DRE.  The Court notes that it will not award double recovery of attorney fees; the sanction imposed here is remedial.  Thus, DRE should be clear as to which attorney fees (and for what attorney time) it is requesting in relation to the Court's Order herein, so that the Court can distinguish attorney fees awarded in conjunction with this Order from any additional attorney fees sought pursuant to some other authority, such as the SPA, in any future motion by DRE.